**<u>Exhibit D</u>**

# MILBANK, TWEED, HADLEY & McCLOY LLP

**1850 K STREET, NW, SUITE 1100**
**WASHINGTON, DC 20006**

_____

202-835-7500

FAX: 202-835-7586

ANDREW M. LEBLANC
Partner
202-835-7574
Fax:  202-263-7574
E-Mail:  aleblanc@milbank.com

April 19, 2016

**NEW YORK**
212-530-5000
FAX: 212-530-5219

**LOS ANGELES**
213-892-4000
FAX: 213-629-5063

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-69-71914-3400
FAX: 49-69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**SEOUL**
822-6137-2600
FAX: 822-6137-2626

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

**BY HAND DELIVERY AND ECF**

The Honorable Christopher S. Sontchi
United States Bankruptcy Court for the District of Delaware
824 North Market Street, 5th Floor
Wilmington DE 19801

     Re:    *In re Molycorp, Inc.*, Case No. 15-11357 (CSS)

Dear Judge Sontchi:

     As the Court is aware, we represent OCM MLYCo CTB Ltd. ("Oaktree") in the above-referenced matter.  We regret that we have to involve the Court again in resolution of issues between Oaktree and the Ad Hoc Group of 10% Noteholders (the "Ad Hoc Group"), but disputes over the formation of the credit bid acquisition vehicle in connection with the Molycorp Minerals Sale, Secure Natural Resources LLC ("SNR"), have continued since the hearing before the Court on April 13, 2016 (the "April 13 Hearing").  In particular, the parties have not been able reach agreement on the terms of the Limited Liability Agreement (the "LLC Agreement") for SNR to complete the Molycorp Minerals Sale.[1]

_____

[1]     Capitalized terms used but not defined herein have the meanings ascribed to them in the *Notice of (I) 10% Noteholder Group Settlement Among the Ad Hoc 10% Noteholders, the Debtors, Oaktree and the Creditors' Committee; and (II) Certain Related Matters Regarding Confirmation & Sale Hearing* [D.I. 1495] (the "10% Noteholder Group Settlement") annexed hereto as Exhibit A.

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 2

      As with the disputes resolved at the April 13 Hearing, the primary dispute again centers on the Ad Hoc Group's attempts to control SNR. Oaktree will be the largest shareholder of SNR, owning an approximately 35% equity interest; the members of the Ad Hoc Group will only have 36% of the equity collectively. Despite those relative holdings, the LLC Agreement proposes to: (a) dictate the composition of the board of managers consisting of two JHL employees, one JHL consultant, and two other "independent" managers selected by the Ad Hoc Group and whom Oaktree has never met; (b) grant these managers complete discretion to set the duration of their own terms (without any upper bound) and the manner in which they are elected, with no right for the shareholders to remove these managers; (c) permit transactions with affiliates without any customary checks, such as a vote by disinterested shareholders or a fairness opinion; (d) deny other holders of equity the right to participate in future capital raises for securities characterized as debt securities, and grant the Board complete discretion to determine limitations and restrictions on preemptive rights for equity raises; and (e) allow for equity holders to be dragged into a sale of their equity for illiquid securities rather than cash or marketable securities. These terms are decidedly off-market and are wholly inappropriate for the minority of equity holders represented by the Ad Hoc Group to dictate potentially in perpetuity. Oaktree, pursuant to the 10% Noteholder Group Settlement and the Prepetition Collateral Agency Agreement, is entitled to its *pro rata* share of the equity for its debt being credit bid – the equity the Ad Hoc Group proposes Oaktree receive is anything but *pro rata*. Because the LLC Agreement was not before the Court at the April 13 Hearing (and in fact we had not even seen a draft of it as of that date), the issues dividing the parties are new, but they are again related to the effort by the Ad Hoc Group to exercise supermajority rights as a minority shareholder.

      Over the course of the last several days, Oaktree's concerns have been exacerbated by the conduct of the Ad Hoc Group in trying to close the transaction while the dispute over the terms of the LLC Agreement has continued. As detailed below, the Ad Hoc Group actively misled the Debtors into believing that the Ad Hoc Group and Oaktree had reached agreement on the terms of the governing documents when no such agreement had been reached. Based on the Ad Hoc Group's inaccurate representation to the Debtors that they had "finalized the governance documentation," the Debtors began to close the Molycorp Minerals Sale. After we learned of this and informed the Debtors that no agreement had been reached, the Debtors immediately took steps to rescind any closing steps. The conduct of the Ad Hoc Group further underscores the need for governing documents that provide fair governance rights for all shareholders without control by any one minority shareholder.

### Relevant Factual Background Relating to LLC Agreement

      At the April 13 Hearing, the Court resolved the issue that was before it, namely whether the Ad Hoc Group was entitled to gain control of SNR through the issuance of preferred equity to compensate the Ad Hoc Group for its unreimbursed fees and expenses. Addressing the narrow questions presented to the Court, the Court found "that [the Credit Bid Agreement] should not allow the issuance of preferred shares or any special governance rights that would be

Case 15-11357-CSS    Doc 1042    Filed 04/19/16    Page 3 of 128

The Honorable Christopher S. Sontchi
April 19, 2016
Page 3

related to preferred shares."[2]  Moreover, the Court found that it is clear that as for the Credit Bid
Agreement, and "how . . . we get the current debt applied to credit bidding and buying the asset
through the acquisition vehicle . . . Oaktree gets to share *pro rata* ratably."[3]

In addition, in response to the Ad Hoc Group's request, the Court found that the
Ad Hoc Group had the ability to select the "initial" board of managers pursuant to Section 3(h)(i)
of the Prepetition Collateral Agency Agreement.[4]

The timeline of relevant events following the April 13 Hearing are as follows:

- On Thursday, April 14, 2016, at 7:23 p.m.,[5] counsel for the Ad Hoc Group sent a
revised draft of the Credit Bid Agreement and for the first time, a draft of a proposed LLC
Agreement to Oaktree (the "Draft LLC Agreement"), which was substantially different from
the terms that had been proposed by the Ad Hoc Group in the term sheet that had been
attached to the prior form of Credit Bid Agreement.[6]

- At 2:12 p.m., after we advised them of disagreements, counsel for the Debtors
emailed counsel for the Ad Hoc Group, stating that, "[a]s I understand that there is a delay in
the Closing as a result of continuing discussions between Oaktree's counsel and Sidley
regarding the formation documents of Purchaser, we will continue to hold on to the
signatures until we receive word that Purchaser is able to proceed with Closing."[7]

- Also at 2:12 p.m., we delivered to the Ad Hoc Group a mark-up of the Credit Bid
Agreement and the Draft LLC Agreement reflecting Oaktree's comments,  followed by an
email at 2:21 p.m., reiterating Oaktree's availability for a principals' call to work through the
open issues.[8]

---

[2]     *See* Hearing Tr., Apr. 13, 2016, 39:24-40:1.

[3]     *Id.* at 40:5-18.

[4]     *See* Prepetition Collateral Agency Agreement, § 3(h)(i) (granting the Indenture Trustee the authority "to
direct the time, method, and place of conducting any proceeding for any right or remedy available to the
Collateral Agent, or of the exercising any trust or power conferred on the Collateral Agent").  Oaktree
became a party to the Prepetition Collateral Agency Agreement by executing that certain Collateral Agency
Joinder, dated as of September 11, 2014, among Oaktree, the Company, and Wells Fargo.

[5]     All times are Eastern Standard Time.

[6]     *See* Exhibit B, electronic correspondence from Jillian K. Ludwig (Sidley Austin LLP ("Sidley Austin")),
Subject: "Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 14,
2016, 7:23 p.m. EST).

[7]     *See* Exhibit C, electronic correspondence from Erin S de la Mare, Jones Day, Subject: "RE: Molycorp –
Wire Transfer Instructions," (April 15, 2016, 2:12 p.m. EST).

[8]     *See* Exhibit D, electronic correspondence from Lauren Doyle (Milbank Tweed Hadley & McCloy, LLP
("Milbank Tweed")), Subject: "RE: Molycorp – Second Amended Credit Bid Agreement and Newco LLC
Agreement," (April 15, 2016, 2:21 p.m. EST).

The Honorable Christopher S. Sontchi
April 19, 2016
Page 4

- At 3:08 p.m., counsel for the Ad Hoc Group requested a lawyers-only call to discuss Oaktree's mark-up of the documents.[9] Just before the lawyers-only call, counsel for the Ad Hoc Group responded to counsel for the Debtors' earlier email regarding the open disputes with Oaktree, stating that they were "jumping on a call with Oaktree" and would have further clarity thereafter.[10]

- At 3:30 p.m., we had a call with counsel for the Ad Hoc Group to discuss Oaktree's mark-up, during which counsel declined to negotiate the terms of the LLC Agreement. We again reiterated the need for a principals' call and counsel for the Ad Hoc Group informed us that they would take the request back to their client.[11]

- At 10:10 p.m., counsel for the Ad Hoc Group notified Debtors' counsel that they were still working towards the Closing, and further stated, "[i]n the event that we are not able to reach an agreement and close this evening, we are requesting the Debtors' consent to extend the termination date in the APA until tomorrow (or such other time as we may request to complete the deal)."[12]

- At 11:37 p.m., without consulting us, counsel for the Ad Hoc Group told the Debtors, "*[t]his confirms that the Purchaser is now ready to proceed with Closing*," and thanked the Debtors' counsel for their patience while they worked to "*finalize[] the governance documentation to facilitate tonight's Closing*."[13] We understand that the Debtors then began to release signatures and begin the Closing.

- On Saturday, April 16, 2016, the Ad Hoc Group sent an "execution copy" of the LLC Agreement that had been signed by the members of the Ad Hoc Group and requested that Oaktree return its executed signature page in order to receive it 35.283% of the common equity units of SNR.[14] Following that email, in response to our request, counsel for the Ad

---

[9] *See* <u>Exhibit E</u>, electronic correspondence from Jillian Ludwig (Sidley Austin), Subject: "RE: Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 15, 2016, 3:08 p.m. EST).

[10] *See* <u>Exhibit C</u>, electronic correspondence from Jillian K. Ludwig, Sidley Austin LLP, Subject: "RE: Molycorp – Wire Transfer Instructions," (April 15, 2016, 3:14 p.m. EST).

[11] *See* <u>Exhibit F</u>, electronic correspondence from Lauren Doyle (Milbank Tweed), Subject: "RE: Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 15, 2016, 6:22 p.m. EST).

[12] *See* <u>Exhibit C</u>, electronic correspondence from Jillian K. Ludwig, Sidley Austin LLP, Subject: "RE: Closing Documents," (April 15, 2016, 10:10 p.m. EST).

[13] *See* <u>Exhibit C</u>, electronic correspondence from Jillian K. Ludwig, Sidley Austin LLP, Subject: "Molycorp – Execution Copies of the Credit Bid Letters, Bring Down Letters, and LLC Agreement -- Proceed with Closing," (April 15, 2016, 11:37 p.m. EST) (emphasis added).

[14] *See* <u>Exhibit G</u>, electronic correspondence from Jillian Ludwig (Sidley Austin), Subject: "Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 16, 2016, 5:21 p.m. EST).

Case 15-11357-CSS   Doc 1622   Filed 04/19/16   Page 5 of 28

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 5

Hoc Group told us that the members of the Ad Hoc Group did "not wish to participate in a business-to-business meeting."[15]

- On Sunday, April 17, 2016, counsel for the Ad Hoc Group told us for the first time that they believed that they had closed on the Molycorp Minerals Sale on Friday. After our inquiry, the Debtors advised us that they understood, based on the emails from the Ad Hoc Group, that Oaktree and the Ad Hoc Group reached agreement on the terms of the Sale Documentation. Upon learning that no agreement had been reached, the Debtors immediately informed all parties that they were rescinding the closing steps that had been taken and not closing until resolution of the outstanding issues.

## Discussion

The Ad Hoc Group is abusing the limited right the Court found it has to appoint the "initial" board of managers to continue its attempts to disenfranchise all other members of SNR in perpetuity. Indeed, the Draft LLC Agreement is completely off-market in that it seeks to place nearly all decisions of SNR in the hands of a board of managers that will have been appointed entirely by holders, in the aggregate, of just 36% of the equity interests of SNR. The Draft LLC Agreement provides that the "initial" board of managers will determine its own term of service and standard for election, and then have the power to amend the LLC Agreement to permanently enshrine that term, again, without any equity holder consent. Even a majority of equity holders have no right to remove managers, and all vacancies that may come up are filled only by the board of managers.

The Ad Hoc Group has suggested that Oaktree and the other shareholders who collectively hold 64% of the equity interests are protected because 3 of the 5 managers are "independent," and the managers are subject to fiduciary duties. With respect to "independence," two of the initial managers are JHL designees and JHL personnel and a third is a person that has for some time served as an advisor to JHL, and was proposed at the outset of these cases to be the CRO for Mountain Pass as a term of the Ad Hoc Group's DIP financing proposal.[16] No other member of SNR will have the right to appoint a designee. With respect to fiduciary duties as a protection, there is no protection against the board and a majority of the holders agreeing to amend the LLC Agreement as soon as the day after closing to waive the

---

[15]   *See* Exhibit H, electronic correspondence from Jillian Ludwig (Sidley Austin), Subject: "RE: Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 16, 2016, 7:03 p.m. EST).

[16]   As noted above, if any of the managers departs at any time, their replacement would be selected by the other managers, so it is clear that this board of managers will never be more "independent" than this initial board.

Case 15-11337-CSS   Doc 1062   Filed 04/21/16   Page 7 of 128

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 6

requirement that managers owe fiduciary duties to SNR and its members. Similarly, there are absolutely no restrictions on affiliate transactions.[17]

       Oaktree does not believe that the Court intended that the Ad Hoc Group could use the Court's ruling at the April 13 Hearing to strip the members of SNR – who collectively hold a majority of the equity, including Oaktree, the single largest equity holder of SNR – of their basic rights under Delaware corporate law.

       Section 3(h)(i) of the Prepetition Collateral Agency Agreement, the authoritative source of rights cited by the Ad Hoc Group, only goes so far as to allow the Ad Hoc Group (by virtue of its majority control of the 10% Notes) "to direct the time, method, and place of conducting any proceeding for any right or remedy available to the Collateral Agent, or of the exercising any trust or power conferred on the Collateral Agent."[18] The Ad Hoc Group has exercised this right by determining to credit bid (on a *pro rata* basis) the obligations secured by the collateral controlled by the Collateral Agent, as provided for under the Prepetition Collateral Agency Agreement. However, the interests in SNR, the vehicle formed to acquire the collateral pursuant to the credit bid, are to be distributed ***equally and ratably***. Pursuant to section 3(c)(iii) of the Prepetition Collateral Agency Agreement, "[e]ach Secured Party (acting through the Senior Indenture Trustee or its applicable Additional Authorized Representative, as applicable) acknowledges and agrees that the payment and satisfaction of all of the Secured Obligation will be secured ***equally and ratably*** by the Transaction Liens established in favor of the Collateral Agent for the benefit of the Secured Parties."[19] Moreover, Section 4(d) of the Prepetition Collateral Agency Agreement provides that "***all moneys or other property held by the Collateral Agent . . . shall, to the extent available for distribution be distributed . . . equally and ratably.***"[20]

       The distribution of the equity interests in SNR is the distribution of property under the Prepetition Collateral Agency Agreement, and those interests must be distributed equally and ratably. The Ad Hoc Group's decision making authority does not extend to a right to dictate the allocation of collateral among the secured parties, which is exactly what the Ad Hoc Group seeks to do by refusing to negotiate the terms of the Credit Bid Agreement and the LLC Agreement, and placing control of SNR in its perpetually appointed board of managers.

---

[17]    Notably, the members of the Ad Hoc Group continue to try to increase their relative percentage of ownership of SNR through the revised Credit Bid Agreement—seeking to secure for themselves the opportunity to purchase the equity interests in SNR that would otherwise be issued to any 10% Noteholder who either (a) is not accredited or otherwise not a qualified investor, or (b) elects to receive a cash payment rather than its pro rata share of the equity interests, or (c) does not sign the LLC Agreement. There is no basis under the documents to provide the Ad Hoc Group this unique right, which should be shared by all members of SNR equally and ratably.

[18]    *See* Prepetition Collateral Agency Agreement, § 3(h)(i).

[19]    *See* Prepetition Collateral Agency Agreement, § 3(c)(iii).

[20]    *See* Prepetition Collateral Agency Agreement, § 4(d) (emphasis added).

The Honorable Christopher S. Sontchi
April 19, 2016
Page 7

       The Ad Hoc Group cannot use the limited liability company form of SNR, the "initial" board of managers, or the LLC Agreement to strip the secured parties of the basic rights they would be entitled to as a stockholder of a Delaware corporation under the General Corporation Law of the State of Delaware (the "DGCL"), including without limitation:

- The right to vote to elect directors at annual meetings; DGCL § 211(b)
- The right to have directors elected by a plurality vote of the stockholders; DGCL § 216
- The right of stockholders holding a majority of the voting shares to remove any director, with or without cause; DGCL § 141(k)
- Delaware corporation directors' unwaivable duty of loyalty and duty of good faith; DGCL § 102(b)(7)
- Appraisal rights in connection with any merger; DGCL § 262
- The right to inspect the Company's books and records. DGCL § 220

       Nevertheless, certain key, off-market provisions of the Draft LLC Agreement seek to trample over these rights and protections,[21] and the Court should direct that they be struck or modified to not adversely affect the rights of holders of SNR equity.[22]

- **Board Mechanics** – The initial board of managers, which will determine the length of its own term and the means by which a future board can be appointed, is comprised of 2 managers controlled by one member of the Ad Hoc Group and 3 "independent" managers, also selected by the Ad Hoc Group.  No other member of SNR, not even the largest shareholder will have the right to appoint or vote on the appointment or removal of any manager.[23]
- **Amendments** – The LLC Agreement states that it may be amended by approval of the board of managers and the members of SNR holding a majority of its common equity interests.[24]  Without a limitation on amendments, there is nothing that would prevent the board of managers selected by the Ad Hoc Group and a majority of the members of SNR from amending the LLC Agreement to eliminate the few

---

[21]    To determine whether these are off-market, the Court need look no further than the minority protections that Oaktree, as a 92.5% shareholder of the Reorganized Plan Debtors, is providing to the minority shareholders there.  In almost every respect (other than board rights, given Oaktree's majority position), the protections are far greater than what is proposed to be imposed by a distinct minority of shareholders in SNR against the majority holders of that entity.

[22]    Attached hereto as <u>Exhibit I</u> is a blackline of the proposed LLC Agreement reflecting Oaktree's comments. The list contained herein is only intended to be illustrative of the Ad Hoc Group's efforts to use the board of managers of SNR to wrest control (to which it is not entitled) over the corporate decisions of SNR. Oaktree believes that, given the opportunity, the parties could negotiate a reasonable resolution of these issues.

[23]    LLC Agreement, § 4.2(c).

[24]    LLC Agreement, § 13.2(a).

The Honorable Christopher S. Sontchi
April 19, 2016
Page 8

protections to be granted to Oaktree thereunder, including the fiduciary duties of
SNR's managers.

- **Affiliate Transactions** – The LLC Agreement provides no express limitation on
  affiliate transactions. Because there are no limitations on the ability to amend the
  LLC Agreement, the LLC Agreement could be amended to waive the managers'
  fiduciary duties and remove the sole protection SNR's members have against affiliate
  transactions.

- **Information Rights** – The LLC Agreement does not provide for equal information
  rights. By virtue of its having designated certain members of the "initial" board of
  managers, which is self-perpetuating, the Ad Hoc Group will have disproportionate
  access to information.[25]

- **Preemptive Rights / Issuances of New Classes of Securities** – The LLC Agreement
  provides that the terms and conditions on which preemptive rights are to be exercised,
  including any limitations or restrictions thereon or exemptions therefrom, are
  determined by the board of managers.[26] Oaktree has no protection against the
  "initial" board of managers creating broad restrictions or exemptions that limit or
  effectively eliminate Oaktree's ability to exercise these rights, or from characterizing
  issuances as debt issuances to avoid pre-emptive rights all together.

- **Drag Along** – The LLC Agreement provides that a majority of the board of managers
  and a majority of the members of SNR may approve a drag-along sale, even if such
  sale is for illiquid securities, and the members will have no appraisal rights with
  respect thereto.[27]

Contrary to the Ad Hoc Group's assertions, the proposed terms of the Draft LLC
Agreement go well beyond the scope of the Court's ruling at the April 13 Hearing, deprives
Oaktree of the full benefit of its 35% equity interest in SNR by replacing its ability to vote on the
election and removal of SNR's board of managers, and does not treat Oaktree equally and ratably
*vis-a-vis* the members of the Ad Hoc Group.

Finally, the Ad Hoc Group's position that it does not have to negotiate the terms
of the Credit Bid Agreement and the LLC Agreement with Oaktree directly contradicts the 10%
Noteholder Group Settlement, which expressly provides that that the Sale Documentation[28] shall
be reasonably acceptable to Oaktree and "with respect to Oaktree, whether the Sale
Documentation is "reasonably acceptable" shall mean whether it is in form and substance
consistent with the terms of the 10% Noteholder Group Settlement (including without limitation

---

[25]     LLC Agreement, Article IX.

[26]     LLC Agreement, §§ 3.2(a) and 7.1.

[27]     LLC Agreement, §§ 3.6 and 6.4(a).

[28]     The Sale Documentation includes any governing documents with respect to Newco. *See* 10% Noteholder
         Group Settlement, ¶ 3 & n.2.

Case 15-11371-CSS   Doc 1622   Filed 04/19/16   Page 9 of 13

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 9

paragraph 2 hereof, the Plan, and the Prepetition Collateral Agency Agreement and related prepetition security documents)."[29]

        Oaktree continues to believe that the parties should have been able to negotiate a consensual resolution of these issues.  The Ad Hoc Group has apparently determined based on what the Court said at the April 13 Hearing that it has no such obligation to negotiate.

        As such, we request that the Court find that the Draft LLC Agreement, consistent with the 10% Noteholder Group Settlement, the Prepetition Collateral Agency Agreement and the Court's ruling at the April 13 Heating, must provide members with the basic protections reflected in Oaktree's mark-up of the Draft LLC Agreement.

        Sincerely,

        /s/__Andrew M. Leblanc___

        Andrew M. Leblanc

---

[29]      10% Noteholder Group Settlement, ¶ 3.

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------x
          :

In re                            :    Chapter 11
          :

MOLYCORP, INC., *et al.*,[1]      :    Case No. 15-11357 (CSS)
          :

        Debtors.        :    (Jointly Administered)
          :

---------------------------------------------------------x

## NOTICE OF:  (I) 10% NOTEHOLDER GROUP SETTLEMENT AMONG THE AD HOC 10% NOTEHOLDERS, THE DEBTORS, OAKTREE AND THE CREDITORS' COMMITTEE; AND (II) CERTAIN RELATED MATTERS REGARDING CONFIRMATION & SALE HEARING

      1.     Attached hereto as <u>Exhibit A</u> is a copy of the 10% Noteholder Group Settlement Among the Ad Hoc 10% Noteholders, the Debtors, Oaktree and the Creditors' Committee (the "10% Noteholder Group Settlement"), dated March 25, 2016.  Capitalized terms not otherwise defined herein have the meanings given to them in the 10% Noteholder Group Settlement.[2]

      2.     The 10% Noteholder Group Settlement resolves all of the objections of the Ad Hoc 10% Noteholders to:  (a) that certain Agreement Between Oaktree, Molycorp Inc. and Its Affiliated Debtors in Possession, the Official Committee of Unsecured Creditors of Molycorp Inc., et al, and National Union Fire Insurance Company Of Pittsburgh, Pa. (solely with Respect to Section IV) to Resolve Asserted Claims Against Oaktree and the Debtors' Directors & Officers and to Address Related Chapter 11 Issues [Docket No. 1302, Ex. A] (the "Plan Settlement Agreement"); and (b) confirmation of the Debtors' Third Amended Joint Plan of Reorganization  (as it may be amended, supplemented or modified, including to incorporate the terms of the 10% Noteholder Group Settlement, the "Plan").

---

[1]    The Debtors are the following 21 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Molycorp, Inc. (1797); Industrial Minerals, LLC; Magnequench, Inc. (1833); Magnequench International, Inc. (7801); Magnequench Limited; Molycorp Advanced Water Technologies, LLC (1628); MCP Callco ULC; MCP Canada Holdings ULC; MCP Canada Limited Partnership; MCP Exchangeco Inc.; Molycorp Chemicals & Oxides, Inc. (8647); Molycorp Luxembourg Holdings S.à r.l.; Molycorp Metals & Alloys, Inc. (9242); Molycorp Minerals Canada ULC; Molycorp Minerals, LLC (4170); Molycorp Rare Metals Holdings, Inc. (4615); Molycorp Rare Metals (Utah), Inc. (7445); Neo International Corp.; PP IV Mountain Pass, Inc. (1205); PP IV Mountain Pass II, Inc. (5361); RCF IV Speedwagon Inc. (0845).

[2]    To the extent of any inconsistency between the terms of the 10% Noteholder Group Settlement and this notice, the terms of the 10% Noteholder Group Settlement shall control.

