**Exhibit A**

1       UNITED STATES BANKRUPTCY COURT
         DISTRICT OF DELAWARE

2

3 IN RE:         )  Case No. 15-11357 (CSS)
             )  Chapter 11

4 MOLYCORP, INC, *et al.,*   )
             )

5       Debtors.  )  Courtroom No. 6
             )  824 Market Street

6             )  Wilmington, Delaware 19801
             )

7             )  April 20, 2016
             )  3:00 P.M.

8

9        TRANSCRIPT OF HEARING
    BEFORE HONORABLE CHRISTOPHER S. SONTCHI
     UNITED STATES BANKRUPTCY JUDGE

10

11 <u>TELEPHONIC APPEARANCES:</u>

12 For the Debtors:   Jones Day
            By:  PAUL LEAKE, ESQUIRE

13             LISA LAUKITIS, ESQUIRE
           222 East 41st Street

14           New York, New York 10017

15 ECRO:        LESLIE MURIN

16 Transcription Service:  Reliable
           1007 N. Orange Street

17           Wilmington, Delaware 19801
           Telephone:  (302) 654-8080

18           E-Mail:  gmatthews@reliable-co.com

19

20 Proceedings recorded by electronic sound recording;
 transcript produced by transcription service.

21

22

23

24

25

```
 1  For Oaktree:              Milbank Tweed Hadley & McCloy LLP
                              By:  ANDREW LEBLANC, ESQUIRE
 2                            1850 K Street, NW
                              Washington, DC 20006
 3
    For Ten Percent Noteholders:
 4                            Kramer Levin Naftalis & Frankel LLP
                              By:  JOSHUA BRODY, ESQUIRE
 5                            1177 Avenue of the Americas
                              New York, New York 10036
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                INDEX

2                                                              Page

3   NOTICE OF AGENDA MATTERS:
    For the Debtors, by Mr. Leake                              4
4   For Oaktree, by Mr. LeBlanc                                5
    For Ten Percent Noteholders, by Mr. Brody                 14
5   For the Debtors, by Ms. Laukitis                          20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commence 2:41 p.m.)

2       (Call to order of the Court)

3            THE COURT:  I apologize ahead of time.  I m calling

4   from a cell phone from out of the office.  I don t have any

5   of my normal items in front of me.  Ms. Murin said if you

6   could, please, identify yourself each time that would be

7   helpful.  I didn t quite hear -- I just want to confirm, I

8   think I heard that Mr. Leake and Ms. Laukitis are on the

9   phone; is that true?

10           MR. LEAKE:  Yes, Your Honor.

11           THE COURT:  Okay.  Very good.

12           As always, the Debtor gets the joy of at least

13  saying hello first.  So, Mr. Leake, before, I guess, we turn

14  it over to Mr. LeBlanc and Mr. Brody, does the Debtor have

15  anything it would like to say?

16           MR. LEAKE:  Only hello; Paul Leake from Jones Day,

17  Your Honor, on behalf of the Debtors.  If there is anything

18  that we would have to say Ms. Laukitis will address that, but

19  that would only be after hearing from both Oaktree and the

20  Tens because that s where the disagreement is.

21           THE COURT:  Okay.  All right.  I don t know, Mr.

22  Brody and Mr. LeBlanc, if you discussed who would like to go

23  first.

24           MR. LEBLANC:  I m sorry, Your Honor.  This is Andrew

25  LeBlanc of Milbank Tweed.  We haven t discussed it, but I m

1  happy to address it first, if that pleases the Court.

2         THE COURT:  Any objection, Mr. Brody?

3         MR. BRODY:  No.  Josh Brody from Kramer Levin.  No,

4  Your Honor, I m happy to go first as well, but I will leave

5  that up to however Your Honor wants to proceed.

6         THE COURT:  All right.  Well, Mr. LeBlanc appears to

7  be the complainer; not pejoratively, just the complainant.

8  So let s let Mr. LeBlanc go first.

9         MR. LEBLANC:  Thank you, Your Honor.  Again, Andrew

10  LeBlanc of Milbank Tweed on behalf of Oaktree.

11         Your Honor, let me apologize.  I think I can

12  apologize on behalf of all parties that we have to again come

13  before you to deal with an issue that has arisen with the

14  closing of the Molycorp Minerals sale.  I do think that the

15  letters that were submitted yesterday, and I m sure the Court

16  has had a chance to look at them, do highlight what the

17  issues are.  So I ll try to keep my comments pointed and

18  really to be in, many respects, responsive to what was in Mr.

19  Brody s letter of yesterday rather than repeating what s in

20  our letter.

21         What I think has now become clear to us is we just

22  have a fundamental disagreement, I think at least in part,

23  about what Your Honor said last week and then, in addition to

24  that, about what the documents actually say are the parties

25  respective rights and ability to consent.  In particular, I

1 think what we heard last week, Your Honor, was they can

2 appoint the initial board, things that happen subsequent to

3 that are issues that have to be addressed with the Chancery

4 Court, but I don t think Your Honor ruled on because you

5 hadn t seen, nor had we at that point even seen the form of

6 the LLC agreement.  I don t think Your Honor said that they

7 could put, literally, anything into the LLC agreement and it

8 would be permissible because at core what we re entitled to

9 under our settlement agreement, under the collateral trust

10 agreement and, I think, under Your Honor s direction of last

11 week is equal treatment under these documents.

12         Let me just address -- I would normally start with -

13 -

14         THE COURT:  Mr. LeBlanc, you say equal treatment,

15 but let me ask you; what does the language specifically say?

16 Doesn t it simply say ratable treatment?

17         MR. LEBLANC:  It does, Your Honor, ratable

18 treatment.  And so from our perspective --

19         THE COURT:  Okay.  How is that equal?  No, no -- go

20 ahead, sorry.

21         MR. LEBLANC:  Your Honor, its ratable treatment.  So

22 to the extent that they re getting issued common equity; our

23 common equity can t be substantially, effectively

24 subordinated.  They couldn t issue two classes of shares; one

25 that had voting rights and one that didn t have voting rights

1  give us the non-voting shares and take the voting shares for

2  themselves.  I ll work the Court through an example or two in

3  the documents.  That is exactly what they have done here

4  through the structure of the LLC agreement.

5        So you can see from our mark-up, we have not

6  commented on their appointment of the initial board members.

7  We do have great issue with the structure of the board, its

8  composition and the rights that they have given to the board

9  because, in effect -- and I ll give the Court two examples of

10  this.  They have, in effect, given themselves the board

11  positions, which the board, itself, will determine the terms

