# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| N. | Preservation of Causes of Action | 58 |
| O. | Administrative Consolidation | 59 |
| P. | Payment of Indenture Trustee Allowed Fees | 59 |

**ARTICLE V. TREATMENT OF COMPENSATION AND BENEFITS PROGRAMS** ... 59

| | | |
|---|---|---|
| A. | MIP | 59 |
| B. | Employee Compensation and Benefits Programs | 59 |
| C. | Magnequench Pension Plan | 60 |
| D. | Workers' Compensation Programs | 60 |

**ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ... 60

| | | |
|---|---|---|
| A. | Assumption of Executory Contracts or Unexpired Leases | 60 |
| B. | Cure of Defaults for Assumed Executory Contracts or Unexpired Leases | 61 |
| C. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 62 |
| D. | Preexisting Obligations to the Plan Debtors Under Executory Contracts or Unexpired Leases | 63 |
| E. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 63 |
| F. | Assignments Related to the Restructuring Transactions | 63 |

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS** ... 63

| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to be Distributed | 63 |
| B. | Distribution on Account of Claims Allowed After the Effective Date | 64 |
| C. | Rights and Powers of Disbursing Agent | 64 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 65 |
| E. | Means of Cash Payments | 67 |
| F. | Establishment of Reserves | 67 |
| G. | Compliance with Tax Requirements | 67 |
| H. | Surrender of Cancelled Instruments or Securities | 68 |
| I. | Claims Paid or Payable by Third Parties | 68 |
| J. | Setoffs | 69 |
| K. | Fractional Plan Distributions | 69 |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| L. | Allocation Between Principal and Accrued Interest | 69 |

**ARTICLE VIII. RESOLUTION OF DISPUTED CLAIMS** .................................................. 70
- A. Resolution of Disputed Claims ..................................................................... 70
- B. Distributions on Account of Disputed Claims Once Allowed ...................... 71
- C. Authority to Amend Schedules ..................................................................... 71
- D. Disallowance of Claims ................................................................................ 72
- E. Expungement or Adjustment to Claims Without Objection .......................... 72
- F. Amendments to Claims ................................................................................. 72

**ARTICLE IX. SETTLEMENT, DISCHARGE RELEASE, INJUNCTION AND RELATED PROVISIONS** ............................................................................................ 72
- A. Compromise and Settlement of Claims, Interests, and Controversies .......... 72
- B. Subordinated Claims ..................................................................................... 73
- C. Discharge of Claims ...................................................................................... 73
- D. Plan Debtor Release ...................................................................................... 74
- E. Releases by Holders of Claims and Interests ................................................ 75
- F. Molycorp Minerals Debtors Release ............................................................. 77
- G. Exculpation ................................................................................................... 78
- H. Injunction ...................................................................................................... 78

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ............................................................................ 80
- A. Conditions to Confirmation ........................................................................... 80
- B. Conditions Precedent to the Effective Date .................................................. 81
- C. Waiver of Conditions to Confirmation or the Effective Date ....................... 81
- D. Effect of Nonoccurrence of Conditions to the Effective Date ...................... 81
- E. Request for Waiver of Stay of Confirmation Order ...................................... 82

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ........................................................................................................................... 82
- A. Modification and Amendments ..................................................................... 82
- B. Effect of Confirmation on Modifications ..................................................... 82
- C. Revocation or Withdrawal of the Plan .......................................................... 83

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| **ARTICLE XII. RETENTION OF JURISDICTION** | | 83 |
| **ARTICLE XIII. MISCELLANEOUS PROVISIONS** | | 85 |
| A. | Immediate Binding Effect | 85 |
| B. | Additional Documents | 85 |
| C. | Payment of Statutory Fees | 85 |
| D. | Oaktree Fees and Expenses | 85 |
| E. | Dissolution of the Creditors' Committee | 86 |
| F. | Request for Expedited Determination of Taxes | 86 |
| G. | Nonseverability of Plan Provisions | 86 |
| H. | Headings | 87 |
| I. | Successors and Assigns | 87 |
| J. | Service of the Plan Supplement and Disclosure Statement Exhibits | 87 |
| K. | Service of Documents | 87 |

