73.     **"DIP Lenders"** means the lenders that are party to the DIP Facility from time to time.

74.     **"DIP Order"** means the Final Order Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code (I) Authorizing Debtors to Obtain Superpriority Secured Debtor-in-Possession Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, and (IV) Granting Related Relief [Docket No. 278].

75.     **"Directors and Officers"** means the Debtors' and the Non-Debtor Affiliates' current and former directors and officers.

76.     **"Directors and Officers Consent Right"** means in form and substance acceptable to the Directors and Officers named as defendants in the Adversary Proceeding, *provided, however*, such consent right shall be limited solely to provisions in this Plan which embody Section IV of the Committee Settlement Agreement or any amendments or modifications to the release, exculpation, and injunction provisions set forth in Article IX, and solely to the extent such amendments or modifications are inconsistent with such provisions as set forth in the Second Amended Plan as modified to reflect Section IV of the Committee Settlement Agreement.

77.     **"Disbursing Agent"** means, on the Effective Date, the Post-Effective Date Plan Debtors or their agent or any other Entity or Entities designated by the Plan Debtors or the Post-Effective Date Plan Debtors to make or facilitate distributions required under the Plan.

78.     **"Disclosure Statement"** means the Second Amended Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization dated January 20, 2016, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law, as approved by the Disclosure Statement Order.

79.     **"Disclosure Statement Order"** means that certain Order (A) Approving Disclosure Statement, (B) Approving the Form and Manner of Service of Disclosure Statement Notice, (C) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Reorganization, (D) Scheduling Hearing on Confirmation of Plan of Reorganization and (E) Approving Procedures for the Assumption of Executory Contracts and Unexpired Leases [Docket No. 1144].

80.     **"Disputed"** means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

81.     **"Distribution Date"** means, except as otherwise set forth in the Plan, such date or dates selected by the Post-Effective Date Plan Debtors in accordance with the terms of the Plan to make distributions on account of Allowed Claims.

82.     **"Distribution Record Date"** means the date for determining which Holders of Allowed Claims, other than Holders of Claims related to public securities, are eligible to receive

distributions hereunder, which shall be (a) the Confirmation Date or (b) such other date as designated in the Confirmation Order. The Distribution Record Date for Holders of Allowed Claims related to public securities shall be the date on which distributions are made to holders of public securities pursuant to the terms of the Plan.

83. **"Document Website"** means the internet site address https://cases.primeclerk.com/molycorp at which all of the exhibits and schedules to the Plan and the Disclosure Statement will be available to any party in interest and the public, free of charge.

84. **"Downstream Businesses"** means the C&O, MM&A and RM businesses, and which, for the avoidance of doubt, includes Molycorp Silmet.

85. **"Downstream Businesses Sale"** means the sale, pursuant to the terms hereof and the Bid Procedures Order and subject to the approval of the Bankruptcy Court, which approval shall be sought in connection with the confirmation of the Plan, of substantially all of the Plan Debtors' assets associated with each of the Downstream Businesses, but excluding Excluded Assets.

86. **"Downstream Businesses Sale Agreements"** means any and all agreements entered into by and between any of the Plan Debtors and one or more purchasers in connection with the Downstream Businesses Sale, including any asset purchase agreements, stock purchase agreements or other agreements effectuating and consummating the Downstream Businesses Sale and any exhibits, attachments, annexes, or schedules to any of the foregoing, the form of which material agreements shall be included in the Plan Supplement, with definitive material agreements included in the Plan Supplement within two (2) Business Days of their execution.

87. **"Downstream Businesses Sale Net Proceeds"** means the Net Proceeds from the sale of the Downstream Businesses.

