161. **"Oaktree Parent Facility"** means the lending facility provided under (a) that certain credit agreement, dated as of September 11, 2014, by and among Parent (as borrower), lenders parties thereto from time to time, and the Oaktree Agent, as the same may have been amended, restated, supplemented, or otherwise modified to date; and (b) all other agreements, documents, and instruments executed in connection therewith.

162. **"Oaktree Parent Facility Claim"** means all Claims arising under or in connection with the Oaktree Parent Facility.

163. **"Oaktree Prepetition Claims"** means all (a) Oaktree Lease Document Claims, (b) Oaktree Magnequench Facility Claims and (c) Oaktree Parent Facility Claims.

164. **"Oaktree Prepetition Facilities"** means the Oaktree Parent Facility and the Oaktree Magnequench Facility.

165. **"Oaktree Stand-Alone Reorganization Distribution"** means (a) 92.5% of the Reorganized Parent Common Equity, subject to dilution by the MIP; (b) the Oaktree Molycorp, Inc. Downstream Intercompany Allocation and (c) Cash equal to Oaktree's Pro Rata share of the value of the assets of Molycorp Metals & Alloys, Inc., after satisfaction of Allowed Secured Claims, Priority Claims and Administrative Claims against such Plan Debtor.

166. **"Ordinary Course Administrative Claim"** means an Administrative Claim arising from, or with respect to, the sale of goods or rendition of services in the ordinary course of the applicable Plan Debtor's business on, or after, the Petition Date, including Intercompany Claims incurred in the ordinary course of the Plan Debtors' businesses. Ordinary Course Administrative Claims include Administrative Claims of employees for wages, expense reimbursement, and health and welfare benefits.

167. **"Ordinary Course Professionals Order"** means the Order Authorizing the Retention and Payment of Professionals Utilized by the Debtors in the Ordinary Course of Business [Docket No. 224].

168. **"Other Priority Claim"** means any Claim against any Plan Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim, (b) a Priority Tax Claim or (c) a DIP Facility Claim.

169. **"Other Secured Claim"** means any Secured Claim against a Plan Debtor other than (a) the Oaktree Prepetition Claims, (b) a 10% Notes Secured Claim or (c) a DIP Facility Claim.

170. **"Parent"** means Molycorp, Inc.

171. **"Pari Passu Collateral"** means "Collateral" as defined in the Pari Passu Collateral Agency Agreement.

172. **"Pari Passu Collateral Agency Agreement"** means that certain Collateral Agency Agreement, dated as of June 11, 2012 (as the same may have been supplemented (including pursuant to the Oaktree Joinder (as defined in the DIP Order)), modified, extended,

-18-

NAI-1500956096v1

renewed, restated and/or replaced at any time, and as modified by the DIP Order, by and among Parent, the 10% Notes Guarantors (as defined in the DIP Order), the 10% Notes Indenture Trustee, the Oaktree Agent (as defined in the DIP Order) and the Pari Passu Collateral Agent.

173. **"Pari Passu Collateral Agent"** means Wells Fargo Bank, National Association.

174. **"PBGC"** means the Pension Benefit Guaranty Corporation.

175. **"Petition Date"** means June 25, 2015.

176. **"Plan"** means this joint plan of reorganization proposed by the Plan Debtors to the extent applicable to each Plan Debtor.

177. **"Plan Alternatives"** has the meaning ascribed to it in the Introduction.

178. **"Plan Debtors"** means, collectively, the following Entities: Parent; Magnequench, Inc.; Magnequench International, Inc.; Magnequench Limited; MCP Callco ULC; MCP Canada Holdings ULC; MCP Canada Limited Partnership; MCP Exchangeco Inc.; Molycorp Chemicals & Oxides, Inc.; Molycorp Luxembourg Holdings S.à r.l.; Molycorp Metals & Alloys, Inc.; Molycorp Minerals Canada ULC; Molycorp Rare Metals Holdings, Inc.; Molycorp Rare Metals (Utah), Inc.; and Neo International Corp.

