Case 15-11357-CSS    Doc 1580-12    Filed 04/08/16    Page 43 of 49

b.  **Treatment:** On the Effective Date, all Parent Interests shall be cancelled and extinguished. Holders of Parent Interests shall receive no distributions under the Plan on account of their Interests.

c.  **Voting:** Class 9A is Impaired. Holders of Parent Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

10. **Subsidiary Plan Debtor Equity Interests (Classes 10B, 10D and 10E)**

a.  **Classification:** Classes 10B, 10D and 10E consist of all Subsidiary Plan Debtor Equity Interests.

b.  **Treatment:** The Plan takes into account Allowed Subsidiary Plan Debtor Equity Interests when calculating distributions to be made to third-party creditors. Notwithstanding the foregoing treatment of Subsidiary Plan Debtor Equity Interests for purposes of calculating distributions to third-party creditors, Holders of Subsidiary Plan Debtor Equity Interests shall receive no distributions under the Plan on account of their Interests, subject to Section IV.G of the Plan. At the option of the Plan Debtors (subject to the Oaktree Consent Right) or the Wind-Down Officer, as applicable, Subsidiary Plan Debtor Equity Interests may be reinstated or cancelled and extinguished in accordance with the provisions of Section IV.G.

c.  **Voting:** Classes 10B, 10D and 10E are Unimpaired. Holders of Subsidiary Plan Debtor Equity Interests are deemed to have accepted the Plan.

## C. Special Provisions Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Plan Debtors' or the Post-Effective Date Plan Debtors' rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any Unimpaired Claims.

## D. Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## E. Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote, and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan will be presumed accepted by the Holders of such Claims or Interests in such Class pursuant to the Confirmation Order.

-37-

F.  **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Plan Debtors will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Plan Debtors reserve the right to modify the Plan in accordance with Article XI to the extent, if any, Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.  **9019 Settlement**

The Bankruptcy Court shall consider the approval of the 9019 Settlement in connection with the Plan pursuant to the standards under Bankruptcy Rule 9019.

1.  **The Committee Settlement Agreement**

In exchange for the distributions set forth herein with respect to Holders of Claims in Class 5A, including without limitation, the Class 5A Equity, the Class 5A Stand-Alone Cash Distribution, the Class 5 Cash Out Option, the Class 5A Sale Distribution, the Class 5A Insurance Payment and the Indenture Trustees Allowed Fee Payment, the Adversary Proceeding shall be dismissed with prejudice against Oaktree and the Directors and Officers. The Creditors Committee and its Representatives, Oaktree and its Representatives, the Plan Debtors and their Representatives, the Directors and Officers, and National Union shall be deemed to have provided and received the mutual full and final releases from all claims and Causes of Action, including without limitation, those claims and Causes of Action that may be asserted on behalf of the Plan Debtors' Estates as more fully set forth in Section IV.N hereof. In addition, pursuant to the Committee Settlement Agreement, all Avoidance Actions and all other claims of the Plan Debtors against Holders of Claims in Class 5 shall be released; *provided, however,* that notwithstanding anything to the contrary herein, no release shall be granted to Holders of Claims in Class 5 that object to the Plan. All other claims and Causes of Action not released pursuant to the Plan shall vest in the Reorganized Plan Debtors as more fully set forth in Section IV.N.

The Committee Settlement Agreement is conditioned on Oaktree's Claims being allowed in full in the amount of no less than the Oaktree Maximum Distribution. The Committee Settlement Agreement also provides that for all purposes the value of the Reorganized Parent Common Equity distributed under the Plan be calculated using the Plan Debtors' midpoint valuation of $417 million.

In addition, the Committee Settlement Parties have agreed to, and the Court is requested to make, the following Requested Findings, which for the avoidance of doubt, shall not be conditions to confirmation of the Plan, and the Plan may be confirmed even if the Court declines to make any of the Requested Findings if all other conditions to confirmation have been satisfied:

(1) The Holders of Claims in Class 5A are entitled to receive the Class 5A Insurance Payment.

-38-

(2) The Convertible Notes Claims shall be allowed in the amounts set forth in Section III.B.5.b.

