of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Proposal" means any proposals, whether oral or written, to purchase all or any part of the Purchased Assets, whether directly or through a merger, reorganization, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction.

"Bidding Procedures Order" means the Order of the Bankruptcy Court, entered on January 14, 2016, approving, among other things, the bidding procedures for conducting a sale and auction of the Purchased Assets and the assumption of the Assumed Liabilities.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Bernardino, California are authorized or required by Law to close.

"Cash Collateral" means cash collateral (as defined in section 363(a) of the Bankruptcy Code) subject to a Lien in favor of the Secured Parties under the Security Documents.

"Claim" has the meaning given to such term in section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986.

"Collateral Agency Agreement" means that certain Collateral Agency Agreement (as amended, restated, supplemented or otherwise modified from time to time), dated as of June 11, 2012, by and among the Grantors (as defined therein), the Trustee, and the Collateral Agent.

"Collateral Agent" means Wells Fargo Bank, National Association, in its capacity as collateral agent under the Collateral Agency Agreement.

"Contract" means any contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, instrument, license, lease, purchase order, sale order or other legally binding agreement), whether written or oral.

"Credit Bid Agreement" means that certain Amended and Restated Credit Bid Agreement and Direction, dated as of March 28, 2016, by and among Purchaser, the Trustee, the Collateral Agent, JHL Capital Group Holdings One LLC, QVT Fund V LP, QVT Fund IV LP, and Quintessence Fund L.P. (as amended or supplemented from time to time in accordance with the terms thereof.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in

connection with the assumption and/or assignment of any Purchased Contract, as determined by the Bankruptcy Court.

"Disclosure Statement" means the Disclosure Statement for Debtors' Third Amended Joint Plan of Reorganization, filed by the Debtors in connection with the Bankruptcy Case on March 4, 2016, as amended or modified from time to time in accordance with the provisions set forth therein.

"Downstream Debtors" has the meaning given to such term in the Plan.

"Employee Claim" means any Claim, demand, action, cause of action, damage, loss, cost, Liability or expense, including legal costs, made or brought by any Employee, including, but not limited to, any Claim made pursuant to any applicable Laws relating to employment standards, occupational health and safety, labor relations, workers compensation, pay equity, employment equity, minimum wage, overtime, tip credit, the Consolidated Omnibus Budget Reconciliation Act, WARN Act, the Americans with Disabilities Act, the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Family and Medical Leave Act or the Fair Labor Standards Act or any other federal, state or local, statutory or decisional Law regarding employment discrimination.

"Employee Obligations" means all wages, bonuses, incentive, equity, equity-based or similar compensation obligations, deferred compensation arrangements, vacation pay, sick time, pension payments, overtime pay, change of control payments, severance pay and any other termination or severance obligations and any other compensation or obligation which may be due by statute, contract or Law relating to the employment of the Employees in respect of the Business.

"Employee Plan" means each (a) employee benefit plan (within the meaning of Section 3(3) of ERISA), (b) retirement, welfare benefit, bonus, stock option, stock purchase, restricted stock, incentive, supplemental retirement, deferred compensation, retiree health, life insurance, severance, Code Section 125 flexible benefit, vacation plans and any similar employee benefit plan, program or agreement and (c) individual employment, termination, severance, retention, change in control or other similar agreements, in each case, pursuant to which Sellers or their Affiliates currently have any obligation with respect to any Employee.

"Employees" means all individuals, as of the Effective Date, whether or not actively at work as of the Effective Date, who are employed by Molycorp Minerals, LLC, or who are employed by Sellers other than Molycorp Minerals, LLC primarily in connection with the Business, together with individuals who are hired in respect of the Business after the Effective Date and prior to the Closing.

