**Exhibit D**

# MILBANK, TWEED, HADLEY & McCLOY LLP

**1850 K STREET, NW, SUITE 1100**
**WASHINGTON, DC 20006**
_____

202-835-7500

FAX: 202-835-7586

ANDREW M. LEBLANC
Partner
202-835-7574
Fax: 202-263-7574
E-Mail: aleblanc@milbank.com

April 19, 2016

**NEW YORK**
212-530-5000
FAX: 212-530-5219

**LOS ANGELES**
213-892-4000
FAX: 213-629-5063

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-69-71914-3400
FAX: 49-69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**SEOUL**
822-6137-2600
FAX: 822-6137-2626

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

**BY HAND DELIVERY AND ECF**

The Honorable Christopher S. Sontchi
United States Bankruptcy Court for the District of Delaware
824 North Market Street, 5th Floor
Wilmington DE 19801

Re:     _In re Molycorp, Inc._, Case No. 15-11357 (CSS)

Dear Judge Sontchi:

As the Court is aware, we represent OCM MLYCo CTB Ltd. ("Oaktree") in the above-referenced matter. We regret that we have to involve the Court again in resolution of issues between Oaktree and the Ad Hoc Group of 10% Noteholders (the "Ad Hoc Group"), but disputes over the formation of the credit bid acquisition vehicle in connection with the Molycorp Minerals Sale, Secure Natural Resources LLC ("SNR"), have continued since the hearing before the Court on April 13, 2016 (the "April 13 Hearing"). In particular, the parties have not been able reach agreement on the terms of the Limited Liability Agreement (the "LLC Agreement") for SNR to complete the Molycorp Minerals Sale.[1]

---

[1]     Capitalized terms used but not defined herein have the meanings ascribed to them in the _Notice of (I) 10% Noteholder Group Settlement Among the Ad Hoc 10% Noteholders, the Debtors, Oaktree and the Creditors' Committee; and (II) Certain Related Matters Regarding Confirmation & Sale Hearing_ [D.I. 1495] (the "10% Noteholder Group Settlement") annexed hereto as Exhibit A.

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 2

As with the disputes resolved at the April 13 Hearing, the primary dispute again centers on the Ad Hoc Group's attempts to control SNR.  Oaktree will be the largest shareholder of SNR, owning an approximately 35% equity interest; the members of the Ad Hoc Group will only have 36% of the equity collectively.  Despite those relative holdings, the LLC Agreement proposes to:  (a) dictate the composition of the board of managers consisting of two JHL employees, one JHL consultant, and two other "independent" managers selected by the Ad Hoc Group and whom Oaktree has never met; (b) grant these managers complete discretion to set the duration of their own terms (without any upper bound) and the manner in which they are elected, with no right for the shareholders to remove these managers; (c) permit transactions with affiliates without any customary checks, such as a vote by disinterested shareholders or a fairness opinion; (d) deny other holders of equity the right to participate in future capital raises for securities characterized as debt securities, and grant the Board complete discretion to determine limitations and restrictions on preemptive rights for equity raises; and (e) allow for equity holders to be dragged into a sale of their equity for illiquid securities rather than cash or marketable securities.  These terms are decidedly off-market and are wholly inappropriate for the minority of equity holders represented by the Ad Hoc Group to dictate potentially in perpetuity.  Oaktree, pursuant to the 10% Noteholder Group Settlement and the Prepetition Collateral Agency Agreement, is entitled to its *pro rata* share of the equity for its debt being credit bid – the equity the Ad Hoc Group proposes Oaktree receive is anything but *pro rata*.  Because the LLC Agreement was not before the Court at the April 13 Hearing (and in fact we had not even seen a draft of it as of that date), the issues dividing the parties are new, but they are again related to the effort by the Ad Hoc Group to exercise supermajority rights as a minority shareholder.

Over the course of the last several days, Oaktree's concerns have been exacerbated by the conduct of the Ad Hoc Group in trying to close the transaction while the dispute over the terms of the LLC Agreement has continued.  As detailed below, the Ad Hoc Group actively misled the Debtors into believing that the Ad Hoc Group and Oaktree had reached agreement on the terms of the governing documents when no such agreement had been reached.  Based on the Ad Hoc Group's inaccurate representation to the Debtors that they had "finalized the governance documentation," the Debtors began to close the Molycorp Minerals Sale.  After we learned of this and informed the Debtors that no agreement had been reached, the Debtors immediately took steps to rescind any closing steps.  The conduct of the Ad Hoc Group further underscores the need for governing documents that provide fair governance rights for all shareholders without control by any one minority shareholder.