3.      At a high-level, the 10% Noteholder Group Settlement will result in the following:

- The Ad Hoc 10% Noteholders' $1,000,000 credit bid as set forth in an agreed form of asset purchase agreement (the "Credit Bid APA") shall be deemed the Successful Bid (as defined in the Bidding Procedures Order) for the sale and purchase of: (i) all cash collateral of the Molycorp Minerals Debtors other than (1) the Molycorp Minerals Intercompany Amount and (2) any amounts resulting from the sale of up to 56,000 kg of NdPr inventory by Molycorp Minerals, LLC after the date of the 10% Noteholder Group Settlement; (ii) certain specified intellectual property and related assets and contracts; and (iii) the Specified Mineral Properties (collectively, the "Purchased Assets");

- Unless otherwise ordered by the Court, the Debtors will seek approval of the Credit Bid APA at the Sale and Confirmation Hearing.  However, the approval of the Credit Bid APA is not a condition to confirmation of the Plan, and will only be approved to the extent such sale does not have an adverse impact on the confirmation of the Plan with respect to the Downstream Debtors or any of the Downstream Transferred Assets;

- Oaktree and the Ad Hoc 10% Noteholders have agreed, pursuant to the conditions set forth the 10% Noteholder Group Settlement, to a mechanic to fund a reserve for the costs set forth on Exhibit 3 to the 10% Noteholder Group Settlement, which includes (a) the costs and expenses of seeking approval of the Credit Bid APA, (b) carrying and severance costs prior to the consummation of the Molycorp Minerals Sale and (c) wind-down or chapter 7 costs;

- The Ad Hoc 10% Noteholders will consent to the transfer pursuant to the Plan of Molycorp Silmet AS and certain intellectual property related to the Downstream Businesses to Reorganized Parent, or entities owned, directly or indirectly, by Reorganized Parent;

- All fees and expenses of the Ad Hoc 10% Noteholders incurred in connection with these cases shall be paid upon consummation of the Plan in an amount up to $5,000,000; (ii) the fees and expenses of the Indenture Trustee shall be paid from the cash recovery allocable to the 10% Noteholders on account of their allowed secured claim; and (iii) to the extent legally permissible, the Ad Hoc 10% Noteholders may submit any fees and expenses above $5,000,000 for reimbursement to be paid out of the cash recovery allocable to the 10% Noteholders.

- The Parties have agreed to certain mutual releases, and the Ad Hoc 10% Noteholders will support the various releases in the Plan, including the releases contemplated to be given by the Molycorp Minerals Debtors;

- The Debtors shall withdraw the *Motion of the Debtors for an Order Authorizing Them to Surcharge Certain Collateral Pursuant to Section 506(c) of the Bankruptcy Code* [Docket No. 1352] and the Ad Hoc 10% Noteholders shall withdraw the *Motion of Ad Hoc 10% Noteholders to Compel the Debtors to Comply with the Bidding Procedures*

*Order or, Alternatively, to Convert the Molycorp Minerals Debtors' Cases to Liquidations Under Chapter 7* [Docket No. 1349]; and

- The Plan will be withdrawn with respect to the Molycorp Minerals Debtors, and, as a result, the Debtors will not be seeking confirmation of the Plan as to the Molycorp Minerals Debtors at the Sale and Confirmation Hearing currently scheduled to begin on March 29, 2016 at 10:00 a.m. (ET).

***The foregoing high-level summary has been provided for convenience only and is qualified in its entirety by the terms of the 10% Noteholder Group Settlement. Parties are encouraged to read and review the full terms of the 10% Noteholder Group Settlement, which is attached as an exhibit hereto.***

4.      Given the 10% Noteholder Group Settlement and the withdrawal of the Plan as to the Molycorp Minerals Debtors, the Debtors intend to seek two orders from the Bankruptcy Court at the Sale and Confirmation Hearing:

- An order confirming the Plan as to each of the Debtors other than the Molycorp Minerals Debtors (the "Plan Debtors") and approving the Plan Settlement Agreement and the 10% Noteholder Group Settlement and the mutual settlements, releases and other transactions between the Plan Debtors and the Molycorp Minerals Debtors contemplated by the Plan and the 10% Noteholder Group Settlement (the "Confirmation Order"); and

- An order approving the sale of the Purchased Assets pursuant to the Credit Bid APA (the "Sale Order").

5.      In advance of the start of the Confirmation and Sale Hearing, the Debtors anticipate filing with the Court:  (a) the Credit Bid APA; (b) an amended Plan; and (c) the forms of the Confirmation Order and the Sale Order.

Dated:  March 25, 2016
        Wilmington, Delaware

Respectfully submitted,


/s/      _Ashley E. Jacobs_
M. Blake Cleary (No. 3614)
Edmon L. Morton (No. 3856)
Justin H. Rucki (No. 5304)
Ashley E. Jacobs (No. 5635)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

        -and-

Paul D. Leake
Lisa Laukitis
George R. Howard
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Brad B. Erens
Joseph M. Tiller
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585


ATTORNEYS FOR DEBTORS

## EXHIBIT A

10% Noteholder Group Settlement

## 10% NOTEHOLDER GROUP SETTLEMENT AMONG THE AD HOC 10% NOTEHOLDERS, THE DEBTORS, OAKTREE AND THE CREDITORS' COMMITTEE

March 25, 2016

This 10% Noteholder Group Settlement (the "10% Noteholder Group Settlement") by and among Molycorp, Inc. and its affiliated debtors and debtors in possession (the "Debtors"), each 10% Noteholder that is a signatory hereto (collectively, the "Ad Hoc 10% Noteholders"), OCM MLYCo CTB Ltd. ("Oaktree") and the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases (the "Creditors' Committee" and collectively with the Debtors, the Ad Hoc 10% Noteholders and Oaktree, the "Parties"). This 10% Noteholder Group Settlement shall be incorporated into the Debtors' Third Amended Joint Plan of Reorganization (as it may be amended, supplemented or modified, the "Plan"). All capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan. In the event of an inconsistency between this 10% Noteholder Group Settlement and any definitive documentation, the provisions of this 10% Noteholder Group Settlement shall govern.

**THIS 10% NOTEHOLDER GROUP SETTLEMENT DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH IMPLEMENTING THE AGREEMENTS SET FORTH HEREIN, AND ANY DEFINITIVE AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS PROPOSAL AND THE PLAN AND OTHERWISE ACCEPTABLE TO THE PARTIES AS EXPRESSLY SET FORTH HEREIN. NOTHING IN THIS 10% NOTEHOLDER GROUP SETTLEMENT SHALL BE DEEMED TO BE A STIPULATION, CONCESSION, ADMISSION, OR PROBATIVE OF ANY VIEW, FACT, OPINION, POSITION, OR OTHERWISE. THIS 10% NOTEHOLDER GROUP SETTLEMENT DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.**

### Sale of Certain Assets Pursuant to a Permitted 10% Noteholder Credit Bid

1.  The Ad Hoc 10% Noteholders' credit bid as set forth in the form of asset purchase agreement submitted by the Ad Hoc 10% Noteholders to the Debtors on February 26, 2016, as modified in accordance with the terms of this 10% Noteholder Group Settlement (the "Credit Bid" and the asset purchase agreement, the "Credit Bid APA"), shall be deemed the Successful Bid (as defined in the Bid Procedures Order) for the sale and purchase of certain assets (the "Molycorp Minerals Sale") owned by Molycorp Minerals, LLC ("Minerals"). The Credit Bid APA shall provide:

    (a)     The Purchase Price (as defined in the Credit Bid APA) shall be $1,000,000.00 plus the assumption of certain liabilities; and

(b)     The term "Purchased Assets" means the following properties, assets, right and Claims of any Seller (other than the Excluded Assets (as defined below)):

  (i)     All cash collateral (as defined in section 363(a) of the Bankruptcy Code) that is held by the Molycorp Minerals Debtors other than (1) the Molycorp Minerals Intercompany Amount and (2) any amounts resulting from the sale of up to 56,000 kg of NdPr inventory by Molycorp Minerals LLC after the date hereof (the "Inventory Proceeds");

  (ii)    The Intellectual Property (as defined in the Credit Bid APA) and the associated goodwill of Sellers (A) related to the design, development, marketing and sale of rare earth-based products for the removal of contaminants from water including SorbX™ and PhosFIX™ trademarks, (B) related to the process patents set forth on Schedule 2.1(b)(iii),[1] and (C) expressly set forth on Exhibit 2 (collectively, the "Purchased Intellectual Property"):

  (iii)   The Specified Mineral Properties, defined as "(a) to the extent severable, the mineral rights with respect to the subsurface estate at the Mountain Pass Facility and as more particularly described in the Deed, and (b) unpatented mining claims associated with the Mountain Pass Facility held by any Seller, in each case that are not expressly designated as Excluded Assets");

  (iv)    The Contracts (as defined in the Credit Bid APA) and agreements related to the Purchased Intellectual Property to which any Seller is a party unless subsequently excluded from the Credit Bid APA by the Ad Hoc 10% Noteholders after the execution of this 10% Noteholder Group Settlement.

(c)     For the avoidance of doubt, the Purchased Assets shall not include and the Credit Bid shall expressly exclude each of the following (the "Excluded Assets"):

  (i)     the shares held by Molycorp Minerals, LLC in Molycorp Silmet AS ("Silmet");

  (ii)    that certain promissory note issued by Silmet to Minerals, dated February 13, 2013, and the related Loan Agreement,

---

[1] See Exhibit 1.

dated February 13, 2013, between Molycorp Silmet AS and Minerals;

    (iii)    all intellectual property owned by Minerals other than the Purchased Intellectual Property;

    (iv)    all Executory Contracts and Unexpired Leases scheduled on the Debtors' Schedule of Assumed Executory Contracts and Unexpired Leases (together items (i)-(iv) the "Downstream Transferred Assets");

    (v)    the fee-owned surface real estate;

    (vi)    the Molycorp Minerals Intercompany Amount;

    (vii)    the Inventory Proceeds;

    (viii)    all assets that will be owned directly or indirectly by the Reorganized Parent pursuant to the Plan; and

    (ix)    the Oaktree Equipment.

    (d)    The Credit Bid APA shall provide that approval of the Molycorp Minerals Sale pursuant to the Credit Bid APA shall not be a condition to confirmation of the Plan.

    (e)    The Credit Bid APA shall include a condition that the Molycorp Minerals Sale will only be approved to the extent that such sale does not have an adverse impact on the confirmation of the Plan with respect to the Downstream Debtors or any of the Downstream Transferred Assets.

2.    For the avoidance of doubt, the Credit Bid APA shall provide that Oaktree shall receive its pro rata share (35.283%) of the total number of common units issued by any acquisition vehicle formed to acquire any of the Purchased Assets ("Newco").

**Process for Consummating the Credit Bid**

3.    Subject to the Fee Arrangement (as defined below), the applicable Molycorp Minerals Debtors and the Ad Hoc 10% Noteholders shall execute the Credit Bid APA and file it with the Bankruptcy Court no later than 12:00 pm ET on March 28, 2016 (the Credit Bid APA, including any Bankruptcy Court order approving the sale pursuant to the Credit Bid (the "Sale Documentation")).[2] The Sale Documentation shall be reasonably acceptable to the Ad Hoc 10% Noteholders, the Debtors and Oaktree; provided however that with respect to Oaktree, whether the Sale Documentation is "reasonably acceptable" shall mean whether it is in form and substance consistent with the terms of this 10% Noteholder Group Settlement

---

[2] The Sale Documentation shall include any governing documents with respect to Newco, which documents shall not be required to be filed with the Bankruptcy Court.

(including without limitation paragraph 2 hereof, the Plan, and the Prepetition Collateral Agency Agreement and related prepetition security documents). The Creditors' Committee expressly reserves the right to object to the terms of the Credit Bid APA and the sale order approving the Credit Bid solely to the extent such terms are inconsistent with the terms of this 10% Noteholders Settlement and that such terms negatively impact distributions to or treatment of Claims in Class 5A and the Parties agree that any objections of the Creditors' Committee under these provisions may be raised with the Bankruptcy Court at the hearing with respect to such matters. In the event of any inconsistency between this 10% Noteholder Group Settlement and the Sale Documentation, the terms of this 10% Noteholder Group Settlement shall control.

4. In connection with the Credit Bid, the Debtors, subject to Paragraph 5 below and the Fee Arrangement, shall work in good faith with the Ad Hoc 10% Noteholders to effectuate the transfer of the Specified Mineral Properties in connection with consummation of the Credit Bid (the "Mineral Rights Transfer"), including taking reasonable steps necessary to transfer the Debtors' unpatented mining claims and to "sever" any mineral rights from the fee-owned surface real estate and to contest any objections to such "severing;"

5. Unless otherwise ordered by the Bankruptcy Court, at the Sale and Confirmation Hearing, as defined in the Bid Procedures Order, the Debtors shall seek approval of the Credit Bid pursuant to the Bid Procedures Order and under section 363 of the Bankruptcy Code, provided, however, that, notwithstanding anything herein to the contrary, so long as the Debtors use commercially reasonable efforts to obtain approval of the Credit Bid in good faith, approval by the Bankruptcy Court of the Credit Bid and/or the Mineral Rights Transfer shall not be a condition to this 10% Noteholder Group Settlement or a condition to confirmation of the Plan, provided, further, however, that to the extent the Bankruptcy Court does not approve the Credit Bid and/or the Mineral Rights Transfer or any other portion of the Molycorp Minerals Sale pursuant to the Credit Bid, the parties agree that (i) only those assets approved to be sold pursuant to the Credit Bid shall be sold pursuant to the terms of the Credit Bid APA, and thereafter, (ii) the Debtors shall not take any action to effectuate a sale, transfer, or distribution of the Purchased Assets remaining, including without limitation, to the extent applicable, the Specified Mineral Properties, or the fee-owned real estate, and (iii) the Molycorp Minerals Debtors[3] may convert their cases from chapter 11 to chapter 7 of the Bankruptcy Code.

6. Pending consummation of the Molycorp Minerals Sale, the Inventory Proceeds and the Molycorp Minerals Intercompany Amount shall be held at Minerals, and a portion of such funds shall be set aside to fund the costs set forth on Exhibit 3 (collectively the "Minerals Wind-down Expense Reserve"). The Minerals Wind-down Expense Reserve shall include: (i) an initial amount of $400,000 (the "Molycorp Sale Budget"), which will be used to fund the costs and expenses of seeking approval of the Credit Bid and the Molycorp Minerals Sale pursuant to the Credit Bid APA, including without limitation in connection with any opposition to any objection to the Credit Bid and/or the "severing" of any of the mineral

---

[3] The "Molycorp Minerals Debtors" are: (1) PP IV Mountain Pass II, Inc.; (2) PP IV Mountain Pass Inc.; (3) RCF Speedwagon Inc.; (4) Molycorp Minerals, LLC; (5) Industrial Minerals, LLC; and (6) Molycorp Advanced Water Technologies, LLC.

rights from the fee-owned surface real estate (collectively, the "Molycorp Minerals Sale Matters"), including all reasonable and documented fees and expenses of any of the Estates' professionals incurred in connection with the Molycorp Minerals Sale Matters (but excluding fees and expenses related to the Downstream Asset Transfer) whether incurred in connection with or after confirmation of the Plan and/or conversion of the Molycorp Minerals Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) an initial amount of $2.1 million, to fund (A) the estimated amount for Mountain Pass carrying costs prior to the consummation of the Molycorp Minerals Sale, (B) costs associated with the termination of the remaining employees at Minerals, and (C) the wind-down and/or chapter 7 costs associated with the remaining assets of Minerals not sold pursuant to the Credit Bid or otherwise transferred pursuant to the terms hereof, (iii) following consent by Oaktree and the Ad Hoc Noteholders or automatically upon consummation of the Mineral Rights Transfer, the balance of the costs set forth on Exhibit 3. The amount of the Minerals Wind-down Expense Reserve may be reduced with the prior written consent of the Molycorp Minerals Debtors or, after conversion of the chapter 11 cases of the Molycorp Minerals Debtors to cases under chapter 7, the chapter 7 trustee.

7. Notwithstanding anything to the contrary in the Plan, this 10% Noteholder Group Settlement, or any order of the Bankruptcy Court, all costs, fees and expenses incurred by any of the Estate's professionals in connection with Molycorp Minerals Sale Matters shall be subject to the Molycorp Sale Budget and shall be payable solely from the Minerals Sale Reserve. To the extent that the Debtors' professionals determine in good faith that approximately $350,000 of the Molycorp Sale Budget has been used, the Debtors' professionals will provide written notice to Oaktree and the Ad Hoc 10% Noteholders setting forth such fees and expenses with particularity and requesting an increase in the Molycorp Sale Budget. Oaktree and the Ad Hoc 10% Noteholders shall make a determination within two (2) business days whether to approve an increase in the Molycorp Sale Budget. To the extent that Oaktree and the Ad Hoc 10% Noteholders do not timely inform the Debtors' professionals of their intent to increase the Molycorp Sale Budget, the Debtors' professionals shall have no further obligations under the 10% Noteholder Group Settlement relating to the Molycorp Minerals Sale Matters following the incurrence of $400,000 of fees and expenses; provided that, if the Ad Hoc 10% Noteholders elect to increase the Molycorp Sale Budget but Oaktree does not, (i) the Molycorp Minerals Debtors' professionals shall effectuate an orderly transition of any ongoing work to professionals identified by the Ad Hoc 10% Noteholders whose retention is approved by the Bankruptcy Court, (ii) all fees and expenses related to such transition and any professional fees and expenses thereafter incurred by the Molycorp Minerals Debtors shall be borne solely by the 10% Noteholders, and (iii) the Debtors shall continue to perform their express obligations set forth in this 10% Noteholder Group Settlement. This Paragraph 7 shall constitute the "Fee Arrangement."

8. The Ad Hoc 10% Noteholders agree that notwithstanding anything to the contrary herein, the schedule for confirmation of the Plan with respect to the Debtors other than the Molycorp Minerals Debtors shall continue on the schedule set forth in the Order (A) Authorizing Service of the Supplemental Solicitation Materials and (B) Scheduling Certain Revised Dates and Deadlines in Connection with Confirmation of the Plan of Reorganization [Docket No. 1391].

**Certain Other Transfers Between Minerals and Other Debtors**

9. The Ad Hoc 10% Noteholders shall consent to the transfer pursuant to the Plan of the Downstream Transferred Assets, in each case, to the Reorganized Parent or an entity that will be directly or indirectly controlled by the Reorganized Parent, free and clear of any lien, claim, interest or pledge. If the Plan is consummated without transfer of the Downstream Transferred Assets, this 10% Noteholder Group Settlement shall remain effective.

10. As soon as reasonably practicable after the consummation of the Molycorp Minerals Sale, the balance of the Molycorp Minerals Intercompany Amount and the Inventory Proceeds not used to fund the Minerals Wind-down Expense Reserve shall be distributed on a pro rata basis to Oaktree and the 10% Noteholders.

11. Nothing herein shall affect Oaktree's ownership of the Oaktree Equipment and in accordance with the Bid Procedures, Oaktree shall have a reasonable amount of time following the closing of the Molycorp Minerals Sale to remove (as it may determine in its sole discretion) the Oaktree Equipment in accordance with the terms of Oaktree Lease Documents.

**Procedures for Minerals' Chapter 11 Case**

12. The parties agree that the Plan shall be withdrawn as to the Molycorp Minerals Debtors.

13. The parties agree to work in good faith until the Effective Date of the Plan to determine whether a chapter 11 plan for the Molycorp Minerals Debtors can be confirmed. If the Parties determine, in good faith, as of the Effective Date of the Plan, that a chapter 11 plan for the Molycorp Minerals Debtors cannot be confirmed, the Molycorp Minerals Debtors may convert their cases from chapter 11 to chapter 7 of the Bankruptcy Code. For the avoidance of doubt, fees and expenses incurred by the Estate's professionals in connection with this paragraph shall not be counted against the Molycorp Sale Budget.

**Support for the Plan and Mutual Releases**

14. The Ad Hoc 10% Noteholders agree to take all actions reasonably necessary to support the confirmation of the Plan, including withdrawing (to the extent necessary) any objections that have been filed to the Plan and that all such objections are resolved. The Ad Hoc 10% Noteholders agree not to direct the 10% Notes Indenture Trustee, and Wells Fargo, as Collateral Agent, to object to any part of the Plan and/or the Plan Settlement Agreement. Each 10% Noteholder that is a signatory to this 10% Noteholder Group Settlement agrees to vote in favor of the Plan and agrees that on the date hereof, counsel to the Ad Hoc Noteholder Group will file a declaration setting forth the amount and number of votes previously submitted by the members of the Ad Hoc 10% Noteholder Group and providing that such votes shall instead be deemed as votes to accept the Plan.

15. Without limiting paragraph 14 above, the Ad Hoc 10% Noteholders agree to support approval of the Class 5A Stand-Alone Distribution, including but not limited to, the amount

of the Class 5A Equity or the allocation of the Class 5A Equity among the members of Class 5A, the Class 5A Stand-Alone Cash Distribution, the Class 5A Insurance Payment, and the Class 5 Cash Out Option for Class 5A-1.

16. The Ad Hoc 10% Noteholders also agree to support and take all actions reasonably necessary to support the granting of Debtor Releases by the Molycorp Minerals Debtors in connection with the 9019 Settlement set forth in the Plan (including if such releases are sought outside of the Plan) and the approval of the Third Party Release in the Plan.

17. The Ad Hoc 10% Noteholders and their respective affiliates and advisors (each in their capacity as such), the 10% Notes Indenture Trustee and its advisors (solely in their capacity as such), and Wells Fargo, as Collateral Agent, and its advisors (solely in their capacity as such), shall each be included as a Released Party and as a Releasing Party; provided, however, that the 10% Notes Indenture Trustee or Wells Fargo, as Collateral Agent, shall not be included as a Released Party and as a Releasing Party if it objects (or, with respect to the 10% Notes Indenture Trustee, fails to withdraw its objection prior to the commencement of the Sale and Confirmation Hearing) to the terms of the Plan Settlement Agreement or to the 10% Noteholder Group Settlement as incorporated in the Plan.

18. The Plan shall be further revised to provide that (i) all fees and expenses of the Ad Hoc 10% Noteholders incurred in connection with these cases shall be paid upon consummation of the Plan in an amount up to $5,000,000; (ii) the fees and expenses of the 10% Notes Indenture Trustee shall be paid from the cash recovery allocable to the 10% Noteholders on account of their allowed secured claim; and (iii) to the extent legally permissible, the Ad Hoc 10% Noteholders may submit any fees and expenses above $5,000,000 for reimbursement to be paid out of the cash recovery allocable to the 10% Noteholders. Except as set forth in this paragraph 18, none of the 10% Noteholders, the Ad Hoc 10% Noteholders, the 10% Notes Indenture Trustee, the Collateral Agent, or any of their Representatives shall have any further right to seek payment of any fees, expenses, costs, or indemnification, from any of the Debtors, the Reorganized Debtors, or any Released Party.

## Other Terms of the 10% Noteholder Group Settlement

19. The Debtors shall withdraw the *Motion of the Debtors for an Order Authorizing Them to Surcharge Certain Collateral Pursuant to Section 506(c) of the Bankruptcy Code*, with prejudice.

20. The Ad Hoc 10% Noteholders shall withdraw the *Motion of Ad Hoc 10% Noteholders to Compel the Debtors to Comply with the Bidding Procedures Order or, Alternatively, to Convert the Molycorp Minerals Debtors' Cases to Liquidations Under Chapter 7*, as moot.

21. The 10% Noteholders claim shall be allowed in the amount of $687.2 million, provided, however, that the 10% Notes Deficiency Claim in Class 5A shall not be allowed in an amount that exceeds $680.7 million.

22. The obligations of the Ad Hoc 10% Noteholders in paragraphs 14, 15, 16, and 20 shall not be conditioned on Bankruptcy Court approval or on consummation of the Molycorp Minerals Sale. The express obligations of the Creditors' Committee in paragraphs 13, 25 and 26 shall

not be conditioned on approval of the releases by the Molycorp Minerals Debtors referred to in paragraph 16.

23. Provided that the Sale Documentation is consistent with this 10% Noteholder Group Settlement, Oaktree shall not object on the basis that the terms of 10% Noteholder Group Settlement or the parties' performance hereunder, and the submission of the Credit Bid, the terms thereof including the terms of the Credit Bid APA, and the actions of the 10% Noteholders and the Collateral Agent in connection therewith do not comply with the Collateral Agency Agreement, the Security Agreement, the Deed of Trust, or the Bid Procedures and Oaktree shall take all actions reasonably requested to support the approval of the Credit Bid and the Credit Bid APA and the Mineral Rights Transfer in accordance with the terms hereof.

24. The Debtors, subject to the Fee Arrangement, shall seek approval of the 10% Noteholder Group Settlement at the Sale and Confirmation Hearing, whether as part of an order confirming the Plan or separate order, and such order or portion of the Confirmation Order concerning the 10% Noteholder Group Settlement as applicable, shall be acceptable to the Ad Hoc 10% Noteholders, Oaktree and the Debtors.

25. The Debtors, the Creditors' Committee, Oaktree, and the Ad Hoc 10% Noteholders agree to support, and will not object to, approval of the Credit Bid, the Credit Bid APA, and the 10% Noteholder Group Settlement by the Court, and, prior to such approval, shall take no steps contrary to obtaining approval of the Credit Bid, the Credit Bid APA, and the 10% Noteholder Group Settlement.

26. The Creditors' Committee will not seek a finding that payments to advisors of the Ad Hoc 10% Noteholders prior to the petition date were preferences, nor seek to disallow, subordinate, or designate the votes associated with the claims of the Ad Hoc 10% Noteholders on such grounds, or any other grounds.

27. The valid and perfected liens of the Ad Hoc 10% Noteholders and Oaktree shall continue in full force and effect on all assets of Molycorp Minerals Debtors other than the Transferred Downstream Assets, and after consummation of the Credit Bid, the Purchased Assets and the Transferred Downstream Assets.

28. No waiver, modification, or amendment of this 10% Noteholder Group Settlement shall have any effect unless it is in writing and executed by each Party that is a signatory hereto.