12  and the board, itself, will decide if they re even ever voted

13  on.

14        Now, let me just give two examples of issues that we

15  have raised in our papers.  I ll do so with reference to Mr.

16  Brody s letter.  Footnote 9 of his letter, Mr. Brody says

17  that we re protected because matters are put to a vote of the

18  members that -- he say s referencing the board composition,

19  he says matters put to a vote of the members shall be

20  approved by a plurality of the common units that are voting

21  on the matter in the case of election of managers.  That

22  would be fine.  That s what we ve asked for with a defined

23  term for the initial board of managers.

24        If you actually look at the agreement, Your Honor,

25  there s a preamble to that very sentence that he quotes from

1  in his letter.  This is in Section 3.3(a)(1) of the LLC

2  agreement.  It says unless otherwise determined by the board,

3  managers shall be elected by members owning a plurality.  It

4  goes on from there.  Your Honor, the point with respect to

5  that issue is the board, themselves, can just disenfranchise

6  everyone because they have been granted the right in the LLC

7  agreement to avoid having to vote ever; to dictate their own

8  terms.  So it s different, fundamentally, then identifying

9  who the initial board members are.  To say that that board

10 will then be able to allow themselves to exist in perpetuity

11 without challenge and without a vote.

12        I ll give a second example, Your Honor.  Preemptive

13 rights.  This is a big issue.  I think Mr. Brody even refers

14 to it in his letter as an anti-delusion protection.  What he

15 says in his letter is that we complain that we don t have

16 preemptive rights and he says yes, they do, look at Section

17 7.1 of the LLC agreement.  Your Honor, if look at Section 7.1

18 of the LLC agreement it s almost remarkable.  Section 7.1 is

19 actually -- the title is determination by board.  What is

20 says -- the first thing that jumps off the page is it only

21 relates to preemptive rights, meaning the ability to

22 participate only in equity raises; not in debt raises.  So

23 they could issue debt to an affiliate because there is no

24 limitation on affiliate transactions without offering that to

25 anybody else.  So JHL could raise debt exactly the way that

1  Your Honor said they couldn t do with preferred equity.  They

2  could recreate that entire structure by calling it a

3  management fee and raising convertible debt to do it.  And

4  there would be no limitation in this agreement.

5       But even more than that, when you look at the

6  section on preemptive rights, its actually entitled

7  determination by board because what it says is for the first

8  120 days there are preemptive rights with respect to common

9  equity issues, but after says provided, however, that with

10 respect to any issuance of securities by the company more

11 than 120 days following the closing date the board shall

12 determine the specific terms and conditions on which such

13 preemptive rights may be exercised, including any limitations

14 and restrictions thereon or exemptions therefrom.

15      It even says following that determination the board

16 shall, without the consent of any member, amend this

17 agreement to set forth their determination.  If you look at

18 the provision that Mr. Brody next cites to say we re

19 protected because there needs to be a vote of the majority of

20 the members to change the LLC agreement, it says -- and I ll

21 quote again from the LLC.  It says  except as otherwise

22 provided herein.   So with respect to preemptive rights we

23 have literally nothing after 120 days.

24      The point of all of this, Your Honor, is these are

25 decidedly off market terms.  You can look just at the LLC or

1 the corporate documents that we negotiated with the Unsecured

2 Creditors Committee where we owe ninety-two and a half

3 percent.  And they have better protections. They re not

4 minority protections in the case of us because this is a

5 minority imposing these protections on the majority, but

6 these are decidedly off market, Your Honor, and they

7 fundamentally change the nature of the equity that we re

8 getting on a go forward basis because, by every account, JHL

9 and QVT will have equity that is more valuable for all time

10 then the equity we are getting because that is effective

11 equity in the sense that it has voting rights, whereas our

12 rights don t have it.

13         Your Honor, the trouble that we have with this -- as

14 concerning as it would be standing alone -- in the context of

15 what happened, and really what s happened over the course of

16 the last two weeks in trying to get us to this point, it s

17 made all the more troubling.  We had the issue with the

18 preferred that Your Honor resolved last week where we argued

19 that they were, effectively, trying to take control of this

20 company through the preferred.  As I noted to the Court last

21 week, the first time we saw a document, the credit bid

22 agreement signed was when they filed it with the Court.  Here

23 the same thing happened and, frankly, in our view even worse

24 then what happened with respect to the credit bid agreement.

25         On Friday, the Debtors, and we think appropriately

1   so because they re parties to our settlement agreement, said

2   we understand there s a dispute between Oaktree and the Tens

3   with respect to the governing documents because Oaktree has a

4   consent right, let us know when that s resolved.  The email

5   correspondence during the day made clear that we were having

6   discussions.  Then unbeknownst to us, at 11:45 on Friday

7   night, counsel to the Ad Hoc Group sent an email saying the

8   buyer is now prepared to close and saying that they have

9   resolved the disputes with respect to the governing

10  documents.

11          Based upon that -- and the Debtors are here and can

12  speak for themselves, but our understanding is they

13  understood from that communication that they had resolved the

14  issues with Oaktree.  In point of fact, we were completely

15  uninvolved because after we spoke with them at about 3:30, we

16  didn t hear from them again until the next day, till

17  Saturday, after the Debtors had already taken steps to close.

18          Your Honor, I raise that because it s important

19  context for this.  What we see now is twice in the course of

20  a week the Ad Hoc Group has tried to take control of the

21  acquisition vehicle before it ever closes, in a way that is

22  entirely inconsistent with our settlement agreement and would

23  disenfranchise us for our thirty plus percent interest.  If

24  the steps that had been taken, Your Honor, had been

25  irreversible and the Debtors had actually transferred assets