## INTRODUCTION

Molycorp, Inc. and the other Plan Debtors, propose the following joint plan of reorganization for the resolution of the outstanding claims against, and equity interests in, the Plan Debtors pursuant to chapter 11 of the Bankruptcy Code. The Plan Debtors include all of the Debtors in the above-captioned cases *except for*: (1) PP IV Mountain Pass II, Inc.; (2) PP IV Mountain Pass Inc.; (3) RCF Speedwagon Inc.; (4) Molycorp Minerals, LLC ("Molycorp Minerals"); (5) Industrial Minerals, LLC; and (6) Molycorp Advanced Water Technologies, LLC (collectively, the "Molycorp Minerals Debtors"). The Plan Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

In this Plan, the Debtors have revised the Third Amended Joint Plan of Reorganization [Docket No. 1393] (the "Third Amended Plan") to (a) incorporate the terms of the 10% Noteholder Group Settlement and (b) remove the Molycorp Minerals Debtors in accordance with Section XI.C of the Third Amended Plan, and the Third Amended Plan is hereby withdrawn with respect to the Molycorp Minerals Debtors.

While the Plan has been withdrawn as to the Molycorp Minerals Debtors, the Plan nevertheless contemplates certain settlements between the Plan Debtors and the Molycorp Minerals Debtors pursuant to, among other things, the terms of the 10% Noteholder Group Settlement (as defined below). In broad strokes, the Plan contemplates two possible alternative plan structures (the "Plan Alternatives"): (1) the sale of the Downstream Businesses pursuant to the Plan and distributions to creditors of the Net Proceeds from such sale on the Effective Date of the Plan (the "Downstream Businesses Sale"); or (2) if the Plan Debtors' sales process is unsuccessful in attracting a bid (or combination of bids) sufficient to trigger the conditions for the Downstream Businesses Sale or the Plan Debtors are otherwise unable to consummate the Downstream Businesses Sale, a stand-alone reorganization around the Downstream Businesses (the "Stand-Alone Reorganization").

The Plan incorporates the terms of the Committee Settlement Agreement among the Debtors, Oaktree, the Creditors' Committee and National Union. The treatment for Holders of Claims and Interests herein conforms to the agreements reached between the Committee Settlement Parties in the Committee Settlement Agreement.

Holders of Claims and Interests may refer to the Disclosure Statement for a more detailed discussion of the Plan Alternatives, the Plan Debtors' history, businesses, results of operations, historical financial information, projections, and assets; events occurring during these Chapter 11 Cases; and the ongoing sales process. In addition, an explanation of the Committee Settlement Agreement, a description of the settlements contained in the Plan related to the Committee Settlement Agreement and a summary of the distributions to be made hereunder are set forth in the Plan Settlement Summary [Docket No. 1393].

Other agreements and documents supplement the Plan and have been or will be Filed with the Bankruptcy Court as part of the Plan Supplement no later than seven (7) days prior to the Voting Deadline.

# ARTICLE I.
# DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### A. Defined Terms

As used in this Plan, capitalized terms have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1. **"10% Noteholder"** means any Holder of the 10% Notes.

2. **"10% Noteholder Group Settlement"** means that certain 10% Noteholder Group Settlement Among the Ad Hoc 10% Noteholders, the Debtors, Oaktree and the Creditors' Committee, dated March 25, 2016 and filed with the Court [Docket No. 1495].

3. **"10% Noteholder Permitted Credit Bid"** means the credit bid for the Molycorp Minerals Purchased Assets pursuant to the terms of the 10% Noteholder Group Settlement.

4. **"10% Noteholder Permitted Credit Bid APA"** means the approved asset purchase agreement for the credit bid for the Molycorp Minerals Purchased Assets pursuant to the terms of the 10% Noteholder Group Settlement.