88. **"Downstream Businesses Sale Trigger"** means if the aggregate total of the estimated Downstream Businesses Sale Net Proceeds (but excluding any non-Cash proceeds) from the highest bid(s) is greater than $520.8 million, unless the Plan Debtors and Oaktree otherwise agree to a lesser amount; provided, however, that if Oaktree submits a credit bid for the Downstream Businesses (as defined in the Bid Procedures), the Creditors' Committee's consent shall also be required to reduce the Downstream Businesses Sale Trigger; provided, further, that any increase in the Downstream Businesses Sale Trigger shall require the consent of Oaktree, the Plan Debtors and the Creditors Committee (which consent, in the case of the Creditors' Committee, shall not be unreasonably withheld), other than an increase to reflect additional sums becoming due as a result of an extension of the maturity date of the DIP Facility (which extension shall be in Oaktree's sole discretion) and any accrual of interest or lease payments on Oaktree's Prepetition Facilities or the Oaktree Lease Agreement, which shall require the consent of only Oaktree and the Plan Debtors.

89. **"Downstream Entities"** means (a) in the case of the Stand-Alone Reorganization: (i) the Downstream Plan Debtors, (ii) Molycorp Metals & Alloys, Inc., Industrial Minerals LLC and any Non-Debtor Affiliates that owe money to Parent; or (b) if the Downstream Businesses Sale Trigger occurs: (i) each of the Entities list in clause (a), plus

-10-

(ii) each of the DIP Facility Guarantors.

90. **"Downstream Entities Intercompany Claims"** means all Claims of Parent against any Downstream Entities.

91. **"Downstream Plan Debtors"** means: (a) Neo International Corp.; (b) Magnequench, Inc.; (c) Magnequench International, Inc.; (d) Magnequench Limited; (e) MCP Canada Holdings ULC; (f) MCP Canada Limited Partnership; (g) Molycorp Chemicals & Oxides, Inc.; (h) Molycorp Minerals Canada ULC; (i) Molycorp Rare Metals Holdings, Inc.; and (j) Molycorp Rare Metals (Utah), Inc.

92. **"Downstream Transferred Assets"** means (i) the Molycorp Silmet Equity; (ii) that certain promissory note issued by Molycorp Silmet to Molycorp Minerals, dated February 13, 2013, and the related Loan Agreement, dated February 13, 2013, between Molycorp Silmet and Molycorp Minerals; (iii) all intellectual property owned by Molycorp Minerals other than the Purchased Intellectual Property (as defined in the 10% Noteholder Group Settlement); and (iv) all Executory Contracts and Unexpired Leases scheduled on the Schedule of Assumed Executory Contracts and Unexpired Leases.

93. **"Effective Date"** means the date that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent specified in Section X.B have been satisfied or waived (in accordance with Section X.C), but in no event later than April 8, 2016, or such later date as agreed to by the Plan Debtors and Oaktree.

94. **"Entity"** means an "Entity" as defined in section 101(15) of the Bankruptcy Code, and includes an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization or government or any political subdivision thereof, or other person (including any "Person" as defined in section 101(14) of the Bankruptcy Code) or Entity.

95. **"ERISA"** means Title IV of the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. §§ 1301-1461 (2012, Supp. I 2013).

96. **"Estate"** means, as to each Plan Debtor, the estate created for that Plan Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

97. **"Excluded Assets"** means (a) any Cash of the Plan Debtors; (b) Avoidance Actions that may be asserted by or on behalf of the Plan Debtors; and (c) intercompany accounts receivable of any Plan Debtor not purchased as part of the sale of the Downstream Plan Debtors (net of intercompany accounts payable) from Entities that are greater than 20% owned, directly or indirectly, by Parent.

98. **"Exculpated Claim"** means any Cause of Action related to any act or omission derived from, based upon, related to or arising from (a) the Chapter 11 Cases, (b) formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the Plan, the Plan Supplement or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement,

-11-

(c) the filing of the Chapter 11 Cases, (d) any post-petition act taken or omitted to be taken in connection with the Chapter 11 Cases or the restructuring of the Plan Debtors, (e) the pursuit of confirmation of the Plan and (f) the administration and implementation of the Plan.