179. **"Plan Documents"** means the Plan, the Disclosure Statement, the Disclosure Statement Order, the Bid Procedures, the Bid Procedures Order, the Confirmation Order, the Downstream Businesses Sale Agreements and the other documents included in the Plan Supplement or entered into in connection with the consummation of the Plan, each as may be altered, amended, modified, or supplemented in accordance with the terms hereof and each of which shall be subject to the Oaktree Consent Right and the Creditors' Committee Consent Right, as applicable. For the avoidance of doubt, in the event of any conflict or inconsistency between the Disclosure Statement, the Plan and the Bid Procedures, the Bid Procedures will control only with respect to the Bid Procedures.

180. **"Plan Supplement"** means the compilation of documents, schedules and exhibits to be Filed no later than seven days prior to the Voting Deadline (unless otherwise provided in the Plan) and that will include, to the extent applicable, the material Downstream Businesses Sale Agreements (or the forms thereof provided to Qualified Bidders (as defined in the Bid Procedures Order)), the Wind Down Budget, the Wind-Down Officer Agreement, the draft forms of New Certificates of Incorporation, the draft forms of New By Laws, the size and composition of the New Board, the Reorganized Parent Common Equity Holder Agreement, the Schedule of Rejected Executory Contracts or Unexpired Leases, the Schedule of Assumed Executory Contracts and Unexpired Lease, a list of Retained Causes of Action and the Restructuring Transactions Exhibit, each as may thereafter be altered, amended, modified, or supplemented in accordance with the terms hereof and each of which shall be subject to the Oaktree Consent Right.

181. **"Post-Effective Date Plan Debtors"** means (a) if the Downstream Businesses Sale Trigger occurs, the Wind-Down Plan Debtors, or (b) if the Downstream Businesses Sale Trigger does not occur, the Reorganized Plan Debtors.

-19-

182. **"Prime Clerk"** means Prime Clerk, LLC, in its capacity as notice, claims, and solicitation agent for the Debtors.

183. **"Priority Claim"** means Priority Tax Claims and Other Priority Claims.

184. **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

185. **"Pro Rata"** means, when used in reference to a distribution of property to holders of Allowed Claims, a proportionate distribution of property so that the ratio of (a)(i) the amount of property distributed on account of an individual Allowed Claim to (ii) the amount of such individual Allowed Claim is the same as the ratio of (b)(i) the amount of property distributed to all such Allowed Claims to (ii) the total amount of all Allowed Claims entitled to receive such distribution. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating Pro Rata distributions of property to holders of Allowed Claims in such Class.

186. **"Professional"** means (a) any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code, and (b) any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

187. **"Proof of Claim"** means a proof of Claim Filed with the Bankruptcy Court or Prime Clerk in connection with the Chapter 11 Cases.

188. **"Purchaser"** means the purchaser or purchasers of any of the Debtors' assets as part of the Downstream Businesses Sale.

189. **"Recharacterized Intercompany Claims"** means, subject to the terms and conditions of the Committee Settlement Agreement, the deemed recharacterization of Claim No. 367 (Filed by Magnequench International, Inc. Against Molycorp, Inc.), Claim No. 368 (Filed by Magnequench, Inc. Against Molycorp, Inc.), Claim No. 391 (Filed by Molycorp, Inc. Against Molycorp Luxembourg Holdings S. R.L.), Claim No. 427 (Filed by Molycorp Minerals Canada ULC Against MCP Exchangeco, Inc.), and Claim No. 435 (Filed by Molycorp, Inc. Against MCP Exchangeco, Inc.) as equity solely for purposes of calculating distributions to third party creditors under the Plan in accordance with the terms of the Committee Settlement Agreement.

190. **"Released Parties"** means, collectively, the following Entities: (a) the Plan Debtors; (b) the Non-Debtor Affiliates; (c) the Creditors' Committee and the members thereof (solely in their capacity as such); (d) the DIP Facility Agent; (e) the DIP Lenders; (f) Oaktree; (g) National Union (however, with respect to the Directors and Officers, all releases granted by the Directors and Officers in favor of National Union shall be limited to any and all claims that the Debtors' estates asserted or could have asserted in the Adversary Proceeding or claims for insurance coverage based on the claims the Debtors and their estates released in the Committee Settlement Agreement); (h) the Ad Hoc 10% Noteholders; (i) the 10% Notes Indenture Trustee (solely in its capacity as such); (j) Pari Passu Collateral Agent (solely in its capacity as such); and (k) with respect to each of the foregoing Entities (a)-(j), such Entity's current and former affiliates and such Entity's and such affiliates' respective Representatives (each in their capacity

as such); and (l) the Directors and Officers; provided, however, that the Molycorp Minerals Debtors shall not be a Released Party hereunder.