(3) If the Downstream Businesses Sale Trigger occurs, to the extent legally permissible, and notwithstanding anything to the contrary in Section III.B.4.b all other remaining value of the Plan Debtors' Estates remaining after (1) receipt of payment by Oaktree of the Oaktree Maximum Distribution Amount, and (2) payment pursuant to the terms hereof in full in Cash of the (i) Administrative Claims (other than the DIP Facility Claims), (ii) Priority Tax Claims, (iii) Other Priority Claims, (iv) General Unsecured Claims against the Downstream Plan Debtors and (v) the Wind-down Reserve, shall be distributed to the Holders of Claims in Class 5A.

(4) The Recharacterized Intercompany Claims shall be deemed recharacterized as equity solely for purposes of calculating distributions under this Plan to third-party creditors and the Plan will take into account all Recharacterized Intercompany Claims solely for purpose of calculating distributions to third party creditors; *provided*, that the Debtors may determine, in good faith, not to support the recharacterization of the Recharacterized Intercompany Claims as part of the Committee Settlement Agreement, *provided, further, however*, the Creditors' Committee shall retain the right, to seek to recharacterize the Recharacterized Intercompany Claims irrespective of the Debtors' determination.

(5) If the Downstream Businesses Sale Trigger occurs, the payments to Oaktree shall be made from the following sources: (a) first, from the Oaktree Molycorp Minerals Allocation Amount; and (b) second, from the proceeds from the sale of the Downstream Entities.

(6) If the Downstream Businesses Sale Trigger occurs, the DIP Facility Claims shall be deemed to be satisfied prior to the Oaktree Prepetition Claims, and the DIP Facility Claims shall be deemed satisfied first through its Allowed Administrative Claims against MCP Exchangeco Inc. and Molycorp Luxembourg Holdings S.à r.l.

(7) If the Downstream Businesses Sale Trigger occurs, after payment of the Oaktree Maximum Distribution Amount in full in Cash and after the following amounts required to be paid under the Plan have been paid in full in cash (i) Administrative Claims (other than the DIP Facility Claims), (ii) Priority Tax Claims, (iii) Other Priority Claims, (iv) General Unsecured Claims against the Downstream Plan Debtors and (v) the Wind-down Reserve, the Oaktree Liens shall be released on the DIP Loan Disbursement Account (as defined in the DIP Order) and the Parent's unencumbered Cash accounts for the benefit of the Holders of Claims in Class 5A.

Any amounts incurred by the Creditors' Committee's legal professionals on and after the Committee Settlement Effective Date with respect to the Creditors' Committee Legal Fee Cap

Matters in excess of the Creditors' Committee Legal Fee Cap shall be disallowed unless and until, if the Downstream Businesses Sale Trigger has occurred, Oaktree has received payment of the Oaktree Maximum Distribution amount in full in Cash.

As part of the Committee Settlement Agreement, the Plan Debtors shall pay the Indenture Trustees Allowed Fee Payment on account of the Indenture Trustees Allowed Fees.

As part of the Committee Settlement Agreement, upon emergence, the Reorganized Plan Debtors will have no Oaktree-related debt and no preferred equity will be outstanding. The Reorganized Plan Debtors are entitled to seek and obtain debt from parties unrelated to Oaktree on emergence or from any party thereafter provided such capital raises comply with the minority equityholder protections set forth in Section IV.D.2 hereof.

As part of the Committee Settlement Agreement, and in settlement of the claims asserted in the Adversary Proceeding against the Directors and Officers, National Union shall pay the Class 5A Insurance Payment on the Effective Date to the Estate of the Parent for the sole benefit of the Class 5A Creditors. As part of the Committee Settlement Agreement, the Creditors' Committee shall be deemed to grant a release, on behalf of the Plan Debtors' Estates and the Molycorp Minerals Debtors' estates, to the Directors and Officers (regardless of whether such directors or officers are named as defendants in the Adversary Proceeding) and National Union from any and all claims asserted in the Adversary Proceeding and any and all claims that the Plan Debtors' estates or the Molycorp Minerals Debtors' estates could have asserted against such Directors and Officers based on events occurring prior to the Petition Date as more fully set forth in Article IX. In addition, National Union shall have the National Union Consent Right and the Directors and Officers named as defendants in the Adversary Proceeding shall have the Directors and Officers Consent Right.