"Environmental Law" means any Law or Order in effect at the relevant date or for the relevant period relating to the protection of human health and safety or the environment (including air, surface water, groundwater, surface impoundments, drainage basins, catchment basins, drinking water and drinking water supply, wetlands,

-3-

streams, ponds, sediment, soil, land surfaces or subsurface strata), and plant and animal life (including threatened or endangered species), or natural resources, or to Releases of or exposure to Hazardous Material or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. §§ 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Clean Water Act (33 U.S.C. §§ 1251, et seq.), the Clean Air Act (42 U.S.C. §§ 7401, et seq.) the Toxic Substances Control Act (15 U.S.C. §§ 2601, et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136, et seq.), the Occupational Safety and Health Act (29 U.S.C. §§ 651, et seq.), and analogous state and local Laws.

"Excluded Contracts" means all Contracts other than Purchased Contracts, including all executory contracts and unexpired leases scheduled on the Debtors' Schedule of Assumed Executory Contracts and Unexpired Leases.

"Excluded Downstream Intellectual Property" means the Intellectual Property owned by Molycorp Minerals, LLC primarily used or held for use by the Debtors' Downstream Businesses (as defined in the Bidding Procedures Order), including the Molycorp™, Magnequench™, and Neo™ trademarks.

"Excluded Intercompany Loan" means that certain promissory note issued by Molycorp Silmet AS to Molycorp Minerals, LLC, dated February 13, 2013, and the related Loan Agreement, dated February 13, 2013, between Molycorp Silmet AS and Molycorp Minerals, LLC.

"Excluded Matter" means the effect of: (i) any change in the United States economy or financial markets in general; (ii) any change that generally affects the industrial sectors in which Sellers generally compete; (iii) any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions; (iv) any change in applicable Laws or accounting rules; (v) any actions taken or proposed to be taken by Purchaser or any of its Affiliates; (vi) any effect resulting from the public announcement of this Agreement; or (vii) any effect directly resulting from the filing of the Bankruptcy Case and a Seller's inability to pay certain obligations as a direct result of the filing of the Bankruptcy Case; provided that, with respect to clauses (i), (ii), (iii) and (iv), such effects do not disproportionately and adversely affect the Business, taken as a whole, as compared to other companies operating in the industries in which Sellers operate.

"Final Order" means an Order, judgment, or other decree that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"Hazardous Material" means any substance, material or waste, to the extent the nature, presence or amount of which is limited or regulated by any Governmental Body under any applicable Environmental Laws, including petroleum and its by-products, asbestos, and any material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "radioactive material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under any provision of Environmental Law.

"Indebtedness" of any Person means, without duplication, (i) the principal and interest of, and premium (if any) in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Indenture" means that certain Indenture, dated May 25, 2012, by and among the Company, the Guarantors (as defined therein) and UMB Bank, National Association (as successor to Wells Fargo Bank, National Association), as trustee.

"Intellectual Property" means all worldwide intellectual property rights, including all (i) patents, patent applications, continuations, continuations-in-part, substitutions, renewals, extensions, reexaminations, re-filings, divisions, re-issues, and inventions, (ii) trademarks, service marks, trade names and trade dress, logos, insignias, designs, symbols, or other similar designations of source or origin and general intangible of like nature, which expressly includes the goodwill and any common law rights associated with or symbolized by any of the foregoing, (iii) domain names, (iv) registered and common law copyrights and works of authorships, including copyrights in computer

-5-

Software, (v) confidential and/or non-public and proprietary information, including trade secrets, confidential business information, ideas, concepts, methods, processes, formulae, reports, data, research and development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, and know-how ("Trade Secrets"), (vi) registrations and applications for registration and renewal of the foregoing, and (vii) any past, present or future Claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"IRS" means the Internal Revenue Service.

"Knowledge of Sellers" means the actual knowledge of the following senior officers of the Company: Geoff Bedford, Chief Executive Officer; Michael Doolan, Chief Financial Officer, Jeffrey Hogan, Executive Vice President of Resources; and Paul A Parasugo III, Director, Mountain Pass Operations.