## Relevant Factual Background Relating to LLC Agreement

At the April 13 Hearing, the Court resolved the issue that was before it, namely whether the Ad Hoc Group was entitled to gain control of SNR through the issuance of preferred equity to compensate the Ad Hoc Group for its unreimbursed fees and expenses.  Addressing the narrow questions presented to the Court, the Court found "that [the Credit Bid Agreement] should not allow the issuance of preferred shares or any special governance rights that would be

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 3

related to preferred shares."[2]  Moreover, the Court found that it is clear that as for the Credit Bid Agreement, and "how . . . we get the current debt applied to credit bidding and buying the asset through the acquisition vehicle . . . Oaktree gets to share *pro rata* ratably."[3]

In addition, in response to the Ad Hoc Group's request, the Court found that the Ad Hoc Group had the ability to select the "initial" board of managers pursuant to Section 3(h)(i) of the Prepetition Collateral Agency Agreement.[4]

The timeline of relevant events following the April 13 Hearing are as follows:

On Thursday, April 14, 2016, at 7:23 p.m.,[5] counsel for the Ad Hoc Group sent a revised draft of the Credit Bid Agreement and for the first time, a draft of a proposed LLC Agreement to Oaktree (the "Draft LLC Agreement"), which was substantially different from the terms that had been proposed by the Ad Hoc Group in the term sheet that had been attached to the prior form of Credit Bid Agreement.[6]

At 2:12 p.m., after we advised them of disagreements, counsel for the Debtors emailed counsel for the Ad Hoc Group, stating that, "[a]s I understand that there is a delay in the Closing as a result of continuing discussions between Oaktree's counsel and Sidley regarding the formation documents of Purchaser, we will continue to hold on to the signatures until we receive word that Purchaser is able to proceed with Closing."[7]

Also at 2:12 p.m., we delivered to the Ad Hoc Group a mark-up of the Credit Bid Agreement and the Draft LLC Agreement reflecting Oaktree's comments,  followed by an email at 2:21 p.m., reiterating Oaktree's availability for a principals' call to work through the open issues.[8]

---

[2]     *See* Hearing Tr., Apr. 13, 2016, 39:24-40:1.

[3]     *Id.* at 40:5-18.

[4]     *See* Prepetition Collateral Agency Agreement, § 3(h)(i) (granting the Indenture Trustee the authority "to direct the time, method, and place of conducting any proceeding for any right or remedy available to the Collateral Agent, or of the exercising any trust or power conferred on the Collateral Agent").  Oaktree became a party to the Prepetition Collateral Agency Agreement by executing that certain Collateral Agency Joinder, dated as of September 11, 2014, among Oaktree, the Company, and Wells Fargo.

[5]     All times are Eastern Standard Time.

[6]     *See* Exhibit B, electronic correspondence from Jillian K. Ludwig (Sidley Austin LLP ("Sidley Austin")), Subject: "Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 14, 2016, 7:23 p.m. EST).

[7]     *See* Exhibit C, electronic correspondence from Erin S de la Mare, Jones Day, Subject: "RE: Molycorp – Wire Transfer Instructions," (April 15, 2016, 2:12 p.m. EST).

[8]     *See* Exhibit D, electronic correspondence from Lauren Doyle (Milbank Tweed Hadley & McCloy LLP ("Milbank Tweed")), Subject: "RE: Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 15, 2016, 2:21 p.m. EST).