*[SIGNATURE PAGES FOLLOW]*

Agreed and Accepted by:

MOLYCORP, INC., on behalf of itself and each of
its subsidiaries and affiliates

By: _____

NAME: Geoffrey Bedford
TITLE President and Chief Executive Officer

Agreed and Accepted by:

JHL CAPITAL GROUP HOLDINGS ONE LLC

By: _____

    NAME: James H. Litinsky
    TITLE: Authorized Signatory

QVT FUND IV LP
By its general partner, QVT Associates GP LLC

By: _____

    NAME:
    TITLE:

QVT FUND V LP
By its general partner, QVT Associates GP LLC

By: _____

    NAME:
    TITLE:

QUINTESSENCE FUND L.P.
By its general partner, QVT Associates GP LLC

By: _____

    NAME:
    TITLE:

Agreed and Accepted by:

JHL CAPITAL GROUP HOLDINGS ONE LLC

By: _____
      NAME: James H. Litinsky
      TITLE: Authorized Signatory

QVT FUND IV LP
By its general partner, QVT Associates GP LLC

By: _____
      NAME: Arthur Chu
      TITLE: Authorized Signatory

QVT FUND V LP
By its general partner, QVT Associates GP LLC

By: _____
      NAME:  Arthur Chu
      TITLE:  Authorized Signatory

QUINTESSENCE FUND L.P.
By its general partner, QVT Associates GP LLC

By: _____
      NAME:  Arthur Chu
      TITLE:  Authorized Signatory

Agreed and Accepted by:

OCM MLYCo CTB Ltd.
By: _oakree cptcl mangerent L.P. , its director_

By: _____

    NAME:   **Emily Stephens**
    TITLE:   **Managing Director**

By: _____

    NAME:   **Nick Basso**
    TITLE:   **Vice President**

Agreed and Accepted by:

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF MOLYCORP, INC., ET AL.

By: _____

Luc Despins
Paul Hastings, LLP
Counsel to the Creditors' Committee

Agreed and Accepted by:

PLYMOUTH LANE PARTNERS (MASTER), LP
Solely in its capacity as Chair of the Committee and
not in its individual capacity:
By Plymouth Lane Capital Management, LLC, its
investment advisor:

By: _____

NAME: Mark Kronfeld
TITLE: GC

**EXHIBIT 1**

| Country | Status | Scope | Owner |
|---|---|---|---|
| Bangladesh | Issued | Title: Porous and Durable Ceramic Filter Monolith Coated with Cerium Oxide for Removing Contaminates from Water | |
| New Zealand | Issued/Granted | Title: USE OF A DUAL POLYMER SYSTEM FOR ENHANCED WATER RECOVERY AND IMPROVED SEPARATION OF SUSPENDED SOLIDS AND OTHER SUBSTANCES FROM AN AQUEOUS MEDIA | |
| Bangladesh | Issued/Maintain | Title: Process for Removing Arsenic From Aqueous Streams | |
| Australia | Issued/Maintain | Title: Process for Removing Arsenic From Aqueous Streams 2004207832 Aug 13 2009 | |
| Australia | Issued/Maintain | Title: Process for Removing Arsenic From Aqueous Streams 2009251182  June 1 2010 | |
| Australia | Issued/Maintain | Title: Process for Removing Arsenic From Aqueous Streams | |
| China | Issued/Maintain | Title: Process for Removing Arsenic From Aqueous Streams | |
| India | Issued/Maintain | Patent Number: 227856  Title: A Method for Removing Arsenic From An Aqueous Feed | |
| Bangladesh | Issued/Maintain | Title: Process for Removing Arsenic From Aqueous Streams | |
| Mexico | Issued/Maintain | Title: Process for Removing Arsenic From Aqueous Streams | |
| USA | Issued/Maintain | Patent Nubmer: 6863825 B2  Title: Process for Removing Arsenic From Aqueous Streams | Molycorp Minerals, LLC |
| Europe | Pending | Title: Process for Removing Arsenic From Aqueous Streams Witham Arsenic Removal Patent Application should defend | |
| USA | Issued | Patent Number: 7300589 Title: Process for Removing Arsenic from Drinking water  1st claim requires oxidation | Molycorp Minerals, LLC |
| USA | Issued | Patent Number: 7048853 B2 Title: Process for Removing Arsenic from Drinking water | Molycorp Minerals, LLC |

NAI-1500930542v7

| Country | Status | Scope | Owner |
|---------|--------|-------|-------|
| USA | Issued | Patent Number: 7686976 B2  Title: Composition for Removing Arsenic from Aqueous Streams does require Ce to be supported on a clay or something | Molycorp Minerals, LLC |
| USA | Issued | Title: Water Purification Device for Arsenic Removal Patent Number: 8475658 | Molycorp Minerals, LLC |
| PCT1 list | Pending | CERIC OXIDE WITH EXCEPTIONAL ARSENIC REMOVAL PROPERTIES | |
| USA | Pending | CERIC OXIDE WITH EXCEPTIONAL ARSENIC REMOVAL PROPERTIES | Molycorp Minerals, LLC |
| PCT1 list | Pending | Ceric Oxide with Exceptional Target Material Removal Properties | |
| USA | Pending | Ceric Oxide with Exceptional Target Material Removal Properties | Molycorp Minerals, LLC |
| USA | Issued/Maintain | Title: Process Using Rare Earths to Remove Oxyanions From Aqueous Streams Patent #7338603 | Molycorp Minerals, LLC |
| Australia | Issued/Maintain | Title: Process Using Rare Earths to Remove Oxyanions From Aqueous Streams | |
| Mexico | Issued/Maintain | Title: Process Using Rare Earths to Remove Oxyanions From Aqueous Streams | |
| Canada | Issued/Notice of Allowance | Title: Process Using Rare Earths to Remove Oxyanions From Aqueous Streams | |
| Brazil | Pending | Title: Process Using Rare Earths to Remove Oxyanions From Aqueous Streams | |
| USA | Issued | Patent Number: 2008/0156734 A1 Title: Apparatus for treating a flow of an aqueous solution containing arsenic | Molycorp Minerals, LLC |
| Canada | Pending | Title: Aggregate Composition for Treating a Contaminated Fluid Number: 2,703,821 | |
| Japan | Pending | Title: Aggregate Composition for Treating a Contaminated Fluid and Method for Forming Thereof | |
| Bangladesh | Issued | Title: Composition and Process for Making the Composition 287/2008 | |

| Country | Status | Scope | Owner |
|---|---|---|---|
| Brazil | Pending | Title: Aggregate Composition for Treating a Contaminated Fluid PI-0816585-8 | |
| Europe | Pending | Title: Aggregate Composition for Treating a Contaminated Fluid RE use in a cartridge like filter for contaminant removal | |
| China | Issued | Title: Aggregate Composition of Treating a Contaminanted Fluid 2008/80123682.8 | |
| Bangladesh | Issued | Title: Compositions for Treating Aqueous Solutions and Gases and Processes for Making such Aggregate Compositions 222/2009 | |
| Mexico | Issued | Title: Composition and Process for Making the Composition | |
| USA | Issued | Title: Composition and Process for Making the Composition    RE use in a cartridge like filter for contaminant removal | Molycorp Minerals, LLC |
| USA | Issued | Patent Number: 2009/0111689 A1 Title: Composition and process for making the composition | Molycorp Minerals, LLC |
| USA | Issued | Patent #8,557,730 issued on 10/15/2013 | Molycorp Minerals, LLC |
| Brazil | Pending | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants PI-0817185-8 | |
| Bangladesh | Issued/Maintain | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants 222/2009 | |
| China | Issued/Notice of Allowance | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants 2008/80123663.5 | |
| Bangladesh | Issued/Maintain | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants 286/2008 | |
| Mexico | Issued/Notice of Allowance | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants | |

| Country | Status | Scope | Owner |
|---|---|---|---|
| USA | Pending/Appeal | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants | Molycorp Minerals, LLC |
| Canada | Pending | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants 2703858 | |
| Europe | Pending | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants 8843686 | |
| Hong Kong | Pending | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants | |
| USA | Pending | Title: Apparatus and Process for Treating an Aqueous Solution Containing Biological Contaminants | Molycorp Minerals, LLC |
| Australia | Issued | Title: Remediation of Physiologically Active Compounds from Waste Water | |
| Japan | Issued/Notice of Allowance | Title: Remediation of Physiologically Active Compounds from Waste Water | |
| USA | Pending | Title: Remediation of Physiologically Active Compounds from Waste Water | Molycorp Minerals, LLC |
| Korea | Pending | Title: Remediation of Physiologically Active Compounds from Waste Water | |
| Mexico | Pending | Title: Remediation of Physiologically Active Compounds from Waste Water | |
| Australia | Pending | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. | |
| Brazil | Pending | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. | |

| Country | Status | Scope | Owner |
|---------|--------|-------|-------|
| Canada | Pending | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. | |
| Europe | Pending | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. | |
| USA | Issued/Notice of Allowance | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. | Molycorp Minerals, LLC |
| USA | Pending | Title: NON-METAL-CONTAINING OXYANION REMOVAL FROM WATERS USING RARE EARTHS | Molycorp Minerals, LLC |
| China | Pending | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. Other metals Bi, Cr, Co, Mn, Zn, Zr, Al, Cu, potentially Sb, Cd, Hg, U | |
| Japan | Pending | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. | |

| Country | Status | Scope | Owner |
|---------|--------|-------|-------|
| Korea | Pending | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. | |
| Mexico | Pending | Title: Rare Earth Removal of Hydrated and Hydroxyl Species Purpose: Primarily drafted to go after Pb carbonate and used Pourbaix diagrams to prove it.  Also added metals from -21 to be more specific. | |

**EXHIBIT 2**

| Country | Status | Scope | Owner |
|---------|--------|-------|-------|
| USA | Issued | Patent Number: 5433931 | Molycorp Minerals, LLC |
| USA | Issued | Patent Number: 5207995  Title: Recovery of Cerium From Fluoride-containing Ores | Molycorp Minerals, LLC |
| China | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| Denmark | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| Canada | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| South Africa | Issued | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| Australia | Issued | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |

| Country | Status | Scope | Owner |
|---|---|---|---|
| Brazil | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| Europe | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| Madagascar | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| Korea | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| USA | Issued | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | Molycorp Minerals, LLC |
| Ceuta, Melilla | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |

| Country | Status | Scope | Owner |
|---------|--------|-------|-------|
| India | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| Malaysia | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| Thailand | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |
| USA | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | Molycorp Minerals, LLC |
| Vietnam | Pending | Title: HYDROMETALLURGICAL PROCESS AND METHOD FOR RECOVERING METALS.  The invention relates generally to mineral processing plants and facilities and particularly to hydrometallurgical plants and facilities for recovering metals. | |

# EXHIBIT 3

# FUNDING OF CERTAIN WINDDOWN AND CHAPTER 7 COSTS ($'000)

| Pre NEO Reorganization Effective Date ($'000) | |
| --- | --- |
| **Sources** | |
| Sale to MM&A of Mountain Pass NdPr Inventory | $2,240 |
| *(56,000 kg at $40 per kg)* | |
| **Total** | **$2,240** |
| **Uses** | |
| RIF Costs | $1,696 [1] |
| Cash Remaining at Molycorp Minerals, LLC | 544 |
| **Total** | **$2,240** |

| Post NEO Reorganization Effective Date ($'000) | |
| --- | --- |
| **Sources** | |
| Cash Remaining at Molycorp Minerals, LLC | $544 |
| Value on Account of Downstream I/C Payments [2] | 6,326 |
| **Total** | **$6,870** |
| **Uses** | |
| Estimated Chapter 7 Budget [3] | $2,500 |
| Molycorp Sale Budget [4] | 400 |
| Remaining Cash [5][6] | 3,970 |
| **Total** | **$6,870** |

[1] Costs to be funded from Minerals Wind-down Expense Reserve.

[2] On account of Downstream entities' intercompany payables and intercompany loan payables.

[3] Estimated amount for two months of Mountain Pass operating costs in chapter 7, chapter 7 trustee fees, other professional fees and contingency.

[4] Estimated professional fees for mineral rights transfer.

[5] Balance may change based on Mountain Pass carrying cost until conversion to chapter 7.

[6] Contemplated to be distributed to Oaktree and 10% Noteholders pursuant to the pari passu collateral split (35.29% / 64.71%) immediately prior to conversion of Molycorp Minerals, LLC to chapter 7 under the proposed settlement among the parties, subject to Court approval.

# EXHIBIT B

| | |
|---|---|
| **From:** | Ludwig, Jillian |
| **To:** | Leblanc, Andrew; Doyle, Lauren; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel |
| **Cc:** | Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua |
| **Subject:** | Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement |
| **Date:** | Thursday, April 14, 2016 7:24:23 PM |
| **Attachments:** | Second Amended Credit Agreement and Direction.DOCX<br>Molycorp Newco LLC Agreement.docx |

Subject to FRE 408

All,

Attached please find the Second Amended Credit Bid Agreement and Direction and the SNR LLC Agreement, in connection with tomorrow's closing.

Please note that these documents remain subject to the comments and approval of JHL, QVT, the Trustee, and the Collateral Agent.

Regards,

Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

> **From:** Doyle, Lauren [mailto:LDoyle@milbank.com]
> **Sent:** Wednesday, April 06, 2016 3:44 PM
> **To:** Valentino, Luke; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel; Leblanc, Andrew
> **Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia; jbrody@kramerlevin.com
> **Subject:** RE: Revised Molycorp Credit Bid Agreement
>
> Subject to FRE 408
>
> As discussed with Matt, attached is a revised mark-up of the Credit Bidding Agreement. Please note that this draft has not been reviewed by Oaktree and remains subject to their review, comment, and approval in all respects and subject to change.
>
> Please let us know if you would like to have a call to discuss.
>
> Regards,
>
> Lauren
>
> _____
>
> **Lauren C. Doyle** | Milbank
> 28 Liberty Street | New York, NY 10005
> T: +1 212.530.5053 | F: +1 212.822.5053
> ldoyle@milbank.com | www.milbank.com
>
> **From:** Valentino, Luke [mailto:lvalentino@sidley.com]
> **Sent:** Friday, April 01, 2016 4:09 PM
> **To:** Doyle, Lauren; Golenbock, Scott; Kinney, Brian
> **Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia
> **Subject:** Revised Molycorp Credit Bid Agreement
>
> Attached is a revised version of the credit bid agreement. This version incorporates your proposal regarding the capitalization of unpaid fees and the removal of the rights offering. As such, it is consistent with the terms of the settlement agreement and in final form. Please confirm.
>
> **LUKE J. VALENTINO**
>
> **SIDLEY AUSTIN LLP**
> One South Dearborn
> Chicago, IL 60603
> +1 312 853 7696
> lvalentino@sidley.com
> www.sidley.com
>
> **SIDLEY** 

*****************************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

*****************************************************************************************************

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

Case 15-11357-CSS   Doc 1022-3   Filed 04/15/16   Page 1 of 28

# EXHIBIT C

| From: | Erin S de la Mare |
|---|---|
| To: | Leblanc, Andrew |
| Cc: | Lisa G Laukitis; Jeffrey D. Litle |
| Subject: | Fw: Molycorp - Execution Copies of the Credit Bid Agreement, Bring Down Letters, and LLC Agreement -- Proceed with Closing |
| Date: | Sunday, April 17, 2016 9:31:37 PM |
| Attachments: | Second Amended Credit Agreement and Direction.pdf |
| | SNR LLC Agreement.pdf |

Here are the relevant communications.

----- Forwarded by Erin S de la Mare/JonesDay on 04/17/2016 09:18 PM -----

| From: | "Ludwig, Jillian" <jillian.ludwig@sidley.com> |
|---|---|
| To: | Erin S de la Mare <esdelamare@JonesDay.com>, Justin P Farra <jfarra@jonesday.com>, "Jeffrey D. Litle" <jdlitle@JonesDay.com>, "Lisa G. Laukitis (llaukitis@jonesday.com)" <llaukitis@jonesday.com> |
| Cc: | "Clemente, Matthew A." <mclemente@sidley.com>, "Sekhon, Vijay S." <vsekhon@sidley.com>, "Shi, Sylvia" <sylvia.shi@sidley.com>, "Valentino, Luke" <lvalentino@sidley.com>, "Leonard, Laura L." <lleonard@sidley.com>, "Evans, Alexandra F." <afevans@sidley.com>, "Garvey, Jackson" <jgarvey@sidley.com> |
| Date: | 04/15/2016 11:37 PM |
| Subject: | Molycorp - Execution Copies of the Credit Bid Agreement, Bring Down Letters, and LLC Agreement -- Proceed with Closing |

Erin,

Attached please find the fully-executed copies of the Second Amended Credit Agreement and Direction and the LLC Agreement of Secure Natural Resources LLC.

This confirms that the Purchaser is now ready to proceed with Closing.

You are authorized to release all signature pages previously provided to you in connection with Closing.  Please let us know if there is anything further you need from us in that regard.

Please send us confirmation of occurrence the Closing via transmission of electronic copies of the Closing documents and please also confirm our agreement that the original signature pages of the Deeds will be released to us, and wires initiated, at or before 9:00 a.m. (PT) on Monday, April 18, 2016 so that the conveyances and assignments may be recorded.

I would also like to personally thank you and your team on your patience today and this evening as we finalized the governance documentation to facilitate tonight's Closing.

Please let me know if you have any questions or need anything further.

Regards,
Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

*********************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*********************************************************************************

----- Forwarded by Erin S de la Mare/JonesDay on 04/17/2016 09:21 PM -----

| From: | "Ludwig, Jillian" <jillian.ludwig@sidley.com> |
|---|---|
| To: | Erin S de la Mare <esdelamare@JonesDay.com>, Justin P Farra <jfarra@jonesday.com> |
| Cc: | "Jeffrey D. Litle" <jdlitle@JonesDay.com>, "Clemente, Matthew A." <mclemente@sidley.com>, "Sekhon, Vijay S." <vsekhon@sidley.com>, "Shi, Sylvia" <sylvia.shi@sidley.com>, "Valentino, Luke" <lvalentino@sidley.com> |

Date:     04/15/2016 10:10 PM
Subject:   RE: Closing Documents

Erin,

We are continuing to work diligently towards closing with the Indenture Trustee.  In the event that we are not able to reach an agreement and close
this evening, we are requesting the Debtors' consent to extend the termination date in the APA until tomorrow (or such other time as we may request
to complete the deal).

Could you please you please confirm?

Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

**********************************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

**********************************************************************************************************

----- Forwarded by Erin S de la Mare/JonesDay on 04/17/2016 09:23 PM -----

From:     "Ludwig, Jillian" <jillian.ludwig@sidley.com>
To:       Erin S de la Mare <esdelamare@JonesDay.com>, "Evans, Alexandra F." <afevans@sidley.com>
Cc:       "Shi, Sylvia" <sylvia.shi@sidley.com>, Justin P Farra <jfarra@jonesday.com>
Date:     04/15/2016 03:14 PM
Subject:   RE: Molycorp - Wire Transfer Instructions

Thank you, to confirm we are jumping on a call with Oaktree in 15 minutes and hope to have further clarity at that time.

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

**From:** Erin S de la Mare [mailto:esdelamare@JonesDay.com]
**Sent:** Friday, April 15, 2016 2:12 PM
**To:** Evans, Alexandra F.
**Cc:** Ludwig, Jillian; Shi, Sylvia; Justin P Farra
**Subject:** RE: Molycorp - Wire Transfer Instructions

Hi Alexandra,

Thanks.  The assistant to the paralegal helping us in L.A. is going to walk the pages over to your office (I understand the offices are very
close).  As I understand that there is a delay in the Closing as a result of continuing discussions between Oaktree's counsel and Sidley
regarding the formation documents of Purchaser, we will continue to hold on to the signatures until we receive word that Purchaser is
able to proceed with Closing.

Erin de la Mare (bio)
**JONES DAY® - One Firm Worldwide℠**

North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Office +1.216.586.7119
esdelamare@jonesday.com

| | |
|---|---|
| From: | "Evans, Alexandra F." <afevans@sidley.com> |
| To: | Erin S de la Mare <esdelamare@JonesDay.com> |
| Cc: | "Shi, Sylvia" <sylvia.shi@sidley.com>, "Ludwig, Jillian" <jillian.ludwig@sidley.com> |
| Date: | 04/15/2016 03:08 PM |
| Subject: | RE: Molycorp - Wire Transfer Instructions |

Hi Erin,

Once we are in a position to close, we are happy to send our Sidley messenger to your LA office to pick up the original signature pages (fortunately our offices are close to one another). The messenger will then go directly to First Am's offices with the original deeds. If you could provide the contact information for your Jones Day colleague now it will help us prep the messenger in advance so they will know the drill once the time comes. Thanks.

Alex

**ALEXANDRA F. EVANS**
Staff Attorney

**SIDLEY AUSTIN LLP**
+1 213 896 6063
afevans@sidley.com

**From:** Ludwig, Jillian
**Sent:** Thursday, April 14, 2016 5:02 PM
**To:** Erin S de la Mare
**Cc:** Evans, Alexandra F.; Shi, Sylvia
**Subject:** Molycorp - Wire Transfer Instructions

Erin,

Further to our call this afternoon, attached are the wiring instructions for First American and Sidley's trust account, respectively.

As discussed, the Noteholder/Oaktree cash collateral should be transferred as follows:

Funds transfer:
1. Debtors transfer cash collateral amount equal to transfer taxes to First American
2. Debtors transfer remaining cash collateral amount to Sidley Trust account
First American is coordinating recordation of the two deeds. They will need a wire in the amount of the transfer tax in advance of recording so this should be sent as early in the day tomorrow as possible. It is important that the wire include the title/escrow number referenced on the attached.

Please let us know if you have any questions.

Regards,
Jill
**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 7523
jillian.ludwig@sidley.com

www.sidley.com

*****************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*****************************************************************************************

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other
privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so
that our records can be corrected.
==========

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other
privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so
that our records can be corrected.
==========

Case 15-11357-CSS    Doc 1022-4    Filed 04/15/16    Page 1 of 28

# EXHIBIT D

| | |
|---|---|
| **From:** | Doyle, Lauren |
| **To:** | Golenbock, Scott; "Ludwig, Jillian"; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel |
| **Cc:** | Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua |
| **Subject:** | RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement |
| **Date:** | Friday, April 15, 2016 2:20:55 PM |
| **Attachments:** | image001.png |

Jill,

As I mentioned on our call, Oaktree is available to get on a principals call to discuss the open issues. Let us know what works.

Thanks,

Lauren

**Lauren C. Doyle | Milbank**
28 Liberty Street | New York, NY 10005
T: +1 212.530.5053 | F: +1 212.822.5053
ldoyle@milbank.com| www.milbank.com

**From:** Golenbock, Scott
**Sent:** Friday, April 15, 2016 2:12 PM
**To:** 'Ludwig, Jillian'; Leblanc, Andrew; Doyle, Lauren; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

All, revised drafts are attached, which are sent subject to our client's review and comments. Please let us know when you're available for a call to discuss.

Scott

**Scott Golenbock | Milbank**
28 Liberty Street | New York, NY 10005
T: +1 212.530.5181 | F: +1 212.530.5219
SGolenbock@milbank.com | www.milbank.com

**From:** Ludwig, Jillian [mailto:jillian.ludwig@sidley.com]
**Sent:** Thursday, April 14, 2016 7:23 PM
**To:** Leblanc, Andrew; Doyle, Lauren; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Subject to FRE 408

All,

Attached please find the Second Amended Credit Bid Agreement and Direction and the SNR LLC Agreement, in connection with tomorrow's closing.

Please note that these documents remain subject to the comments and approval of JHL, QVT, the Trustee, and the Collateral Agent.

Regards,

Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

**From:** Doyle, Lauren [mailto:LDoyle@milbank.com]
**Sent:** Wednesday, April 06, 2016 3:44 PM
**To:** Valentino, Luke; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel; Leblanc, Andrew
**Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia; jbrody@kramerlevin.com
**Subject:** RE: Revised Molycorp Credit Bid Agreement

Subject to FRE 408

As discussed with Matt, attached is a revised mark-up of the Credit Bidding Agreement. Please note that this draft has not been reviewed by Oaktree and remains subject to their review, comment, and approval in all respects and subject to change.

Please let us know if you would like to have a call to discuss.

Regards,

Lauren

**Lauren C. Doyle | Milbank**
28 Liberty Street | New York, NY 10005
T: +1 212.530.5053 | F: +1 212.822.5053
ldoyle@milbank.com| www.milbank.com

**From:** Valentino, Luke [mailto:lvalentino@sidley.com]
**Sent:** Friday, April 01, 2016 4:09 PM
**To:** Doyle, Lauren; Golenbock, Scott; Kinney, Brian
**Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia
**Subject:** Revised Molycorp Credit Bid Agreement

Attached is a revised version of the credit bid agreement. This version incorporates your proposal regarding the capitalization of unpaid fees and the removal of the rights offering. As such, it is consistent with the terms of the settlement agreement and in final form. Please confirm.

**LUKE J. VALENTINO**

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 7696
lvalentino@sidley.com
www.sidley.com
SIDLEY



*********************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*********************************************************************************************

==============================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the
employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination,
distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify
the sender and delete this e-mail message from your computer.

# EXHIBIT E

| From: | Ludwig, Jillian |
|---|---|
| To: | Doyle, Lauren; Golenbock, Scott; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel |
| Cc: | Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua |
| Subject: | RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement |
| Date: | Friday, April 15, 2016 3:09:16 PM |
| Attachments: | image001.png |

Lauren and Scott,

Are you available for an initial lawyer's only call at 2:30 CT / 3:30 ET to discuss?

We can use my dial-in:

1-888-446-7584

Code: 546 902

iPhone: 1-888-446-7584;;546902#

Regards,

Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

---

**From:** Doyle, Lauren [mailto:LDoyle@milbank.com]
**Sent:** Friday, April 15, 2016 1:21 PM
**To:** Golenbock, Scott; Ludwig, Jillian; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Jill,

As I mentioned on our call, Oaktree is available to get on a principals call to discuss the open issues. Let us know what works.

Thanks,

Lauren

---

**Lauren C. Doyle** | Milbank
28 Liberty Street | New York, NY 10005
T: +1 212.530.5053 | F: +1 212.822.5053
ldoyle@milbank.com | www.milbank.com

**From:** Golenbock, Scott
**Sent:** Friday, April 15, 2016 2:12 PM
**To:** 'Ludwig, Jillian'; Leblanc, Andrew; Doyle, Lauren; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

All, revised drafts are attached, which are sent subject to our client's review and comments. Please let us know when you're available for a call to discuss.