1  and had actually closed, I think we would have filed a

2  different motion with respect to this because it seems clear

3  to us, based on the documents that the Ad Hoc Group wanted

4  the Debtors to believe that we had reached an agreement and,

5  therefore, they would close.  It could not have been further

6  from the truth.

7           In fact, the Debtors own actions -- when we learned

8  of this on Sunday we asked the Debtors, because we had heard

9  from the principal at JHL that the sale had closed on Friday

10 -- we asked the Debtors and their response was you need to

11 tell us what s going on because we understood you reached an

12 agreement with the Tens.  And when they learned that we had

13 not, they immediately rescinded the steps that they had taken

14 during closing.

15          Your Honor, I give that as context because this is

16 important for us because it determines whether or not we re

17 ever going to realize any value because based upon the

18 actions we ve seen to date we are not comfortable that if

19 they re given any ability to exercise extra rights as a

20 shareholder who gets to draft the LLC agreement in the first

21 instance, we have every confidence that they re going to use

22 that to take advantage of our thirty-five percent interest in

23 this company.  We are very concerned.  We think it s

24 inconsistent with our agreement.

25          So, Your Honor, with that, I m happy to respond.

1  One thing I will note, Your Honor, I know -- just so Your

2  Honor understands, I know that Mr. Brody -- it s not Mr.

3  Brody and his firm that s involved in the transactional side

4  of this, so I understand Mr. Brody is responding on behalf of

5  actions that were taken by others.  I know that he learned of

6  the issues around the closing at the same time that we did

7  because he and I were speaking to one another.  So I know

8  it s somewhat of an unfair position to put him in, but we

9  view the actions that transpired on Friday as very serious

10  issues because it seemed to us that somebody was trying to

11  mislead the Debtors into closing.

12          Your Honor, we ve put forth a -- without going into

13  the specific issues that we have, which are detailed in our

14  letter, we put forth a revised version of the LLC agreement

15  that was termed the execution version by them.  It does

16  require us to consult with them because there are provisions

17  that say just standard terms and conditions.  We would hope

18  if Your Honor gives direction that makes clear that -- Your

19  Honor s direction last week that they could appoint the

20  initial board did not mean that they could put, literally,

21  anything else into the agreement that disenfranchised us.

22  I m hopeful that we can come to agreement on these terms.

23          With that, Your Honor, we d ask that the Court

24  direct that we do not have to execute the LLC agreement the

25  Debtors have filed and that the parties should negotiate

1   around the terms that we have provided.  Unless the Court has

2   any other questions, I ll save any additional comments after

3   Mr. Brody speaks.

4          THE COURT:  I do not have any questions.  Thank you,

5   Mr. LeBlanc.

6          MR. BRODY:  Thank you, Your Honor.  Josh Brody from

7   Kramer Levin on behalf of the Ad Hoc Noteholders.

8          I will echo one of the things that Mr. LeBlanc said

9   that I also apologize for taking up Your Honor s time while

10  he s out of the office.  I certainly would also say that I m

11  a little bit disappointed that we have to come back in front

12  of Your Honor on this.

13         I m also a little more disappointed in some of the

14  ways that Mr. LeBlanc and Oaktree have decided to

15  characterize the dispute in front of Your Honor because the

16  reality is -- and I think you can break their letter into two

17  parts.  There s the front where they have all these

18  allegations about what supposedly happened on Friday night at

19  the closing and then they get into the substance.  I think if

20  you skip to the second half of the letter where they get into

21  the substance, it becomes pretty clear why they have the

22  first part because the second half of the letter, which I ll

23  go into in a little more detail in a minute, it s pretty

24  clear that they re just seeking to rewrite the settlement

25  agreement and seek a variety of rights that they do not

1   negotiate for, have no provisions for, whether under the
2   settlement agreement, the prepetition collateral agency
3   agreement or what I understood Your Honor s ruling to be last
4   week.

5          I guess, at the outset, I would say that having
6   looked into what exactly happened Friday night I just
7   outright dispute Mr. LeBlanc s contention that anyone tried
8   to mislead the Debtors or anybody else to believing that
9   Oaktree had signed off and, therefore, we were just trying
10  to, you know, pull a fast one.  But the reality is, Your
11  Honor, that just doesn t matter because the fact is that the
12  underlying issues that the Court needs to decide are the same
13  no matter what.  The question is are the provisions that we
14  put in the LLC agreement consistent with, you know, Your
15  Honor s ruling, and the settlement agreement and the like.

16         Frankly, you know, I told Mr. LeBlanc on Sunday --
17  he and I had a discussion -- I said, look, whether we close
18  or not I know any issues you have you ll raise with Judge
19  Sontchi and we ll respond; that s how it will get resolved.
20  So I think that he s trying to, sort of, have a little bit of
21  a muscling contest here to try to distract the Court from the
22  actual issue that Your Honor needs to decide.  And, again,
23  that issue really is are the provisions that they re
24  complaining about in the LLC agreement consistent with Your
25  Honor s ruling in the various documents.

1    I find it very telling, Your Honor, that, you know,

2   if you look at Mr. LeBlanc s letter he actually says this.

3   He said it just now that essentially, Your Honor, we think

4   they re bad actors and, therefore, we have concerns about

5   what we ve already agreed to in the context of the settlement

6   agreement and the prepetition collateral agency agreement.

7   That s kind of a pre-text that they re using to ask Your

8   Honor to give them additional rights that they just simply do

9   not have.

10    So, for example, I think it s very telling Mr.

11   LeBlanc is complaining that certain provisions are  off

12   market.   I don t see why that is even remotely relevant.

13   Anything that we negotiated, the deal is the deal.  If they

14   wanted additional rights and they wanted additional

15   protections, which I ll talk about in a second that they

16   really have, they should have tried to negotiate and make

17   that point of the deal and they did not.