5. **"10% Notes"** means those 10% Senior Secured Notes due 2020 issued pursuant to the 10% Notes Indenture.

6. **"10% Notes Claim"** means a Claim arising from or under the 10% Notes and the 10% Notes Indenture subject to the stipulation between the Creditors' Committee, the Ad Hoc 10% Noteholders and the 10% Notes Indenture Trustee [Docket No. 1327], which shall be Allowed in the amount of $687.2 million.

7. **"10% Notes Deficiency Claim"** means the Allowed 10% Notes Claim in Class 5A, which shall be Allowed in the amount of $680.7 million.

8. **"10% Notes Documents"** means the 10% Notes Indenture and all other agreements, documents, and instruments executed in connection therewith.

9. **"10% Notes Indenture"** means that certain indenture dated as of May 25, 2012, by and among Parent, as issuer, certain of its subsidiaries as guarantors, and the 10% Notes Indenture Trustee, as the same may have been amended, restated, supplemented, or otherwise modified from time to time.

10. **"10% Notes Indenture Trustee"** means UMB Bank, National Association, in its capacity as successor trustee under the 10% Notes Indenture, or any successor trustee thereunder.

11. **"10% Notes Secured Claim"** means the portion of the Allowed 10% Notes Claim equal to the value of the distribution on account of the 10% Notes pursuant to

section III.B.4.c of the Plan.

12.     **"9019 Settlement"** means the settlements and compromises contained in the Plan including the terms of the Committee Settlement Agreement and the 10% Noteholder Group Settlement to the extent incorporated into the Plan.

13.     **"Ad Hoc 10% Noteholders"** means the ad hoc group of holders of the 10% Notes comprised of the signatories to the 10% Noteholder Group Settlement.

14.     **"Administrative Claim"** means a Claim for costs and expenses of administration Allowed under sections 503(b), 507(a)(2), or 1114(e)(2) of the Bankruptcy Code, including claims for the following: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Plan Debtors (such as wages, salaries, commissions for services and payments for goods delivered or services rendered, including leased equipment and premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or Allowed under sections 330 and 331 of the Bankruptcy Code, including Fee Claims (to the extent Allowed); (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; and (d) Intercompany Claims incurred after the Petition Date.

15.     **"Administrative Claims Bar Date"** means the first Business Day that is 30 days after the Effective Date or such earlier date as specified in the Bar Date Order for a particular Administrative Claim, subject to any exceptions specifically set forth in the Plan or Confirmation Order.

16.     **"Administrative Claims Objection Deadline"** means the date that is 60 days after the Effective Date, subject to any exceptions specifically set forth in the Plan or Confirmation Order.

17.     **"Adversary Proceeding"** means adversary proceeding #16-50005, captioned Official Committee of Unsecured Creditors of Molycorp, Inc., et al. v. Oaktree Capital Management, L.P., et al.

18.     **"Affiliate"** means an "affiliate," as defined in section 101(2) of the Bankruptcy Code.

19.     **"Allowed"** means the following with respect to Claims: (a) any Claim that (i) is timely Filed by the applicable Claims Bar Date or (ii) as to which there exists no requirement for the holder of a Claim to File such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order; (b) any Claim that (i) is listed in the Schedules as not contingent, not unliquidated, and not disputed and (ii) for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed under the Plan or by a Final Order. With respect to any Claim described in clauses (a) and (b) above, such Claim will be considered "Allowed" only if, and to the extent that, (i) no objection to the allowance of such Claim has been asserted on or before the Claims Objection Bar Date, or (ii) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order. Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed" hereunder for any purpose other than voting on the Plan.

NAI-1500956096v1

20.     **"Avoidance Actions"** means any and all actual or potential claims and Causes of Action to avoid a transfer of interest in property, or an obligation incurred, by the Plan Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code or under similar state or federal statutes and common law.

21.     **"Ballot"** means the form distributed to Holders of Impaired Claims entitled to vote on the Plan on which such Holders indicate whether they vote to accept or reject the Plan.