99. **"Exculpated Parties"** means each of: (a) the Plan Debtors; (b) the Creditors' Committee and its members (solely in their capacity as such); and (c) and with respect to the Entities in clauses (a) and (b) such Entity's Representatives solely in their respective capacities as such.

100. **"Executory Contract"** or **"Unexpired Lease"** means a contract or lease (including, with respect to each of the foregoing, any modifications, amendments, addenda or supplements thereto or restatements) to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code and the Confirmation Order.

101. **"Exhibit"** means an exhibit attached to the Plan or included in the Plan Supplement.

102. **"Existing Board"** means the current Board of Directors of Parent.

103. **"Face Amount"** means (a) if a timely proof of Claim has been filed: (i) if the proof of Claim is in a fully liquidated amount, such liquidated amount, (ii) if the proof of Claim includes an unliquidated portion, an amount either (A) set forth in a Final Order resolving such Claim or (B) if no such Final Order has yet been entered, an amount proposed by the Plan Debtors or the Post-Effective Date Plan Debtors in their reasonable estimation, such amount not to be less than the liquidated portion of the Claim; provided, however, that in each case, if a party requests that the amount of the Claim be estimated for purposes of calculating distributions, the Face Amount shall be the amount so estimated by the Bankruptcy Court; or (b) if a proof of Claim has not been filed: (i) the amount set forth in the Schedules, if such amount is listed as liquidated, undisputed and non-contingent; or (ii) if the amount set forth in the Schedules is listed as unliquidated, disputed or contingent, but the applicable creditor still has the right to file a proof of Claim with respect to such Claim, an amount reasonably estimated, in the discretion of the Plan Debtors or the Post-Effective Date Plan Debtors.

104. **"Fee Claim"** means an Administrative Claim of any Professional under sections 328, 330(a), 331, 503, or 1103 of the Bankruptcy Code for compensation for services rendered or expenses incurred in the Chapter 11 Cases.

105. **"Fee Order"** means the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 229] entered by the Bankruptcy Court on July 17, 2015.

106. **"File," "Filed,"** or **"Filing"** means file, filed, or filing with the Bankruptcy Court (or other court) or its authorized designee in the Chapter 11 Cases or, with respect to the filing of a Proof of Claim or proof of Interest, Prime Clerk.

107. **"Final Fee Application"** means an application for final allowance of the Professional's aggregate Fee Claim as described in Section II.A.5.

-12-

108. **"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek rehearing, vacatur, or certiorari has expired or been waived and no appeal or petition for rehearing, vacatur, or certiorari has been timely taken, or as to which any appeal that has been taken, or any petition for rehearing, vacatur, or certiorari that has been, or may be, Filed has been resolved by the highest court to which the order or judgment was appealed from or which rehearing, vacatur, or certiorari was sought. The existence of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order will not prevent such order from being a Final Order.

109. **"General Unsecured Claim"** means any Claim that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Other Priority Claim, Secured Claim, Subordinated Convertible Notes Claim, Section 510(b) Claim, or Intercompany Claim, and which, for the avoidance of doubt, includes the 10% Notes Deficiency Claims and the Convertible Notes Claims and the Oaktree Prepetition Claims to the extent such Claims (or any portion of such Claims) are not Secured Claims at the applicable Plan Debtor; *provided, however,* that notwithstanding the foregoing, Oaktree shall not vote in Class 5A and shall not be entitled to any Class 5A Equity, the Class 5A Stand-Alone Cash Distribution, Class 5A Sale Distribution, and/or Class 5A Insurance Payment.

110. **"Holder"** means an Entity holding a Claim or Interest, as applicable.

111. **"Impaired"** means, with respect to a Class of Claims or Interests, a Claim or an Interest that is Impaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

112. **"Imputed Value"** means the imputed value of the Class 5A Equity, which shall be calculated using the Plan Debtors' midpoint valuation of $417 million, multiplied by .75; *provided,* that Imputed Value shall be utilized solely in connection with the Class 5 Cash Out Option.