191. **"Releasing Parties"** means, collectively: (a) the Plan Debtors; (b) the Non-Debtor Affiliates, (c) the DIP Agent; (d) the DIP Lenders; (e) Oaktree; (f) the Creditors' Committee and the members thereof (solely in their capacity as such); (g) all Holders of Claims that are deemed to accept the Plan; (h) all Holders of Claims who either (1) vote to accept or (2) receive a ballot but abstain from voting on the Plan; (i) all Holders of Claims entitled to vote who vote to reject the Plan that do not elect on their Ballot to opt-out of the Third Party Release; (j) all Holders of Claims that are deemed to reject the Plan but do not send a notice to the Plan Debtors to opt out of the Third Party Releases; (k) all other Holders of Claims and Interests to the extent permitted by law; (l) the Ad Hoc 10% Noteholders; (m) the 10% Notes Indenture Trustee (solely in its capacity as such); (n) the Pari Passu Collateral Agent (solely in its capacity as such); and (o) with respect to each of the foregoing Entities, such Entity's current and former affiliates and such Entity's and such affiliates' respective Representatives (each in their capacities as such); provided, however, that the Molycorp Minerals Debtors shall not be a Releasing Party hereunder.

192. **"Requested Findings"** means the findings delineated as 1-7 that are contained in Section IV.A, *provided* that notwithstanding anything herein to the contrary, none of the Requested Findings shall be conditions to confirmation of the Plan, and the Plan may be confirmed even if the Court declines to make any of the Requested Findings if all other conditions to confirmation have been satisfied.

193. **"Remaining Assets"** means any assets remaining after the consummation of the Downstream Businesses Sale, including the Excluded Assets.

194. **"Reorganized Plan Debtor"** means, if the Downstream Businesses Sale Trigger does not occur, on and after the Effective Date, subject to the Restructuring Transactions, each Plan Debtor as to which the Plan is confirmed.

195. **"Reorganized Parent"** means, if the Downstream Businesses Sale Trigger does not occur, on and after the Effective Date, the parent of the Reorganized Plan Debtors, which Entity may be either a Reorganized Plan Debtor or a newly formed Entity.

196. **"Reorganized Parent Common Equity"** means, if the Downstream Businesses Sale Trigger does not occur, all of the equity interests of common equity of Reorganized Parent, $0.001 par value per share, authorized pursuant to the New Certificate of Incorporation of the Reorganized Parent, including such equity interests to be issued pursuant to the Plan.

197. **"Reorganized Parent Common Equity Holder Agreement"** means an agreement to be entered into on the Effective Date governing the rights and protections of the holders of the Reorganized Parent Common Equity, a form of which shall be filed with the Plan Supplement and shall be subject to the Oaktree Consent Right and the Creditors' Committee Consent Right.

198. **"Representatives"** means, with respect to any Entity, any successor, predecessor, assign, any current or former officer, director, partner, limited partner, general partner,

shareholder, member, subsidiary, managed account or fund, manager, trustee, management company, investment manager, affiliate, principal, employee, agent, attorney, advisor, investment banker, financial advisor, accountant, consultant, fund advisor, or any other professional of such Entity.

199. **"Restructuring Transactions"** means, collectively, those mergers, consolidations, restructurings, asset transfers, dispositions, liquidations, or dissolutions that the Plan Debtors, in consultation with Oaktree, or the Post-Effective Date Plan Debtors determine to be necessary or appropriate in connection with the Plan or the Plan Debtors' emergence from the Chapter 11 Cases, subject to the Oaktree Consent Right.

200. **"Restructuring Transactions Exhibit"** means an exhibit, which shall be included in the Plan Supplement, which sets forth the Restructuring Transactions the Plan Debtors intend to implement on the Effective Date.

201. **"Retained Causes of Action"** means, if the Downstream Businesses Sale occurs, the list of claims and Causes of Action to be retained by the Wind-Down Plan Debtors, which for the avoidance of doubt shall not include any claims or Causes of Action otherwise released pursuant to the terms of the Plan.

202. **"RM"** means Parent's rare metals Downstream Business.