Neither approval of the settlement with National Union nor receipt of the National Union Payment by the Class 5A Creditors shall be conditions to confirmation of the Plan, provided, however, that National Union's obligation to make the Class 5A Insurance Payment shall be conditioned solely on the Bankruptcy Court approving the Creditors' Committee's releases of the Directors and Officers and National Union described above, the Plan Debtors Release set forth in Section IX.D, the Third Party Releases set forth in Section IX.E, the Molycorp Minerals Debtors Release set forth in Section IX.F, the Exculpation of the Directors and Officers set forth in Section IX.G, and the Injunction set forth in Section IX.H.

2.  **Class 5 Cash Out Option**

Within two (2) Business Days of the Confirmation Date, a notice shall be sent to all Holders of Allowed Claims in Class 5A notifying them of the Class 5A Cash Election Procedure and Deadline and explaining certain elections that such Holders may make, as applicable, through electronic submission to Prime Clerk.

In connection with implementing the Class 5 Cash Out Option, Holders of Allowed Claims in Class 5A may elect through Prime Clerk to have their Claim reduced in amount, which each such Holder will determine in its sole discretion. In the event of a Class 5 Cash Out Oversubscription, Cash shall be distributed from the Class 5A Stand-Alone Distribution to Class 5A Cash Out Creditors in order of smallest Claim to largest Claim until all funds in the Class 5A

-40-

Stand-Alone Cash Distribution are depleted; *provided*, that the Reorganized Plan Debtors may (i) with the consent of the Creditors' Committee, determine that more Cash will be provided to allow additional Class 5 Cash Out Creditors to receive Cash distributions at the Imputed Value of Class 5A Equity or (ii) distribute Class 5A Equity to Class 5 Cash Out Creditors in accordance with the Plan. Furthermore, if a Holder of an Allowed Class 5A Claim elects to reduce its Claim amount and such Holder does not receive Cash (or receives a combination of Cash and Class 5A Equity) on account of its reduced Claim, such Holder's Claim will be reinstated to its original Allowed amount and any distributions of Class 5A Equity will be based on such reinstated amount. For the avoidance of doubt, Holders of Allowed Claims in Class 5A shall be required to elect that all or none of their Allowed Claims receive Cash in connection with electing to be treated as a Class 5 Cash Out Creditor, no partial elections shall be allowed

3. **The 10% Noteholder Group Settlement**[3]

The 10% Noteholder Group Settlement contemplates, among other things, the sale and purchase of certain assets owned by the Molycorp Minerals Debtors for a purchase price of $1,000,000 and the assumption of certain liabilities. Solely to the extent necessary and applicable, the full terms of the 10% Noteholder Group Settlement shall be deemed incorporated herein by reference. For the avoidance of doubt, the Purchased Assets (as defined in the Credit Bid APA) shall not include and the Credit Bid shall expressly exclude, among other things the Downstream Transferred Assets, the Fee-Owned Real Estate, the Molycorp Minerals Intercompany Amount; the Inventory Proceeds; all assets that will be owned directly or indirectly by the Reorganized Parent pursuant to the Plan; and the Oaktree Equipment.

The Credit Bid APA shall provide that approval of the Molycorp Minerals Sale pursuant to the Credit Bid APA shall not be a condition to confirmation of the Plan.

The Credit Bid APA shall also include a condition that the Molycorp Minerals Sale will only be approved to the extent that such sale does not have an adverse impact on the confirmation of the Plan with respect to the Downstream Plan Debtors or any of the Downstream Transferred Assets.

The Credit Bid APA shall provide that Oaktree shall receive its pro rata share (35.283%) of the total number of common units issued by any acquisition vehicle formed to acquire any of the Purchased Assets.

a. **Process for Consummating the Credit Bid**

The applicable Molycorp Minerals Debtors and the Ad Hoc 10% Noteholders shall execute the Credit Bid APA and file it with the Bankruptcy Court no later than 12:00 pm ET on March 28, 2016.