"Law" means any federal, state, local or foreign law, statute, directive, code, ordinance, rule or regulation, Order, binding interpretations or common law requirement.

"Legal Proceeding" means any judicial, administrative, investigative or arbitral actions, suits, proceedings (public or private) or Claims or any proceedings by or before a Governmental Body, and any appeal from any of the foregoing.

"Liability" means any Indebtedness, loss, liability, Claim, commitment, undertaking, damage, expense, fine, penalty, sanction, cost, guaranty, endorsement, royalty, deficiency or obligation (including those arising out of any Legal Proceeding, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, Claim, lease, charge, option, right of first refusal, easement, restriction or encumbrance or any other similar encumbrance in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Mineral Properties" means (i) all Mineral Rights with respect to the subsurface estate of the Owned Real Property at the Mountain Pass Facility and (ii) all unpatented mining claims associated with the Mountain Pass Facility held by any Seller.

"Mineral Rights" means all of Sellers' right, title and interest, if any, in and to all oil, gas and other hydrocarbon substances, inert gases, rocks, minerals, and metals, soils, clays, and all other organic and inorganic matter whatsoever, located below the surface of the Owned Real Property, whether now known to exist or hereafter discovered, including, but not limited to, the rights to explore for, develop, and remove such oil, gas, and other hydrocarbon substances, inert gases, rocks, minerals, and metals, soils, clays, and all other organic and inorganic matter whatsoever, but excluding any and all right, title and interest in mills, buildings, pipes and all other mine

-6-

improvements and machinery or tools used in working or developing the Mountain Pass Facility.

"Mining Laws" means any Law or Order authorizing, restricting, conditioning or otherwise regulating any exploration, mining, processing or reclamation activities conducted on, from or in connection with the Mineral Properties.

"Molycorp Minerals Intercompany Amount" has the meaning given to such term in the Plan.

"Oaktree" means Oaktree Capital Management, L.P., collectively with certain of its affiliates and funds under its management.

"Oaktree Equipment" means the equipment owned by Oaktree and leased to Molycorp Minerals, LLC.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business, consistent with past practice, including the operation of the Business in accordance with the Limited Operations Plan from and after the date of the implementation of the Limited Operations Plan.

"Party" or "Parties" means Purchaser and each of Sellers, as the case may be.

"Permits" means any approvals, registrations, certificates of occupancy, clearances, authorizations, consents, licenses, permits or certifications of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way and Liens disclosed in policies or commitments of title insurance which have been made available to Purchaser prior to the Effective Date and that would not interfere in any material respect with the use of the Purchased Assets, (ii) statutory Liens for Taxes not yet due and payable, (iii) surface use agreements, zoning, entitlement and other land use and environmental regulations or restrictions by any Governmental Body provided that such regulations or restrictions have not been violated by Sellers, and (iv) Liens that will be released by the Sale Order.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Plan" means the Third Amended Joint Plan of Reorganization filed by the Debtors in connection with the Bankruptcy Case on March 11, 2016, as amended or modified from time to time in accordance with the provisions set forth therein.

-7-

"Purchased Intellectual Property Licenses" means (i) licenses or sublicenses of Purchased Intellectual Property granted by any Seller to any third party or any other instruments or other arrangements to which any Seller is a party, pursuant to which any third party has obtained any right, title or interest in any Purchased Intellectual Property, (ii) licenses or sublicenses of Intellectual Property granted by any third party to any Seller for use primarily in connection with the Business (and the transfer of which would not have a material and adverse impact on the Downstream Debtors or any of the Downstream Transferred Assets), or any other permissions or agreements pursuant to which any Seller has obtained any right, title or interest in Intellectual Property used primarily in the Business (and the transfer of which would not have a material and adverse impact on the Downstream Debtors or any of the Downstream Transferred Assets), and (iii) agreements between any Seller and any third party relating to the use, development, prosecution, enforcement or commercialization of Purchased Intellectual Property.