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 4

At 3:08 p.m., counsel for the Ad Hoc Group requested a lawyers-only call to discuss Oaktree's mark-up of the documents.[9]  Just before the lawyers-only call, counsel for the Ad Hoc Group responded to counsel for the Debtors' earlier email regarding the open disputes with Oaktree, stating that they were "jumping on a call with Oaktree" and would have further clarity thereafter.[10]

At 3:30 p.m., we had a call with counsel for the Ad Hoc Group to discuss Oaktree's mark-up, during which counsel declined to negotiate the terms of the LLC Agreement.  We again reiterated the need for a principals' call and counsel for the Ad Hoc Group informed us that they would take the request back to their client.[11]

At 10:10 p.m., counsel for the Ad Hoc Group notified Debtors' counsel that they were still working towards the Closing, and further stated, "[i]n the event that we are not able to reach an agreement and close this evening, we are requesting the Debtors' consent to extend the termination date in the APA until tomorrow (or such other time as we may request to complete the deal)."[12]

At 11:37 p.m., without consulting us, counsel for the Ad Hoc Group told the Debtors, "*[t]his confirms that the Purchaser is now ready to proceed with Closing*," and thanked the Debtors' counsel for their patience while they worked to "*finalize[] the governance documentation to facilitate tonight's Closing*."[13]  We understand that the Debtors then began to release signatures and begin the Closing.

On Saturday, April 16, 2016, the Ad Hoc Group sent an "execution copy" of the LLC Agreement that had been signed by the members of the Ad Hoc Group and requested that Oaktree return its executed signature page in order to receive it 35.283% of the common equity units of SNR.[14]  Following that email, in response to our request, counsel for the Ad

---

[9]     *See* Exhibit E, electronic correspondence from Jillian Ludwig (Sidley Austin), Subject: "RE: Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 15, 2016, 3:08 p.m. EST).

[10]    *See* Exhibit C, electronic correspondence from Jillian K. Ludwig, Sidley Austin LLP, Subject: "RE: Molycorp – Wire Transfer Instructions," (April 15, 2016, 3:14 p.m. EST).

[11]    *See* Exhibit F, electronic correspondence from Lauren Doyle (Milbank Tweed), Subject: "RE: Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 15, 2016, 6:22 p.m. EST).

[12]    *See* Exhibit C, electronic correspondence from Jillian K. Ludwig, Sidley Austin LLP, Subject: "RE: Closing Documents," (April 15, 2016, 10:10 p.m. EST).

[13]    *See* Exhibit C, electronic correspondence from Jillian K. Ludwig, Sidley Austin LLP, Subject: "Molycorp – Execution Copies of the Credit Bid Agreement, Bring Down Letters, and LLC Agreement -- Proceed with Closing," (April 15, 2016, 11:37 p.m. EST) (emphasis added).

[14]    *See* Exhibit G, electronic correspondence from Jillian Ludwig (Sidley Austin), Subject: "Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 16, 2016, 5:21 p.m. EST).

The Honorable Christopher S. Sontchi
April 19, 2016
Page 5

Hoc Group told us that the members of the Ad Hoc Group did "not wish to participate in a business-to-business meeting."[15]

On Sunday, April 17, 2016, counsel for the Ad Hoc Group told us for the first time that they believed that they had closed on the Molycorp Minerals Sale on Friday. After our inquiry, the Debtors advised us that they understood, based on the emails from the Ad Hoc Group, that Oaktree and the Ad Hoc Group reached agreement on the terms of the Sale Documentation. Upon learning that no agreement had been reached, the Debtors immediately informed all parties that they were rescinding the closing steps that had been taken and not closing until resolution of the outstanding issues.

## Discussion

The Ad Hoc Group is abusing the limited right the Court found it has to appoint the "initial" board of managers to continue its attempts to disenfranchise all other members of SNR in perpetuity. Indeed, the Draft LLC Agreement is completely off-market in that it seeks to place nearly all decisions of SNR in the hands of a board of managers that will have been appointed entirely by holders, in the aggregate, of just 36% of the equity interests of SNR. The Draft LLC Agreement provides that the "initial" board of managers will determine its own term of service and standard for election, and then have the power to amend the LLC Agreement to permanently enshrine that term, again, without any equity holder consent. Even a majority of equity holders have no right to remove managers, and all vacancies that may come up are filled only by the board of managers.