Scott

---

**Scott Golenbock** | Milbank
28 Liberty Street | New York, NY 10005
T: +1 212.530.5181 | F: +1 212.530.5219
SGolenbock@milbank.com | www.milbank.com

**From:** Ludwig, Jillian [mailto:jillian.ludwig@sidley.com]
**Sent:** Thursday, April 14, 2016 7:23 PM
**To:** Leblanc, Andrew; Doyle, Lauren; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Subject to FRE 408

All,

Attached please find the Second Amended Credit Bid Agreement and Direction and the SNR LLC Agreement, in connection with tomorrow's closing.

Please note that these documents remain subject to the comments and approval of JHL, QVT, the Trustee, and the Collateral Agent.

Regards,

Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

**From:** Doyle, Lauren [mailto:LDoyle@milbank.com]
**Sent:** Wednesday, April 06, 2016 3:44 PM
**To:** Valentino, Luke; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel; Leblanc, Andrew
**Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia; jbrody@kramerlevin.com
**Subject:** RE: Revised Molycorp Credit Bid Agreement

Subject to FRE 408

As discussed with Matt, attached is a revised mark-up of the Credit Bidding Agreement. Please note that this draft has not been reviewed by Oaktree and remains subject to their review, comment, and approval in all respects and subject to change.

Please let us know if you would like to have a call to discuss.

Regards,

Lauren

---

**Lauren C. Doyle** | Milbank
28 Liberty Street | New York, NY 10005
T: +1 212.530.5053 | F: +1 212.822.5053
ldoyle@milbank.com | www.milbank.com

**From:** Valentino, Luke [mailto:lvalentino@sidley.com]
**Sent:** Friday, April 01, 2016 4:09 PM
**To:** Doyle, Lauren; Golenbock, Scott; Kinney, Brian
**Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia
**Subject:** Revised Molycorp Credit Bid Agreement

Attached is a revised version of the credit bid agreement. This version incorporates your proposal regarding the capitalization of unpaid fees and the removal of the rights offering. As such, it is consistent with the terms of the settlement agreement and in final form. Please confirm.

**LUKE J. VALENTINO**

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 7696
lvalentino@sidley.com
www.sidley.com




***********************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

***********************************************************************************************

=================================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

=================================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

Case 15-11357-CSS    Doc 1622-6   Filed 04/15/16   Page 1 of 28

# EXHIBIT F

| | |
|---|---|
| **From:** | Doyle, Lauren |
| **To:** | Ludwig, Jillian; Golenbock, Scott; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel |
| **Cc:** | Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua |
| **Subject:** | Re: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement |
| **Date:** | Friday, April 15, 2016 6:22:00 PM |
| **Attachments:** | image001.png |

Jill,

As discussed on our call, we think the best way to move this forward is for our clients to speak directly. We are happy to arrange this call over the weekend. Let us know what times work for your client or we can find out from Oaktree what times work for them.

Regards,

Lauren

_____

Lauren C. Doyle | Milbank

28 Liberty Street | New York, NY 10005

T: +1 212.530.5053 | F: +1 212.822.5053

ldoyle@milbank.com| www.milbank.com

**From:** Ludwig, Jillian
**Sent:** Friday, April 15, 2016 3:09 PM
**To:** Doyle, Lauren; Golenbock, Scott; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Lauren and Scott,

Are you available for an initial lawyer's only call at 2:30 CT / 3:30 ET to discuss?

We can use my dial-in:

1-888-446-7584

Code: 546 902

iPhone: 1-888-446-7584;;546902#

Regards,

Jill

**JILLIAN K. LUDWIG**

Associate

**SIDLEY AUSTIN LLP**

+1 312 853 7523

jillian.ludwig@sidley.com

**From:** Doyle, Lauren [mailto:LDoyle@milbank.com]
**Sent:** Friday, April 15, 2016 1:21 PM
**To:** Golenbock, Scott; Ludwig, Jillian; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Jill,

As I mentioned on our call, Oaktree is available to get on a principals call to discuss the open issues. Let us know what works.

Thanks,

Lauren

_____

**Lauren C. Doyle** | Milbank

28 Liberty Street | New York, NY 10005

T: +1 212.530.5053 | F: +1 212.822.5053

ldoyle@milbank.com| www.milbank.com

**From:** Golenbock, Scott
**Sent:** Friday, April 15, 2016 2:12 PM
**To:** 'Ludwig, Jillian'; Leblanc, Andrew; Doyle, Lauren; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

All, revised drafts are attached, which are sent subject to our client's review and comments. Please let us know when you're available for a call to discuss.

Scott

_____

**Scott Golenbock** | Milbank

28 Liberty Street | New York, NY 10005

T: +1 212.530.5181 | F: +1 212.530.5219

SGolenbock@milbank.com | www.milbank.com

**From:** Ludwig, Jillian [mailto:jillian.ludwig@sidley.com]
**Sent:** Thursday, April 14, 2016 7:23 PM
**To:** Leblanc, Andrew; Doyle, Lauren; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua

**Subject:** Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Subject to FRE 408

All,

Attached please find the Second Amended Credit Bid Agreement and Direction and the SNR LLC Agreement, in connection with tomorrow's closing.

Please note that these documents remain subject to the comments and approval of JHL, QVT, the Trustee, and the Collateral Agent.

Regards,

Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

---

**From:** Doyle, Lauren [mailto:LDoyle@milbank.com]
**Sent:** Wednesday, April 06, 2016 3:44 PM
**To:** Valentino, Luke; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel; Leblanc, Andrew
**Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia; jbrody@kramerlevin.com
**Subject:** RE: Revised Molycorp Credit Bid Agreement

Subject to FRE 408

As discussed with Matt, attached is a revised mark-up of the Credit Bidding Agreement. Please note that this draft has not been reviewed by Oaktree and remains subject to their review, comment, and approval in all respects and subject to change.

Please let us know if you would like to have a call to discuss.

Regards,

Lauren

---

Lauren C. Doyle | Milbank
28 Liberty Street | New York, NY 10005
T: +1 212.530.5053 | F: +1 212.822.5053
ldoyle@milbank.com| www.milbank.com

**From:** Valentino, Luke [mailto:lvalentino@sidley.com]
**Sent:** Friday, April 01, 2016 4:09 PM
**To:** Doyle, Lauren; Golenbock, Scott; Kinney, Brian
**Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia
**Subject:** Revised Molycorp Credit Bid Agreement

Attached is a revised version of the credit bid agreement. This version incorporates your proposal regarding the capitalization of unpaid fees and the removal of the rights offering. As such, it is consistent with the terms of the settlement agreement and in final form. Please confirm.

**LUKE J. VALENTINO**

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 7696
lvalentino@sidley.com
www.sidley.com

SIDLEY 

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

=================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

=================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail

Case 15-11357-CSS    Doc 1022-6    Filed 04/15/16    Page 4 of 28

message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

# EXHIBIT G

| | |
|---|---|
| **From:** | Ludwig, Jillian |
| **To:** | Leblanc, Andrew; Doyle, Lauren; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel |
| **Cc:** | Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua; Horowitz, Gregory |
| **Subject:** | Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement |
| **Date:** | Saturday, April 16, 2016 5:22:35 PM |
| **Attachments:** | Second Amended Credit Agreement and Direction.pdf |
| | SNR LLC Agreement.pdf |
| | CP Redline - Molycorp Newco LLC Agreement v 14 to v 17.pdf |
| | CP Redline - Second Amended Credit Agreement and Direction v 13 to v 16.pdf |

All,

In connection with the closing of the Molycorp Minerals Sale, and in accordance with the terms of the prepetition Collateral Agency Agreement and the 10% Noteholder Group Settlement, attached please find the LLC Agreement and the Second Amended Credit Bid Agreement and Direction, with redlines against the versions that were circulated to you on Thursday. Please return Oaktree's signature page to the Joinder to the LLC Agreement to effectuate SNR's issuance to Oaktree of its pro rata interest (being 35.283%) of the common units in SNR.

Regards,

Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

*********************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

*********************************************************************************************

Case 15-11357-CSS    Doc 1022-8    Filed 04/15/16    Page 2 of 28

# EXHIBIT H

| | |
|---|---|
| **From:** | Ludwig, Jillian |
| **To:** | Khalil, Samuel; Doyle, Lauren |
| **Cc:** | Golenbock, Scott; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua; Gregory Horowitz |
| **Subject:** | RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement |
| **Date:** | Saturday, April 16, 2016 7:04:12 PM |
| **Attachments:** | image001.png |

Samuel,

We took Lauren's suggestion back to our clients following our call with her yesterday. Our clients do not wish to participate in a business-to-business meeting.

Regards,
Jill


Sent with Good Work (www.good.com)

---

**From:** Khalil, Samuel <SKhalil@milbank.com>
**Date:** Saturday, Apr 16, 2016, 5:11 PM
**To:** Doyle, Lauren <LDoyle@milbank.com>
**Cc:** Ludwig, Jillian <jillian.ludwig@sidley.com>, Golenbock, Scott <SGolenbock@milbank.com>, Leblanc, Andrew <ALeblanc@milbank.com>, Kinney, Brian <BKinney@milbank.com>, Ebberson, James <JEbberson@milbank.com>, Dunne, Dennis <DDunne@milbank.com>, Valentino, Luke <lvalentino@sidley.com>, Clemente, Matthew A. <mclemente@sidley.com>, Sekhon, Vijay S. <vsekhon@sidley.com>, Box, John R. <jbox@sidley.com>, Shi, Sylvia <sylvia.shi@sidley.com>, Brody, Joshua <JBrody@KRAMERLEVIN.com>
**Subject:** Re: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

We have not received a response to this email, yet you are sending out documents. Are you ignoring it intentionally?

---

**Samuel A. Khalil** | Milbank
28 Liberty Street | New York, NY 10005
P: +1 212.530.5015 | F: +1 212.822.5015
skhalil@milbank.com | www.milbank.com

On Apr 15, 2016, at 6:22 PM, Doyle, Lauren <LDoyle@milbank.com> wrote:

> Jill,
>
> As discussed on our call, we think the best way to move this forward is for our clients to speak directly. We are happy to arrange this call over the weekend. Let us know what times work for your client or we can find out from Oaktree what times work for them.
>
>
> Regards,
> Lauren
>
> ---
> Lauren C. Doyle | Milbank
> 28 Liberty Street | New York, NY 10005
> T: +1 212.530.5053 | F: +1 212.822.5053
> ldoyle@milbank.com | www.milbank.com

**From:** Ludwig, Jillian
**Sent:** Friday, April 15, 2016 3:09 PM
**To:** Doyle, Lauren; Golenbock, Scott; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Lauren and Scott,
Are you available for an initial lawyer's only call at 2:30 CT / 3:30 ET to discuss?
We can use my dial-in:
1-888-446-7584
Code: 546 902
iPhone: 1-888-446-7584;;546902#
Regards,
Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

**From:** Doyle, Lauren [mailto:LDoyle@milbank.com]
**Sent:** Friday, April 15, 2016 1:21 PM
**To:** Golenbock, Scott; Ludwig, Jillian; Leblanc, Andrew; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Jill,

As I mentioned on our call, Oaktree is available to get on a principals call to discuss the open issues. Let us know what works.

Thanks,

Lauren

---

**Lauren C. Doyle | Milbank**
28 Liberty Street | New York, NY 10005
T: +1 212.530.5053 | F: +1 212.822.5053
ldoyle@milbank.com | www.milbank.com

**From:** Golenbock, Scott
**Sent:** Friday, April 15, 2016 2:12 PM
**To:** 'Ludwig, Jillian'; Leblanc, Andrew; Doyle, Lauren; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** RE: Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

All, revised drafts are attached, which are sent subject to our client's review and comments. Please let us know when you're available for a call to discuss.

Scott

---

**Scott Golenbock | Milbank**
28 Liberty Street | New York, NY 10005
T: +1 212.530.5181 | F: +1 212.530.5219
SGolenbock@milbank.com | www.milbank.com

**From:** Ludwig, Jillian [mailto:jillian.ludwig@sidley.com]
**Sent:** Thursday, April 14, 2016 7:23 PM
**To:** Leblanc, Andrew; Doyle, Lauren; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel
**Cc:** Valentino, Luke; Clemente, Matthew A.; Sekhon, Vijay S.; Box, John R.; Shi, Sylvia; Brody, Joshua
**Subject:** Molycorp - Second Amended Credit Bid Agreement and Newco LLC Agreement

Subject to FRE 408

All,

Attached please find the Second Amended Credit Bid Agreement and Direction and the SNR LLC Agreement, in connection with tomorrow's closing.

Please note that these documents remain subject to the comments and approval of JHL, QVT, the Trustee, and the Collateral Agent.

Regards,

Jill

**JILLIAN K. LUDWIG**
Associate

**SIDLEY AUSTIN LLP**
+1 312 853 7523
jillian.ludwig@sidley.com

> **From:** Doyle, Lauren [mailto:LDoyle@milbank.com]
> **Sent:** Wednesday, April 06, 2016 3:44 PM
> **To:** Valentino, Luke; Golenbock, Scott; Kinney, Brian; Ebberson, James; Dunne, Dennis; Khalil, Samuel; Leblanc, Andrew
> **Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia; jbrody@kramerlevin.com
> **Subject:** RE: Revised Molycorp Credit Bid Agreement
>
> Subject to FRE 408
>
> As discussed with Matt, attached is a revised mark-up of the Credit Bidding Agreement. Please note that this draft has not been reviewed by Oaktree and remains subject to their review, comment, and approval in all respects and subject to change.
>
> Please let us know if you would like to have a call to discuss.
>
> Regards,
>
> Lauren
>
> ---
>
> **Lauren C. Doyle | Milbank**
> 28 Liberty Street | New York, NY 10005
> T: +1 212.530.5053 | F: +1 212.822.5053
> ldoyle@milbank.com | www.milbank.com

> **From:** Valentino, Luke [mailto:lvalentino@sidley.com]
> **Sent:** Friday, April 01, 2016 4:09 PM
> **To:** Doyle, Lauren; Golenbock, Scott; Kinney, Brian
> **Cc:** Clemente, Matthew A.; Sekhon, Vijay S.; Ludwig, Jillian; Box, John R.; Shi, Sylvia
> **Subject:** Revised Molycorp Credit Bid Agreement
>
> Attached is a revised version of the credit bid agreement. This version incorporates your proposal regarding the capitalization of unpaid fees and the removal of the rights offering. As such, it is consistent with the terms of the settlement agreement and in final form. Please confirm.
>
> **LUKE J. VALENTINO**
>
> **SIDLEY AUSTIN LLP**
> One South Dearborn



Chicago, IL 60603
+1 312 853 7696
lvalentinp@sidley.com
www.sidley.com

*************************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*************************************************************************************************


============================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or
agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or
copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete
this e-mail message from your computer.


============================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent
responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-
mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from
your computer.


============================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible
for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly
prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

# EXHIBIT I

Execution Version Milbank Comments 4/19/16

## SECURE NATURAL RESOURCES LLC

LIMITED LIABILITY COMPANY AGREEMENT

Dated as of April 15, 2016

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

**Page(s)**

ARTICLE I DEFINITIONS ............................................................................................... 1

    SECTION 1.1    Definitions ............................................................................. 1

    SECTION 1.2    Definitions; Cross-References ............................................ 1

    SECTION 1.3    Interpretation ....................................................................... 1

ARTICLE II GENERAL PROVISIONS ........................................................................... 1

    SECTION 2.1    Formation ............................................................................. 1

    SECTION 2.2    Name ..................................................................................... 1

    SECTION 2.3    Term ...................................................................................... 1

    SECTION 2.4    Purpose; Powers .................................................................. 1

    SECTION 2.5    Foreign Qualification ......................................................... 1

    SECTION 2.6    Registered Office; Registered Agent; Principal Office; Other Offices ................................................................................... 1

    SECTION 2.7    Tax Classification ............................................................... 1

ARTICLE III CLASSES OF UNITS; THE MEMBERS .................................................. 1

    SECTION 3.1    Names, Addresses and Units of Members; Admission ... 1

    SECTION 3.2    Units ..................................................................................... 1

    SECTION 3.3    Action by the Members ...................................................... 1

    SECTION 3.4    Certain Reorganizations ..................................................... 1

    SECTION 3.5    Freedom to Pursue Opportunities ..................................... 1

    SECTION 3.6    Cooperation with an Initial Public Offering .................... 1

    SECTION 3.7    No Appraisal Rights ........................................................... 1

ARTICLE IV MANAGEMENT OF THE COMPANY ................................................... 1

    SECTION 4.1    Board of Managers; Delegation of Authority and Duties ... 1

**Execution Version**

SECTION 4.2    Establishment of the Board ............................................ 1

SECTION 4.3    Board Meetings ...................................................................... 1

SECTION 4.4    Approval or Ratification of Acts or Contracts ................. 1

SECTION 4.5    Action by Written Consent or Telephone Conference ...... 1

SECTION 4.6    Officers and Agents .............................................................. 1

ARTICLE V DISTRIBUTIONS ......................................................................... 1

SECTION 5.1    Distributions .......................................................................... 1

SECTION 5.2    Security Interest and Right of Set-Off or Recoupment ...... 1

ARTICLE VI TRANSFERABILITY OF INTERESTS; ADMISSION AND
RESIGNATION OF MEMBERS ......................................................................... 1

SECTION 6.1    Restrictions on Transfer ...................................................... 1

SECTION 6.2    Right of First Refusal .......................................................... 1

SECTION 6.3    Tag-Along Rights .................................................................. 1

SECTION 6.4    Drag-Along Rights ................................................................ 1

SECTION 6.5    Representations, Warranties and Covenants in Connection with
Sales ......................................................................................... 1

SECTION 6.6    Permitted Transfers .............................................................. 1

SECTION 6.7    Admission of Additional Members ...................................... 1

SECTION 6.8    Effect of Transfer .................................................................. 1

ARTICLE VII PREEMPTIVE RIGHTS ............................................................ 1

SECTION 7.1    Determination by Board ...................................................... 1

ARTICLE VIII REGISTRATION RIGHTS ...................................................... 1

SECTION 8.1    Demand Registration ............................................................ 1

SECTION 8.2    Piggyback Registration ........................................................ 1

SECTION 8.3    Expenses of Registration ...................................................... 1

| SECTION 8.4 | Obligations of the Company | 1 |
|---|---|---|
| SECTION 8.5 | Indemnification | 1 |
| SECTION 8.6 | Information by Holder | 1 |
| SECTION 8.7 | Assignment of Registration Rights | 1 |
| SECTION 8.8 | Delay of Registration | 1 |
| SECTION 8.9 | Limitations on Subsequent Registration Rights | 1 |
| SECTION 8.10 | Rule 144 and 144A | 1 |
| SECTION 8.11 | "Market Stand Off" Agreement | 1 |
| SECTION 8.12 | Termination of Registration Rights | 1 |

ARTICLE IX INFORMATION RIGHTS ... 1

| SECTION 9.1 | Books and Records | 1 |
|---|---|---|
| SECTION 9.2 | Fiscal Year | 1 |
| SECTION 9.3 | Accounting and Financial Matters | 1 |

ARTICLE X REPRESENTATIONS, WARRANTIES AND COVENANTS ... 1

| SECTION 10.1 | Representations, Warranties and Covenants of Each of the Parties | 1 |
|---|---|---|
| SECTION 10.2 | Additional Representations, Warranties and Covenants of the Company | 1 |

ARTICLE XI LIABILITY, EXCULPATION, INDEMNIFICATION ... 1

| SECTION 11.1 | Liability | 1 |
|---|---|---|
| SECTION 11.2 | Exculpation | 1 |
| SECTION 11.3 | Indemnification | 1 |
| SECTION 11.4 | Exception to Right of Indemnification | 1 |
| SECTION 11.5 | Advancement of Expenses | 1 |
| SECTION 11.6 | Notice of Proceedings | 1 |

SECTION 11.7   Non-Exclusivity; Survival of Rights; Primacy of Indemnification; Subrogation .......... 1

ARTICLE XII DISSOLUTION; WINDING UP .......... 1

SECTION 12.1   Dissolution .......... 1

SECTION 12.2   Winding Up .......... 1

SECTION 12.3   Order of Distribution .......... 1

SECTION 12.4   No Resignation or Removal .......... 1

ARTICLE XIII MISCELLANEOUS .......... 1

SECTION 13.1   Confidentiality .......... 1

SECTION 13.2   Notices .......... 1

SECTION 13.1   Amendments and Waivers .......... 1

SECTION 13.2   Governing Law .......... 1

SECTION 13.3   Jury Trial .......... 1

SECTION 13.4   Successors and Assigns .......... 1

SECTION 13.5   Entire Agreement .......... 1

SECTION 13.6   No Effect Upon Lending Relationships .......... 1

SECTION 13.7   Counterparts .......... 1

SECTION 13.8   Section Titles .......... 1

SECTION 13.9   Severability .......... 1

SCHEDULE A        List of Members
EXHIBIT A          Form of Joinder Agreement

**Execution Version**

# LIMITED LIABILITY COMPANY AGREEMENT OF
# SECURE NATURAL RESOURCES LLC

This Limited Liability Company Agreement (this "Agreement") of Secure Natural Resources LLC, a Delaware limited liability company (the "Company"), dated and effective as of April 15, 2016, is entered into by and among the Company, the Members (as defined below) set forth in Schedule A hereto (the "Initial Members") and each other Person who becomes a Member in accordance with the terms of this Agreement.

## RECITALS

WHEREAS, the Company was formed on February 24, 2016 as a limited liability company under the Act by the filing of the Certificate of Formation of the Company (the "Certificate") with the office of the Secretary of State of the State of Delaware; and

WHEREAS, on the date hereof, the Initial Members are acquiring Common Units (as defined below) in the Company in exchange for certain indebtedness held by the Initial Members and issued by Molycorp, Inc., a Delaware corporation ("Molycorp") in accordance with the Asset Purchase Agreement (as defined below), and all parties hereto desire to set forth the terms and conditions of the ownership, management and operation of the Company.

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.1        Definitions.  For purposes of this Agreement, the following terms shall have the following meanings:

"10% Notes" means the 10% Senior Secured Notes issued by Molycorp pursuant to the Indenture dated as of May 25, 2012 among Molycorp, the Guarantors party thereto, and UMB Bank, N.A., as successor trustee to Wells Fargo Bank, National Association.

"Act" means the Delaware Limited Liability Company Act, Title 6, §§ 18-101, et seq.

"Affiliate" means, with respect to any Person, (i) any other Person that Controls, is Controlled by, or is under common Control with such Person, and (ii) any investment fund or account sponsored or managed by such Person or any other Person that Controls, is Controlled by, or is under common Control with such Person; and the term "Affiliated" has a meaning correlative to the foregoing.  No Member shall be deemed to be an Affiliate of

1

another Member solely due to a Member's ownership of Securities or by virtue of this Agreement.[1]

Notwithstanding the foregoing, the Company, its Subsidiaries and its other Controlled Affiliates shall not be considered Affiliates of any Member.

"Applicable Law" means, with respect to any Person, all provisions of laws, statutes, ordinances, rules, regulations, permits, certificates, judgments, decrees or orders of any Governmental Authority applicable to such Person.

"Asset Purchase Agreement" means that Asset Purchase Agreement, dated April 15, 2016, by and among Molycorp, the other sellers party thereto and the Company.

"beneficial owner" has the meaning ascribed to such term in Rule 13d-3 of the Exchange Act.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York, New York are authorized or required by law to be closed.

"Common Member" means a Member that owns any Common Units.

"Common Unit" means a Unit representing a limited liability company interest in the Company with the rights and obligations specified in this Agreement with respect to Common Units.

"Closing Date" means April 15, 2016.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Covered Person" means (a) each current or former Officer or Manager, in each case in his, her or its capacity as such, or in his or her capacity as a director, officer, employee or agent of another limited liability company or corporation, partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, where serving at the request of the Company, and each such Person's successors, heirs, estates or legal representatives, (b) each Person, if any, to whom or which any rights or responsibilities of the Board hereunder have been assigned, delegated, designated or otherwise Transferred, (c) any Affiliate, in his, her or its capacity as such, of each Member or of any Person set forth in clause (b), and (d) each director, officer, member, manager, shareholder, trustee, employee, partner, beneficiary, Affiliate, agent and Controlling Person, in his, her or its capacity as such, of each Member or of any other Person set forth in clauses (b) or (c); in each case in

---

[1] **Note to Sidley: Per the term sheet previously circulated as an attachment to the Credit Bid Agreement, customary limitations on affiliate transactions need to be added.**

2

**Execution Version**

clauses (a), (b), (c) and (d) whether or not such Person continues to have the applicable status referred to in such clauses.

"Credit Bid Agreement" means the Second Amended and Restated Credit Bid Agreement and Direction dated as of April 15, 2016 by and among (i) JHL Capital Group Holdings One LLC, QVT Fund V LP, QVT Fund IV LP, and Quintessence Fund L.P., (ii) UMB Bank, N.A., (iii) Wells Fargo Bank, National Association, and (iv) the Company.

"Disabling Conduct" means, in respect of any Person, an act or omission (a) that is a criminal act by such Person that such Person had no reasonable cause to believe was lawful, (b) that constitutes fraud, bad faith, gross negligence or willful misconduct by such Person or (c) that is a material violation of this Agreement or such Person's employment, consulting or similar agreement with the Company or any of its Subsidiaries.

"Distributable Assets" means all cash receipts, and, if distribution thereof is determined to be desirable by the Board, other assets of the Company from any and all sources, reduced by operating expenses, payments (if any) required to be made in connection with any loan to the Company and any reserves established by the Board in good faith for unpaid expenses, contingent obligations or other liabilities.

"Encumbrance" means any charge, claim, community or other marital property interest, right of first option, right of first refusal, mortgage, pledge, lien, security interest or other encumbrance (except as resulting from the express terms of this Agreement).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Fair Market Value" means, with respect to any Unit, property or asset, as of any date of determination, the fair market value of such Unit, property or asset as determined by the Board in good faith.

"Governmental Authority" means any international, national, federal, state, provincial or local governmental, regulatory or administrative authority, agency, commission, court, tribunal, arbitral body or self-regulated entity, whether domestic or foreign.

"Holder" means any Member owning Registrable Securities, securities exercisable for or convertible into Registrable Securities or securities exercisable for securities convertible into Registrable Securities.