18    So, for example, you know, they complained a little

19   bit about JHL the majority controlling.  But, for example,

20   even some of the issues that they complain about actually

21   requires not just the board of directors, but also requires a

22   majority of members of the acquisition vehicle to make a

23   determination like, for example, the drag rights.  Their

24   complaint is that if we don t have appraisal rights they can

25   be forced into some sort of liquid security, but they can

1  only be forced into that if a majority of the members decided

2  that s what they want to do.  It s not just up to the board.

3       So they can complain if they want additional rights

4  to stop that, then, frankly, they re not looking for equally

5  and ratably, they re looking for additional rights that even

6  as a minority holder they can somehow stop that.  I think

7  Your Honor hit the nail on the head when you asked Mr.

8  LeBlanc about what the actual language of the collateral

9  agency agreement is because it s not about equal, it s about

10  ratably.  They re getting the thirty-five percent.  That, I

11  think, is important.

12       Mr. LeBlanc wants to talk about context.  I think

13  context, of course, is important.  And the settlement

14  agreement that we had and the conversation and the hearing we

15  had with Your Honor last week made clear as I understood it,

16  it looked to paragraph 18 of the settlement agreement and

17  pointed to the issue and made a determination.  I really do

18  have a very difficult time, for lack of a better word, the

19  stuff Mr. LeBlanc is trying to paint us as the second time

20  we re trying to, you know, pull something over on people.  We

21  had a dispute.  We came in front of the Court.  I m not sure

22  else he wants us to have resolved that, other than he s just

23  demanding that we should have conceded to their position.

24       I think, Your Honor, I m also not going to really go

25  through the rest of the points that I d raised in my letter

1   because I think that it s pretty clear, hopefully Your Honor

2   has a chance to read those letters, that all of these various

3   items really are issues that I understood Your Honor to be

4   saying that if Oaktree is unhappy about decisions the board

5   is making, things that were given to the board s discretion,

6   they can go to Delaware Chancery Court and they can seek to

7   have their rights enforced there.  It s not something that

8   Your Honor should be deciding now.

9          In some respects, what they re basically asking you

10  to do -- Mr. LeBlanc is up front with you.  They are wanting

11  you to force us to renegotiate the terms that they are okay

12  with -- terms that they want and are okay with in the LLC

13  agreement as if we were negotiating the settlement agreement

14  from scratch.  I think it s just a pretty significant

15  overreach on their part.  Again, some of the items that they

16  raise its pretty clear this is not just about governance or

17  their concern.  They are not happy that all they get is their

18  thirty-five percent.  They want rights that are greater than

19  that.

20         For example, affiliate transactions.  Any affiliate

21  transaction is absolutely going to be required to or is going

22  to be subject to any sort of fiduciary duty that the board

23  has.  So for Mr. LeBlanc to complain about it -- any decision

24  that the board makes will be subject to their fiduciary duty.

25  I just don t really know why he thinks its okay to start

1   enforcing terms like that.  It s very nice that, you know,

2   creditors came, that they were able to negotiate for certain

3   rights in the Neo agreement with the Neo equity, but that

4   wasn t the deal that we agreed to here.  All we agreed to

5   here was -- and the consent right that they have under the

6   Ten Percent Noteholder settlement is limited to the fee issue

7   that Your Honor has already ruled on and the fact they have

8   to get their thirty-five percent.

9          Now, I guess Mr. LeBlanc s argument that somehow

10  because they don t have all the minority rights they think

11  they want that somehow dilutes them, its creative, but,

12  frankly, there is really no basis for it because they re

13  getting everything that they want or that they re entitled to

14  I should say.  Things that, for example, that require a

15  majority direction, they re going to require the board to

16  make a determination or a majority approval by the members of

17  SNR.

18         One last thing.  Again, I really don t want to get

19  into any sort of he said/she said about what happened on

20  Friday night.  I just think it s irrelevant.  There is one

21  thing that I want to make crystal clear for the Court.  You

22  read Mr. LeBlanc s letter.  He gives a pretty distinct

23  impression that the Ad Hoc Ten Percent Noteholders were never

24  willing to have any negotiation with Oaktree, but he

25  conveniently leaves out the fact that there was an all hand s

1  call with clients on Monday and then there was a further

2  exchange of markups on Tuesday.  So we never said we were

3  never willing to negotiate and Your Honor needs to step in

4  and enforce that is just flat out not true.

5          So unless Your Honor has any other questions, I ll

6  stop for now.

7          THE COURT:  Thank you, Mr. Brody.

8          Mr. Leake, anything?  Ms. Laukitis.

9          MS. LAUKITIS:  No, Your Honor.

10          The only thing I ll say is that I agree with what

11  Mr. Brody said that it s not really relevant to the dispute

12  between the parties today what happened on Friday with

13  respect to the closing, but I will say that as for the

14  Debtors our understanding certainly was that there had been

15  an agreement reached between the parties and I think our

16  actions in rescinding the closing afterwards support that

17  understanding.

18          THE COURT:  Okay.  Thank you.

19          I do actually have a question for you.  Can you hear

20  me okay?

21          MS. LAUKITIS:  Yes.

22          THE COURT:  Okay.  What would the effect, if

23  anything, be on the plan if this transaction doesn t, in

24  fact, close?

25          MS. LAUKITIS:  Our belief and understanding is that

1  it does not have an impact on the plan.  The Tens settlement

2  was not a condition to confirmation and, therefore, if there

3  is not a closing of this it doesn t affect our ability to go

4  effective on the plan as confirmed.

5       THE COURT:  Okay.  Now you wouldn t get the two and

6  a half million dollars?

7       MS. LAUKITIS:  Correct.  The Trustee would have to -

8  - the Trustee, to the extent appointed a Chapter 7 Trustee or

9  I suppose if there was no closing on this it would be a low

10  likelihood of there being any agreement between the Tens and