22.     **"Bankruptcy Code"** means title 11 of the United States Code, as it was in effect on the Petition Date or thereafter amended with retroactive applicability to the Chapter 11 Cases.

23.     **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

24.     **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended with retroactive applicability to the Chapter 11 Cases.

25.     **"Bar Date Order"** means the order of the Bankruptcy Court entered on August 17, 2015 [Docket No. 393], establishing certain deadlines for the Filing of Proofs of Claims in the Debtors' chapter 11 cases, as the same may be amended, modified, or supplemented.

26.     **"Bid Procedures"** means the bidding procedures attached as Exhibit 1 to the Bid Procedures Order that will govern the Molycorp Minerals Sale and the Downstream Businesses Sale.

27.     **"Bid Procedures Order"** means the Order (A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Certain Bidder Incentives in Connection with the Debtors' Entry Into Stalking Horse Agreements, if Any, and (C) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases [Docket No. 1095] and annexed as Exhibit 3 to the Disclosure Statement.

28.     **"Business Day"** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

29.     **"C&O"** means Parent's chemicals and oxides Downstream Business.

30.     **"Cash"** means the lawful currency of the United States of America and equivalents thereof.

31.     **"Causes of Action"** means any claim, cause of action (including Avoidance Actions), controversy, demand, right of setoff or recoupment, cross claim, counterclaim, demand, right, action, lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, remedies, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or

-4-

unsecured, foreseen or unforeseen, direct or indirect, choate or inchoate, assertable directly or derivatively (including without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any securities laws, fraudulent transfer or similar claims.

32. **"Chapter 11 Cases"** means the cases that the Plan Debtors commenced on the Petition Date in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

33. **"Claim"** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Plan Debtor.

34. **"Claims Bar Date"** means the applicable bar date by which a Proof of Claim or a request for payment of Administrative Claim must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and the Confirmation Order, and which was October 13, 2015 under the Bar Date Order for most holders of prepetition claims and December 23, 2015 under the Bar Date Order for all governmental units holding Claims against the Plan Debtors.

35. **"Claims Objection Bar Date"** means, for all Claims, the later of (a) 180 days after the Effective Date or (b) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order or a Final Order for objecting to a particular Claim.

36. **"Claims Register"** means the official register of Claims maintained by Prime Clerk.

37. **"Class"** means a class of Claims or Interests, as described in Article III.

38. **"Class 5 Cash Out Creditors"** means Holders of Allowed Claims in Class 5A that (i) elect to receive Cash, rather than Class 5A Equity by and pursuant to the Class 5A Cash Election Procedure and Deadline or (ii) (a) hold such Claim in Class 5A in an amount which is less than $1,000,000 and (b) fail to opt-out of receiving Cash instead of Class 5A Equity by and pursuant to the Class 5A Cash Election Procedure and Deadline.

39. **"Class 5 Cash Out Option"** means, if the Downstream Businesses Sale Trigger does not occur, the right of Class 5 Cash Out Creditors, subject to the Class 5 Cash Out Oversubscription and the provisions of Section IV.A.2 of this Plan, to receive a Cash payment on account of their Allowed Claim in Class 5A in an amount equal to the Imputed Value of the Class 5A Equity, which amounts shall be paid solely from the Class 5A Stand-Alone Cash Distribution; *provided,* that any and all Class 5A Equity that is not distributed to Holders of Allowed Claims electing the Class 5 Cash Out Option shall be distributed to Holders of Allowed Claims in Class 5A, which are receiving Class 5A Equity, on a Pro Rata basis.

-5-

40. **"Class 5 Cash Out Oversubscription"** means the point at which the aggregate amount of Cash to be paid to Class 5 Cash Out Creditors would result in payments of Cash by the Plan Debtors or Reorganized Plan Debtors in excess of the Class 5A Stand-Alone Cash Distribution.

41. **"Class 5A Cash Election Procedure and Deadline"** means the process of making the applicable election, through Prime Clerk, on or before the date that is forty-five (45) Business Days after the Confirmation Date all as more fully described in the Notice of Class 5A Cash Out Election, which notice shall be an exhibit to the Confirmation Order.