113. **"Indenture Trustees"** means (a) the Convertible Notes Indenture Trustees, (b) the Subordinated Convertible Notes Indenture Trustee and (c) the 10% Notes Indenture Trustee.

114. **"Indenture Trustees Allowed Fees"** means the reasonable and documented fees and expenses of each of the Convertible Notes Indenture Trustees and the Subordinated Convertible Notes Indenture Trustee incurred through the Effective Date.

115. **"Indenture Trustees Allowed Fee Payment"** means an amount not to exceed $1.75 million in the aggregate on account of the Indenture Trustees Allowed Fees.

116. **"Insured Claim"** means any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date that is covered under an insurance policy applicable to any of the Plan Debtors or their businesses.

117. **"Intercompany Claim"** means (a) any Claim of any Plan Debtor against any

-13-

other Plan Debtor, (b) any Claim of any Plan Debtor against any Non-Debtor Affiliate and (c) any Claim of any Non-Debtor Affiliate against any Plan Debtor, but not including any Recharacterized Intercompany Claims.

118. **"Interests"** means the common stock, limited liability company interests, and any other equity, ownership, or profits interests in any Plan Debtor and options, warrants, rights, or other securities or agreements to acquire common stock, limited liability company interests, or other equity, ownership, or profits or interests in any Plan Debtor (arising under, or in connection with, any employment agreement), and includes any "Equity Security" (as defined in section 101(16) of the Bankruptcy Code) in any Plan Debtor.

119. **"Internal Revenue Code"** means the Internal Revenue Code of 1986, as amended.

120. **"Judicial Code"** means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

121. **"IRS"** means the Internal Revenue Service of the United States of America.

122. **"Liability"** or **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

123. **"Magnequench Pension Plan"** means the defined benefit pension plan known as the Magnequench International, Inc. Hourly Pension Plan sponsored and maintained by Magnequench International, Inc.

124. **"MII"** means Magnequench International, Inc.

125. **"MIP"** means the post-Effective Date management incentive and retention plan to be formulated and adopted by the New Board.

126. **"MM&A"** means Parent's magnetic materials and alloys Downstream Business.

127. **"Molycorp, Inc. Downstream Intercompany Amount"** means the aggregate total amount of Allowed Downstream Entities Intercompany Claims (after netting any amounts owed to the obligor on each such Claim, but solely to the extent that the net Claim amount is collectible, or owed by a Non-Debtor Affiliate or a Plan Debtor at which Holders of General Unsecured Claims are paid in full), less the costs and expenses of recovery of same (including all Taxes on any such recovery and/or on the deemed or actual distribution of the proceeds of such recovery), but solely to the extent that the net Claim amount is collectible and such Intercompany Claims are Allowed Claims and not recharacterized as Interests.

128. **"Molycorp Minerals"** means Molycorp Minerals, LLC.

129. **"Molycorp Minerals Debtors"** means: (1) PP IV Mountain Pass II, Inc.;

-14-

Case 15-11371-CSS  Doc 1580-1  Filed 04/08/16  Page 7 of 49

(2) PP IV Mountain Pass Inc.; (3) RCF Speedwagon Inc.; (4) Molycorp Minerals, LLC; (5) Industrial Minerals, LLC; and (6) Molycorp Advanced Water Technologies, LLC.

130. **"Molycorp Minerals Debtors Released Parties"** means, collectively, the following Entities: (a) Oaktree; (b) the Creditors' Committee and the members thereof (solely in their capacity as such); (c) the Pari Passu Collateral Agent (solely in its capacity as such); (d) National Union; (e) the Directors and Officers; (f) the Ad Hoc 10% Noteholders; and (g) the 10% Notes Indenture Trustee (solely in its capacity as such).