203. **"Run-off Insurance"** means directors' and officers' liability insurance and employment practices liability insurance for a six (6) year period covering events occurring at or prior to the Effective Date.

204. **"Schedule of Assumed Executory Contracts and Unexpired Leases"** means, if the Downstream Businesses Sale Trigger occurs, a schedule that will be Filed as part of the Plan Supplement, in form and substance reasonably satisfactory to the Plan Debtors and the Purchaser(s), of all Executory Contracts and Unexpired Leases that the Plan Debtors intend to assume or assume and assign pursuant to the Downstream Businesses Sale Agreement(s).

205. **"Schedule of Rejected Executory Contracts and Unexpired Leases"** means, if the Downstream Businesses Sale Trigger does not occur, a schedule that will be Filed as part of the Plan Supplement and will include a list of all Executory Contracts and Unexpired Leases that the Plan Debtors intend to reject as of the Effective Date.

206. **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors on or about August 20, 2015, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, restated, modified or supplemented.

207. **"SEC"** means the Securities and Exchange Commission created pursuant to the Securities Exchange Act of 1934.

208. **"Second Amended Plan"** means the Debtors' Second Amended Joint Plan of Reorganization, filed on January 21, 2016 [Docket No. 1153].

209. **"Section 510(b) Claim"** means any Claim against any Plan Debtor arising from rescission of a purchase or sale of a security of any Plan Debtor or an Affiliate of any Plan Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.

210. **"Secured Claim"** means a Claim that is secured by a lien on property in which an Estate has an interest, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

211. **"Securities Act of 1933"** means the Securities Act of 1933 and the rules and regulations promulgated pursuant thereto.

212. **"Securities Exchange Act of 1934"** means the Securities Exchange Act of 1934 and the rules and regulations promulgated pursuant thereto.

213. **"Stand-Alone Reorganization"** means, if the Downstream Businesses Sale Trigger does not occur, the stand-alone reorganization around the Downstream Businesses.

214. **"Subordinated Convertible Notes"** means those certain 5.00% convertible notes due 2017 and issued under that certain Debenture dated June 11, 2012, by and between Neo Materials Technologies Inc. and Computershare Trust Company of Canada (as trustee), for which, pursuant to that certain indenture dated June 11, 2012, by and between Parent and Computershare Trust Company of Canada (as trustee), Parent provided an unsecured payment guaranty, payment of which is subordinated to the payment in full of the 10% Notes.

215. **"Subordinated Convertible Notes Claim"** means a Claim arising from the Subordinated Convertible Notes and the Subordinated Convertible Notes Indentures.

216. **"Subordinated Convertible Notes Indentures"** means that certain Debenture dated June 11, 2012, by and between Neo Materials Technologies Inc. and Computershare Trust Company of Canada (as trustee); and that certain indenture dated June 11, 2012, by and between Parent and Computershare Trust Company of Canada (as trustee).

217. **"Subordinated Convertible Notes Indenture Trustee"** means Computershare Trust Company of Canada, in its capacity as trustee under the Subordinated Convertible Notes Indentures.

218. **"Subsidiary Plan Debtor"** means any Plan Debtor other than Parent.

219. **"Subsidiary Plan Debtor Equity Interests"** means, as to a particular Subsidiary Plan Debtor, any Interests in such Plan Debtor.

220. **"Tax"** means (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, employment, payroll, withholding, property, excise, severance, stamp, occupation, premium, environmental, escheat or windfall profit tax, custom, duty or other tax, governmental fee or

-23-

other like assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local, provincial or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

221. **"Third Party Release"** means the Releases by Holders of Claims and Interests set forth in Section IX.E.

222. **"Unimpaired"** means, with respect to a Class of Claims or Interests, a Claim or an Interest that is Unimpaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

223. **"U.S. Trustee"** means the United States Trustee for the District of Delaware.

224. **"Voting Deadline"** means March 25, 2016 at 5:00 p.m., Eastern Time, which is the deadline for submitting ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

225. **"Wind-Down Budget"** means, if the Downstream Businesses Sale Trigger occurs, a budget, which shall be included in the Plan Supplement after the conclusion of the Auction, estimating the funds necessary to administer the Plan with respect to the Plan Debtors and their Estates and wind-down any Plan Debtors remaining in existence after the consummation of the Downstream Businesses Sale, including, without limitation, an estimate of post-Effective Date anticipated receipts and recoverable assets, the costs of holding and liquidating the Plan Debtors' remaining property, making distributions required by the Plan, and all Taxes on any sale, transfer, liquidation or other disposition or recovery and on the deemed or actual distribution of the proceeds thereof.