The Sale Documentation shall be reasonably acceptable to the Ad Hoc 10% Noteholders, the Debtors and Oaktree; <u>provided however</u> that with respect to Oaktree, whether the Sale Documentation is "reasonably acceptable" shall mean whether it is in form and substance

---

[3] Capitalized terms used in this Section IV.A.3 of the Plan and not otherwise defined have the meanings given to them in the 10% Noteholder Group Settlement.

consistent with the terms of the 10% Noteholder Group Settlement (including without limitation paragraph 2 of the 10% Noteholder Group Settlement, the Plan, and the Prepetition Collateral Agency Agreement and related prepetition security documents). The Creditors' Committee expressly reserves the right to object to the terms of the Credit Bid APA and the sale order approving the Credit Bid solely to the extent such terms are inconsistent with the terms of the 10% Noteholders Settlement and that such terms negatively impact distributions to or treatment of Claims in Class 5A and the Parties agree that any objections of the Creditors' Committee under these provisions may be raised with the Bankruptcy Court at the hearing with respect to such matters.

In connection with the Credit Bid, the Debtors, subject to Paragraph 5 of the 10% Noteholder Group Settlement and the Fee Arrangement, shall work in good faith with the Ad Hoc 10% Noteholders to effectuate the transfer of the Specified Mineral Properties in connection with consummation of the Credit Bid, including taking reasonable steps necessary to transfer Molycorp Minerals' unpatented mining claims and to "sever" any mineral rights from the fee-owned surface real estate and to contest any objections to such "severing."

Unless otherwise ordered by the Bankruptcy Court, at the Sale and Confirmation Hearing, as defined in the Bid Procedures Order, the Debtors shall seek approval of the Credit Bid pursuant to the Bid Procedures Order and under section 363 of the Bankruptcy Code, provided, however, that, notwithstanding anything in the 10% Noteholder Group Settlement to the contrary, so long as the Debtors use commercially reasonable efforts to obtain approval of the Credit Bid in good faith, approval by the Bankruptcy Court of the Credit Bid and/or the Mineral Rights Transfer shall not be a condition to the 10% Noteholder Group Settlement or a condition to confirmation of the Plan, provided, further, however, that to the extent the Bankruptcy Court does not approve the Credit Bid and/or the Mineral Rights Transfer or any other portion of the Molycorp Minerals Sale pursuant to the Credit Bid, the parties agree that (i) only those assets approved to be sold pursuant to the Credit Bid shall be sold pursuant to the terms of the Credit Bid APA, and thereafter, (ii) the Debtors shall not take any action to effectuate a sale, transfer, or distribution of the Purchased Assets remaining, including without limitation, to the extent applicable, the Specified Mineral Properties, or the fee-owned real estate, and (iii) the Molycorp Minerals Debtors may convert their cases from chapter 11 to chapter 7 of the Bankruptcy Code.

Pending consummation of the Molycorp Minerals Sale, the Inventory Proceeds and the Molycorp Minerals Intercompany Amount shall be held at Molycorp Minerals, and approximately $4.7 million of such funds shall be set aside to fund the costs set forth on Exhibit 3 to the 10% Noteholder Group Settlement, which includes (i) $400,000 for the costs and expenses of seeking approval of the Credit Bid and the Molycorp Minerals Sale pursuant to the Credit Bid APA, (ii) an initial amount of $2.1 million, to fund Mountain Pass carrying costs, costs associated with the termination of the remaining employees at Molycorp Minerals and the wind-down and/or chapter 7 costs associated with the remaining assets of Molycorp Minerals not sold pursuant to the Credit Bid or otherwise transferred pursuant to the terms of the 10% Noteholder Group Settlement and (iii) following consent by Oaktree and the Ad Hoc 10% Noteholders or automatically upon consummation of the Mineral Rights Transfer, the balance of the costs set forth on Exhibit 3 to the 10% Noteholder Group Settlement.

The Ad Hoc 10% Noteholders agree that notwithstanding anything to the contrary in the 10% Noteholder Group Settlement, the schedule for confirmation of the Plan with respect to the Plan Debtors shall continue on the schedule set forth in the Order (A) Authorizing Service of the Supplemental Solicitation Materials and (B) Scheduling Certain Revised Dates and Deadlines in Connection with Confirmation of the Plan of Reorganization [Docket No. 1391].