"Purchaser Lien" means a Lien in favor of the Secured Parties under the Security Documents.

"Purchaser Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (regardless of whether such event, change, effect, condition, state of facts or occurrence constitutes a breach of any representation, warranty or covenant of Purchaser hereunder) which has had or would reasonably be expected to have, individually or when considered together with any other event, change, effect, condition, state of facts or occurrence, a material and adverse effect on the ability of Purchaser to consummate the Transactions or perform its obligations under this Agreement.

"Reclamation Obligation" means any and all actions required during, or following cessation of, any exploration, mining or processing activities conducted by or in connection with the Owned Real Property or the Mineral Properties, or required at or on the Owned Real Property or the Mineral Properties, that are required by Law (including Mining Laws), Order, Permit or Contract.

"Records and Other Information" means all data, information (including tangible and intangible information), agreements, files, books (including accounting books and records), specifications, drawings, reports, procedures, test records and results, other records and filings made with Governmental Bodies, and similar records, in each case, to the extent relating to the Purchased Assets and the Specified Mineral Properties.

"Release" means any release, spill, emission, leaking, pumping, injection, pouring, emptying, escape, deposit, disposal, discharge, dispersal or leaching into the environment of any Hazardous Material, or any migration thereof, into outdoor or indoor environmental media (including soil, surface waters, groundwater, sediments or air), or into or out of any property, whether intentional or unintentional.

"Remedial Action" means any investigation, analysis, study, evaluation, monitoring, testing, assessment, correction, decommissioning or remediation of a

-8-

Release or threatened Release required pursuant to applicable Environmental Law or by a Governmental Body.

"Reorganized Parent" has the meaning given to such term in the Plan.

"Representative" means, with respect to any Person, any and all directors, officers, partners, members, managers, employees, consultants, financial advisors, counsel, accountants and other agents, including potential financing sources of such Person.

"Sale Order" shall be an Order of the Bankruptcy Court, in the form attached hereto as Exhibit A or as otherwise approved by Purchaser, Trustee and the Collateral Agent, each in its reasonable discretion, which Order may be included by the Debtors in the Order of the Bankruptcy Court approving the Plan.

"Secured Parties" has the meaning set forth in the Collateral Agency Agreement.

"Security Documents" has the meaning set forth in the Collateral Agency Agreement.

"Seller Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (regardless of whether such event, change, effect, condition, state of facts or occurrence constitutes a breach of any representation, warranty or covenant of Sellers hereunder) which has had or would reasonably be expected to have, when considered in the aggregate together with any other events, changes, effects, conditions, states of facts or occurrences, (i) a material adverse effect on or a material adverse change in or to the Purchased Assets, Assumed Liabilities, or the Business, considered as a whole or (ii) a material and adverse effect on the ability of Sellers to consummate the Transactions in a timely manner, in each case other than an event, change, effect, condition or occurrence resulting from an Excluded Matter.

"Settlement Agreement" means that certain 10% Noteholder Group Settlement by and among the Debtors, each 10% Noteholder that is a signatory thereto, OCM MLYCo CTB Ltd. and the official committee of unsecured creditors appointed in the Bankruptcy Case, dated March 25, 2016.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case whether internally or externally written.

-9-

"Specified Mineral Properties" means all Mineral Properties that are not expressly designated as Excluded Assets and, in the case of clause (i) of the definition of "Mineral Properties", solely to the extent severable.

"Tax Authority" means any government, or agency, instrumentality or employee thereof, charged with the administration of any Law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges, customs, duties, governmental fees, or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, escheat payments, severance, stamp, occupation, property and estimated taxes, (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code, or by contract, indemnity or otherwise, and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Tax Return" means all returns, declarations, reports, claims for refund, estimates, information returns and statements filed or required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"Title Company" means First American Title Insurance Company.