The Ad Hoc Group has suggested that Oaktree and the other shareholders who collectively hold 64% of the equity interests are protected because 3 of the 5 managers are "independent," and the managers are subject to fiduciary duties. With respect to "independence," two of the initial managers are JHL designees and JHL personnel and a third is a person that has for some time served as an advisor to JHL, and was proposed at the outset of these cases to be the CRO for Mountain Pass as a term of the Ad Hoc Group's DIP financing proposal.[16] No other member of SNR will have the right to appoint a designee. With respect to fiduciary duties as a protection, there is no protection against the board and a majority of the holders agreeing to amend the LLC Agreement as soon as the day after closing to waive the

---

[15]     *See* Exhibit H, electronic correspondence from Jillian Ludwig (Sidley Austin), Subject: "RE: Molycorp – Second Amended Credit Bid Agreement and Newco LLC Agreement," (April 16, 2016, 7:03 p.m. EST).

[16]     As noted above, if any of the managers departs at any time, their replacement would be selected by the other managers, so it is clear that this board of managers will never be more "independent" than this initial board.

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 6

requirement that managers owe fiduciary duties to SNR and its members.  Similarly, there are absolutely no restrictions on affiliate transactions.[17]

Oaktree does not believe that the Court intended that the Ad Hoc Group could use the Court's ruling at the April 13 Hearing to strip the members of SNR – who collectively hold a majority of the equity, including Oaktree, the single largest equity holder of SNR – of their basic rights under Delaware corporate law.

Section 3(h)(i) of the Prepetition Collateral Agency Agreement, the authoritative source of rights cited by the Ad Hoc Group, only goes so far as to allow the Ad Hoc Group (by virtue of its majority control of the 10% Notes) "to direct the time, method, and place of conducting any proceeding for any right or remedy available to the Collateral Agent, or of the exercising any trust or power conferred on the Collateral Agent."[18]  The Ad Hoc Group has exercised this right by determining to credit bid (on a *pro rata* basis) the obligations secured by the collateral controlled by the Collateral Agent, as provided for under the Prepetition Collateral Agency Agreement.  However, the interests in SNR, the vehicle formed to acquire the collateral pursuant to the credit bid, are to be distributed ***equally and ratably***.  Pursuant to section 3(c)(iii) of the Prepetition Collateral Agency Agreement, "[e]ach Secured Party (acting through the Senior Indenture Trustee or its applicable Additional Authorized Representative, as applicable) acknowledges and agrees that the payment and satisfaction of all of the Secured Obligation will be secured ***equally and ratably*** by the Transaction Liens established in favor of the Collateral Agent for the benefit of the Secured Parties."[19]  Moreover, Section 4(d) of the Prepetition Collateral Agency Agreement provides that "***all moneys or other property held by the Collateral Agent . . . shall, to the extent available for distribution be distributed  . . . equally and ratably***."[20]

The distribution of the equity interests in SNR is the distribution of property under the Prepetition Collateral Agency Agreement, and those interests must be distributed equally and ratably.  The Ad Hoc Group's decision making authority does not extend to a right to dictate the allocation of collateral among the secured parties, which is exactly what the Ad Hoc Group seeks to do by refusing to negotiate the terms of the Credit Bid Agreement and the LLC Agreement, and placing control of SNR in its perpetually appointed board of managers.

---

[17]     Notably, the members of the Ad Hoc Group continue to try to increase their relative percentage of ownership of SNR through the revised Credit Bid Agreement—seeking to secure for themselves the opportunity to purchase the equity interests in SNR that would otherwise be issued to any 10% Noteholder who either (a) is not accredited or otherwise not a qualified investor, or (b) elects to receive a cash payment rather than its pro rata share of the equity interests, or (c) does not sign the LLC Agreement.  There is no basis under the documents to provide the Ad Hoc Group this unique right, which should be shared by all members of SNR equally and ratably.

[18]     *See* Prepetition Collateral Agency Agreement, § 3(h)(i).

[19]     *See* Prepetition Collateral Agency Agreement, § 3(c)(iii).

[20]     *See* Prepetition Collateral Agency Agreement, § 4(d) (emphasis added).