"Initial Public Offering" means the first underwritten public offering and sale of common equity of a Person (including, in the case of the Company or any of its Subsidiaries, any entity created and used as a vehicle for offering the securities of the Company or any of its Subsidiaries, as the case may be) to the public pursuant to an effective registration statement filed with the SEC pursuant to the Securities Act; provided, that an Initial Public Offering shall

3

not include an offering made on Form S-4 or Form S-8 (or any successor form) in connection with a business acquisition or combination or an employee benefit plan, respectively.

"JHL" means JHL Capital Group Holdings One LLC, its Affiliates and its and its Affiliates' respective successors and assigns.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit A attached hereto.

"Member" means each Person that is a party to this Agreement, owns Units and has been admitted (but has not subsequently ceased to be a Member in accordance herewith) as a member of the Company in accordance with the terms of this Agreement and the Act. The Members shall collectively constitute the "members" (as that term is defined in the Act) of the Company.

"Options" shall mean any rights or options to subscribe for, purchase or otherwise acquire Units granted pursuant to any employment or consulting agreement with the Company or its Subsidiaries or pursuant to any equity compensation plan or program of the Company.

"Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"Prospectus" means the prospectus included in any Registration Statement, all amendments and supplements to such prospectus, including post-effective amendments, and all other material incorporated by reference in such prospectus.

"QVT" means each of QVT Fund V LP, QVT Fund IV LP, and Quintessence Fund L.P., each of their Affiliates and each of their and their Affiliates' respective successors and assigns.

"register", "registered" and "registration" means a registration effected pursuant to a registration statement filed with the SEC (the "Registration Statement") in compliance with the Securities Act, and the declaration or ordering by the SEC of the effectiveness of such Registration Statement.

"Registrable Securities" means (i) the Units owned (whether now owned or hereafter acquired) by a Holder or any Transferee to the extent permitted by Section 8.7 and Section 8.12 hereof, and (ii) any Units issued as (or as of any such date of determination then currently issuable upon the conversion or exercise of any warrant, right or other security that is issued as) a dividend or other distribution with respect to, or in exchange or in replacement of, the Units contemplated by the immediately foregoing clause (i); provided, however, that Units shall cease to be treated as Registrable Securities if (a) a Registration Statement covering such Units has been declared effective by the SEC and such Units have been disposed of pursuant to such effective Registration Statement, (b) a Registration Statement on Form S-8 covering such Units is effective, (c) such Units are sold pursuant to Rule 144 promulgated under the

4

Securities Act or may be sold pursuant to Rule 144 promulgated under the Securities Act without any time, volume or manner of sale limitations, or (d) such Units cease to be outstanding.

"Registration Expenses" means any and all expenses incident to the performance by the Company of its obligations under Article VIII hereof, including (i) all SEC and stock exchange registration and filing fees (including, if applicable, the fees and expenses of any "qualified independent underwriter," as such term is defined in Rule 5121 of the Financial Industry Regulatory Authority (or any successor provision), and of its counsel), (ii) all fees and expenses of complying with securities or "blue sky" laws (including fees and disbursements of counsel for the underwriters in connection with "blue sky" qualifications of the Registrable Securities), (iii) all printing, messenger and delivery expenses, (iv) all fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange and all rating agency fees, (v) the reasonable fees and disbursements of counsel for the Company and of its independent public accountants, including the expenses of any special audits and/or comfort letters required by or incident to such performance and compliance, (vi) any fees and disbursements of underwriters customarily paid by the issuers or sellers of securities, including liability insurance if the Company so desires or if the underwriters so require, and the reasonable fees and expenses of any special experts retained in connection with the registration, but excluding underwriting discounts and commissions and transfer taxes, if any, (vii) the reasonable fees and out-of-pocket expenses of not more than one law firm (as selected by the owners of a majority of the Registrable Securities included in such registration) incurred by all the Holders in connection with the registration; (viii) the costs and expenses of the Company relating to analyst and investor presentations or any "road show" undertaken in connection with the registration and/or marketing of the Registrable Securities and (ix) any other fees and disbursements customarily paid by the issuers of securities.

"Relative Equity Percentage" means, with respect to any Member, the fraction, expressed as a percentage, determined by dividing (a) the aggregate number of Common Units owned by such Member as of the time of determination by (b) the aggregate number of Common Units owned, as of such time of determination, by all of the Members who were Members immediately prior to the applicable Earlier Issuance.

"Sale Event" means a bona-fide, arm's-length Transfer (including a Transfer structured as a merger, reorganization, consolidation or other similar business combination) in one or a series of related transactions to a Person not Affiliated with a Member of (a) more than fifty percent (50%) of Common Units or (b) all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities" means Units and any other equity securities (or rights, options, warrants or other securities convertible into or exercisable or exchangeable for Units or other equity securities) of the Company or any of its Subsidiaries.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Securityholder" means a holder of Securities.

"Shelf Registration Statement" means a Registration Statement of the Company filed with the SEC on Form S-3 or on Form S-1 for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act (or any similar rule that may be adopted by the SEC) covering the Registrable Securities, as applicable.

"Subsidiary" means, with respect to any Person (the "parent") at any date, (a) any other corporation, limited liability company, association or other business entity of which, (i) securities or other ownership interests representing more than fifty percent (50%) of the voting power of all equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of the board of directors, managers or similar governing body thereof or (ii) the majority interest in the capital or profits of such corporation, limited liability company, association or other business entity, are owned, controlled, directly or indirectly, or held by the parent and/or one or more subsidiaries of the parent and (b) any other Person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent.

SECTION 1.2        Definitions; Cross-References.

| Terms | Section |
| --- | --- |
| Agreement | Preamble |
| Authorization Date | Section 6.2(a) |
| Board | Section 4.1(a) |
| Certificate | Recitals |
| Claims and Expenses | Section 11.3 |
| Company | Preamble |
| Common Manager | Section 4.2(b) |
| Conversion Price | Section 3.2(b) |
| Conversion Rate | Section 3.2(b) |
| Demand Registration | Section 8.1(a) |
| Demanding Members | Section 8.1(a) |
| Drag-Along Member Recipients | Section 6.4(a) |
| Drag-Along Sale | Section 6.4(a) |
| Drag-Along Sale Notice | Section 6.4(a) |
| Drag-Along Sellers | Section 6.4(a) |
| Election Notice | Section 6.2(b) |
| Eligible Tag-Along Members | Section 6.3(a) |
| Exempted Persons | Section 3.5~~3.5~~3.4(a) |
| First Refusal Period | Section 6.2(b) |
| Indemnified Party | Section 8.5(c) |
| Indemnifying Party | Section 8.5(c) |
| IPO Conversion | Section 3.6~~3.6~~3.5( |

| Terms | Section |
|---|---|
| IPO Corporation | Section 3.6 3.5(a) |
| Lock-Up Period | Section 8.11 |
| Manager | Section 4.2(a) |
| Maximum Tag-Along Period | Section 6.3(b) |
| Offer Notice | Section 6.2(a) |
| Offered Units | Section 6.2(a) |
| Officers | Section 4.6(a) |
| Original Issue Price | Section 3.2(b) |
| Other Members | Section 6.2(a) |
| Permitted Transfers | Section 6.6 |
| Piggyback Registration | Section 8.2(a) |
| Post-IPO Subject Securities | Section 3.6 3.5(b) |
| Pre-IPO Subject Securities | Section 3.6 3.5(b) |
| Pro Rata Tag-Along Share | Section 6.3(d)(i) |
| Qualified Public Offering | Section 3.2(b)(i) |
| Sale Notice | Section 6.3(a) |
| Selling Member | Section 6.3(a) |
| Similar Law | Section 10.1(p) |
| Sponsor Indemnitors | Section 11.7(d) |
| Tag-Along Participation Notice | Section 6.3(b) |
| Tag-Along Sale | Section 6.3(a) |
| Tag-Along Sale Percentage | Section 6.3(a) |
| Tag-Along Securities | Section 6.3(a) |
| Tag-Along Sellers | Section 6.3(a) |
| Tagging Members | Section 6.3(a) |
| Transfer | Section 6.1(b) |
| Transferee | Section 6.1(b) |
| Transferring Members | Section 6.2(a) |
| Transferor | Section 6.1(b) |
| Transferred | Section 6.1(b) |
| Transferring | Section 6.1(b) |
| Units | Section 3.2(a) |
| Withdrawal | Section 8.1(c) |

SECTION 1.3    <u>Interpretation</u>.  In this Agreement, except to the extent that the context otherwise requires:

(a)      the words "herein," "hereof" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision hereof;

(b)      unless otherwise specified, references to Articles, Sections, Subsections, clauses, Schedules, Exhibits, preambles and recitals are references to Articles, Sections, Subsections, clauses, Schedules, Exhibits, preambles and recitals hereof;

(c)      the table of contents hereof and the headings herein are for convenience only and shall not affect the interpretation hereof;

(d)      references to any document or agreement, including this Agreement, shall be deemed to include references to such document or agreement as amended, supplemented, replaced or restated from time to time in accordance with its terms and subject to compliance with any requirements set forth therein;

(e)      references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(f)      references to any party hereto shall include its successors and permitted assigns;

(g)      wherever the word "include," "includes" or "including" is used herein, it shall be deemed to be followed by the words "without limitation," and any list of examples following such term shall in no way restrict or limit the generality of the word or provision with respect to which such examples are provided;

(h)      the words "shall" and "will" are used interchangeably throughout this Agreement, and the use of either connotes a mandatory requirement;

(i)      the word "or" is not meant to be exclusive, and shall be interpreted as "and/or";

(j)      unless otherwise specified, references to "day" or "days" are references to calendar days;

(k)      the terms "Dollars" and "$" mean United States Dollars;

(l)      pronouns used herein, whether in masculine, feminine or neuter forms, shall be deemed to include, when appropriate, each of the masculine, feminine and neuter forms and both the singular and plural, and the grammatical construction of sentences shall be deemed to conform thereto;

8

**Execution Version**

(m)     references to any particular class of Units herein shall be deemed to include any Post-IPO Subject Securities contemplated by Section 3.63.5 or any other equity security received in connection with any combination of shares, recapitalization, merger, consolidation, or other reorganization, or by way of stock split, stock dividend or other distribution in respect of such class of Units or Post-IPO Subject Securities;

(n)     references to any time periods herein that are initiated by the receipt of a notice shall not be deemed to include the date such notice is received in the calculation of such time period; and

(o)     all parties are deemed to have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises under any provision hereof, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions hereof.

## ARTICLE II

## GENERAL PROVISIONS

SECTION 2.1     <u>Formation</u>.  The Company has been organized as a Delaware limited liability company by the execution and filing of the Certificate under and pursuant to the Act.  The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

SECTION 2.2     <u>Name</u>.  The name of the Company is "Secure Natural Resources LLC", and all Company business shall be conducted in that name or in such other names that comply with Applicable Law as the Board may select from time to time.

SECTION 2.3     <u>Term</u>.  The term of the Company commenced on the date the Certificate was filed with the office of the Secretary of State of the State of Delaware and shall continue in existence indefinitely until the Company is dissolved in accordance with the provisions hereof and of the Act.

SECTION 2.4     <u>Purpose; Powers</u>.  The purpose of the Company shall be (i) to engage in any lawful business and activities permitted by the Act or the laws of any jurisdiction in which the Company may do business, and (ii) to do all things necessary, desirable or incidental to the accomplishment of any such business and activities.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

SECTION 2.5     <u>Foreign Qualification</u>.  Prior to the Company's conducting business in any jurisdiction other than the State of Delaware, the Board shall, if it so

9

determines that such compliance is required or otherwise appropriate, cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Board or the Officers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Board or any Officer, each Member shall execute and deliver all certificates and other instruments conforming with this Agreement that are reasonably necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

SECTION 2.6    Registered Office; Registered Agent; Principal Office; Other Offices. The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by Applicable Law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by Applicable Law. The principal office of the Company shall be at such place as the Board may designate from time to time, which need not be in the State of Delaware. The Company may have such other offices as the Board may designate from time to time.

SECTION 2.7    Tax Classification. The Company is authorized to, and shall make, an election to be classified as an association taxable as a corporation on Internal Revenue Service Form 8832 and any comparable state or local form with an effective date ~~as of the day following~~no later than the Closing Date. Each Member consents to such election and shall cooperate with the Company to the extent necessary to effect such election and any similar election under state or local law. **Without the unanimous consent of the Members, no election shall be made or transaction entered into that would cause the Company (or any successor to the Company) to be treated as other than a corporation for U.S. federal income tax purposes.** Each Member acknowledges and agrees that any gain or loss recognized as a result of the exchange of creditor claims for assets contemplated by the Credit Bid Agreement shall be recognized ~~either~~ by the Member directly or by the Company prior to it being classified as an association taxable as a corporation for federal and applicable state and local income tax purposes. Each Member shall file all tax returns consistently with this Section 2.7.

## ARTICLE III

## CLASSES OF UNITS; THE MEMBERS

SECTION 3.1        Names, Addresses and Units of Members; Admission.  The names and addresses of the Members, the number and classes of Units owned by each Member are as set forth on Schedule A hereto.  Schedule A shall be revised from time to time by the Board following (a) the admission of a new Member, (b) the issuance, repurchase or Transfer of Units to reflect such issuance, repurchase or Transfer, (c) the conversion of any Units or (d) a change of address of a Member.  Each person who is executing this Agreement as of the Closing Date is admitted as a Member of the Company upon such execution and, simultaneously with such admission, the Company hereby issues to such Member the number and classes of Units set forth opposite such Member's name as set forth on Schedule A hereto.  For a period of one hundred and eighty (180) days following the Closing Date, the Company shall issue Common Units to the holders of 10% Notes who comply with the provisions of (and subject to the terms and conditions of) Section 3(b) of the Credit Bid Agreement.

SECTION 3.2        Units.

(a)        Issuance and Creation of Units.  Subject to the terms of this Agreement (including Article VII), the Company is authorized to issue equity interests in the Company designated as "Units," which shall constitute limited liability company interests under the Act. The Units shall consist initially of the Common Units, which shall have the rights, privileges, limitations, restrictions and/or obligations as set forth herein.  The total number of Units of any class that may be issued hereunder shall not be limited, and the references to Units shall be deemed to include fractional Units (which shall be calculated to the thousandth of a decimal place).  [The Board is authorized to create and issue new Units or other Securities from time to time in one or more classes, or one or more series of such classes, which classes or series (or the holders thereof) shall have, subject to the provisions of Applicable Law, such rights, preferences, privileges, limitations, restrictions and/or obligations as shall be fixed by the Board, including with respect to:  (i) the right of each class or series to receive dividends or share in distributions; (ii) maintaining separate and distinct records for each class or series; (iii) allocating specific assets, liabilities, debts, obligations and expenses to each class or series; (iv) the rights of each class or series upon dissolution and liquidation of the Company; (v) the price at which, and the terms and conditions upon which, each class or series may be redeemed by the Company, if any class or series is so redeemable; (vi) the rate at which, and the terms and conditions upon which, each class or series may be converted into another class or series of Units or other Securities; (vii) the right of the owners of each class or series to information about the Company, including limitations of the rights in Section 18-305 of the Act; and (viii) the right of each class or series to vote on Company matters.  The Board may amend this Agreement without the consent of any Member in order to effect the creation or issuance of Units or other Securities or any class or series thereof and the granting of any such rights, preferences, privileges, limitations, restrictions and/or obligations pursuant to this Section 3.2(a).][2]

---

[2] **Note to Sidley: The Board should only be permitted to issue new preferred Units if the Members have preemptive rights for any such issuance under this Agreement on customary terms.  Please see footnote below in Section 7.1.**

(b)    <u>Certificates for Units</u>.  Unless and until the Board shall determine otherwise, Units shall be uncertificated and recorded in the books and records of the Company, including <u>Schedule A</u>.  If at any time the Board shall determine to certificate Units, such certificates shall contain such legends as the Board shall determine are reasonably necessary or advisable.

SECTION 3.3          <u>Action by the Members</u>.

(a)    <u>Meetings of the Members</u>.

(i)    <u>Quorum; Actions of the Members</u>.  At all meetings of the Members, the presence of Members, in person or by proxy, owning a majority of the then outstanding Common Units required to take the action or actions to be voted upon at such meeting shall constitute a quorum for the transaction of business.  ~~Unless otherwise determined by the Board,~~ Managers shall be elected by Members owning a plurality of the Common Units that are voted in the election of Managers.  Except as otherwise provided in this Agreement, on each other matter presented to the Members for a vote, an action by the Members on such matter shall require and shall become effective upon the affirmative vote of the Members owning a majority of the then outstanding Common Units.  Each Member shall be entitled to one vote for each Common Unit held by it.  A Member shall not be obligated to abstain from voting on any matter (or vote in any particular manner) because of any interest (or conflict of interest) of such Member in such matter. ~~Except as expressly provided in this Agreement, no Members shall have any right to vote with respect to any matter hereunder under the Act, at law, in equity or otherwise with respect to the Company's affairs.~~

(ii)    <u>Meeting Place; Notice</u>.  The Board shall have the authority, without requirement for consent by any Member, to call meetings of Members, to be held within or outside the State of Delaware, in order to discuss any business that may arise at such meeting.  Meetings of Members may be called by the Board at any time and from time to time on not less than forty-eight (48) hours' notice to the Members and held at such place or places as shall be determined from time to time by the Board.  Notice of any meeting of Members shall be given in accordance with Section 13.2. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by Applicable Law.  Attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purposes of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in any waiver of notice.  Minutes of each meeting shall be prepared at the direction of the Board.

(iii)    <u>Telephonic Meetings</u>.  Members may participate in a meeting of Members by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting.  If all participants are participating by conference telephone or other communications

12

equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

(iv)    Proxies.  Members may participate in a meeting of the Members in person or by proxy.  Any such proxy may be granted in writing, by means of electronic transmission or as otherwise permitted by Applicable Law.

(b)    Action by the Members Without a Meeting.  Any vote, consent, approval or other action required or permitted to be taken by the Members may be taken without a meeting by the written consent of Members owning a majority of the Common Units.  No meeting or prior notice shall be required in connection therewith.  Such consent, writing or writings shall be filed with the minutes of the proceedings of the Members, and written copies of such consent, writing or writings shall be sent to each Member promptly, and in any event within fifteen (15) days, after such action by written consent has been taken.

SECTION 3.4 Certain Reorganizations.  The Board shall have the authority to cause the Company to change its legal form or tax status, including to amend this Agreement in accordance with Section 13.3 to accomplish such change.

**SECTION 3.4**        SECTION 3.5 Freedom to Pursue Opportunities.  Each of the parties hereto expressly acknowledges and agrees that notwithstanding any duty that may otherwise exist hereunder or at law or in equity, to the fullest extent permitted by Applicable Law:

(a)    each of the past, present and future Members and each of their respective Affiliates, officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries and agents (the foregoing Persons in this clause (a), the "Exempted Persons"), has the right to, and shall have no duty (contractual, fiduciary or otherwise) not to, directly or indirectly engage in any business, business activity or line of business, including those that are the same or similar to those of the Company or any of its Subsidiaries or may be deemed to be competing with the Company or any of its Subsidiaries; and

(b)    in the event that any Exempted Person acquires knowledge of a potential transaction or matter that may be a business opportunity for any of the Company and/or one or more of its Subsidiaries, on the one hand, and such Exempted Person or any other Person, on the other hand, such Exempted Person shall have no duty (contractual, fiduciary or otherwise) to communicate or present such business opportunity to the Company or any of its Subsidiaries or Affiliates, as the case may be, and notwithstanding any provision of this Agreement to the contrary, shall not be liable to the Company or any of its Affiliates, Members or creditors for breach of any duty (contractual, fiduciary or otherwise) by reason of the fact that such Exempted Person, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company or any of its Subsidiaries.

**SECTION 3.5**        SECTION 3.6 Cooperation with an Initial Public Offering.

13

**Execution Version**

(a)     The Board may determine at any time that the Company or any of its Subsidiaries should engage in an Initial Public Offering. In connection with any proposed Initial Public Offering approved by the Board, the Board may (i) cause this Agreement to be amended to provide for a conversion in accordance with Delaware law to a corporation or such other capital structure as the Board may determine, (ii) cause the distribution of shares, units or other equity interests of any Subsidiary of the Company to the Members in accordance with Section 5.1, (iii) form a Subsidiary holding company and distribute its shares to the Members, (iv) change the domicile of the Company or any of its Subsidiaries to another jurisdiction to facilitate any of the foregoing and/or (v) take such other steps as it deems necessary or appropriate to create a suitable vehicle for an offering, in each such case in accordance with the Act and Applicable Law (the resulting entity, the "IPO Corporation"), and in each case for the express purpose of an initial offering of the securities of such IPO Corporation for sale to the public in a registered public offering pursuant to the Securities Act (an "IPO Conversion").

(b)     In connection with any proposed IPO Conversion, at the determination of the Board, all or any portion of the Units (the "Pre-IPO Subject Securities") may be converted into or exchanged or redeemed for shares (or other equity securities and/or options at Fair Market Value) (the "Post-IPO Subject Securities"). In connection with any such conversion, exchange or redemption, the number of Post-IPO Subject Securities to be issued to the Members in respect to the Pre-IPO Subject Securities shall be determined by the Board based upon (i) the Fair Market Value of the Company on the date of the IPO Conversion as determined by the Board and (ii) the resulting relative values of the Pre-IPO Subject Securities assuming the Company is dissolved and the net proceeds are distributed to the owners of Pre-IPO Subject Securities in accordance with Section 5.1 of this Agreement. If any such conversion, exchange or redemption is effected, each Member agrees to execute and deliver all agreements, instruments and documents as may be reasonably requested or required by the Board in order to consummate such conversion, exchange or redemption.

(c)     If the Board determines to effect an IPO Conversion, each Member shall cooperate in good faith with the Board, including taking all actions reasonably requested or required by the Board, in connection with consummating the IPO Conversion (including the voting of any Units (including any voting as may be necessary to effect a transfer by continuation or to authorize an increase in share capital, whether by dissolution of the Company and creation of a new entity, amendment to this Agreement or otherwise) to approve such IPO Conversion and to take any other actions necessary or appropriate in order to effectuate an IPO Conversion). Without limiting the generality of the foregoing, in connection with the IPO Conversion, if the Board determines, the IPO Corporation and each Member shall enter into a stockholders agreement which shall have substantially identical terms and conditions (taking into account differences in ownership, type of securities and other circumstances, if any) as set forth in Sections 1.3, 2.4, 2.5, 2.6, 3.3, **and** 3.4 ~~and 3.5~~, Article IV, Article VIII, Article XI and Article XIII and any associated definitions and which shall be subject to the approval of the Board.

(d)     Prior to a distribution of the securities of a Subsidiary of the Company (other than publicly traded securities), if the Board determines, as a condition of the

14

distribution or issuance of any such securities to the Members, each Member shall enter into a stockholders agreement which shall have substantially identical terms and conditions (taking into account differences in ownership, type of securities and other circumstances) as set forth in Sections 1.3, 2.4, 2.5, 2.6, 3.3, **and** 3.4 ~~and 3.5~~, Article IV, Article VIII, Article XI and Article XIII and which shall be subject to the approval of the Board.  The Company shall withhold distributions or issuances of any such securities until such stockholders agreement or similar agreement is executed and delivered by a Member who would otherwise be entitled to receive such distribution or issuance (it being understood that any such withholding of distributions or issuances shall not constitute a breach of this Agreement or of any duty hereunder, at law, in equity or otherwise).

**SECTION 3.6**   ~~SECTION 3.7~~ No Appraisal Rights.  ~~No Person~~**Each Member** shall be entitled to ~~any~~ appraisal rights with respect to such Person's Units~~, whether individually or as part of any class or group of holders,~~ in the event of a liquidation, dissolution, merger, consolidation, Sale Event or other transaction involving the Company, any of its Subsidiaries or its or their securities ~~unless such rights are expressly provided by the agreement of merger, agreement of consolidation or other document effectuating such transaction.~~**to the same extent provided to a stockholder under the General Corporation Law of the State of Delaware.**

ARTICLE IV

MANAGEMENT OF THE COMPANY

SECTION 4.1        Board of Managers; Delegation of Authority and Duties.

(a)    Management.  The business and affairs of the Company shall be managed by a board of managers (the "Board"), which shall possess and may exercise the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company, including (i) approving all material transactions by the Company, and (ii) approving the compensation of the management of the Company.  The Members agree that, subject to the terms of this Agreement, all determinations, decisions and actions duly made or taken by the Board shall be conclusive and absolutely binding upon the Company and its successors, personal representatives and permitted assigns.

(b)    Delegation by Board.  The Board shall have the power and authority to delegate to one or more Persons any of the Board's rights and powers to manage and control the business and affairs of the Company, including to delegate to one or more Managers, Members, agents or employees of the Company (including Officers) or of a Member or any Affiliate of a Member, and to delegate by a management agreement or another agreement with, or otherwise to, other Persons.  The Board may authorize any Person (including any Member, Manager or Officer) to enter into and perform under any document on behalf of the Company.

(c)    Committees.  The Board may, from time to time, designate one or more committees, each of which shall be comprised of at least two Managers.  Any such committee, until dissolved by the Board, shall have and may exercise any or all of the authority of the Board.  At every meeting of any such committee, the presence of a majority of all the members

15

thereof shall constitute a quorum, and the affirmative vote of a majority of the members present shall be necessary for the adoption of any resolution. The Board may dissolve any committee at any time.

(d)    Managers as Agents. To the extent of their powers set forth herein, the Board (acting as a Board in accordance with this Agreement and Applicable Law) is an agent of the Company for the purpose of the Company's business and affairs, and the actions of the Board taken as the Board in accordance with such powers set forth herein shall bind the Company. Notwithstanding the last sentence of Section 18-402 of the Act, except as a resolution of the Board that is not inconsistent with this Agreement may otherwise provide, no individual Manager, in his or her capacity as such, shall have any authority to bind the Company (notwithstanding the fact that the Board, acting as the Board, may do so as provided above in this Section 4.1(d)).