11  the sureties on how to proceed in Chapter 11.  But a Chapter

12  7 Trustee would have to fight for use of cash collateral.

13       THE COURT:  Okay.  Mr. LeBlanc, any reply?

14       MR. LEBLANC:  Just very, very briefly, Your Honor,

15  because it s actually in reply to a question you had asked

16  me.  Your Honor, our consent right under the settlement

17  agreement says that it has to be reasonably acceptable to us;

18  meaning it shall be in form and substance consistent with the

19  terms of the settlement agreement, the plan, the prepetition

20  collateral agency agreement and related prepetition security

21  documents.

22       The prepetition collateral agency agreement says

23  that all money s or other property held by the collateral

24  agent shall, to the extent available for distribution, be

25  distributed equally and ratably.  The settlement agreement,

1   itself, says that for the avoidance of doubt we get our *pro*

2   *rata* share of the total number of common units.  It doesn t

3   modify that that receipt of property has to be equally and

4   ratably with the other holders.  And that s really the

5   gravamen of our objection is that the special governance

6   rights that they have reserved for themselves -- and Mr.

7   Brody didn t even respond to the points that I made with

8   respect to board composition where they can simply eliminate

9   a vote of any shareholders or with respect to preemptive

10  rights where they could simply eliminate it after 120 days.

11  It just doesn t make the shares equal.  That is fundamentally

12  our complaint, Your Honor.

13          THE COURT:  Hang on just for a second because I m

14  having trouble with my computer.  Can you direct me to -- I

15  apologize, this is the problem with hearing remotely.  Please

16  hold for a minute while I try to use all of my incredibly

17  Neanderthal computer abilities to get back what I need in

18  front of me.

19          Okay.  I don t -- all right, I d like to focus on

20  the language that s in the settlement agreement that you just

21  read to me, but I don t necessarily have it in front of me.

22  Did you attach that to your letter, Mr. LeBlanc, settlement

23  agreement?

24          MR. LEBLANC:  We did not, Your Honor.  We attached

25  it to our letter of last week, Your Honor.  We didn t attach

1  it this week.

2          THE COURT:  All right.

3          MR. LEBLANC:  I apologize.

4          THE COURT:  That s okay.

5          MR. LEBLANC:  I can give you the docket number as

6  well, Your Honor, if you d like that.

7          THE COURT:  Yeah, what s the docket number?

8          MR. LEBLANC:  Of the settlement agreement itself is

9  1495 and it s attachment one.

10          THE COURT:  Wow, 1495 goodness gracious.  I m pulling

11  it up now.  I m going to ask you to direct me to what you

12  just read about the reasonableness, if you will, of the

13  required reasonableness of the LLC agreement.

14          MR. LEBLANC:  I will, Your Honor.  Just let me know

15  when you d like me to.

16          THE COURT:  I have it in front of me, but if you ll

17  just give me a section number or a page.

18          MR. LEBLANC:  It s paragraph three, which is on page

19  three; internally, page four of twenty-six of the filed

20  version.

21          THE COURT:  Process of consummating the credit bid?

22          MR. LEBLANC:  Yes, Your Honor.  And so it s really

23  the second sentence.  The first sentence is just the sale --

24  the definition -- gives the definition of a sale

25  documentation.

1          THE COURT:  Right.

2          MR. LEBLANC:  And footnote two I think is relevant:

3     the sale documentation shall include any governing documents

4     with respect to Newco.  Newco is the acquisition vehicle here

5     SNR.  And then the second sentence is the one that I think is

6     relevant to what Your Honor is saying -- asking.

7          THE COURT:  Oh okay.  So I see it s the footnote that

8     they -- that the sale document should include some governing

9     documents?

10          MR. LEBLANC:  That s correct.

11          THE COURT:  It does give you a reasonably acceptable

12     provision, okay.  I can tell you I was coming from, having

13     read your letter is the following.  And, Mr. Brody, I m going

14     to ask you to respond to something in just a second.

15          And that was that the LLC agreement really isn t in

16     front of me.  I m not approving -- I m not signing an order

17     approving the LLC agreement.  What I did was I approved the

18     settlement agreement.  And any disputes under the settlement

19     agreement are something that I am in a position to rule on,

20     if necessary.  But any further provisions under the LLC

21     agreement or under the collateral trust document -- I can t

22     remember the prepetition collateral agency agreement --

23     excuse me -- are really intercreditor disputes and, I guess,

24     future LLC member disputes that are not important to or

25     relevant to the Bankruptcy Court.

1        You know, frankly, and one of the reasons I asked Ms.

2    Laukitis this question is I don t actually care whether you

3    close or not.  That s not my problem.  And, in fact, one

4    could argue, and I m sure if I let Mr. Bressler and the

5    Sureties chime in, they would say they d prefer just leave

6    the Mineral rights with this Debtor.  It makes more value for

7    the mine to actually have the Mineral rights associated with

8    it.

9        So, you know, whether or not you close or not and

10    whether you litigate over whether you re not going to close

11    is not my problem.  My problem is the settlement agreement.

12    And what I was going to say is that I haven t seen anything

13    in Mr. Leblanc s letter that I thought impacted what was in

14    the settlement agreement.  And now he has pointed me to

15    something that I had overlooked, so I apologize.

16        That there s this provision that says with respect

17    providing, however, that with respect to Oaktree whether the

18    sale documentation is reasonably acceptable to them.  And it

19    then goes on to say inform investors consistent with the

20    terms of this settlement including without limitation

21    paragraph two hereof the plan and the prepetition collateral

22    agents agreement and related prepetition security documents.

23        So, Mr. Brody, if you could respond to the argument

24    that or the proposition that this is my problem, you know, if

25    the agreement is my problem because there s this reasonably

1  acceptable language that gives Oaktree some say in what the

2  LSG agreement says and, I guess, gives me skin in the game to

3  decide the issue.

4      MR. BRODY:  Well, Your Honor, frankly, I can -- Josh

5  Brody for the Tens and Noteholders.

6      I don t dis -- I think the way I ve been thinking