42. **"Class 5A Equity"** means 7.5% of the Reorganized Parent Common Equity, subject to dilution by the MIP.

43. **"Class 5A Insurance Payment"** means $3 million to be paid by National Union to the Parent and distributed to the Holders of Claims in Class 5A.

44. **"Class 5A Sale Distribution"** means 7.5% of the Downstream Businesses Sale Net Proceeds and Cash remaining at the Plan Debtors on the Effective Date after the following amounts required to be paid under the Plan have been paid in full in cash (i) Administrative Claims (other than the DIP Facility Claims), (ii) Priority Tax Claims, (iii) Other Priority Claims, (iv) General Unsecured Claims against the Downstream Plan Debtors and (v) the Wind-Down Reserve.

45. **"Class 5A Stand-Alone Cash Distribution"** means $2 million in Cash, which Cash shall be used to fund the Class 5 Cash Out Option if the Downstream Businesses Sale Trigger does not occur; *provided*, that to the extent there is excess Cash after the Class 5 Cash Out Creditors receive their distributions, such Cash shall be distributed to Holders of Allowed Claims in Class 5A on a Pro Rata basis.

46. **"Class 5A Stand-Alone Distribution"** means the Class 5A Equity and/or the Class 5A Stand-Alone Cash Distribution, as applicable.

47. **"Committee Settlement Agreement"** means that certain Agreement Between Oaktree, Molycorp Inc. and Its Affiliated Debtors in Possession, the Official Committee of Unsecured Creditors of Molycorp Inc., et al, and National Union Fire Insurance Company of Pittsburgh, Pa. (solely with Respect to Section IV) to Resolve Asserted Claims Against Oaktree and the Debtors' Directors & Officers and to Address Related Chapter 11 Issues, executed on the Committee Settlement Effective Date and filed with the Court [Docket No. 1302, Ex. A].

48. **"Committee Settlement Effective Date"** means February 22, 2016.

49. **"Committee Settlement Parties"** means the Debtors, Oaktree, the Creditors' Committee, National Union (solely with respect to Section IV of the Committee Settlement Agreement) and the Directors and Officers (solely with respect to Section IV of the Committee Settlement Agreement).

50. **"Compensation and Benefits Program"** means all of the Plan Debtors' employment and severance policies, and all compensation, and benefit plans, policies, and

programs, and other arrangements (and all amendments and modifications thereto), in each case in place as of the Effective Date.

51.    **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases.

52.    **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

53.    **"Confirmation Hearing"** means, collectively, the hearing or hearings held by the Bankruptcy Court on the confirmation of the Plan.

54.    **"Confirmation Order"** means the order of the Bankruptcy Court that confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

55.    **"Convertible Notes"** means, collectively, the following unsecured convertible notes issued by Parent: (a) those certain 3.25% Convertible Senior Notes due 2016 and issued pursuant to that certain Indenture dated as of June 15, 2011, between Parent and Delaware Trust Company, as successor trustee (the "2016 Indenture"); (b) those certain 6.00% Convertible Senior Notes due 2017 and issued pursuant to that certain Base Indenture (as supplemented by the First Supplemental Indenture dated as of August 22, 2012), between Parent and Wilmington Savings Fund Society, FSB, as successor trustee (the "2017 Indenture"); (c) those certain 5.50% Convertible Senior Notes due 2018 and issued pursuant to that certain Base Indenture (as supplemented by the Second Supplemental Indenture dated as of January 30, 2013), between Parent and Wilmington Savings Fund Society, FSB, as successor trustee (the "2018 Indenture").

56.    **"Convertible Notes Claim"** means a Claim arising under or in connection with (a) the Convertible Notes or (b) the Convertible Notes Indentures.

57.    **"Convertible Notes Indentures"** means, collectively, the applicable indentures (as such indentures may have been amended or restated) governing the Convertible Notes.