131. **"Molycorp Minerals Intercompany Amount"** means the value of Intercompany Claims owed to Molycorp Minerals from the Downstream Plan Debtors, Molycorp Metals & Alloys, Inc., Industrial Minerals LLC, Molycorp Silmet and any Non-Debtor Affiliate (after netting any amounts owed to the obligor on such Claims), but solely to the extent that the net Claim amount is collectible and such Intercompany Claims are Allowed Claims and not recharacterized as Interests.

132. **"Molycorp Minerals Purchased Assets"** means the "Purchased Assets" as defined in the 10% Noteholder Permitted Credit Bid APA.

133. **"Molycorp Minerals Sale"** means the sale and purchase of certain assets owned by the Molycorp Minerals Debtors pursuant to the 10% Noteholder Permitted Credit Bid APA.

134. **"Molycorp Silmet"** means Molycorp Silmet AS.

135. **"Molycorp Silmet Equity"** means 100% of the issued and outstanding equity ownership interests of Molycorp Minerals in Molycorp Silmet.

136. **"Mountain Pass"** means the Mountain Pass rare earth mining facility located in San Bernardino County, California.

137. **"National Union"** means National Union Fire Insurance Company of Pittsburgh, Pa.

138. **"National Union Consent Right"** means in form and substance acceptable to National Union, *provided, however*, such consent right shall be limited solely to provisions in this Plan which embody Section IV of the Committee Settlement Agreement or any amendments or modifications to the release, exculpation, and injunction provisions set forth in Article IX, and solely to the extent such amendments or modifications are inconsistent with such provisions as set forth in the Second Amended Plan as modified to reflect Section IV of the Committee Settlement Agreement.

139. **"Net Proceeds"** means in connection with any sale, transfer, liquidation or disposition or receipt of Cash or income, Cash proceeds (and, if applicable, the estimated Cash that may be realized from any non-Cash consideration) received by any Plan Debtor net of (a) commissions, attorneys' fees, accountants' fees, investment banking fees and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by such Plan Debtor in connection therewith; (b) all Taxes on any sale, transfer, liquidation or other disposition or recovery and on the deemed or actual distribution of proceeds

thereof, including an appropriate reserve (if applicable) for Taxes; and (c) any amounts escrowed or reserved against indemnification obligations or purchase price adjustments.

140. **"New Board"** means the board of directors, board of managers or equivalent governing body of each of the Reorganized Parent and the Reorganized Plan Debtors (as applicable), the size and composition of which shall be included in the Plan Supplement.

141. **"New Bylaws"** means the bylaws, limited liability agreement, or functionally equivalent document (as applicable) of each of Reorganized Parent and the Reorganized Plan Debtors (as applicable), the forms of which will be included in the Plan Supplement.

142. **"New Certificates of Incorporation"** means the certificate of incorporation, certificate of formation, or functionally equivalent document (as applicable) of each of Reorganized Parent and the Reorganized Plan Debtors (as applicable), the forms of which will be included in the Plan Supplement.

143. **"New Corporate Governance Documents"** means the (a) New Certificates of Incorporation and (b) New Bylaws.

144. **"Non-Debtor Affiliate"** means any direct or indirect subsidiary that is greater than 20% owned, directly or indirectly by Parent that is not a Debtor.

145. **"Non-Debtor Prepetition Oaktree Guarantors"** means the following Entities: (a) Magnequench Neo Powders Pte. Ltd.; (b) Molycorp Korea Inc.; (c) Neo Performance Materials (Singapore) Pte. Ltd.; (d) Molycorp Japan, Inc.; (e) NMT Holdings GmbH; (f) Molycorp Silmet AS; and (g) Molycorp Chemicals & Oxides (Europe) Ltd.

146. **"Oaktree"** means OCM MLYCo CTB Ltd. in its capacity as (a) the DIP Lenders; (b) the administrative agent, collateral agent, and lender under the Oaktree Prepetition Facilities; and (c) the lessor and collateral agent under the Oaktree Lease Documents.