226. **"Wind-Down Plan Debtors"** means, if the Downstream Businesses Sale Trigger occurs, the Plan Debtors still in existence after the Effective Date.

227. **"Wind-Down Officer"** means the Entity appointed by the Plan Debtors, subject to the Oaktree Consent Right, and identified at or prior to the Confirmation Hearing to be the sole officer, director and/or member (as applicable) of each of the Wind-Down Plan Debtors as of the Effective Date to wind up the affairs of the Wind-Down Plan Debtors.

228. **"Wind-Down Officer Agreement"** means the agreement governing the terms and conditions of the employment of the Wind-Down Officer, dated as of the Effective Date, in the form included in the Plan Supplement.

229. **"Wind-Down Reserve"** means the reserve(s) established from the Plan Debtors' Cash on hand on the Effective Date and the Downstream Businesses Sale Net Proceeds prior to making any distributions under the Plan, to fund the Wind-Down Budget.

-24-

### B. Rules of Interpretation and Computation of Time

#### 1. Rules of Interpretation

For purposes of the Plan and unless otherwise provided herein the following rules of interpretation apply: (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed, or to be Filed, means such document or Exhibit, as it may have been or may be amended, modified, or supplemented in accordance with the terms hereof; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns, and Affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of, or to, the Plan; (f) the words **"herein,"**, **"hereof,"** **"hereunder,"** and **"hereto"** refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) the words **"includes"** and **"including"** are not limiting; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation of the Plan; (i) subject to the provisions of any contract, certificates of incorporation, by-laws, similar constituent documents, instruments, releases, or other agreements or documents entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (j) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the Plan.

#### 2. Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

#### 3. Reference to Monetary Figures

All references in the Plan to monetary figures refer to the lawful currency of the United States of America, unless otherwise expressly provided.

#### 4. Appendices, Plan Documents, and Plan Supplement

All Plan Documents, the Plan Supplement, all Exhibits, and any appendices, supplements, or annexes to the Plan or any Plan Document, or any Plan Supplement document, are incorporated into the Plan by reference and are a part of the Plan as if set forth herein.

# ARTICLE II.
# ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

## A.    Administrative Claims

### 1.    General

Except as further specified in Section II.A and subject to the Administrative Claims Bar Date and the procedures set forth in Article VIII and unless otherwise agreed by the Holder of an Administrative Claim and the applicable Plan Debtor or the Post-Effective Date Plan Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than DIP Facility Claims and postpetition Intercompany Claims) will receive Cash equal to the Allowed amount of such Administrative Claim on either (a) the latest to occur of (i) the Effective Date or as soon thereafter as practicable, (ii) the date such Claim becomes an Allowed Administrative Claim or as soon thereafter as practicable, and (iii) such other date as may be agreed upon by the Post-Effective Date Plan Debtors and the Holder of such Claim; or (b) on such other date as the Bankruptcy Court may order.

### 2.    Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the applicable Post-Effective Date Plan Debtor, in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

### 3.    DIP Facility Claims

On the Effective Date, the DIP Facility Claims shall be (a) Allowed in full, in the amount of no less than $142,471,550.18 (plus any unpaid fees, costs, and expenses), and (b) shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any Entity.

In full and final satisfaction of all DIP Facility Claims, the DIP Lenders shall receive on the Effective Date or as soon thereafter as reasonably practicable (a) if the Downstream Businesses Sale Trigger occurs, payment in full, in Cash, or (b) if the Downstream Businesses Sale Trigger does not occur, (i) the Oaktree DIP Financing Distribution and (ii) with respect to the balance of the DIP Facility Claims, their Pro Rata share of the Oaktree Stand-Alone Reorganization Distribution. For the avoidance of doubt, all fees, costs, and expenses required to be paid under the terms of the DIP Facility, including without limitation, the fees of the DIP Facility Agent, shall be paid in Cash.

### 4.    Ordinary Course Administrative Claims

Each Plan Debtor or Post-Effective Date Plan Debtor (as applicable) will pay its Ordinary