### b. Certain Other Transfers between Molycorp Minerals and the Plan Debtors

The Ad Hoc 10% Noteholders shall consent to the transfer pursuant to the Plan of the Downstream Transferred Assets, in each case, to the Reorganized Parent or an entity that will be directly or indirectly controlled by the Reorganized Parent, free and clear of any lien, claim, interest or pledge. If the Plan is consummated without transfer of the Downstream Transferred Assets, the 10% Noteholder Group Settlement shall remain effective.

As soon as reasonably practicable after the consummation of the Molycorp Minerals Sale, the balance of the Molycorp Minerals Intercompany Amount and the Inventory Proceeds not used to fund the Minerals Wind-down Expense Reserve shall be distributed on a pro rata basis to Oaktree and the 10% Noteholders.

Nothing in the 10% Noteholder Group Settlement shall affect Oaktree's ownership of the Oaktree Equipment and in accordance with the Bid Procedures, Oaktree shall have a reasonable amount of time following the closing of the Molycorp Minerals Sale to remove (as it may determine in its sole discretion) the Oaktree Equipment in accordance with the terms of Oaktree Lease Documents.

### c. Procedures for Minerals' Chapter 11 Case

The parties agree that the Plan shall be withdrawn as to the Molycorp Minerals Debtors.

The parties agree to work in good faith until April 8, 2016 to determine whether a chapter 11 plan for the Molycorp Minerals Debtors can be confirmed. If the Parties determine, in good faith, that a chapter 11 plan for the Molycorp Minerals Debtors cannot be confirmed, the Molycorp Minerals Debtors may convert their cases from chapter 11 to chapter 7 of the Bankruptcy Code on or after that date.

### d. Support for the Plan and Mutual Releases

The Ad Hoc 10% Noteholders agree to take all actions reasonably necessary to support the confirmation of the Plan, including withdrawing (to the extent necessary) any objections that have been filed to the Plan and that all such objections are resolved. The Ad Hoc 10% Noteholders agree not to direct the 10% Notes Indenture Trustee, and Wells Fargo, as Collateral Agent, to object to any part of the Plan and/or the Committee Settlement Agreement. Each 10% Noteholder that is a signatory to the 10% Noteholder Group Settlement agrees to vote in favor of the Plan and agrees that on March 28, 2016, counsel to the Ad Hoc 10% Noteholders will file a declaration setting forth the amount and number of votes previously submitted by the Ad Hoc 10% Noteholders and providing that such votes shall instead be deemed as votes to accept the Plan.

Without limiting paragraph 14 of the 10% Noteholder Group Settlement, the Ad Hoc 10% Noteholders agree to support approval of the Class 5A Stand-Alone Distribution, including but not limited to, the amount of the Class 5A Equity or the allocation of the Class 5A Equity among the members of Class 5A, the Class 5A Stand-Alone Cash Distribution, the Class 5A Insurance Payment, and the Class 5 Cash Out Option.

The Ad Hoc 10% Noteholders also agree to support and take all actions reasonably necessary to support the granting of Debtor Releases by the Molycorp Minerals Debtors in connection with the Committee Settlement Agreement set forth in the Plan (including if such releases are sought outside of the Plan) and the approval of the Third Party Release in the Plan.

The Ad Hoc 10% Noteholders and their respective affiliates and advisors (each in their capacity as such), the 10% Notes Indenture Trustee and its advisors (solely in their capacity as such), and Wells Fargo, as Collateral Agent, and its advisors (solely in their capacity as such), shall each be included as a Released Party and as a Releasing Party; provided, however, that the 10% Notes Indenture Trustee or Wells Fargo, as Collateral Agent, shall not be included as a Released Party and as a Releasing Party if it objects (or, with respect to the 10% Notes Indenture Trustee, fails to withdraw its objection prior to the commencement of the Sale and Confirmation Hearing) to the terms of the Committee Settlement Agreement or to the 10% Noteholder Group Settlement as incorporated in the Plan.