"Transaction Documents" means this Agreement, the Bill of Sale, the Assignment Agreement, the IP Assignment Agreement, the Deed, and each other agreement, document or instrument contemplated by this Agreement or necessary to the consummation of the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the Transaction Documents.

"Trustee" means UMB Bank, N.A. in its capacity as indenture trustee under the Indenture, or any successor.

"WARN Act" means the Worker Adjustment and Retraining Notification ACT of 1988, and all other similar Laws of any state, locality or other Governmental Body.

1.2    Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, the following terms have the meanings set forth in the Sections indicated:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Allocation Schedule | 10.2 |
| Assignment Agreement | 4.2(b) |
| Assumed Cure Costs | 2.5 |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |

-10-

| Term | Section |
|---|---|
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale | 4.2(a) |
| Business | Recitals |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA | 2.4(p) |
| Company | Preamble |
| Confidentiality Agreements | 8.7 |
| Credit Bid Amount | 3.1(a) |
| Credit Bid Agreement | 6.6 |
| Debtors | Recitals |
| Deed | 4.2(d) |
| Downstream Transferred Assets | 2.2(d) |
| Effective Date | Preamble |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| IP Assignment Agreement | 4.2(c) |
| Inventory Proceeds | 2.2(g) |
| Mountain Pass Facility | Recitals |
| Necessary Consent | 2.6(a) |
| Non-Party Person | 11.11(a) |
| Owned Real Property | 2.2(f) |
| Periodic Non-Income Taxes | 10.3(a) |
| Petition Date | Recitals |
| Post-Closing Straddle Period | 10.3(b) |
| Pre-Closing Straddle Period | 10.3(b) |
| Previously Omitted Contract | 2.7(a) |
| Previously Omitted Contract Designation | 2.7(a) |
| Previously Omitted Contract Notice | 2.7(b) |
| Privileged Communications | 11.12(a) |
| Purchased Assets | 2.1(b) |
| Purchased Contracts | 2.1(b)(iv) |
| Purchased Intellectual Property | 2.1(b)(iii) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Seller or Sellers | Preamble |
| Straddle Period | 10.3(b) |
| Termination Date | 4.4(a) |
| Trade Secrets | 1.1 (Intellectual Property) |
| Transfer Taxes | 10.1 |

1.3  **Other Definitional and Interpretive Matters.** (a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

Conjunctive. The word "or" is used in the inclusive sense of "and/or".

Contracts. Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms and includes all exhibits, schedules and other attachments thereto.

Dollars. Any reference in this Agreement to $ will mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

GAAP. Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

Gender and Number. Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

Headings. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Law. Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive

-12-

amendment, modification, codification, replacement or re-enactment of such section or other provision.

(b) The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(c) This Agreement and each Transaction Document has been drafted, negotiated and executed in the English language. If this Agreement or any Transaction Document is translated into another language, the English text will govern and control for all purposes.

## II. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1 <u>Purchase and Sale of Assets</u>. (a) On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will purchase, acquire and accept from the applicable Seller, and each Seller will sell, transfer, assign, convey and deliver to Purchaser, all of such Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than those Liens created by Purchaser and Permitted Exceptions) and Excluded Liabilities.

(b) The term "<u>Purchased Assets</u>" means the following properties, assets, rights and Claims of any Seller (other than the Excluded Assets):

(i) all Cash Collateral (other than, for the avoidance of doubt, (A) the Molycorp Minerals Intercompany Amount and (B) the Inventory Proceeds);

(ii) the Mineral Properties that are designated as Specified Mineral Properties as of the Closing Date;

(iii) the Intellectual Property and the associated goodwill of Sellers (A) related to the design, development, marketing and sale of rare earth-based products for the removal of contaminants from water, including SorbX™ and PhosFIX™ trademarks, (B) related to the process patents set forth on <u>Schedule 2.1(b)(iii)</u>, and (C) otherwise as expressly set forth on <u>Schedule 2.1(b)(iii)(C)</u> (collectively, the "<u>Purchased Intellectual Property</u>"); and

(iv) the Contracts related to the Purchased Intellectual Property to which any Seller is a party (including Purchased Intellectual Property Licenses), as set forth on <u>Schedule 2.1(b)(iv)</u> (collectively, the "<u>Purchased Contracts</u>").