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 7

        The Ad Hoc Group cannot use the limited liability company form of SNR, the "initial" board of managers, or the LLC Agreement to strip the secured parties of the basic rights they would be entitled to as a stockholder of a Delaware corporation under the General Corporation Law of the State of Delaware (the "DGCL"), including without limitation:

> The right to vote to elect directors at annual meetings; DGCL § 211(b)
> The right to have directors elected by a plurality vote of the stockholders; DGCL § 216
> The right of stockholders holding a majority of the voting shares to remove any director, with or without cause; DGCL § 141(k)
> Delaware corporation directors' unwaivable duty of loyalty and duty of good faith; DGCL § 102(b)(7)
> Appraisal rights in connection with any merger; DGCL § 262
> The right to inspect the Company's books and records. DGCL § 220

        Nevertheless, certain key, off-market provisions of the Draft LLC Agreement seek to trample over these rights and protections,[21] and the Court should direct that they be struck or modified to not adversely affect the rights of holders of SNR equity.[22]

> **Board Mechanics –** The initial board of managers, which will determine the length of its own term and the means by which a future board can be appointed, is comprised of 2 managers controlled by one member of the Ad Hoc Group and 3 "independent" managers, also selected by the Ad Hoc Group. No other member of SNR, not even the largest shareholder will have the right to appoint or vote on the appointment or removal of any manager.[23]
>
> **Amendments –** The LLC Agreement states that it may be amended by approval of the board of managers and the members of SNR holding a majority of its common equity interests.[24] Without a limitation on amendments, there is nothing that would prevent the board of managers selected by the Ad Hoc Group and a majority of the members of SNR from amending the LLC Agreement to eliminate the few

---

[21]    To determine whether these are off-market, the Court need look no further than the minority protections that Oaktree, as a 92.5% shareholder of the Reorganized Plan Debtors, is providing to the minority shareholders there. In almost every respect (other than board rights, given Oaktree's majority position), the protections are far greater than what is proposed to be imposed by a distinct minority of shareholders in SNR against the majority holders of that entity.

[22]    Attached hereto as Exhibit I is a blackline of the proposed LLC Agreement reflecting Oaktree's comments. The list contained herein is only intended to be illustrative of the Ad Hoc Group's efforts to use the board of managers of SNR to wrest control (to which it is not entitled) over the corporate decisions of SNR. Oaktree believes that, given the opportunity, the parties could negotiate a reasonable resolution of these issues.

[23]    LLC Agreement, § 4.2(c).

[24]    LLC Agreement, § 13.2(a).

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 8



protections to be granted to Oaktree thereunder, including the fiduciary duties of SNR's managers.

**Affiliate Transactions** – The LLC Agreement provides no express limitation on affiliate transactions. Because there are no limitations on the ability to amend the LLC Agreement, the LLC Agreement could be amended to waive the managers' fiduciary duties and remove the sole protection SNR's members have against affiliate transactions.

**Information Rights** – The LLC Agreement does not provide for equal information rights. By virtue of its having designated certain members of the "initial" board of managers, which is self-perpetuating, the Ad Hoc Group will have disproportionate access to information.[25]

**Preemptive Rights / Issuances of New Classes of Securities** – The LLC Agreement provides that the terms and conditions on which preemptive rights are to be exercised, including any limitations or restrictions thereon or exemptions therefrom, are determined by the board of managers.[26] Oaktree has no protection against the "initial" board of managers creating broad restrictions or exemptions that limit or effectively eliminate Oaktree's ability to exercise these rights, or from characterizing issuances as debt issuances to avoid pre-emptive rights all together.

**Drag Along** – The LLC Agreement provides that a majority of the board of managers and a majority of the members of SNR may approve a drag-along sale, even if such sale is for illiquid securities, and the members will have no appraisal rights with respect thereto.[27]

Contrary to the Ad Hoc Group's assertions, the proposed terms of the Draft LLC Agreement go well beyond the scope of the Court's ruling at the April 13 Hearing, deprives Oaktree of the full benefit of its 35% equity interest in SNR by replacing its ability to vote on the election and removal of SNR's board of managers, and does not treat Oaktree equally and ratably *vis-a-vis* the members of the Ad Hoc Group.

Finally, the Ad Hoc Group's position that it does not have to negotiate the terms of the Credit Bid Agreement and the LLC Agreement with Oaktree directly contradicts the 10% Noteholder Group Settlement, which expressly provides that that the Sale Documentation[28] shall be reasonably acceptable to Oaktree and "with respect to Oaktree, whether the Sale Documentation is "reasonably acceptable" shall mean whether it is in form and substance consistent with the terms of the 10% Noteholder Group Settlement (including without limitation

---

[25]     LLC Agreement, Article IX.

[26]     LLC Agreement, §§ 3.2(a) and 7.1.