(e)    Fiduciary Duties. Subject to Section ~~3.5~~**3.4**, each member of the Board shall owe to the Company and its Members the fiduciary duties that a director of a Delaware corporation owes to such corporation and its stockholders under Delaware law.

(f)    Activities of Members and Managers.

(i)    Each Member acknowledges and agrees that no Member shall, in its capacity as a Member, be bound to devote any or all of such Member's business time to the affairs of the Company, and that each Member and such Member's Affiliates do and will continue to engage for such Member's own account and for the account of others in other business ventures. Each Member acknowledges and agrees that no other Member, in its capacity as such, shall have any duties, including any fiduciary duties, to the Company or any other Member.

(ii)    Each of the Managers, in his or her capacity as a manager, shall be required to devote only such time and effort to the affairs of the Company as may be necessary to manage and operate the Company; provided, however, that, subject to the terms and conditions of any applicable employment agreements, no minimum number of hours is required to be devoted by any Manager on a weekly, monthly, annual or other basis.

SECTION 4.2        Establishment of the Board.

(a)    Size. There shall be established a Board initially composed of five (5) natural persons (each, a "Manager"). Each Manager is hereby designated as a "manager" of the Company within the meaning of Section 18-101(10) of the Act.

(b)    Initial Composition of Board. The initial Managers shall be James Litinsky, Randall Weisenburger, William R. Klesse, Jared Carney and John Park.

---

[3] **Note to Sidley: Managers should serve for reasonable terms, the length of which should be defined at this time, and be subject to re-election at the end of each term by the**

(c)    Resignation/Removal/Vacancy.[3]   Each Manager shall remain in office until his or her death, resignation or removal.   ~~Not later than 90 days after the Closing Date, the Board shall determine the length of the term of office of each Manager, including whether the Managers shall be divided into more than one class.   The Board shall provide written notice of its determination regarding such matters to each Member promptly following the conclusion of such meeting.   Thereafter, the Board may, without the consent of any Member, amend this Agreement in order to set forth the terms of office of each Manager.   Unless otherwise determined by the Board, any~~**Any** vacancies on the Board may be filled ~~only~~ by the vote or written consent of the Board.   ~~No~~**Any** Manager may be removed, with or without cause, by a vote or written consent of the Members **owning a majority of the then outstanding Common Units**.

(d)    Compensation of Managers.   The Board shall have the authority to fix the compensation of the Managers, which compensation shall be paid by the Company.   In addition, the Company shall pay the reasonable, documented and direct out-of-pocket expenses incurred by each Manager in connection with such Manager's service on the Board and its committees.

SECTION 4.3        Board Meetings.

(a)    Quorum; Actions of the Board.

(i)    A majority of the total number of Managers shall constitute a quorum for the transaction of business of the Board at a meeting of the Board and, except as otherwise provided in this Agreement, the act of a majority of the Managers present at a meeting of the Board at which a quorum is present shall be the act of the Board.

(ii)    Each Manager shall have one vote on all such matters.   A Manager who is present at a duly called meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the Person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b)    Place; Waiver of Notice.   Meetings of the Board may be held at such place or places as shall be determined from time to time by resolution of the Board.   At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by resolution of the Board.   Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not

---

**be defined at this time, and be subject to re-election at the end of each term by the Members.**
[3] **Note to Sidley: Managers should serve for reasonable terms, the length of which should be defined at this time, and be subject to re-election at the end of each term by the Members.**

lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in any waiver of notice.

(c)  Regular and Special Meetings.  Regular quarterly meetings of the Board shall be held upon notice as provided below and at such times and places as shall be designated from time to time by resolution of the Board.  Special meetings of the Board may be called on at least twenty-four (24) hours' notice to each Manager by any two Managers.  Such notice to the Managers need notshall state the purpose or purposes of, or the business to be transacted at, such meeting, except as may be otherwise required by Applicable Law.

(d)  Notice.  Notice of any meeting of the Board may be given personally (including by telephone), by mail, facsimile, electronic mail, courier or other means at the address, electronic mail address, telephone number or facsimile number of the Managers or the committee members, as applicable, shown in the Company's books and records.  Notice shall be effective and deemed to have been delivered (i) if given personally, upon delivery, (ii) if given by electronic mail or facsimile, upon dispatch, (iii) if given by courier, upon the earlier of actual delivery and one (1) day after deposit with a nationally recognized overnight courier specifying next day delivery, (iv) if given by mail, three (3) days after it is deposited in the mails (first class or airmail postage prepaid) or (v) if given by other means, when delivered to the address of the Manager set forth in the books and records of the Company.

(e)  Chairman.  The Board shall designate a Manager to serve as Chairman. The Chairman shall, unless a majority of Managers present determine otherwise, preside at all meetings of the Board.  If the Chairman is absent at any meeting of the Board, a majority of the Managers present shall designate another Manager to serve as interim Chairman for that meeting.  Without approval by the Board, the Chairman, in his or her capacity as such, shall have no authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditure or incur any obligations on behalf of the Company or authorize any of the foregoing.  The Chairman shall initially, as of the Closing Date, be James Litinsky.

SECTION 4.4    Approval or Ratification of Acts or Contracts.  Any act or contract that shall be approved or be ratified by the Board in accordance with the terms of this Agreement shall be as valid and as binding upon the Company as if it shall have been approved or ratified by every Member of the Company.

SECTION 4.5    Action by Written Consent or Telephone Conference.

(a)  Any action permitted or required by the Act, the Certificate or this Agreement to be taken at a meeting of the Board may be taken without a meeting if a consent in writing (including electronically), setting forth the action to be taken, is signed (or clearly indicated electronically) by a majority of the Managers.  Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board.  Such consent shall be filed with the minutes of the proceedings of the Board.

**Execution Version**

(b)     Subject to the requirements in this Agreement for notice of meetings, the Managers may participate in and hold a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

SECTION 4.6       Officers and Agents.

(a)     Designation and Appointment.  Without limiting the generality of Section 4.1(b), the Board may, from time to time, designate or retain one or more Persons (subject to the supervision and control of the Board and any of whom may be, but need not be, a Member) as (i) officers ("Officers") of the Company, with titles including "chairman," "chief executive officer," "president," "vice president," "treasurer," "secretary," "general manager," "director" "chief financial officer," and "controller," as and to the extent authorized by the Board or (ii) agents, consultants or other positions as may be necessary or appropriate for the conduct of the Company's business.  Any number of offices or other positions may be held by the same Person.  In its discretion, the Board may choose not to fill any office or other position for any period as it may so determine.  Officers, agents, consultants and such other Persons need not be residents of the State of Delaware or Members.  Any Officers, agents, consultants and such other Persons so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them.  Each Officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided. Each such other Person shall hold such position in accordance with the provisions of his or her appointment thereto.  Subject to Section 3.53.4, the Officers shall owe to the Company and its Members the fiduciary duties that officers of a Delaware corporation owe to such corporation and its stockholders under Delaware law.

(b)     Resignation/Removal of Officers.  Any Officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any Officer may be removed as such, either with or without cause at any time by the Board.  Except as provided in Section 11.3 and Section 11.5, designation of an Officer shall not of itself create any contractual or employment rights.

ARTICLE V

DISTRIBUTIONS

SECTION 5.1       Distributions.

(a)     Any distributions of Distributable Assets shall be made when and as declared by the Board to the holders of Common Units pro rata in accordance with the number of Common Units held by them.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to a Member on account of its interest in the Company if such distribution would violate Section 18-607 of the Act or any other Applicable Law.

SECTION 5.2     <u>Security Interest and Right of Set-Off or Recoupment</u>.  As security for any withholding tax or other liability or obligation to which the Company may be subject as a result of any act or status of any Member, or to which the Company may become subject with respect to the interest of any Member in the Company, the Company shall have (and each Member hereby grants to the Company) a security interest in all Distributable Assets distributable to such Member to the extent of the amount of such withholding tax or other liability or obligation.  The Company shall have a right of set-off or recoupment against such distributions of Distributable Assets to be made to such Member in the amount of such withholding tax or other liability or obligation.  The Company may withhold distributions or portions thereof if it is required to do so by the Code or any other provision of federal, state or local tax or other Applicable Law.  Any amount withheld pursuant to the Code or any other provision of federal, state or local tax or other Applicable Law with respect to any distribution to a Member shall be treated as an amount distributed to such Member for all purposes under this Agreement.

ARTICLE VI

TRANSFERABILITY OF INTERESTS; ADMISSION AND RESIGNATION OF MEMBERS

SECTION 6.1     <u>Restrictions on Transfer</u>.

(a)     Any purported Transfer of Securities that does not comply with the provisions of this Article VI shall be null and void *ab initio*.

(b)     No Member may directly or indirectly sell, exchange, transfer, assign, pledge, encumber or otherwise dispose of ("<u>Transfer</u>"; "<u>Transferring</u>," "<u>Transferred</u>," "<u>Transferor</u>" and "<u>Transferee</u>" having meanings correlative to the foregoing) its Securities other than any transfer that (i) is in compliance with Applicable Law (including state and federal securities laws) and (ii) will not (A) require the Company to register any class of equity under the Securities Act or the Exchange Act or (B) subject the Company to the reporting requirements under the Exchange Act, and in each case any such Transfer shall be subject to the remaining provisions of this Article VI (as applicable).  The restrictions on Transfer set out in this Section 6.1(b) shall terminate upon the earlier to occur of (i) immediately prior to the consummation of an Initial Public Offering by the Company, and (ii) a Sale Event; provided, that, for the avoidance of doubt, Transfers following any Initial Public Offering by the Company will remain subject to any applicable Lock-Up Period.

20

**Execution Version**

(c)     For the avoidance of doubt, any change in the direct or indirect ownership or control of any Member as a result of any merger, acquisition, joint venture, investment, sale of all or part of the equity, business or assets, or other transaction undertaken by a direct or indirect shareholder, member, partner or other equity owner of such Member shall not constitute a transfer by such Member of its interests in the Company or an assignment of the rights and benefits inuring to such Member thereby, so long as the primary objective of undertaking such change or divestiture is not to circumvent the restrictions on Transfer contained in this Article VI.  For the avoidance of doubt, any such change in the direct or indirect ownership or control of any Member that has the primary objective of circumventing the restrictions on Transfer contained in this Article VI shall be subject to this Article VI, including, without limitation, this Section 6.1, Section 6.2, Section 6.3 and Section 6.4.

(d)     No Member may Transfer any Securities unless (i) such Transfer (other than any Transfer solely consisting of an Encumbrance) is made on the books of the Company or its Subsidiary, as applicable, (ii) such Transfer is not in violation of any of the provisions of this Agreement and (iii) the Transferee of such Securities (if other than (A) the Company or another Member or (B) a Transferee pursuant to a sale registered under the Securities Act) becomes a party to this Agreement pursuant to Section 6.7.

(e)     Each Member acknowledges that no Securities have been registered under the Securities Act or any state securities or "blue sky" laws and that the Securities may not be Transferred except pursuant to an effective registration statement under the Securities Act and such state laws or pursuant to an exemption from registration under the Securities Act and such state laws.  Each Member agrees that it will not Transfer any Securities at any time if such action would constitute a violation of any securities laws of any applicable jurisdiction or a breach of the conditions to any exemption from registration of Securities under any such laws or a breach of any undertaking or agreement of such Member entered into pursuant to such laws or in connection with obtaining an exemption thereunder.

(f)     No Member shall grant any proxy or enter into or agree to be bound by any voting trust with respect to any Securities or enter into any agreements or arrangements of any kind with any other Member with respect to any Securities inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with other Members or owners of Securities who are not parties to this Agreement), including agreements or arrangements with respect to the acquisition, Transfer or voting of any Securities, nor shall any Member act, for any reason, as a member of a group or in concert with any other Members in connection with the acquisition, Transfer or voting of any Securities in any manner which is inconsistent with the provisions of this Agreement.

SECTION 6.2     Right of First Refusal.

(a)     Subject to compliance with all other provisions of this Agreement, any Member shall be permitted to Transfer all or any portion of such Member's Units, provided, that (except with respect to a Transfer pursuant to Section 6.3 or 6.4 or Permitted Transfers) at least 30 days prior to any such Transfer of any Units, the Member desiring to make such Transfer (the "Transferring Member") shall deliver a written notice (the "Offer Notice") to the Company, specifying in reasonable detail the identity of the prospective Transferee(s), the

number and type of Units to be Transferred (the "Offered Units") and the price and other terms and conditions of the proposed Transfer, including a description of any other agreements entered into or to be entered into by the Transferring Member and the proposed Transferee(s); provided, that if the proposed consideration for such Offered Units consists in whole or in part of something other than U.S. dollars, then the Offer Notice will also contain a good faith estimate of the value of such consideration in U.S. dollars and an explanation of the manner in which such estimate was made. The Company shall provide a copy of the Offer Notice to each other Member (in such capacity, the "Other Members") promptly after the Company's receipt thereof. The Transferring Member shall not consummate such proposed Transfer until at least 60 days after receipt of the Offer Notice by the Company and the Other Members (the "Authorization Date").

(b)      The Company may elect to purchase all (but not less than all) of the Offered Units at the price and on the other terms and conditions set forth in the Offer Notice, by delivering written notice of such election (an "Election Notice") to the Transferring Member with a copy to the Other Members within 30 days after receipt of the Offer Notice (such 30 day period referred to herein as the "First Refusal Period"). If after the expiration of such 30-day period the Company has not elected to purchase all of the Offered Units, the Other Members (or any of them) may elect to purchase all (but not less than all) of the Offered Units (pro rata in accordance with the number of Common Units held by the Other Members), at the price and on the other terms and conditions set forth in the Offer Notice, by delivering an Election Notice to the Transferring Member within 30 days after expiration of the First Refusal Period. If not all of the Other Members elect to purchase their pro rata portion of the Offered Units, the Other Members who have elected to purchase their pro rata portion of the Offered Units shall be entitled to purchase the remaining Offered Units, pro rata in accordance with the number of Common Units held by such Other Members.

(c)      If the Company or the Other Members elect to purchase all of the Offered Units from the Transferring Member, such purchase shall be consummated as soon as practicable after the delivery of the applicable Election Notice to the Transferring Member, but in any event within 60 days after the Authorization Date.

(d)      If the Company and the Other Members do not elect to purchase all of the Offered Units from the Transferring Member, the Transferring Member shall have the right, subject to compliance with Section 6.3, within the 90 days following the Authorization Date to Transfer all (but not less than all) of the Offered Units that have not been purchased by the Company or the Other Members pursuant to this Section 6.2 to the Transferee(s) specified in the Offer Notice in the amounts specified in the Offer Notice at a price not less than the price per unit specified in the Offer Notice and on other terms and conditions no more favorable to the Transferee(s) thereof than specified in the Offer Notice. Any Offered Units not so Transferred within such 90 day period shall be reoffered to the Company and the Other Members pursuant to this Section 6.2 prior to any subsequent Transfer (other than a Transfer pursuant to Section 6.3 or 6.4 or Permitted Transfers).

(e) Notwithstanding anything herein to the contrary, the Board shall be entitled to exempt any proposed Transfer of Units from the provisions of this Section 6.2.

22

SECTION 6.3        Tag-Along Rights

(a)        If, after complying with Section 6.2, one or more Members proposes to Transfer a majority of the outstanding Common Units to another Person (other than a Transfer of the Units held by a Member to such Member's Affiliates) (a "Tag-Along Sale"), such Member(s) (the "Selling Member(s)") shall deliver written notice (a "Sale Notice") of such proposed Tag- Along Sale to each of the other Members (the "Eligible Tag-Along Members") at least ten (10) Business Days prior to the consummation of such proposed Tag-Along Sale, setting forth (i) the number and class of Units proposed to be Transferred (the "Tag-Along Securities"), (ii) the amount and form of consideration to be received for such Tag-Along Securities by such Selling Member(s) and any other consideration to be received directly or indirectly by such Selling Member(s) and its Affiliates in connection with such Tag-Along Sale, (iii) any other material terms and conditions of the proposed Tag-Along Sale, including a copy of the proposed definitive agreement (if available), (iv) the date of the closing of such Tag-Along Sale, (v) the fraction, expressed as a percentage, determined by dividing the number of each class of Units proposed to be sold by the total number of such class of Units owned by the Selling Member(s) (the "Tag-Along Sale Percentage"), and (vi) an invitation to each Eligible Tag-Along Member to elect (the Eligible Tag-Along Members making such election being the "Tagging Members", and, together with the Selling Member(s), the "Tag-Along Sellers") to include in the Tag-Along Sale Units of the same class owned by such Tagging Member as of the date of the Sale Notice, the amount of which (except as contemplated in Section 6.3(d)) does not in any event exceed the Tag-Along Sale Percentage of the total number of such class of Units owned by such Tagging Member as of the date of the Sale Notice.

(b)        Upon delivery of a Sale Notice, each Eligible Tag-Along Member may elect to sell Units of the same class in such Tag-Along Sale pursuant to the same terms and conditions as agreed to by the Selling Member(s) (subject to Section 6.5), by delivering an irrevocable written notice (a "Tag-Along Participation Notice") to the Selling Member(s) within five (5) Business Days of the date of delivery of the Sale Notice, indicating its election to sell up to the number of the same class of Units in the Tag-Along Sale specified by such Eligible Tag-Along Member in such Tag-Along Participation Notice (such specified number not in any event (except as contemplated in Section 6.3(d)) to exceed the Tag-Along Sale Percentage of the total number of such class of Units owned by such Eligible Tag-Along Member as of the date of the Sale Notice).  Upon delivery of a Tag-Along Participation Notice, (i) the Tagging Member that has delivered such Tag-Along Participation Notice shall be obligated to sell to such proposed purchaser on the same terms and conditions as the Tag-Along Sale (subject to Section 6.5), concurrently with the Selling Member(s) and the other Tag-Along Sellers, the number of such class of Units set forth in the Tag-Along Participation Notice (such number not to exceed the total number of such class of Units calculated pursuant to Section 6.3(d)) so long as such sale occurs within ninety (90) days (subject to reasonable extension to the extent necessary to obtain required governmental or other approvals) after the expiration of the five (5) Business Day period for giving Tag-Along Participation Notices with respect to such Tag-Along Sale (the "Maximum Tag-Along Period"); and (ii) in accordance with Section 6.5, such Tagging Member that has delivered such Tag-Along Participation Notice shall be obligated to make, on a several, and not joint and several, basis and as to itself and not as to any other

23

Member, the same representations, warranties and covenants with respect to such Member's title to the Units and such Member's authority as the Selling Member(s) makes with respect to itself in its capacity as a Member and an owner of Units in connection with such Tag-Along Sale.

(c)     Subject to the provisions of this Section 6.3 and Section 6.5, all determinations as to whether to complete any Tag-Along Sale and as to the timing, manner and other terms of any such Tag-Along Sale shall be at the sole discretion of the Selling Member(s); provided, that the Tag-Along Sale is consummated (i) within the Maximum Tag-Along Period, (ii) at the price per Unit set forth in the Sale Notice and (iii) on terms and conditions that are not materially different than the terms and conditions set forth in the Sale Notice. Notwithstanding the foregoing, a Tag-Along Sale may be consummated by the Selling Member(s) and, if any of them so elect, one or more of the Tagging Members on less advantageous terms to them (which may include a decrease in the price per Unit) than those set forth in the Sale Notice, in which case such Tag-Along Sale, if consummated, will be consummated on such new terms and will not again be subject to the provisions of this Section 6.3 so long as such Tag-Along Sale is consummated within the Maximum Tag-Along Period and the Selling Member(s) has provided ten (10) Business Days' notice to each Tagging Member setting forth such revised terms. For the avoidance of doubt, any of the original Tagging Members that does not elect to sell on such less advantageous terms shall not be required to do so. With respect to any Tag-Along Securities referred to in a Sale Notice that are not sold by the Selling Member(s) on or prior to the expiration of the Maximum Tag-Along Period, such Tag-Along Securities will again be subject to the provisions of this Section 6.3 upon any subsequent applicable sale of such Tag-Along Securities by such Selling Member(s).

(d)     The Tag-Along Sellers shall be entitled to sell in the Tag-Along Sale a number of Common Units calculated as follows:

(i)     first there shall be allocated to each Tag-Along Seller a number of Common Units equal to the lesser of (A) the maximum number of such Common Units such Tag-Along Seller has elected to sell in the Tag-Along Sale in its Sale Notice or Tag Along Participation Notice (as applicable) and (B) the number of Common Units determined by multiplying (x) the number of such Common Units subject to the Tag-Along Sale by (y) a fraction, the numerator of which is the number of such Common Units owned by such Tag-Along Seller and the denominator of which is the total number of Common Units owned by all Tag-Along Sellers (the "Pro Rata Tag-Along Share"); and

(ii)     any remaining Common Units subject to the Tag-Along Sale shall be allocated to the Tag-Along Sellers that agree to sell in excess of their Pro Rata Tag-Along Share, *pro rata* to such Tag-Along Sellers based upon such Tag-Along Sellers' relative Pro Rata Tag-Along Shares, or as such Tag-Along Sellers may otherwise agree in writing among themselves.

(e)     This Section 6.3 shall not apply to any Transfer (i) to an Affiliate pursuant to Sections 6.6 and 6.7, (ii) in connection with any Drag-Along Sale pursuant to

Section 6.4, (iii) effected as part of any IPO Conversion, (iv) effected in connection with an Initial Public Offering, or (v) effected pursuant to Article VIII.

(f)     This Section 6.3 shall terminate upon the earlier to occur of (i) immediately prior to the consummation of an Initial Public Offering by the Company, and (ii) a Sale Event.

(g)     The rights of the Members contained in this Section 6.3 may be assigned by such Members in connection with any Transfer permitted under Article VI.

SECTION 6.4     Drag-Along Rights.

(a)     If the Board and Members holding a majority of the outstanding Common Units approve a Sale Event, such Members may give notice (a "Drag-Along Sale Notice") to all of the other Members (the "Drag-Along Member Recipients," and, together with the above-mentioned Members, the "Drag-Along Sellers") that such Members intend to enter into (or have agreed to vote the Securities they own, or to execute a written consent in lieu thereof) such Sale Event (a "Drag-Along Sale") and that such Members require the Drag-Along Member Recipients to participate in such transaction (which, subject to Section 6.5, shall include the requirement that each Drag-Along Member Recipient make the same representations, warranties and covenants as such Members make with respect to themselves in their capacity as Members and owners of Units in the Company in connection with such Drag-Along Sale). Such notice shall also specify (i) the amount and form of consideration to be received by the Drag-Along Sellers or the Company[4] and any other consideration to be received directly or indirectly by any Drag-Along Seller and/or its Affiliates in connection with such Drag-Along Sale, (ii) any other material terms and conditions of the proposed Drag-Along Sale, including a copy of the proposed definitive agreement (if available), (iii) the identity of the proposed Transferee in the proposed Drag-Along Sale, (iv) the date of anticipated completion of the proposed Drag-Along Sale (which date shall be not less than ten (10) Business Days after the date of such notice, or in the event of an amended notice pursuant to Section 6.4(d), no less than ten (10) Business Days after the date of such amended notice) and (v) the action or actions reasonably requested or required of each Drag-Along Member Recipient (without limiting those that may be reasonably requested or required in the future) in order to complete or facilitate such proposed Drag-Along Sale (including (1) the Transfer of Securities owned by the Drag-Along Member Recipient, (2) the voting by such Drag-Along Member Recipient in favor of the Drag-Along Sale and the transactions contemplated thereby and the waiver of any related appraisal or dissenters' rights and/or (3) the execution and delivery of any merger, asset purchase, security purchase, recapitalization or other agreement, as applicable). Subject to Section 6.5, upon receipt of such notice, each Drag-Along Member Recipient shall be obligated to take the actions referred to in

---

[4] **Note to Sidley: The consideration in a Drag-Along Sale should be limited to cash or publicly traded securities.**

subclause (v) above and any other actions reasonably requested by the initiating Drag-Along Sellers in connection with the Drag-Along Sale.

(b)     If a Drag-Along Sale contemplates the Transfer of less than all of the outstanding Securities of the Company, then each Drag-Along Seller shall Transfer a number and class of Securities of the Company equal to the product of the following (rounded to the nearest whole number):  (x) the number of the same class of Securities owned by such Drag-Along Seller multiplied by (y) a fraction, the numerator of which is the aggregate number of such class of Securities being Transferred in such Drag-Along Sale and the denominator of which is the aggregate number of all outstanding Securities of such class as of the date of the Drag-Along Sale.

(c)     To the extent not paid by the Company or the Transferees in such Drag-Along Sale, in connection with the completion of the Drag-Along Sale, all actual and reasonable out-of-pocket costs and expenses reasonably incurred by the Drag-Along Sellers in connection with the transaction or transactions described in the Drag-Along Notice shall be borne on a *pro rata* basis in accordance with the consideration received in respect of its Securities by each of the Drag-Along Sellers in connection with such Drag-Along Sale (as determined by the consideration such Drag-Along Seller would receive in such sale prior to reduction for any indemnification claims), to the extent such costs and expenses are incurred for the benefit of substantially all of the Drag-Along Sellers.

(d)     Subject to the provisions of this Section 6.4 and Section 6.5, all determinations to complete any Drag-Along Sale and as to the timing, manner, price and other terms of any such Drag-Along Sale shall be at the sole discretion of the initiating Drag-Along Members.  In the event that the Drag-Along Sale contemplated by a Drag-Along Sale Notice has not been completed within one-hundred and twenty (120) days after the delivery of the Drag- Along Sale Notice for such Drag-Along Sale (subject to reasonable extension to the extent necessary to obtain required governmental or other approvals), then such Drag-Along Notice shall be null and void, each Drag-Along Member Recipient shall be released from its obligations under such Drag-Along Notice and it shall be necessary for a separate Drag-Along Sale Notice to be furnished by the initiating Drag-Along Seller, and the other terms and provisions of this Section 6.4 separately complied with, in order to consummate a Drag-Along Sale pursuant to this Section 6.4.

(e)     This Section 6.4 shall terminate immediately prior to the consummation of an Initial Public Offering by the Company.