7  about this similar to Your Honor and I m not sure that Mr.

8  Leblanc and I really had any dispute about this is that the

9  reason this did come in front of Your Honor is because of the

10 fact is a question of whether or not their consent right

11 under the settlement agreement is implicated.  And I think

12 that I would -- I would be of the view that to the extent the

13 settlement agreement their consent right is not implicated

14 and as I, you know, sort of discussed it at length, I think

15 it s not because these are issues that don t -- they don t

16 have any sort of rights under the settlement agreement or the

17 provision collateral agency agreement when it comes to things

18 like governance.

19      So in that respect, I would think that Your Honor

20 really -- on that point, all Your Honor needs to say is hey I

21 don t think Oaktree is a consent right under the settlement

22 agreement and, therefore, it may not be Your Honor s problem.

23 And the reality is that -- and this is the way that the

24 credit bid agreement itself works.  Oaktree is not a party to

25 the credit bid agreement.  They re no different than any

1  other minority holder -- minority bond holder, for example.

2         The only parties that execute the settlement

3  agreements are -- sorry that execute the credit bid agreement

4  are the collateral agent and the indenture trustee and the

5  directing Noteholders.  So I think I sort of understand how

6  Your Honor is looking at it, and I think taking a broad step

7  back I would tend to agree that because these rights are not

8  implicated all we need is Your Honor to say is Oaktree s

9  rights are not the consent -- not implicated.  And as a

10  result, the Debtors, for example, can t say well we re not

11  going to close because Oaktree hasn t consented because

12  Oaktree doesn t have a consent right and, therefore, we have

13  -- the APA agreement is between the Debtors and SNR.  A

14  credit bid agreement is amongst the collateral agent, the

15  indenture trustee, and the Noteholders, therefore, we can

16  close.

17         I hope that answers Your Honor s question.

18         THE COURT:  Yeah, I think it is.  I think it does.

19         Mr. Leblanc, do you want to respond to that?

20         MR. LEBLANC:  Yes, Your Honor.  Andrew Leblanc,

21  Milbank Tweed.

22         Your Honor, I just think that s wrong.  The

23  settlement agreement says clearly -- and I apologize, Your

24  Honor.  I thought we had addressed this in the prior dispute

25  that was before the Court with the reference to, I believe,

1  the same provision effectively that was implicated.  The

2  documents needed to be -- we had a consent right with respect

3  to the documents cabined by the language that is here.

4         The governing -- we specifically put the governing

5  documents with respect to Newco because we needed to ensure

6  and wanted to ensure that it was consistent with the

7  prepetition collateral agency agreement, and we got equal and

8  ratable treatment.

9         So I do think, Your Honor -- Mr. Brody is arguing

10  that our complaint or our issues don t implicate the

11  collateral agency agreement.  We disagree with him, but I

12  don t think and he hasn t argued to date that Your Honor

13  doesn t have the ability to decide the issue because of

14  Section -- paragraph three of our settlement agreement.

15        And paragraph three of our settlement agreement is

16  really the one -- it s the hook that allows the Court to look

17  at and we quote extensively from the prepetition collateral

18  agency agreement because that is the reference that Your

19  Honor should look to, to decide whether or not the treatment

20  that they re proposing, pursuant to the LLC agreement, the

21  governing documents for Newco is -- whether we re getting

22  equal and ratable treatment.  And we would submit we re not.

23        I think that s really what the dispute is, is Mr.

24  Brody is saying we are.  We re saying we re not.  I don t

25  think it s a question of whether you have the authority to

1  decide it.  I think we both agree you do.

2        THE COURT:  Mr. Brody, what is it that the

3  prepetition collateral agency agreement doesn t require the

4  types of amendments that Mr. Leblanc is proposing?

5        MR. BRODY:  Your Honor, I think in some respects Mr.

6  Leblanc s argument almost was too much.  The limitation on

7  the ability that section -- and I apologize, I just pulled up

8  the specific section of the collateral agency agreement.  But

9  it s a section that I cited to Your Honor last week that

10  Section (3)(h)(i) gives the majority bondholders the right to

11  direct remedies.  And a credit bid is the part of the

12  direction of remedies.

13        So and I think fundamentally what it really comes

14  down to is Mr. Leblanc making this argument somehow equally

15  ratably means they have to have rights that are -- I m not

16  even sure how to say it because, again, some of the issues

17  that Mr. Leblanc is raising of provisions in the LLC

18  agreement actually require a majority of the members to make

19  a determination.  And all the things in the LLC agreement are

20  ultimately subject to fiduciary duties to which, again, I

21  thought I understood Your Honor addressing last week that

22  those are issues that they have the rights of any other

23  shareholder and they re just going to go into -- and they can

24  into Chancery Court if they have a problem.

25        I mean if Mr. Leblanc is correct, for example, as

1  argued last week.  I think anyone could really argue that the

2  Ad Hoc -- the majority of Noteholders have a right to appoint

3  the board.  But if Mr. Leblanc s arguments were correct he

4  could say no, no.  I have to consent to that; somehow I m not

5  equally ratably because their position is giving them the

6  ability to direct -- to appoint directors I don t like.  And

7  that can t be right because that functionally makes the

8  ability to credit bid as a remedy almost meaningless because

9  you couldn t do anything without a minority holder being able

10 to stand up and tell us how to do it.  I think it s just a

11 bridge too far.

12          THE COURT:  Mr. Leblanc, any last words?

13          MR. LEBLANC:  Sure; yes, Your Honor.

14          I just -- Mr. Brody struggled to find the words for

15 what we re asking for.  The words are equally and ratably.

16 We re equal and ratable.  So that -- he has no defense to

17 provisions that give them the right to appoint the board in

18 perpetuity.

19          We ve agreed that because you need to have something

20 to function, they have the right to appoint the initial

21 board.  That s the discussion that we had last week.  It

22 cannot be the case that it s equal treatment.  No one could

23 look at this and say that our treatment is equal to the