58.    **"Convertible Notes Indenture Trustees"** means, collectively, Wilmington Savings Fund Society, FSB, as successor trustee under the 2017 Indenture and the 2018 Indenture, and Delaware Trust Company, as successor trustee under the 2016 Indenture.

59.    **"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases under section 1102 of the Bankruptcy Code.

60.    **"Creditors' Committee Consent Right"** means in form and substance acceptable to the Creditors' Committee, *provided* that notwithstanding anything to the contrary contained herein, such consent right shall apply solely with respect to matters contained in the Committee Settlement Agreement.

61.    **"Creditors' Committee Legal Fee Cap Matters"** means any amounts incurred on and after the Committee Settlement Effective Date with respect to the matters set forth in Section I.5 of the Committee Settlement Agreement.

62.   **"Creditors' Committee Legal Fee Cap"** means an amount not to exceed $250,000.

63.   **"Creditors' Committee Omnibus Objection to Claims"** means that certain First Omnibus Objection and Memorandum of Law of Official Committee of Unsecured Creditors to Claim No. 367 (Filed by Magnequench International, Inc. Against Molycorp, Inc.), Claim No. 368 (Filed by Magnequench, Inc. Against Molycorp, Inc.), Claim No. 391 (Filed by Molycorp, Inc. Against Molycorp Luxembourg Holdings S.à r.l.), Claim No. 427 (Filed by Molycorp Minerals Canada ULC Against MCP Exchangeco, Inc.), and Claim No. 435 (Filed by Molycorp, Inc. Against MCP Exchangeco, Inc.) (Substantive: Recharacterization and Disallowance) [Docket No. 1235].

64.   **"Cure Cost"** means the amounts required to cure any monetary defaults under an Executory Contract or Unexpired Lease that the Debtors intend to assume or assume and assign (as applicable) under sections 365 or 1123 of the Bankruptcy Code (or such lesser amount that may be agreed upon by the parties under an Executory Contract or Unexpired Lease).

65.   **"De Minimis Plan Debtors"** means Molycorp Metals & Alloys, Inc.

66.   **"Debtor Group"** has the meaning given to it in Section III.A.

67.   **"Debtors"** means, collectively, the following Entities: Parent; Industrial Minerals, LLC; Magnequench, Inc.; Magnequench International, Inc.; Magnequench Limited; Molycorp Advanced Water Technologies, LLC; MCP Callco ULC; MCP Canada Holdings ULC; MCP Canada Limited Partnership; MCP Exchangeco Inc.; Molycorp Chemicals & Oxides, Inc.; Molycorp Luxembourg Holdings S.à r.l.; Molycorp Metals & Alloys, Inc.; Molycorp Minerals Canada ULC; Molycorp Minerals, LLC; Molycorp Rare Metals Holdings, Inc.; Molycorp Rare Metals (Utah), Inc.; Neo International Corp.; PP IV Mountain Pass, Inc.; PP IV Mountain Pass II, Inc.; RCF IV Speedwagon Inc.

68.   **"DIP Credit Agreement"** means the Secured Superpriority Debtor-in-Possession Credit Agreement (as amended, modified, or supplemented from time to time) by and among Parent (as borrower), the DIP Facility Guarantors, the DIP Lenders, and the DIP Facility Agent, as approved by the DIP Order.

69.   **"DIP Facility"** means that certain secured, superpriority debtor-in-possession financing facility in the aggregate principal amount of $135,416,667 entered into pursuant to, and governed by the terms of, the DIP Credit Agreement and the DIP Order.

70.   **"DIP Facility Agent"** means Wilmington Trust, National Association (as Administrative Agent and Collateral Agent), or any successor or designee thereof.

71.   **"DIP Facility Claims"** means any Claims arising under, or in connection with, the DIP Facility.

72.   **"DIP Facility Guarantors"** means (a) Molycorp Luxembourg Holdings S.à r.l.; (b) MCP Exchangeco Inc.; and (c) MCP Callco ULC.