147. **"Oaktree Claims"** means the Oaktree Prepetition Claims and the DIP Facility Claims.

148. **"Oaktree Consent Right"** means in form and substance acceptable to Oaktree, *provided* that if the Downstream Businesses Sale Trigger does occur, such consent right shall only apply in respect of any terms that affect or alter the Downstream Businesses Sale Trigger, the Oaktree Maximum Distribution, the allowance, treatment and distributions to be made to Oaktree under the Plan or the timing of such distributions, including in respect of the DIP Facility Claims, that the Downstream Businesses Sale be approved in connection with confirmation of the Plan, the releases and indemnifications set forth in the Plan that inure to the benefit of Oaktree or its Representatives, or the implementation of the foregoing.

149. **"Oaktree DIP Financing Distribution"** means, subject in all respects to the terms of the DIP Facility, Cash that has been deposited in the DIP Loan Disbursement Account (as defined in the DIP Order) on the Effective Date and any Cash that is returned to the Plan Debtors or their affiliates that previously was in the DIP Loan Disbursement Account after the following amounts required to be paid under the Plan have been paid in full in cash (i)

-16-

Administrative Claims (other than the DIP Facility Claims), (ii) Priority Tax Claims, (iii) Other Priority Claims and (iv) General Unsecured Claims against the Downstream Plan Debtors.

150. **"Oaktree Downstream Businesses Sale Distribution Amount"** means, until Oaktree has received payment in full in Cash of the Oaktree Maximum Distribution, Cash in the amount of 92.5% of the Downstream Businesses Sale Net Proceeds and Cash remaining at the Plan Debtors on the Effective Date after the following amounts required to be paid under the Plan have been paid in full in cash (i) Administrative Claims (other than the DIP Facility Claims), (ii) Priority Tax Claims, (iii) Other Priority Claims, (iv) General Unsecured Claims against the Downstream Plan Debtors and (v) the Wind-Down Reserve.

151. **"Oaktree Early Payment Premium Claims"** means all early payment premiums or stipulated loss value amounts (which amounts are in addition to the regularly scheduled amounts) payable under the Oaktree Prepetition Facilities and/or the Oaktree Lease Documents.

152. **"Oaktree Equipment"** means the equipment leased by Molycorp Minerals pursuant to the terms of the Oaktree Lease Documents.

153. **"Oaktree Lease Agreement"** means that certain Equipment Lease Agreement dated September 11, 2014, by and between Oaktree and Molycorp Minerals, LLC, as the same may have been amended, restated, supplemented, or otherwise modified to date.

154. **"Oaktree Lease Document Claims"** means all Claims arising under or in connection with the Oaktree Lease Documents.

155. **"Oaktree Lease Documents"** means the Oaktree Lease Agreement together with all other agreements, documents, and instruments executed in connection therewith.

156. **"Oaktree Liens"** means the security interests and liens granted to Oaktree to secure the obligations under the DIP Facility and under the Oaktree Prepetition Facilities.

157. **"Oaktree Magnequench Facility"** means the lending facility provided under (a) that certain Credit Agreement dated as of September 11, 2014, by and among Magnequench, Inc. (as borrower), lender parties thereto from time to time, and Oaktree, as agent, as the same may have been amended, restated, supplemented, or otherwise modified to date; and (b) all other agreements, documents, and instruments executed in connection therewith.

158. **"Oaktree Magnequench Facility Claim"** means all Claims arising under or in connection with the Oaktree Magnequench Facility.

159. **"Oaktree Maximum Distribution"** means (A) $513,645,257.93 plus (B) any unpaid fees of Oaktree's professionals, costs, and expenses that have accrued through the Effective Date.

160. **"Oaktree Molycorp, Inc. Downstream Intercompany Allocation"** means 35.29% of the Molycorp, Inc. Downstream Intercompany Amount.