The Plan is hereby deemed revised to provide that (i) all fees and expenses of the Ad Hoc 10% Noteholders incurred in connection with these cases shall be paid upon consummation of the Plan in an amount up to $5,000,000; (ii) the fees and expenses of the 10% Notes Indenture Trustee shall be paid from the cash recovery allocable to the 10% Noteholders on account of their allowed secured claim; and (iii) to the extent legally permissible, the Ad Hoc 10% Noteholders may submit any fees and expenses above $5,000,000 for reimbursement to be paid out of the cash recovery allocable to the 10% Noteholders. Except as set forth in paragraph 18 of the 10% Noteholder Group Settlement, none of the 10% Noteholders, the Ad Hoc 10% Noteholders, the 10% Notes Indenture Trustee, the Collateral Agent, or any of their Representatives shall have any further right to seek payment of any fees, expenses, costs, or indemnification, from any of the Debtors, the Reorganized Plan Debtors, or any Released Party. For the avoidance of doubt, neither the foregoing nor any release, exculpation or other provision of the Plan is intended to and shall not impair the rights of the 10% Notes Indenture Trustee or any of it Representatives as to the 10% Noteholders reserved under Section IV.L of the Plan.

      **e.    Other Terms of the 10% Noteholder Group Settlement**

The Debtors shall withdraw the *Motion of the Debtors for an Order Authorizing Them to Surcharge Certain Collateral Pursuant to Section 506(c) of the Bankruptcy Code*, with prejudice.

The Ad Hoc 10% Noteholders shall withdraw the *Motion of Ad Hoc 10% Noteholders to Compel the Debtors to Comply with the Bidding Procedures Order or, Alternatively, to Convert the Molycorp Minerals Debtors' Cases to Liquidations Under Chapter 7*, as moot.

NAI-1500956096v1

The 10% Noteholders claim shall be allowed in the amount of $687.2 million, provided, however, that the 10% Notes Deficiency Claim in Class 5A shall not be allowed in an amount that exceeds $680.7 million.

The obligations of the Ad Hoc 10% Noteholders in paragraphs 14, 15, 16, and 20 of the 10% Noteholder Group Settlement shall not be conditioned on Bankruptcy Court approval or on consummation of the Molycorp Minerals Sale. The express obligations of the Creditors' Committee in paragraphs 13, 25 and 26 of the 10% Noteholder Group Settlement shall not be conditioned on approval of the releases by the Molycorp Minerals Debtors referred to in paragraph 16 of the 10% Noteholder Group Settlement.

Provided that the Sale Documentation is consistent with this 10% Noteholder Group Settlement, Oaktree shall not object on the basis that the terms of 10% Noteholder Group Settlement or the parties' performance hereunder, and the submission of the Credit Bid, the terms thereof including the terms of the Credit Bid APA, and the actions of the 10% Noteholders and the Collateral Agent in connection therewith do not comply with the Collateral Agency Agreement, the Security Agreement, the Deed of Trust, or the Bid Procedures and Oaktree shall take all actions reasonably requested to support the approval of the Credit Bid and the Credit Bid APA and the Mineral Rights Transfer in accordance with the terms of the 10% Noteholder Group Settlement.

The Debtors, subject to the Fee Arrangement, shall seek approval of the 10% Noteholder Group Settlement at the Sale and Confirmation Hearing, whether as part of an order confirming the Plan or separate order, and such order or portion of the Confirmation Order concerning the 10% Noteholder Group Settlement as applicable, shall be acceptable to the Ad Hoc 10% Noteholders, Oaktree and the Debtors.

The Debtors, the Creditors' Committee, Oaktree, and the Ad Hoc 10% Noteholders agree to support, and will not object to, approval of the Credit Bid, the Credit Bid APA, and the 10% Noteholder Group Settlement by the Court, and, prior to such approval, shall take no steps contrary to obtaining approval of the Credit Bid, the Credit Bid APA, and the 10% Noteholder Group Settlement.

The Creditors' Committee will not seek a finding that payments to advisors of the Ad Hoc 10% Noteholders prior to the Petition Date were preferences, nor seek to disallow, subordinate, or designate the votes associated with the claims of the Ad Hoc 10% Noteholders on such grounds, or any other grounds.

The valid and perfected liens of the Ad Hoc 10% Noteholders and Oaktree shall continue in full force and effect on all assets of Molycorp Minerals Debtors other than the Transferred Downstream Assets, and after consummation of the Credit Bid, the Purchased Assets and the Transferred Downstream Assets.

NAI-1500956096v1