Notwithstanding anything herein to the contrary, Purchaser may, from time to time, remove any Purchased Asset from this <u>Section 2.1</u> in its sole and absolute discretion until two Business Days prior to the Closing and elect to treat such Contract, Permit and/or other asset as an Excluded Asset; <u>provided</u> that after the Closing, Purchaser may declare any Contract to be an Excluded Contract if the Cure Costs for any such

-13-

Contract are subject to dispute as of the Closing and are determined by the Bankruptcy Court after the Closing to be greater than the amount set forth in Schedule 2.3(c) with respect to such Contract; provided, further, that no such exclusion or declaration shall result in any adjustment of the Purchase Price. For the avoidance of doubt, the cost for determining the Cure Costs (whether before or after the Closing) shall be borne by Sellers.

2.2   Excluded Assets. Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers will retain all right, title and interest to, in and under the Excluded Assets, subject to any Purchaser Lien. The term "Excluded Assets" means all assets, properties and rights of any Seller other than the Purchased Assets, including:

(a)   the shares held by Molycorp Minerals, LLC in Molycorp Silmet AS;

(b)   all rights and Claims relating to the Excluded Intercompany Loan;

(c)   all Intellectual Property owned by any of the Sellers other than the Purchased Intellectual Property, including but not limited to the Excluded Downstream Intellectual Property;

(d)   all Excluded Contracts (together items (a)-(d), the "Downstream Transferred Assets");

(e)   the Mineral Properties set forth on Schedule 2.2(e);

(f)   the owned real property set forth on Schedule 2.2(f) (the "Owned Real Property");

(g)   the Molycorp Minerals Intercompany Amount and any amounts resulting from the sale of up to 56,000 kg of NdPr inventory by Molycorp Minerals, LLC after the Effective Date (the "Inventory Proceeds");

(h)   all assets that will be owned, directly or indirectly, by the Reorganized Parent pursuant to the Plan;

(i)   all Permits issued for the operation, reclamation or closure of the Mountain Pass Facility by any Governmental Body, including those Permits that would otherwise be deemed to transfer by operation of law upon transfer of ownership of the Mineral Properties; and

(j)   all Oaktree Equipment.

2.3   Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, the following Liabilities existing as of the Closing Date (collectively, the "Assumed Liabilities"):

-14-

ACTIVE 213897944
NAI-1500932710v12

    (a)    all Liabilities first arising from the ownership of the Purchased Assets by Purchaser on or after the Closing;

    (b)    all Liabilities of Sellers under the Purchased Contracts that arise on or after the Closing Date;

    (c)    any Assumed Cure Costs that Purchaser is required to pay pursuant to Section 2.5, which amounts are estimated by Sellers on Schedule 2.3(c); and

    (d)    any Transfer Taxes.

2.4    Excluded Liabilities. Notwithstanding anything to the contrary set forth herein, Purchaser will not assume and will be deemed not to have assumed any of the Excluded Liabilities. "Excluded Liabilities" means any and all Liabilities of Sellers other than the Assumed Liabilities, including:

    (a)    all Liabilities arising out of, relating to or otherwise in respect of the Purchased Assets and/or Business arising prior to the Closing other than the Assumed Liabilities;

    (b)    all Taxes (other than Transfer Taxes) (i) imposed on any Seller for any period, or (ii) arising out of or related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending on or prior to the Closing;

    (c)    any costs or expenses incurred by a Seller in connection with, or related to, the administration of the Bankruptcy Case, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Case;

    (d)    all Liabilities to the extent arising out of or related to the Excluded Assets, including Liabilities relating to Excluded Contracts;