[27]     LLC Agreement, §§ 3.6 and 6.4(a).

[28]     The Sale Documentation includes any governing documents with respect to Newco. *See* 10% Noteholder Group Settlement, ¶ 3 & n.2.

Milbank, Tweed, Hadley & McCloy LLP

The Honorable Christopher S. Sontchi
April 19, 2016
Page 9

paragraph 2 hereof, the Plan, and the Prepetition Collateral Agency Agreement and related prepetition security documents)."[29]

Oaktree continues to believe that the parties should have been able to negotiate a consensual resolution of these issues.  The Ad Hoc Group has apparently determined based on what the Court said at the April 13 Hearing that it has no such obligation to negotiate.

As such, we request that the Court find that the Draft LLC Agreement, consistent with the 10% Noteholder Group Settlement, the Prepetition Collateral Agency Agreement and the Court's ruling at the April 13 Heating, must provide members with the basic protections reflected in Oaktree's mark-up of the Draft LLC Agreement.

Sincerely,

/s/  Andrew M. Leblanc

Andrew M. Leblanc

---

[29]     10% Noteholder Group Settlement, ¶ 3.

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
MOLYCORP, INC., et al.,¹                :   Case No. 15-11357 (CSS)
                                        :
                 Debtors.               :   (Jointly Administered)
                                        :
-------------------------------------------------------------x
```

## NOTICE OF: (I) 10% NOTEHOLDER GROUP SETTLEMENT AMONG THE AD HOC 10% NOTEHOLDERS, THE DEBTORS, OAKTREE AND THE CREDITORS' COMMITTEE; AND (II) CERTAIN RELATED MATTERS REGARDING CONFIRMATION & SALE HEARING

1.      Attached hereto as Exhibit A is a copy of the 10% Noteholder Group Settlement Among the Ad Hoc 10% Noteholders, the Debtors, Oaktree and the Creditors' Committee (the "10% Noteholder Group Settlement"), dated March 25, 2016. Capitalized terms not otherwise defined herein have the meanings given to them in the 10% Noteholder Group Settlement.²

2.      The 10% Noteholder Group Settlement resolves all of the objections of the Ad Hoc 10% Noteholders to: (a) that certain Agreement Between Oaktree, Molycorp Inc. and Its Affiliated Debtors in Possession, the Official Committee of Unsecured Creditors of Molycorp Inc., et al, and National Union Fire Insurance Company Of Pittsburgh, Pa. (solely with Respect to Section IV) to Resolve Asserted Claims Against Oaktree and the Debtors' Directors & Officers and to Address Related Chapter 11 Issues [Docket No. 1302, Ex. A] (the "Plan Settlement Agreement"); and (b) confirmation of the Debtors' Third Amended Joint Plan of Reorganization  (as it may be amended, supplemented or modified, including to incorporate the terms of the 10% Noteholder Group Settlement, the "Plan").

---

1       The Debtors are the following 21 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Molycorp, Inc. (1797); Industrial Minerals, LLC; Magnequench, Inc. (1833); Magnequench International, Inc. (7801); Magnequench Limited; Molycorp Advanced Water Technologies, LLC (1628); MCP Callco ULC; MCP Canada Holdings ULC; MCP Canada Limited Partnership; MCP Exchangeco Inc.; Molycorp Chemicals & Oxides, Inc. (8647); Molycorp Luxembourg Holdings S.à r.l.; Molycorp Metals & Alloys, Inc. (9242); Molycorp Minerals Canada ULC; Molycorp Minerals, LLC (4170); Molycorp Rare Metals Holdings, Inc. (4615); Molycorp Rare Metals (Utah), Inc. (7445); Neo International Corp.; PP IV Mountain Pass, Inc. (1205); PP IV Mountain Pass II, Inc. (5361); RCF IV Speedwagon Inc. (0845).

2       To the extent of any inconsistency between the terms of the 10% Noteholder Group Settlement and this notice, the terms of the 10% Noteholder Group Settlement shall control.

3. At a high-level, the 10% Noteholder Group Settlement will result in the following:

- The Ad Hoc 10% Noteholders' $1,000,000 credit bid as set forth in an agreed form of asset purchase agreement (the "Credit Bid APA") shall be deemed the Successful Bid (as defined in the Bidding Procedures Order) for the sale and purchase of: (i) all cash collateral of the Molycorp Minerals Debtors other than (1) the Molycorp Minerals Intercompany Amount and (2) any amounts resulting from the sale of up to 56,000 kg of NdPr inventory by Molycorp Minerals, LLC after the date of the 10% Noteholder Group Settlement; (ii) certain specified intellectual property and related assets and contracts; and (iii) the Specified Mineral Properties (collectively, the "Purchased Assets");