SECTION 6.5     Representations, Warranties and Covenants in Connection with Sales.  In connection with a transaction pursuant to Section 6.3 or Section 6.4, all participating Members shall be required to make, on a several, and not joint and several, basis and as to itself and not as to any other Member, the same representations, warranties and covenants with respect to title to the Units and such Member's authority with respect to themselves in their capacity as Members or owners of Securities, but no Member shall be required to make any other representations, warranties or covenants regarding the Company and/or its Subsidiaries; provided, that, notwithstanding anything to the contrary contained herein including the foregoing provisions of this Section 6.5, each Member participating in such transaction shall be

26

required (if applicable under the terms of such transaction) to provide several, and not joint and several, indemnification (if such sale contemplates indemnification) up to, but not exceeding, its *pro rata* portion (as determined by the proceeds such Member would actually receive, as compared to the proceeds all other Members would actually receive, in such sale prior, in each case, to reduction for any indemnification claims) of any such indemnification obligation if such indemnification relates to (a) representations or matters relating to the Company and its Subsidiaries and (b) such Member's individual representations, warranties and covenants including in relation to (i) such Member's ownership of, and title to, the Securities to be Transferred by such Member, (ii) such Member's authority, power and right to enter into and consummate the transaction and (iii) matters otherwise relating to such Member.  For the avoidance of doubt, no Member shall have any liability for any breach of a representation or warranty of any other Member.

SECTION 6.6        Permitted Transfers.  The procedures set forth in Section 6.2 or Section 6.3 shall not apply to any Transfer by a Member of its Securities to an Affiliate of such Member (a "Permitted Transfer").

SECTION 6.7        Admission of Additional Members.  An Affiliate of a Member or any Person otherwise seeking to be admitted as an additional or substitute Member shall (i) execute and deliver a joinder in the form attached to this Agreement as Exhibit A, signifying its agreement to be bound by all the terms and conditions hereof, which joinder shall not be effective unless accepted and countersigned by the Company and, subject to Section 6.1, which the Company shall accept and countersign as promptly as practicable, and (ii) execute and deliver any further documents and take any further actions as may be necessary or appropriate, in the reasonable determination of the Board, to make such Person an additional Member in compliance with the terms and conditions of this Agreement, and shall notify the Company of the address to which notices, consents and communications hereunder shall be sent pursuant to Section 13.2. When a Member Transfers all its Units pursuant to this Article VI, such Member shall cease to be a Member of the Company.

SECTION 6.8        Effect of Transfer.  Following a Transfer of any Unit that is permitted under this Article VI, the Transferee of such Unit shall (a) receive distributions under Article V in respect of such Unit and (b) have all rights as a Member under this Agreement.

ARTICLE VII

PREEMPTIVE RIGHTS

SECTION 7.1        Determination by Board.  Except with respect to the issuance of Common Units in accordance with Section 3(b) of the Credit Bid Agreement, each Member who holds Common Units shall be entitled to preemptive rights, on a pro rata basis, with respect to any issuance of Securities by the Company following the Closing Date; provided, however, that with respect to any issuance of Securities by the Company more than one hundred and twenty (120) days following the Closing Date, the Board shall determine the specific terms and conditions on which such preemptive rights may be exercised, including any limitations or restrictions thereon or exemptions therefrom.  Following such determination, the Board shall, without the consent of any Member, amend this Agreement in order to set forth

such specific terms, conditions, limitations, restrictions and exemptions, and shall provide written notice to each Member describing in reasonable detail such specific terms, conditions, limitations, restrictions and exemptions.][5]

ARTICLE VIII

REGISTRATION RIGHTS

The Company hereby grants to each of the Holders the registration rights set forth in this Article VIII, with respect to the Registrable Securities owned by such Holders.

SECTION 8.1        Demand Registration.

(a)        At any time on or after the date on which the Company has consummated an Initial Public Offering and is eligible to use a Form S-3 registration statement to register Securities under the Securities Act, the holders of a majority of the outstanding Common Units (the "Demanding Members") may request registration under the Securities Act of their Registrable Securities (a "Demand Registration"). The request for a Demand Registration shall be in writing and shall specify the number of Registrable Securities requested to be registered and the intended method of distribution.

(b)        Within ten (10) days after receipt of any request for a Demand Registration, the Company shall give written notice of such requested registration to all other Holders and, subject to Section 8.1(c), will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 15 days after receipt of the Company's notice.

(c)        A request for Demand Registration shall be deemed to have been effected for purposes of Section 8.1(a) if the Registration Statement relating to such Demand Registration has been declared effective by the SEC; provided, however, that if the holders of a majority of Registrable Securities held by the Demanding Members request that the Company withdraw the registration statement relating to such Demand Registration prior to it being declared effective by the SEC, or if such holders revoke such Demand Registration prior to the initial filing of a registration statement relating to such Demand Registration (any such request or revocation a "Withdrawal"), the Demanding Members shall not be entitled to make a subsequent Demand Registration prior to the date that is one-hundred and eighty (180) days after the date of such Withdrawal unless such Withdrawal is as a result of a material adverse change in the Company's business, financial condition or operating results or the market for the Company's equity securities or as a result of an event which materially and adversely affects the Demanding Members' ability to sell their Registrable Securities in compliance with the

---

[5] **Note to Sidley: The Members' preemptive rights should be set forth in this Agreement on customary terms, rather than left entirely to the Board's discretion without parameters.**

federal securities laws (other than an event that results from an act or omission by a Demanding Member).

(d)     The Company shall not be obligated to effect more than one (1) Demand Registration hereunder in any six (6) month period.

(e)     If a Demand Registration is an underwritten offering and the managing underwriters advise the Company that, in their opinion, the number of Registrable Securities requested to be included in such offering, and other securities requested to be included in such offering, exceeds the largest number of securities which can be sold therein without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the holders of a majority of the Registrable Securities requested to be registered, then the Company shall include in such registration, prior to the inclusion of any securities which are not Registrable Securities, the Registrable Securities requested to be included which in the opinion of such underwriters can be sold without adversely affecting the marketability of the offering, allocated in accordance with the following priorities:  first, the Registrable Securities requested to be included therein by the Holders that initially requested such Demand Registration, and, second, the Registrable Securities requested to be included therein by the other Holders of Registrable Securities participating in such Demand Registration, in each case pro rata among the respective Holders on the basis of the number of Registrable Securities so requested to be included therein by each such Holder.

(f)     The Company shall be entitled to postpone for up to one-hundred and eighty (180) days the filing, effectiveness or use of a Registration Statement for a Demand Registration (and the Holders of Registrable Securities participating in the related offering hereby agree not to offer or sell any Registrable Securities pursuant to such Registration Statement during such postponement or suspension) pursuant to Section 8.1(a) if the Company provides written notice to the Demanding Members requesting such registration stating that, in the good faith judgment of the Board, such filing or effectiveness would be reasonably expected to (i) interfere with or adversely affect the negotiation or completion of any material transaction or other material event that is being contemplated by the Company or (ii) involve initial or continuing disclosure obligations relating to a material event or material state of facts regarding the Company, the disclosure of which would, in the reasonable judgment of the Company, be adverse to its interests; provided, however, that in the event of such a postponement or suspension of registration, the holders of Registrable Securities initially requesting such Demand Registration shall be entitled to withdraw such request and, if such request is withdrawn, such Demand Registration shall not count as a Demand Registration hereunder, or constitute a "Withdrawal" pursuant to Section 8.1(c).

(g)     If any public offering pursuant to a Demand Registration shall involve, in whole or in part, an underwritten offering, the Company shall have the right to designate an underwriter or underwriters as the lead or managing underwriter(s) of such underwritten offering, provided that such underwriter shall be reasonably acceptable to the holders of a majority of Registrable Securities held by the Demanding Members.  The holders of Registrable Securities and the Company agree that if the Registrable Securities, or any portion thereof, are sold in any public offering involving, in whole or in part, an underwritten offering, then such

29

holders and the Company will enter into a customary underwriting agreement with the underwriter(s) selected pursuant to the preceding sentence.

SECTION 8.2        Piggyback Registration.

(a)        If at any time or from time to time the Company determines to register any of its securities, either for its own account or for the account of any party owning any Registrable Securities (other than (1) in a registration relating solely to employee benefit plans, (2) a Registration Statement on Form S-4 or S-8 (or such other similar successor forms then in effect under the Securities Act), (3) a registration pursuant to which the Company is offering to exchange its own Securities, (4) a Registration Statement relating solely to dividend reinvestment or similar plans, (5) a Shelf Registration Statement pursuant to which only the initial purchasers and subsequent transferees of debt securities of the Company or any Subsidiary that are convertible for Units and that are initially issued pursuant to Rule 144A and/or Regulation S of the Securities Act may resell such notes and sell the Units into which such notes may be converted or (6) a Demand Registration) (a "Piggyback Registration"), the Company will:

(i)        promptly (but in no event less than fifteen (15) days before the effective date of the relevant Registration Statement) deliver to each Holder written notice thereof; and

(ii)        include in such registration (and any related qualification under state securities laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests delivered within ten (10) days after delivery of such written notice from the Company by any Holders, except as set forth in Section 8.2(b).

(b)        Underwriting.  If the Company gives notice of a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 8.2(a)(i).  In such event the right of any Holder to registration pursuant to this Section 8.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  All Holders proposing to dispose of their Registrable Securities through such underwriting, together with the Company and the other parties distributing their securities through such underwriting, shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company.  If a Piggyback Registration is an underwritten offering and the managing underwriters advise the Company that, in their opinion, the number of Registrable Securities requested to be included in such offering, and other securities requested to be included in such offering, exceeds the largest number of securities which can be sold therein without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the holders of a majority of the Registrable Securities requested to be registered, then the Company shall include in such registration, prior to the inclusion of any securities which are not Registrable Securities, the Registrable Securities requested to be included which in the opinion of such underwriters can be sold without adversely affecting the marketability of the offering, allocated in accordance with the following priorities: first, the Securities the

Company proposes to sell and <u>second</u>, the Registrable Securities requested to be included in such registration, pro rata among the respective Holders thereof on the basis of the number of Registrable Securities so requested to be included therein by each such Holder.  No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration.  For the avoidance of doubt, nothing in this Section 8.2(b) is intended to diminish the number of Registrable Securities to be included by the Company in the underwriting.

(c)　　<u>Right to Terminate Registration</u>.  The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 8.2 prior to the effectiveness of such registration whether or not any Holder has elected to include Registrable Securities in such registration.

SECTION 8.3　　<u>Expenses of Registration</u>.  All Registration Expenses incurred in connection with all registrations effected pursuant to Section 8.1 or Section 8.2 shall be borne by the Company; <u>provided</u> that, for the avoidance of doubt, the Company shall not be required to pay transfer taxes or underwriters' discounts or selling commissions relating to Registrable Securities.

SECTION 8.4　　<u>Obligations of the Company</u>.  Whenever required under this Article VIII to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)　　prepare and file with the SEC a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective, and keep such Registration Statement effective for (x) the lesser of one hundred and eighty (180) days or until the Holder or Holders have completed the distribution relating thereto or (y) for such longer period as may be prescribed herein;

(b)　　prepare and file with the SEC such amendments and supplements to such Registration Statement and the prospectus used in connection with such Registration Statement as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement in accordance with the intended methods of disposition by sellers thereof set forth in such Registration Statement;

(c)　　permit (i) any Holder that (in the good faith reasonable judgment of such Holder) might be deemed to be a Controlling Person of the Company to participate in good faith in the preparation of such Registration Statement and to cooperate in good faith to include therein material, furnished to the Company in writing, that in the reasonable judgment of such Holder and its counsel should be included, and (ii) any Holder that is including Registrable Securities in such Registration Statement a reasonable opportunity to review and comment on any portions of such Registration Statement with respect to which such Holder would be obligated to provide any indemnification or contribution pursuant to Section 8.5;

(d)　　furnish to the Holders such numbers of copies of the Registration Statement and the related Prospectus, including all exhibits thereto and documents incorporated

31

by reference therein and a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them;

(e)    in the event of any underwritten public offering, enter into and perform its obligations under any applicable underwriting agreement, in usual and customary form, with the underwriter(s) of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under any such an agreement;

(f)    notify each Holder of Registrable Securities covered by such Registration Statement as soon as reasonably possible after notice thereof is received by the Company of any written comments by the SEC or any request by the SEC or any other federal or state governmental authority for amendments or supplements to such Registration Statement or such Prospectus or for additional information;

(g)    notify each Holder of Registrable Securities covered by such Registration Statement, at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(h)    notify each Holder of Registrable Securities covered by such Registration Statement as soon as reasonably practicable after notice thereof is received by the Company of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or any order by the SEC or any other regulatory authority preventing or suspending the use of any preliminary or final Prospectus or the initiation or threatening of any proceedings for such purposes, or any notification with respect to the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(i)    use its reasonable best efforts to prevent the issuance of any stop order suspending the effectiveness of any Registration Statement or of any order preventing or suspending the use of any preliminary or final Prospectus and, if any such order is issued, to obtain the withdrawal of any such order as soon as practicable;

(j)    make available for inspection by each Holder including Registrable Securities in such registration, any underwriter participating in any distribution pursuant to such registration, and any attorney, accountant or other agent retained by such Holder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, as such parties may reasonably request, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Holder, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(k)    use its reasonable best efforts to register or qualify, and cooperate with the Holders of Registrable Securities covered by such Registration Statement, the underwriters, if any, and their respective counsel, in connection with the registration or qualification of such

32

Registrable Securities for offer and sale under the securities or "blue sky" or securities laws of each state and other jurisdiction of the United States as any such Holder or underwriters, if any, or their respective counsel reasonably request in writing; provided, that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or take any action which would subject it to taxation or service of process in any such jurisdiction where it is not then so subject;

(l)     obtain for delivery to the Holders of Registrable Securities covered by such Registration Statement and to the underwriters, if any, an opinion or opinions from counsel for the Company, dated the effective date of the Registration Statement or, in the event of an underwritten offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, which opinions shall be reasonably satisfactory to such Holders or underwriters, as the case may be, and their respective counsel;

(m)     in the case of an underwritten offering, obtain for delivery to the Company and the underwriters, with copies to the Holders of Registrable Securities included in such Registration, a cold comfort letter from the Company's independent certified public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters as the managing underwriter or underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement;

(n)     use its reasonable best efforts to list the Registrable Securities covered by such Registration Statement with any securities exchange or automated quotation system on which such class or series of Registrable Securities is then listed;

(o)     provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement;

(p)     cooperate with Holders including Registrable Securities in such registration and the managing underwriters, if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold, such certificates to be in such denominations and registered in such names as such Holders or the managing underwriters may request at least two (2) Business Days prior to any sale of Registrable Securities;

(q)     use its reasonable best efforts to comply with all applicable securities laws and make available to Holders, as soon as reasonably practicable, an earnings statement satisfying the provisions of Section 11(a) of the Securities Act and the rules and regulations promulgated thereunder; and

(r)     in the case of an underwritten offering, cause the senior executive officers of the Company to participate in the customary "road show" presentations that may be reasonably requested by the underwriters and otherwise to facilitate, cooperate with and participate in each proposed offering contemplated herein and customary selling efforts related thereto.

SECTION 8.5        Indemnification.

(a)        The Company will, and does hereby undertake to, to the fullest extent permitted by Applicable Law, indemnify and hold harmless each Holder of Registrable Securities, its Affiliates and each of such Holder's and such Affiliates' respective officers, directors, trustees, employees, partners, managers, members, beneficiaries, Affiliates and agents and each Person, if any, who controls such Holder and such Affiliates, within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, and each underwriter, if any, and each Person who controls any underwriter, of the Registrable Securities owned by or issuable to such Holder, against all claims, losses, damages and liabilities (or actions in respect thereto) arising out of or based on (i) any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular, free writing prospectus or other similar document (including any related Registration Statement, notification, or the like) incident to any registration, qualification, compliance or sale effected pursuant to this Article VIII or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, (ii) any violation or alleged violation by the Company of any federal, state or common law rule or regulation applicable to the Company in connection with any such registration, qualification, compliance or sale, or (iii) any failure to register or qualify Registrable Securities in any state where the Company or its agents have affirmatively undertaken or agreed in writing (including pursuant to Section 8.4(k)) that the Company (the undertaking of any underwriter being attributed to the Company) will undertake such registration or qualification on behalf of the Holders of such Registrable Securities (provided, that in such instance the Company shall not be so liable if it has undertaken its reasonable best efforts to so register or qualify such Registrable Securities) and will reimburse, as incurred, each such Holder, each such Affiliate, each such underwriter and each such director, officer, trustee, employee, partner, manager, member, stockholder, beneficiary, Affiliate, agent and controlling Person, for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action; provided, that the Company will not be liable in any such case to the extent, but only to the extent, that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement (or alleged untrue statement) or omission (or alleged omission) made in reliance upon and in conformity with written information furnished to the Company by such Holder, Affiliate or underwriter expressly for use therein.

(b)        Each Holder (if Registrable Securities owned by or issuable to such Holder are included in such registration, qualification or compliance pursuant to this Article VIII) does hereby undertake, to the fullest extent permitted by Applicable Law, severally and not jointly, to indemnify and hold harmless the Company, each of its officers, directors, employees, stockholders, Affiliates and agents and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, each underwriter, if any, and each Person who controls any underwriter, of the Company's securities covered by such a Registration Statement, and each other Holder, each of such other Holder's Affiliates and each of such other Holder's and its Affiliates' respective officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries, Affiliates and agents and each Person, if any, who controls such Holder within

34

the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such Registration Statement, prospectus, offering circular, free writing prospectus or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, and will reimburse, as incurred, the Company, each such underwriter, each such other Holder, each Affiliate of such other Holder, and each such officer, director, trustee, employee, partner, manager, member, stockholder, beneficiary, Affiliate, agent and Controlling Person of the foregoing, for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) was made in such Registration Statement, prospectus, offering circular, free writing prospectus or other document, in reliance upon and in conformity with written information furnished to the Company by such Holder expressly for use therein; provided, however, that the aggregate liability of each Holder hereunder shall be limited to the proceeds actually received by such Holder (after underwriting discounts and commissions received by such Holder) upon the sale of the Registrable Securities giving rise to such indemnification obligation. It is understood and agreed that the indemnification obligations of each Holder pursuant to any underwriting agreement entered into in connection with any Registration Statement shall be limited to the obligations contained in this Section 8.5(b).

(c)     Each party entitled to indemnification under this Section 8.5 (the "Indemnified Party") shall give notice to the party required to provide such indemnification (the "Indemnifying Party") of any claim as to which indemnification may be sought promptly after such Indemnified Party has actual knowledge thereof, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom; provided, that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be subject to approval by the Indemnified Party (whose approval shall not be unreasonably withheld) and the Indemnified Party may participate in such defense at the Indemnifying Party's expense if representation of such Indemnified Party would be inappropriate due to actual or potential differing interests between such Indemnified Party and any other party represented by such counsel in such proceeding; provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Article VIII, except to the extent that such failure to give notice materially prejudices the Indemnifying Party in the defense of any such claim or any such litigation. An Indemnifying Party, in the defense of any such claim or litigation, may, without the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that (i) includes as a term thereof the giving by the claimant or plaintiff therein to such Indemnified Party of an unconditional release from all liability with respect to such claim or litigation and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party, and provided that any sums payable in connection with such settlement are paid by the Indemnifying Party.

(d)    In order to provide for just and equitable contribution in case indemnification is prohibited or limited by law, the Indemnifying Party, in lieu of indemnifying such Indemnified Party, to the fullest extent permitted by Applicable Law, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and such party's relative intent, knowledge, access to information and opportunity to correct or prevent such actions; provided, however, that, in any case, (i) no Holder will be required to contribute any amount in excess of the proceeds actually received by such Holder (after underwriting discounts and commissions received by such Holder) upon the sale of the Registrable Securities giving rise to such contribution obligation and (ii) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(e)    The indemnities provided in this Section 8.5 shall survive the Transfer of any Registrable Securities by such Holder.

SECTION 8.6        Information by Holder.  Each Holder of Registrable Securities that are included in any registration shall furnish to the Company such information regarding itself and the distribution proposed by it as the Company may reasonably request in writing or as shall otherwise be required in connection with any registration, qualification or compliance referred to in this Article VIII.

SECTION 8.7        Assignment of Registration Rights.  Subject to Section 8.12, the rights of the Members contained in this Article VIII may be assigned by such Members in connection with any Transfer permitted under Article VI.

SECTION 8.8        Delay of Registration.  To the fullest extent permitted by Applicable Law, no Holder shall have any right to obtain, and hereby waives any right to seek, an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Article VIII.

SECTION 8.9        Limitations on Subsequent Registration Rights.  From and after the Closing Date, the Company shall not, without the approval of Members holding a majority of the Common Units, enter into any agreement with any owner or prospective owner of any Securities of the Company that would allow such owner or prospective owner to (i) require the Company to effect a registration or (ii) include any Securities in any registration filed under Section 8.2 hereof.

SECTION 8.10    Rule 144 and 144A.  The Company agrees that, upon the request of any Holder of Registrable Securities or any prospective purchaser of Registrable Securities designated by a Holder, the Company shall promptly provide (but in any case within ten (10) days of a request) to such Holder or potential purchaser, the following information:

(a)    a brief statement of the nature of the business of the Company and any subsidiaries and the products and services they offer;

(b)    the most recent consolidated balance sheets and profit and losses and retained earnings statements, and similar financial statements of the Company for the two (2) most recent fiscal years (such financial information shall be audited, to the extent reasonably available); and

(c)    such other information about the Company, any subsidiaries, and their business, financial condition and results of operations as the requesting Holder or purchaser of such Registrable Securities shall request in order to comply with Rule 144 and Rule 144A promulgated under the Securities Act, as amended, and in connection therewith the anti-fraud provisions of the federal and state securities laws.

The Company hereby represents and warrants to any such requesting Holder and any prospective purchaser of Registrable Securities from such Holder that the information provided by the Company pursuant to this Section 8.10 will, as of their dates, not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  The Company shall also make and keep adequate and current public information with respect to the Company available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the effective date of an Initial Public Offering.

SECTION 8.11    "Market Stand Off" Agreement.  Each Holder hereby agrees that, during (i) such period (which period shall in no event exceed one hundred and eighty (180) days) following the effective date of a Registration Statement of the Company filed in connection with the Initial Public Offering as recommended by the underwriter or underwriters of such offering and (ii) such period (which period shall in no event exceed ninety (90) days) following the effective date of a Registration Statement of the Company filed under the Securities Act subsequent to the Initial Public Offering as recommended by the underwriter or underwriters of such offering and/or the Company (if applicable) (such period, the "Lock-Up Period"), it shall not, to the extent requested by the Company and/or any underwriter, sell, pledge, hypothecate, Transfer, make any short sale of, loan, grant any option or right to purchase of, or otherwise Transfer or dispose of (other than to donees who agree to be similarly bound) any Registrable Securities owned by it at any time during such period, except Registrable Securities included in such registration; provided, that any release of Registrable Securities from such agreement shall be effected among the Holders on a pro rata basis according to the Registrable Securities then owned by them.  Each Holder agrees that it shall deliver to the underwriter or underwriters of any offering to which clause (i) or (ii) is

applicable to such Holder a customary agreement reflecting its agreement set forth in this Section 8.11.

SECTION 8.12       Termination of Registration Rights.  The rights of any particular Holder under this Article VIII shall terminate as to such Holder on the date such Holder, together with its Affiliates, ceases to own five percent (5%) or more of the outstanding Common Units.

ARTICLE IX

INFORMATION RIGHTS

SECTION 9.1       Books and Records.  The Board shall cause the Company and its Subsidiaries to keep complete and accurate books of account and records with respect to the business and affairs of the Company and its Subsidiaries in which shall be entered fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by Persons engaged in businesses of a like character, including Schedule A, and to preserve all such books and records during the term of the Agreement and for a period of six (6) years thereafter.  During such period and upon furnishing reasonable advance notice, each Member and/or its authorized representatives, at its or their sole cost and expense, shall be permitted, at a location reasonably determined by the Company, to reasonably inspect and make copies of such books and records for any proper purpose and consistent with reasonable confidentiality restrictions imposed by the Company at any reasonable time during normal business hours.  Upon written request by any Member made to the Company, the Company shall provide or make available to such Member without charge true copies of this Agreement, including Schedule A, the Company's other organizational documents, and all amendments thereto and restatements thereof.

SECTION 9.2       Fiscal Year.  The fiscal year of the Company shall end on December 31 of each calendar year.

SECTION 9.3       Financial Statements and Other Information.  The Company shall deliver to each Member that (together with its Affiliates) holds at least five percent (5%) of the Common Units outstanding as of such date(s):

(i)       within 60 days after the end of each quarterly accounting period in each fiscal year, the unaudited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for each quarterly period, and consolidating and consolidated balance sheets of the Company and its Subsidiaries as of the end of such quarterly period, all prepared in accordance with generally accepted accounting principles, consistently applied, subject to the absence of footnote disclosures and to normal year-end adjustments; and

(ii)       within 120 days after the end of each fiscal year, [audited] consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal year, and consolidating and consolidated balance sheets of

the Company and its Subsidiaries as of the end of such fiscal year, setting forth in each case comparisons to the annual budget and to the preceding fiscal year, all prepared in accordance with generally accepted accounting principles, consistently applied.

**SECTION 9.4**   ~~SECTION 9.3~~ Accounting and Financial Matters.

~~(a)~~  All determinations, valuations and other matters of judgment required to be made for accounting or tax purposes under this Agreement shall be made by the Board and shall be conclusive and binding on all Members, their successors, heirs, estates or legal representatives and to any other Person, and to the fullest extent permitted by Applicable Law no such Person shall have the right to an accounting or appraisal of the assets of the Company or any successor thereto.