24 treatment of JHL.  We are a larger shareholder than them, yet

25 we have absolutely no governance rights; no rights under the

1  agreement.  And, in fact, even the right to vote can easily

2  be stripped from us.  Our preemptive rights easily be

3  stripped from us.

4         So we just want equal treatment.  That s what we

5  proposed we believe would satisfy the equal treatment

6  requirement.  And that s why we made that proposal, Your

7  Honor.  But we think that the collateral agency agreement and

8  the settlement agreement requires that.

9         THE COURT:  Okay.  Well, here s where I come out and

10  I m going to liberalize because there s no formal motion in

11  front of me.  I ve got a request by letter from Mr. Leblanc

12  that I make certain rulings, which is fine.  We ve been doing

13  this kind of off and on now for a couple of weeks where a

14  dispute comes up and I decide it without formal motion

15  papers, but I m going to deny the relief requested by Mr.

16  Leblanc for the following reasons.

17         I believe that the settlement agreement, which is

18  what I m -- what is my hook and, frankly, what I care about

19  deals with, again, equal and ratable treatment.  And the sale

20  documentation being reasonably acceptable is that it s

21  consistent with the terms of the settlement and the

22  collateral agency agreement and related prepetition security

23  documents.

24         Equal and ratable, I believe, is focused not on

25  corporate governance provision, but is, rather, focused on

1  the distribution of the membership interest to make sure that

2  they fairly and accurately reflect the agreement under the

3  prepetition collateral agreement as to who gives what

4  percentage.  I don t think it requires this Court and to the

5  extent it authorizes me to do it, I m declining the

6  opportunity to engage myself in negotiations over what the

7  LLC agreement does or doesn t provide in connection with its

8  corporate governance.

9       If I m wrong and equal and ratable means these kinds

10 of provisions need to be in the LLC agreement and they re

11 not, you can either not close or if you do close, you can

12 fight about this in some Court of confident jurisdiction

13 that s not U.S. Bankruptcy Court in the District of Delaware.

14 If the provisions and operations of this -- if the sale

15 closes and going forward there are disputes over what the Ad

16 Hoc groups  members do or don t do and how that operates is

17 whether it s consistent with fiduciary duties, again that s

18 an issue for some other Court and not this Court.

19      I m looking at the settlement agreement.  And in my

20 mind, I haven t seen anything identified that s inconsistent

21 with the settlement agreement and I haven t seen anything

22 that s inconsistent with the prepetition collateral agency

23 agreement.  The only reason I look at that is it s

24 incorporated in the settlement; otherwise, I wouldn t bother

25 to look at that either because that s not my problem.

1       So at the end of the day if you guys want to litigate
2  over whether or not you should close or not based on these
3  kinds of rulings and where I think you should go forward go
4  file a lawsuit in State Court and, you know, stop trying to
5  get me involved.  I m not going do anymore decisions on these
6  disputes between these two creditors.  You ve got everything
7  you need from me and you can make your business decision to
8  either go forward with the transaction or not.

9       And if you don t, so be it.  And that property will
10 stay in the estate and it will get managed by whatever
11 Trustee is put in place, whether eleven or seven.  And if you
12 do terrific.  The state will get its money in order to help
13 fund operations at the mine.  And you can forward owning this
14 asset and you can agree to disagree in some other Court.  But
15 I don t see anything that s been put in front of me today
16 that I find to be inconsistent with the settlement agreement
17 or the collateral agency agreement.  That s where I come out.

18      Is there a question?

19      MS. LAUKITIS:  Yes, it s Lisa Laukitis from Jones
20 Day.  I do have a clarifying statement, I think, and a
21 question for you.

22      You referenced a few times that it was to the parties
23 to decide whether they wanted to go forward.  I believe it s
24 not between the Tens and Oaktree as to decide whether they
25 want to close the sale.  It s really between the Debtors and

1    the Tens or the purchaser entity as currently controlled by

2    the Tens pursuant to the credit bid.  What I have heard you

3    say a few times is that you believe that there s nothing in

4    the settlement agreement that would address this current

5    dispute and that the -- there would be nothing to prevent or

6    restrict our ability to close the sale.  And, in fact, it

7    sounds like you might be directing us to close to the extent

8    there s nothing in the settlement agreement that would give

9    us a reason not to.  Am I hearing that correctly?

10           THE COURT:  I m not directing anybody to close.  If

11   there are no impediments to close based on my ruling and the

12   parties don t close and the Debtors are damaged, they can sue

13   in Bankruptcy Court and I ll enforce whatever damages that

14   exist based on a breach of my sale order, to the extent that

15   exists.

16           I m not --, I don t have those documents in front of

17   me.  I don t have the plan in front of me so whether or not

18   there s an obligation to close that would give the Debtors

19   some right if that is breached, I m not going to say right

20   now.  But if there is an obligation and it doesn t occur and

21   the Debtors are damaged, they can always seek relief from the

22   Court.

23           Does that answer your question?

24           MS. LAUKITIS:  (no audible response)

25           MR. LEAKE:  Your Honor, Paul Leake, if I can try a

1  little bit more.

2       The closing is between the Debtors and the purchaser

3  entity.  And I think the question that we re trying to get

4  some clarity on and is, okay, given your ruling then does

5  that mean the Debtors are compelled to close at this point or

6  not compelled to close?  Our understanding was they were

7  going to resolve their issues and once they resolve their

8  issues as the purchaser then they re -- consensually the

9  Debtors were going to close and it s all going to be fine.

10       Now the open issue is if we go ahead and close if we

11  have Oaktree presumably taking whatever actions they want

12  with respect to that saying we shouldn t have because it s

13  inconsistent with the settlement agreement.  And then flip

14  side is if we don t them taking the same position.  So I

15  guess the way they frame it as a question to you is since

16  we re -- this is all having been done by the parties by

17  letter, is it appropriate for us to file a motion seeking

18  authority to or a declaration, perhaps, of that, in fact,

19  conditions have been satisfied for a closing.

20       Because what I don t want to do is end up we get off

21  this phone call and we say do we close or not close knowing

22  that there s going to be a fight either way.  And we re

23  hoping that, you know, a lot of opening consents because they

24  were getting to the point we don t have this problem.  But,

25  second, if they can t get here which after, you know, these

1  rulings I doubt they do, then the next thing is what I don t

2  want to do is end up they re either taking an action to close

3  or not, but at least one of the parties to it, and then that

4  leading to just more litigation down the road with the

5  Debtors for having taken or not taken an action.

6       So that s what I think what Mr. Laukitis was trying

7  to get to.  And one of your concerns was that we were doing

8  this procedurally in a strange way thus far.  Is it something

9  that a motion on notice to parties seeking, you know, a

10  determination what is something that makes it more palatable

11  to, to -- from your perspective about our getting more

12  clarity as to either the authority or the propriety of going

13  or not going ahead with the closing.

14       If I wasn t as clear, it could be otherwise, but

15  clarity to lay out what the issue is that I see and Ms.

16  Laukitis sees before us.

17       MR. BRODY:  Your Honor, could I be heard on this

18  point?

19       THE COURT:  Yes.

20       MR. BRODY:  Again, Josh Brody from Kramer Levin.

21       I understand exactly the question that Mr. Leake and

22  Ms. Laukitis are asking and I think because the way Your

23  Honor I think responded to Ms. Laukitis was you know if there

24  is no closing the Debtor is damaged.  I think the way that

25  I m thinking about is my clients are absolutely prepared to

1 close right now.  And the way we view Your Honor s ruling is

2 that Oaktree s rights have not been triggered by the -- the

3 potential, I should say, has not been triggered by the

4 settlement agreement so there really is no reason why the

5 closing shouldn t take place.

6        And I don t think there s a need for a motion or the

7 like, everything from Your Honor s perspective.  And I

8 appreciate Your Honor does not have the sale order or any of

9 those documents in front of him, but it s just a function of

10 -- there was one dispute over whether or not certain

11 agreement has Oaktree consent right.  Your Honor has ruled

12 that it does not, so there really shouldn t be required any

13 further motion or anything.  We should just be allowed to

14 finish the hearing and close.

15        THE COURT:  Well, here s what I ll say.  Okay.  To

16 the extent that the only thing keeping this transaction from

17 closing was the complaint that had been articulated to me

18 today by Mr. Leblanc and in his letter that I am rejecting,

19 then there s no reason not to close.  If the parties can t

20 get comfortable with that statement and want further

21 guidance, and I guess I m looking specifically to the Debtor

22 in this situation, then I suppose you can seek further relief

23 from the Court and the best way to do it would be by motion.

24        But if the parties were ready to close except for

25 what s been put in front of me today that s been rejected

1  then there s, I believe, no reason they can t close.  I m not

2  going to direct anyone to close based on incomplete

3  information, and I don t feel comfortable with what is in

4  front of me today in the procedural posture that I have in

5  the documents that I m reading off my computer and I m doing

6  the best I can.  I don t feel comfortable compelling anybody

7  to do anything.  But if the parties were comfortable with

8  closing, if this dispute hadn t arose, then I think they have

9  the authority to close.

10         MR. LEBLANC:  Your Honor, this is Andrew Leblanc from

11  Milbank.

12         Could we ask Your Honor that an order be entered with

13  respect to the relief requested?

14         THE COURT:  What relief?  You actually haven t asked

15  for relief.

16         MR. LEBLANC:  Understood.  Well, I was going to

17  suggest that either we or the Ad Hoc group could submit an

18  order.  It s just that we -- I need to obviously consult with

19  my client, but to the extent Your Honor has ruled that the

20  settlement agreement is not implicated by the LLC agreement,

21  we need to preserve our rights with respect to that to the

22  extent that we choose to appeal that.

23         THE COURT:  Well, I think --

24         MR. LEBLANC:  We re not going to seek to stay the

25  closing, Your Honor --

1      THE COURT:  I think you have the order you need.  I

2  think you have -- I think you have the sale order and the

3  order approving the settlement agreement.  And if you believe

4  that actions taken as clarified by me are violation of that

5  order then you have the only order you need.

6      I m simply clarifying the scope of my previous order

7  so that s the order to appeal.  And I suppose you should get

8  busy because your clock is ticking on it.  But I m not going

9  to issue -- I can tell you now, you can file a motion.  I m

10  not going to issue a ruling.  You will have to get that from

11  --

12      MR. LEBLANC:  It wasn t -- no, no, Your Honor.  I

13  started to say that we re not seeking a stay pending appeal.

14  I just want to make sure that we -- because this order --

15  Your Honor s direction today is the only issue about which we

16  -- I need to consult with my client as to whether or not we

17  need to take an appeal from that.

18      THE COURT:  Well, I view my action today not to

19  justify a subsequent order, but to be a ruling in furtherance

20  of what my previous order means.  So I think if you re going

21  to appeal anything you should appeal the order I ve already

22  done.

23      MR. LEBLANC:  Understood, Your Honor.

24      THE COURT:  Okay.  Anything else?  And I m hearing

25  radio silence which is good.  I don t know when we re last

1  going to -- when we re next going to meet but I suppose it

2  will be by teleconference tomorrow.  But if things keep

3  things along the way they ve been going, but it will be what

4  it will be and if you have any further issues contact

5  Chambers.

6          Thank you very much.

7          MR. LEBLANC:  Thank you, Your Honor.

8       (Adjourned)

9

10

11                    CERTIFICATE

12  I certify that the foregoing is a correct transcript from the

13  electronic sound recording of the proceedings in the above-

14  entitled matter.

15
    /s/Mary Zajaczkowski_____           April 21, 2016_____
16  Mary Zajaczkowski, CET**D-531                 Date

17

18

19

20

21

22

23

24

25