    (e)    all Liabilities of Sellers under this Agreement and the Transactions;

    (f)    all Indebtedness owed by any Seller or any predecessor of any Seller;

    (g)    any Employee Obligations to any Employee arising out of such Employee's employment by Sellers;

    (h)    any Employee Claim of any Employee arising out of such Employee's employment by Sellers;

    (i)    any WARN Act Liabilities;

    (j)    any Claim against Sellers;

-15-

(k)     any Liability to any stockholder or other equity holder of any Seller or any predecessor of any Seller;

(l)     any Liability arising out of or related to any Legal Proceeding commenced or threatened against any Seller or any predecessor of any Seller;

(m)     any Liability for infringement or misappropriation of any Intellectual Property arising out of or related to any conduct of any Seller or operation of the Business on or before the Closing Date;

(n)     any Liability of any Seller based upon any Seller's acts or omissions occurring before or after the Closing other than any Assumed Cure Costs;

(o)     all Liabilities arising out of or related to Sellers' Employee Plans and insurance policies;

(p)     all Liabilities to provide continuation health care coverage, to the extent required by and in accordance with Section 4980B of the Code and Sections 601 to 608, inclusive, of ERISA ("COBRA"), to Employees and former employees of Sellers (and their qualified beneficiaries) who left employment or otherwise experience a COBRA qualifying event;

(q)     all Liabilities of Sellers, whether occurring or accruing before, at, or after the Closing Date, (i) arising under or associated with Sellers' noncompliance with Environmental Laws (including fines, penalties, damages, and remedies), the environmental condition of the Owned Real Property, including off-site migration, or the Sellers' failure to undertake, fulfill or complete any Reclamation Obligations; and (ii) arising under Mining Laws and relating to pre-Closing operations or ownership of the Owned Real Property and Mineral Properties; and

(r)     any cloud on title for the Owned Real Property.

2.5     Cure Costs. At the Closing and pursuant to section 365 of the Bankruptcy Code, Sellers will assume the Purchased Contracts (to the extent not previously assumed) and, subject to the terms herein, assign the Purchased Contracts to Purchaser, and Purchaser, subject to the terms herein, will assume the Purchased Contracts. All Cure Costs with respect to the Purchased Contracts (the "Assumed Cure Costs") will be paid by Purchaser, as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order, and not by Sellers, and Sellers will have no liability for any Assumed Cure Costs.

2.6     Non-Assignment of Assets.

(a)     Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof would not be permitted under section 363 and section 365 of the Bankruptcy Code without the approval, authorization or consent of, or

-16-

ACTIVE 213897944
NAI-1500932710v12

granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), and (ii) the Bankruptcy Court has not entered an Order approving such assignment or transfer (including the Sale Order). In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Sellers and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, Sellers and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible and at the expense of Purchaser, under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

(b)     Subject to Section 2.6(a), if after the Closing (i) Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) any Seller holds any Purchased Assets or Assumed Liabilities, Purchaser or the applicable Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party. Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

(c)     Prior to Closing, Sellers will not reject or seek to reject any Contract relating to the Purchased Assets under the Bankruptcy Case without the consent of Purchaser.

2.7     Previously Omitted Contracts.

(a)     If prior to or following Closing it is discovered that a Contract should have been listed on Schedule 2.1(b)(iv) but was not listed on Schedule 2.1(b)(iv) (any such Contract, a "Previously Omitted Contract"), Sellers shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract and all Assumed Cure Costs (if any) for such Previously Omitted Contract. Purchaser shall thereafter deliver written notice to Sellers, no later than ten (10) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "Previously Omitted Contract Designation"). A Previously Omitted Contract designated in accordance with this Section 2.7(a) as "Rejected," or with respect to which Purchaser fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(b)     If Purchaser designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.7(a), (i) Schedule 2.1(b)(iv) shall be amended to include such Previously Omitted Contract and (ii) Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted

-17-