- Unless otherwise ordered by the Court, the Debtors will seek approval of the Credit Bid APA at the Sale and Confirmation Hearing. However, the approval of the Credit Bid APA is not a condition to confirmation of the Plan, and will only be approved to the extent such sale does not have an adverse impact on the confirmation of the Plan with respect to the Downstream Debtors or any of the Downstream Transferred Assets;

- Oaktree and the Ad Hoc 10% Noteholders have agreed, pursuant to the conditions set forth the 10% Noteholder Group Settlement, to a mechanic to fund a reserve for the costs set forth on Exhibit 3 to the 10% Noteholder Group Settlement, which includes (a) the costs and expenses of seeking approval of the Credit Bid APA, (b) carrying and severance costs prior to the consummation of the Molycorp Minerals Sale and (c) wind-down or chapter 7 costs;

- The Ad Hoc 10% Noteholders will consent to the transfer pursuant to the Plan of Molycorp Silmet AS and certain intellectual property related to the Downstream Businesses to Reorganized Parent, or entities owned, directly or indirectly, by Reorganized Parent;

- All fees and expenses of the Ad Hoc 10% Noteholders incurred in connection with these cases shall be paid upon consummation of the Plan in an amount up to $5,000,000; (ii) the fees and expenses of the Indenture Trustee shall be paid from the cash recovery allocable to the 10% Noteholders on account of their allowed secured claim; and (iii) to the extent legally permissible, the Ad Hoc 10% Noteholders may submit any fees and expenses above $5,000,000 for reimbursement to be paid out of the cash recovery allocable to the 10% Noteholders.

- The Parties have agreed to certain mutual releases, and the Ad Hoc 10% Noteholders will support the various releases in the Plan, including the releases contemplated to be given by the Molycorp Minerals Debtors;

- The Debtors shall withdraw the *Motion of the Debtors for an Order Authorizing Them to Surcharge Certain Collateral Pursuant to Section 506(c) of the Bankruptcy Code* [Docket No. 1352] and the Ad Hoc 10% Noteholders shall withdraw the *Motion of Ad Hoc 10% Noteholders to Compel the Debtors to Comply with the Bidding Procedures*

*Order or, Alternatively, to Convert the Molycorp Minerals Debtors' Cases to Liquidations Under Chapter 7* [Docket No. 1349]; and

- The Plan will be withdrawn with respect to the Molycorp Minerals Debtors, and, as a result, the Debtors will not be seeking confirmation of the Plan as to the Molycorp Minerals Debtors at the Sale and Confirmation Hearing currently scheduled to begin on March 29, 2016 at 10:00 a.m. (ET).

***The foregoing high-level summary has been provided for convenience only and is qualified in its entirety by the terms of the 10% Noteholder Group Settlement. Parties are encouraged to read and review the full terms of the 10% Noteholder Group Settlement, which is attached as an exhibit hereto.***

4.      Given the 10% Noteholder Group Settlement and the withdrawal of the Plan as to the Molycorp Minerals Debtors, the Debtors intend to seek two orders from the Bankruptcy Court at the Sale and Confirmation Hearing:

- An order confirming the Plan as to each of the Debtors other than the Molycorp Minerals Debtors (the "Plan Debtors") and approving the Plan Settlement Agreement and the 10% Noteholder Group Settlement and the mutual settlements, releases and other transactions between the Plan Debtors and the Molycorp Minerals Debtors contemplated by the Plan and the 10% Noteholder Group Settlement (the "Confirmation Order"); and

- An order approving the sale of the Purchased Assets pursuant to the Credit Bid APA (the "Sale Order").

5.      In advance of the start of the Confirmation and Sale Hearing, the Debtors anticipate filing with the Court: (a) the Credit Bid APA; (b) an amended Plan; and (c) the forms of the Confirmation Order and the Sale Order.