~~(b) The Board shall consider and make all determinations regarding the preparation of financial statements of the Company and its Subsidiaries, including the format of such financial statements, whether such financial statements shall be audited or unaudited, the frequency upon which such financial statements shall be prepared and whether such financial statements shall be delivered or otherwise made available to the Members.~~

**SECTION 9.5**        **Access. On written request stating the purpose, a Member that (together with its Affiliates) holds at least five percent (5%) of the then outstanding Common Units may make reasonable inquiries of management.**

ARTICLE X

REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 10.1        Representations, Warranties and Covenants of Each of the Parties.  Each of the parties hereto hereby represents and warrants, severally, and not jointly and severally, and as to itself and not as to any other party, to each of the other parties that, on the Closing Date and on any subsequent date on which such representing party acquires Securities from the Company or any of its Subsidiaries (and in respect of Persons who become a party to this Agreement after the Closing Date, such party hereby represents and warrants to each of the other parties on the date of its execution of this Agreement or a Joinder Agreement and on any subsequent date on which such representing party acquires Securities from the Company or any of its Subsidiaries) as follows:

(a)        Such party is duly organized or incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation and has all requisite power and authority to conduct its business as it is now being conducted and is proposed to be conducted.

(b)        Such party has the requisite limited partnership, corporate, limited liability company or other organizational power and authority, as the case may be, to execute, deliver and perform this Agreement and to consummate the transactions contemplated herein. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action, corporate

39

or otherwise, of such party. This Agreement has been duly executed and delivered by such party and constitutes his, her or its legal, valid and binding obligation, enforceable against it, him or her in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies.

(c)     The execution and delivery by such party of this Agreement, the performance by such party of its obligations hereunder and the consummation of the transactions contemplated herein by such party does not and will not violate (i) any provision of its by-laws, charter, articles of association, partnership agreement, operating agreement, trust instrument or other similar document, (ii) any provision of any material agreement to which it is a party or by which it is bound or (iii) any law, rule, regulation, judgment, order or decree to which it is subject.

(d)     No consent, waiver, approval, authorization, exemption, registration, license or declaration is required to be made or obtained by such party in connection with the execution, delivery or enforceability of this Agreement or the consummation of any of the transactions contemplated herein.

(e)     Such party is not currently in violation of any law, rule, regulation, judgment, order or decree, which violation could reasonably be expected at any time to have a material adverse effect upon the Company and its subsidiaries, taken as a whole, or such party's ability to enter into this Agreement or to perform its obligations hereunder.

(f)     There is no pending legal action, suit or proceeding that would materially and adversely affect the ability of such party to enter into this Agreement or to perform its obligations hereunder.

(g)     Such party is an "accredited investor" as defined in Rule 501(a) of the Securities Act.

(h)     Such party is acquiring Securities for its own account for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of any Applicable Law, nor with any present intention of distributing or selling the same in violation of any Applicable Law.

(i)     Such party has been advised by the Company (or a Subsidiary thereof, if applicable) and understands that (i) the offer and sale of Securities to such party has not been registered under the Securities Act or any state "blue sky" laws; (ii) the Securities must be owned indefinitely and such party must continue to bear the economic risk of an investment in the Securities unless the offer and sale of such Securities is subsequently registered under the Securities Act and all applicable state securities laws or an exemption from such registration is available; (iii) there is no established market for any of the Securities and it is not anticipated that there will be any public market for the Securities in the foreseeable future; and (iv) a notation shall be made in the appropriate records of the Company (or a Subsidiary thereof, if applicable) indicating that the Securities are subject to restrictions on Transfer and, if the

services of a securities transfer agent are engaged in the future, appropriate stop-transfer instructions will be issued to such transfer agent with respect to the Securities.

(j)  Such party's financial situation is such that such party can afford to bear the economic risk of owning the Securities for an indefinite period of time, has adequate means for providing for such party's current needs and personal contingencies and can afford to suffer a complete loss of such party's investment in the Securities.

(k)  Such party's knowledge and experience in financial and business matters is such that such party is capable of evaluating the merits and risks of the investment in the Securities.

(l)  Such party understands that the Securities are a speculative investment which involves a high degree of risk of loss of some or all of such party's investment therein, there are substantial restrictions on the transferability of the Securities and, on the Closing Date and for an indefinite period following the Closing Date, there will be no public market for the Securities and, accordingly, it may not be possible for such party to liquidate any or all of such party's investment in case of emergency, if at all.

(m)  Such party and its respective advisors have been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Company and its representatives concerning the Company and its Subsidiaries, the Asset Purchase Agreement, the organizational documents (including this Agreement) of the Company and the terms and conditions of the acquisition of the Securities and to obtain any additional information which such party or its respective advisors deems necessary.

(n)  Such party has completed its independent investigation, verification, analysis, review and evaluation of the Company and its Subsidiaries, the organizational documents (including this Agreement) of the Company and the terms and conditions of the acquisition of the Securities, in each case, as such party has deemed necessary or appropriate, and has relied solely upon such independent investigation, verification, analysis, review and evaluation in determining whether to purchase Securities of the Company or enter into this Agreement.

(o)  All information such party has provided to the Company (or a Subsidiary thereof, if applicable) and the representatives of the Company (or a Subsidiary thereof, if applicable) concerning such party and such party's financial position is complete and correct in all material respects as of the date so provided.

(p)  [Each Member hereby represents, warrants and covenants, severally, and not jointly and severally, and as to itself and not as to any other Member, to each of the other parties that, as of the date hereof and for so long as such Member holds any Units in the Company, no portion of the assets used by such party to acquire or hold the Units constitutes or will constitute the assets of (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) which is subject to Title I of ERISA, (ii) a plan, individual retirement account or other arrangement which is subject to Section 4975 of the Code or any Similar Law (as defined below) or (iii) an entity which is deemed to hold the assets of any of the foregoing

41

types of plans, accounts or arrangements for purposes of ERISA or otherwise. Each such Member agrees to (x) notify the Board and the Company immediately if any representation or warranty contained in this Section 10.1(p) becomes untrue at any time and (y) provide such information and execute and deliver such documents with respect to itself as the Company may from time to time reasonably request to verify the accuracy of such Member's representations and warranties contained in this Section 10.1(p) and/or to comply with any law, regulation or governmental order to which the Company or any of its Affiliates may be subject; provided, that such Members will in no event be obligated to provide any information or execute and deliver such documents with respect to its direct and indirect beneficial owners. "Similar Law" means any federal, state, local, non-U.S. or other law or regulation that would cause the underlying assets of the Company to be treated as assets of such Party by virtue of its interest in the Company and thereby subject the Company and the Board (or other persons responsible for the investment and operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the Code.][6]

SECTION 10.2    Additional Representations, Warranties and Covenants of the Company.

(a)    The Company hereby represents, warrants and covenants to each of the Members that, as of the Closing Date:

(i)    The Company was newly formed for purposes of completing the transactions contemplated by the Asset Purchase Agreement and does not have any liabilities except as incurred in connection therewith or disclosed to the Members in writing.

(ii)    The Company is duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to conduct its business as it is now being conducted and is proposed to be conducted.

(iii)    The Company has the requisite limited liability company power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated herein. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action of the Company. This Agreement has been duly executed and delivered by the Company and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies.

(iv)    Schedule A sets forth the names of the Members and their Units as of the Closing Date. Except as otherwise set forth in this Agreement, the Company (A) does not have any authorized or outstanding subscription, warrant, option,

[6] **Note to Sidley:  Subject to on-going review.**

convertible security or other right (contingent or otherwise) to purchase or acquire any of their Units, (B) is not committed to issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any of its Securities any evidences of indebtedness or assets and (C) has no obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of its Securities or any interest therein or to pay or make any distribution in respect thereof.

(v)     The execution and delivery by the Company of this Agreement, the performance by the Company of its obligations hereunder and the consummation of the transactions contemplated herein by the Company does not and will not violate (A) any provision of the Certificate, (B) any provision of any material agreement to which it is a party or by which it is bound or (C) any law, rule, regulation, judgment, order or decree to which it is subject.

(vi)     (A) There is no pending or, to the knowledge of the Company, threatened legal action, suit or proceeding that would materially and adversely affect the ability of the Company to enter into this Agreement or to perform its obligations hereunder and (B) there are no outstanding orders, writs, judgments, decrees, injunctions or settlements that would reasonably be expected to have a material adverse effect on the Company.

(vii)     No consent, waiver, approval, authorization, exemption, registration, license or declaration is required to be made or obtained by the Company in connection with the execution, delivery or enforceability of this Agreement or the consummation of any of the transactions contemplated hereby.

(b)     The Company shall promptly notify each Member if it determines that such Member's ownership of the Company, or indirect ownership of any Subsidiary of the Company, or any action or proposed action by the Company or any of its Subsidiaries, will likely give rise to any beneficial ownership reporting requirements of the Company or any Member under Sections 13(d) or 13(g) of the Exchange Act, or any other public disclosure or reporting requirements that require disclosure of the identity of any Member or any of its Affiliates, partners, or members.

(c)     In case of any filing or other transaction which would result in the Securities of the Company or the securities of any of its Subsidiaries being listed on any regulated stock exchange, the Company shall notify each Member at least thirty (30) days prior to such filing or other transaction and cooperate with, and take such actions as are reasonably requested by, such Member so that it can comply with and meet all restrictions and obligations applicable to it in connection with any such filing or other transaction.

ARTICLE XI

LIABILITY, EXCULPATION, INDEMNIFICATION

SECTION 11.1     Liability.  To the fullest extent permitted by Applicable Law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise,

43

shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for the repayment, satisfaction or discharge of any portion of such debt, obligation or liability solely by reason of being a Covered Person.

SECTION 11.2    Exculpation.  No Covered Person shall be liable to the Company, any of its Subsidiaries, the Board, any Member or any creditor for any Claims and Expenses arising out of any act or omission of such Covered Person to the extent that such act or omission did not constitute Disabling Conduct.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person believes are within such other Person's professional or expert competence and which such other Person the Covered Person believes has been selected with reasonable care, including information, opinions, reports or statements as to the value and amount of assets, liabilities, profits or losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

SECTION 11.3    Indemnification.  The Company and its Subsidiaries shall indemnify and hold harmless each of the Covered Persons from and against any and all liabilities, obligations, losses, damages, fines, taxes and interest and penalties thereon (other than income taxes and other taxes based on fees or other compensation received by such Covered Person from the Company), claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including reasonable and documented legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever (collectively, "Claims and Expenses") which may be imposed on, incurred by or asserted at any time against such Covered Person by reason of its status as a Covered Person, including that is in any way related to or arising out of the ownership of Securities, the control of, or ability to influence, the Company or any of its Subsidiaries or the management or administration of the Company and its Subsidiaries (if applicable) or the activities of such Covered Person pursuant to this Agreement or otherwise on behalf of the Company and its Subsidiaries; provided, that a Covered Person shall not be entitled to indemnification hereunder (a) against Claims and Expenses that are finally determined by a court of competent jurisdiction or binding arbitration to have resulted from such Covered Person's Disabling Conduct, or (b) to the extent such Claims and Expenses arise out of any economic losses or tax obligations incurred by a Covered Person as a result of its owning Securities of the Company.

SECTION 11.4    Exception to Right of Indemnification.  Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity or pay any expenses (in advance or otherwise) in connection with any claim made against a Covered Person in the following circumstances:

(a)    for which payment has actually been made to or on behalf of such Covered Person under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; provided, that the foregoing provisions of this clause (a) shall not affect the rights of a Covered Person or the Sponsor Indemnitors set forth in Section 11.7(d);

44

(b)      for an accounting of profits made from the purchase and sale (or sale and purchase) by any Covered Person of Securities within the meaning of Section 16(b) of the Exchange Act or similar provisions of state statutory law or common law; or

(c)      in connection with any claim, demand, action, suit or proceeding (or any part thereof) initiated by such Covered Person, including any claim, demand, action, suit or proceeding (or any part thereof) initiated by a Covered Person against the Company or against any other Covered Person (in its capacity as such), unless (i) the Board authorized the claim, demand, action, suit or proceeding (or such relevant part thereof) prior to its initiation or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under Applicable Law.

SECTION 11.5      Advancement of Expenses.  Subject to Section 11.4, the Company shall pay the expenses (including reasonable legal fees and expenses and costs of investigation) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding (other than a claim, demand, action, suit or proceeding brought by the Company against (i) a Member for such Member's material breach or violation of this Agreement or (ii) an employee of the Company or any of its Subsidiaries for such employee's material breach or violation of his or her employment agreement, as such expenses are incurred by such Covered Person and in advance of the final disposition of such matter); provided, that such Covered Person undertakes to repay such expenses if it is determined by agreement between such Covered Person and the Company or, in the absence of such an agreement, by a final judgment of a court of competent jurisdiction that such Covered Person is not entitled to be indemnified pursuant to Section 11.3.

SECTION 11.6      Notice of Proceedings.  Promptly after receipt by a Covered Person of notice of the commencement of any claim, demand, action, suit or proceeding against such Covered Person, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Board of the commencement of such claim, demand, action, suit or proceeding; provided, that the failure of a Covered Person to give notice as provided herein shall not relieve the Company of its obligations under Section 11.3 and Section 11.5 except to the extent that the Company is materially prejudiced by such failure to give timely notice.  In case any such claim, demand, action, suit or proceeding is brought against a Covered Person in his, her or its capacity as a current or former Member (other than a claim, demand, action, suit or proceeding by or in the right of the Company), the Company will be entitled to assume the defense of such proceeding; provided, that (i) the Covered Person shall be entitled to participate in such proceeding and to retain its own counsel at its own expense and (ii) if the Covered Person has been advised by its counsel that the proposed representation of such Covered Person and other parties by the same counsel in such matter would be inappropriate under applicable standards of professional conduct due to actual or potential conflicts of interest between the Covered Person and such other parties with respect to such matter, then the Covered Person shall have the right to control (at its own expense and with counsel reasonably satisfactory to the Company) the defense of such specific claims with respect to the Covered Person (but not with respect to the Company or any other Person); provided, further, that no Covered Person shall consent to the entry of a judgment or enter into a settlement that would require the Company to pay any

45

amounts under this Article XI without the prior written consent of the Company, such consent not to be unreasonably withheld. After notice from the Company to such Covered Person electing to assume the defense of such claim, demand, action, suit or proceeding, the Company will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. Without the consent of such Covered Person, such consent not to be unreasonably withheld, the Company will not consent to the entry of any judgment or enter into any settlement with respect to such claim, demand, action, suit or proceeding that does not include as a term thereof the giving by the claimant or plaintiff to such Covered Person of an unconditional release from all liability arising out of the claim, demand, action, suit or proceeding and all claims asserted therein.

SECTION 11.7    Non-Exclusivity; Survival of Rights; Primacy of Indemnification; Subrogation.

(a)    The rights of indemnification as provided by this Agreement are not intended to be and shall not be deemed to be exclusive of any other rights to which a Covered Person may at any time be entitled under Applicable Law, any agreement, a vote of the Members, a resolution of the Board or otherwise. No amendment, alteration or repeal of this Agreement or of any provision of this Article XI shall limit or restrict any right of a Covered Person under this Article XI in respect of any action taken or omitted by such Covered Person in his, her or its capacity as such prior to such amendment, alteration or repeal. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    Except as provided in clause (d) below, in the event of any payment under this Article XI, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of the Covered Person, who shall execute all papers required and take all action necessary to secure such rights for the Company, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(c)    Except as provided in clause (d) below, the Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that a Covered Person has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(d)    The Company hereby acknowledges that certain Covered Persons may have rights to indemnification, advancement of expenses and/or insurance provided by an Affiliated or otherwise related investment fund or investment manager or certain Affiliates of such investment fund or investment manager (collectively, the "Sponsor Indemnitors"). The Company hereby agrees (i) that the Company is the indemnitor of first resort with respect to matters that are the subject of indemnification or advancement of expenses under this Article XI except to the extent that indemnification is available to a Covered Person from another Subsidiary of the Company, in which case such other Subsidiary shall be the indemnitor of first resort if the arrangements with such other Subsidiary so provide (i.e., the Company's

46

obligations to a Covered Person pursuant to this Article XI are primary to any obligation to such Covered Person from the Sponsor Indemnitors, and any obligation of the Sponsor Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Covered Person are secondary to such obligations of the Company), (ii) that the Company shall be required to advance the full amount of expenses incurred by the Covered Persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Agreement (or any other agreement between the Company and the Covered Person), without regard to any rights a Covered Person may have against the Sponsor Indemnitors (except to the extent that any such advancement or payment is available to a Covered Person from another Subsidiary of the Company, in which case such Subsidiary shall be responsible for such advancement if the arrangements with such Subsidiary so provide), and (iii) that the Company irrevocably waives, relinquishes and releases the Sponsor Indemnitors from any and all claims against the Sponsor Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Sponsor Indemnitors on behalf of any Covered Person with respect to any claim for which a Covered Person has sought indemnification and/or advancement or payment of expenses from the Company shall affect the foregoing and the Sponsor Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Company. The Company agrees that the Sponsor Indemnitors are express third party beneficiaries of the terms of this Section 11.7(d).

## ARTICLE XII

## DISSOLUTION; WINDING UP

SECTION 12.1    Dissolution.  The Company shall be dissolved and its affairs shall be wound up upon a determination by the Board to dissolve the Company at any time.  The death, termination, retirement, dissolution, resignation, expulsion or bankruptcy of any Member shall not cause the dissolution of the Company, and following any such event the remaining Members shall continue the business of the Company.  The Company shall not be dissolved as result of there no longer being any Members of the Company if the Company is continued in accordance with Section 18-801(a)(4) of the Act.  The Members (in their capacity as such) and Managers (in their individual capacity as such but not in their collective capacity as the Board) hereby waive any rights to, and shall not petition for, judicial dissolution of the Company under Section 18-802 of the Act and any rights to petition or apply for the appointment of a liquidator, receiver or trustee under the Act or otherwise.

SECTION 12.2    Winding Up.  If the Company is dissolved pursuant to Section 12.1, the Board has the full right and discretion to manage such process, including without limitation the power to prosecute and defend suits, collect debts, dispose of property, settle and close the business of the Company, discharge the liabilities of the Company, pay reasonable costs and expenses incurred in the winding up, distribute remaining assets to Members (in accordance with Section 5.1) and execute and file a certificate of cancellation under the Act.

SECTION 12.3     Order of Distribution.  Upon any dissolution and winding up of the Company, after satisfaction (whether by payment or the making of reasonable provision for payment thereof) of any liabilities (including all contingent, conditional or unmatured claims) of the Company owed to any creditors, including any Members who are creditors (to the fullest extent permitted by Applicable Law), any remaining assets of the Company shall be paid to each of the Members in accordance with Section 5.1.

SECTION 12.4     No Resignation or Removal.  No Member has the right to resign as a Member of the Company and require repayment of all or any portion of the purchase price for its Units (if any) or redeem its Units, except in each case, in the event of the dissolution and winding up of the Company as provided in this Article XII.

ARTICLE XIII

MISCELLANEOUS

SECTION 13.1     Confidentiality.

(a)     By executing this Agreement, each Member expressly agrees, at all times during the term of the Company and thereafter and whether or not at the time such Person is a Member of the Company, to maintain the confidentiality of, and not to disclose, without the consent of the Company, to any Person other than its Affiliates (who agree to be bound or are bound by confidentiality), any direct or indirect limited partner or any current or prospective investor (in each case, who agrees to be bound or are bound by confidentiality), the Company, another Member, a Person designated by the Company or any of their respective financial planners, accountants, attorneys or other advisors (who agree to be bound or are bound by confidentiality), any information relating to the business, financial results or customers of the Company that is not generally known to the public, except in each case as otherwise required by Applicable Law or judicial or administrative process or by any regulatory or self- regulatory organization having jurisdiction and, except in the case of any Member who is employed by any entity controlled by the Company, in the ordinary course of his duties.

(b)     The Company shall not make, or allow any of its Subsidiaries to make, any public announcement, public disclosure or governmental filing that mentions any Member or beneficial owner of any Member without first notifying such Member and giving such Member a reasonable opportunity to review and comment on such announcement, disclosure or filing.

SECTION 13.2     Notices.  Whenever notice is required or permitted by this Agreement to be given, such notice shall be in writing (including facsimile or similar writing) and shall be given, if to any Member, at its address, facsimile number or email address shown in Schedule A or, if to the Company, at the following address:

Secure Natural Resources LLC
c/o JHL Capital Group LLC
900 N. Michigan Avenue
Suite 1700

Chicago, IL 60611
Attention:  Chairman

Each such notice shall be effective and shall be deemed to have been delivered (i) if given by facsimile or email, upon dispatch, (ii) if given by mail, three (3) days after it is deposited in the mails (first class or airmail postage prepaid) addressed as aforesaid, (iii) if given by courier, upon the earlier of actual delivery and one (1) day after deposit with a nationally recognized overnight courier specifying next day delivery and (iv) if given by any other means, when delivered to the address of such Member or the Company, as the case may be, specified as aforesaid.

SECTION 13.3        Amendments and Waivers.

(a)        Except as otherwise provided herein, this Agreement may be amended or any terms or conditions of this Agreement waived only pursuant to a written instrument approved by the Board and signed by the Company and Members holding at least a majority of the outstanding Common Units.  Notwithstanding the foregoing, it is agreed that any amendment providing rights to purchasers of any additional Common Units or other Securities of the Company, and the effect of admitting such purchasers as members of the Company, shall not require the consent of any Member.

(b)        In addition, any amendment, waiver or modification of any provision of this Agreement that would adversely affect any Member in a manner that is disparate from, or disproportionate to, the manner in which it affects the other Members may be effected only with the consent of the Member so affected.

SECTION 13.4        Governing Law.  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of the Act, the applicable provision of the Act shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances are not affected thereby and that provision shall be enforced to the greatest extent permitted by Applicable Law.

SECTION 13.5        Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 13.6        Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the rights and obligations hereunder may

not be assigned except to the extent permitted hereunder in connection with a Transfer of Units.

SECTION 13.7     Entire Agreement.  This Agreement and the other documents and agreements referred to herein or entered into concurrently herewith embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein; provided, that such other agreements and documents shall not be deemed to be a part of, a modification of or an amendment to this Agreement.  There are no restrictions, promises, representations, warranties, covenants or undertakings with respect to the subject matter contained herein, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter, including the Credit Bid Agreement (except that, in accordance with Section 3.1 of this Agreement, the provisions of Section 3(b) of the Credit Bid Agreement shall continue to apply until the obligations of the Company contained therein have been discharged in accordance therewith).

SECTION 13.8     No Effect Upon Lending Relationships.  Notwithstanding anything contained in other paragraphs and sections of this Agreement to the contrary, (a) nothing contained in this Agreement shall affect, limit or impair the rights and remedies of the Members or any of their respective Affiliates, funding or financing sources or any other lenders in each case in their capacities as lenders to the Company or any of its Subsidiaries and, (b) without limiting the generality of the foregoing, none of the Members or their Affiliates, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, shall have any duty to consider (i) its (or the applicable Member's) status as a holder of Units of the Company, as a Member of the Company or otherwise, (ii) the interests of the Company or any of its Subsidiaries (except to the extent required under any applicable credit or similar agreement or by commercial law applicable to creditors generally) or (iii) any duty it may have to any other Member of the Company or holder of Units of the Company.

SECTION 13.9     Counterparts.  This Agreement (including the Joinder Agreement) may be executed in any number of counterparts, all of which together shall constitute a single instrument.

SECTION 13.10     Section Titles.  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text hereof.

SECTION 13.11     Severability.  The provisions hereof shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision hereof, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability

**Execution Version**

affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

[*The remainder of this page is intentionally left blank.*]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**SECURE NATURAL RESOURCES LLC**

By: _____

Name:  James H. Litinsky
Title:  Authorized Signatory

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**JHL CAPITAL GROUP HOLDINGS ONE LLC**

By: _____

Name:  James H. Litinsky
Title:  Authorized Signatory

**QVT FUND V LP**

By: _____

Name:
Title:

**QVT FUND IV LP**

By: _____

Name:
Title:

**QUINTESSENCE FUND L.P.**

By: _____

Name:
Title:

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**JHL CAPITAL GROUP HOLDINGS ONE LLC**

By: _____
Name:
Title:

**QVT FUND V LP**

By: _____
Name:
Title:

**QVT FUND IV LP**

By: _____
Name:
Title:

**QUINTESSENCE FUND L.P.**

By: _____
Name:
Title:

Execution Version

## SCHEDULE A

### LIST OF MEMBERS AND UNITS

| Name and Address | Common Units |
|---|---|
| JHL Capital Group Holdings One LLC<br>900 N. Michigan Avenue.  Suite 1340, Chicago.  IL 60611 | 298,438.960 |
| QVT Fund VLP<br>1177 Avenue of the Americas, 9th Floor, New York, NY 10036 | 47,097.050 |
| QVT Fund IV LP<br>1177 Avenue of the Americas, 9th Floor, New York, NY 10036 | 10,718.131 |
| Quintessence Fund L.P.<br>1177 Avenue of the Americas, 9th Floor, New York, NY 10036 | 6,125.215 |
| **TOTAL** | 362,379.360 |

## EXHIBIT A

**Form of Joinder Agreement**

   The undersigned is executing and delivering this Joinder Agreement pursuant to the Limited Liability Company Agreement of Secure Natural Resources LLC, a Delaware limited liability company, dated as of April 15, 2016, as amended, supplemented or otherwise modified in accordance with the terms thereof (the "LLC Agreement"). Capitalized terms used but not defined in this Joinder Agreement shall have the respective meanings ascribed to them in the LLC Agreement.

   By executing and delivering this Joinder Agreement to the LLC Agreement, the undersigned hereby agrees to be admitted as a member of the Company and to become a party to, to be bound by, and to comply with all of the provisions of the LLC Agreement in the same manner as if the undersigned were an original signatory to such agreement as a Member. In connection therewith and without limiting the foregoing, effective as of the date hereof the undersigned hereby makes the representations and warranties contained in the LLC Agreement.

   Accordingly, the undersigned has executed and delivered this Joinder Agreement as of the _____ day of _____, 20_____.


_____
Signature of Member


_____
Print Name of Member


_____

_____

_____
Address of
Member


Acknowledged and accepted:

SECURE NATURAL RESOURCES LLC

By: _____

      Name:

      Title: