not include an offering made on Form S-4 or Form S-8 (or any successor form) in connection with a business acquisition or combination or an employee benefit plan, respectively.

"JHL" means JHL Capital Group Holdings One LLC, its Affiliates and its and its Affiliates' respective successors and assigns.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit A attached hereto.

"Member" means each Person that is a party to this Agreement, owns Units and has been admitted (but has not subsequently ceased to be a Member in accordance herewith) as a member of the Company in accordance with the terms of this Agreement and the Act. The Members shall collectively constitute the "members" (as that term is defined in the Act) of the Company.

"Options" shall mean any rights or options to subscribe for, purchase or otherwise acquire Units granted pursuant to any employment or consulting agreement with the Company or its Subsidiaries or pursuant to any equity compensation plan or program of the Company.

"Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"Prospectus" means the prospectus included in any Registration Statement, all amendments and supplements to such prospectus, including post-effective amendments, and all other material incorporated by reference in such prospectus.

"QVT" means each of QVT Fund V LP, QVT Fund IV LP, and Quintessence Fund L.P., each of their Affiliates and each of their and their Affiliates' respective successors and assigns.

"register", "registered" and "registration" means a registration effected pursuant to a registration statement filed with the SEC (the "Registration Statement") in compliance with the Securities Act, and the declaration or ordering by the SEC of the effectiveness of such Registration Statement.

"Registrable Securities" means (i) the Units owned (whether now owned or hereafter acquired) by a Holder or any Transferee to the extent permitted by Section 8.7 and Section 8.12 hereof, and (ii) any Units issued as (or as of any such date of determination then currently issuable upon the conversion or exercise of any warrant, right or other security that is issued as) a dividend or other distribution with respect to, or in exchange or in replacement of, the Units contemplated by the immediately foregoing clause (i); provided, however, that Units shall cease to be treated as Registrable Securities if (a) a Registration Statement covering such Units has been declared effective by the SEC and such Units have been disposed of pursuant to such effective Registration Statement, (b) a Registration Statement on Form S-8 covering such Units is effective, (c) such Units are sold pursuant to Rule 144 promulgated under the

4

Securities Act or may be sold pursuant to Rule 144 promulgated under the Securities Act without any time, volume or manner of sale limitations, or (d) such Units cease to be outstanding.

"Registration Expenses" means any and all expenses incident to the performance by the Company of its obligations under Article VIII hereof, including (i) all SEC and stock exchange registration and filing fees (including, if applicable, the fees and expenses of any "qualified independent underwriter," as such term is defined in Rule 5121 of the Financial Industry Regulatory Authority (or any successor provision), and of its counsel), (ii) all fees and expenses of complying with securities or "blue sky" laws (including fees and disbursements of counsel for the underwriters in connection with "blue sky" qualifications of the Registrable Securities), (iii) all printing, messenger and delivery expenses, (iv) all fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange and all rating agency fees, (v) the reasonable fees and disbursements of counsel for the Company and of its independent public accountants, including the expenses of any special audits and/or comfort letters required by or incident to such performance and compliance, (vi) any fees and disbursements of underwriters customarily paid by the issuers or sellers of securities, including liability insurance if the Company so desires or if the underwriters so require, and the reasonable fees and expenses of any special experts retained in connection with the registration, but excluding underwriting discounts and commissions and transfer taxes, if any, (vii) the reasonable fees and out-of-pocket expenses of not more than one law firm (as selected by the owners of a majority of the Registrable Securities included in such registration) incurred by all the Holders in connection with the registration; (viii) the costs and expenses of the Company relating to analyst and investor presentations or any "road show" undertaken in connection with the registration and/or marketing of the Registrable Securities and (ix) any other fees and disbursements customarily paid by the issuers of securities.

"Relative Equity Percentage" means, with respect to any Member, the fraction, expressed as a percentage, determined by dividing (a) the aggregate number of Common Units owned by such Member as of the time of determination by (b) the aggregate number of Common Units owned, as of such time of determination, by all of the Members who were Members immediately prior to the applicable Earlier Issuance.

"Sale Event" means a bona-fide, arm's-length Transfer (including a Transfer structured as a merger, reorganization, consolidation or other similar business combination) in one or a series of related transactions to a Person not Affiliated with a Member of (a) more than fifty percent (50%) of Common Units or (b) all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities" means Units and any other equity securities (or rights, options, warrants or other securities convertible into or exercisable or exchangeable for Units or other equity securities) of the Company or any of its Subsidiaries.

5

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Securityholder" means a holder of Securities.

"Shelf Registration Statement" means a Registration Statement of the Company filed with the SEC on Form S-3 or on Form S-1 for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act (or any similar rule that may be adopted by the SEC) covering the Registrable Securities, as applicable.

"Subsidiary" means, with respect to any Person (the "parent") at any date, (a) any other corporation, limited liability company, association or other business entity of which, (i) securities or other ownership interests representing more than fifty percent (50%) of the voting power of all equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of the board of directors, managers or similar governing body thereof or (ii) the majority interest in the capital or profits of such corporation, limited liability company, association or other business entity, are owned, controlled, directly or indirectly, or held by the parent and/or one or more subsidiaries of the parent and (b) any other Person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent.

SECTION 1.2    Definitions; Cross-References.

| Terms | Section |
|---|---|
| Agreement | Preamble |
| Authorization Date | Section 6.2(a) |
| Board | Section 4.1(a) |
| Certificate | Recitals |
| Claims and Expenses | Section 11.3 |
| Company | Preamble |
| Common Manager | Section 4.2(b) |
| Conversion Price | Section 3.2(b) |
| Conversion Rate | Section 3.2(b) |
| Demand Registration | Section 8.1(a) |
| Demanding Members | Section 8.1(a) |
| Drag-Along Member Recipients | Section 6.4(a) |
| Drag-Along Sale | Section 6.4(a) |
| Drag-Along Sale Notice | Section 6.4(a) |
| Drag-Along Sellers | Section 6.4(a) |
| Election Notice | Section 6.2(b) |
| Eligible Tag-Along Members | Section 6.3(a) |
| Exempted Persons | Section 3.53.4(a) |
| First Refusal Period | Section 6.2(b) |
| Indemnified Party | Section 8.5(c) |
| Indemnifying Party | Section 8.5(c) |
| IPO Conversion | Section 3.63.5( |

| Terms | Section |
|---|---|
| IPO Corporation | Section 3.63.5(a) |
| Lock-Up Period | Section 8.11 |
| Manager | Section 4.2(a) |
| Maximum Tag-Along Period | Section 6.3(b) |
| Offer Notice | Section 6.2(a) |
| Offered Units | Section 6.2(a) |
| Officers | Section 4.6(a) |
| Original Issue Price | Section 3.2(b) |
| Other Members | Section 6.2(a) |
| Permitted Transfers | Section 6.6 |
| Piggyback Registration | Section 8.2(a) |
| Post-IPO Subject Securities | Section 3.63.5(b) |
| Pre-IPO Subject Securities | Section 3.63.5(b) |
| Pro Rata Tag-Along Share | Section 6.3(d)(i) |
| Qualified Public Offering | Section 3.2(b)(i) |
| Sale Notice | Section 6.3(a) |
| Selling Member | Section 6.3(a) |
| Similar Law | Section 10.1(p) |
| Sponsor Indemnitors | Section 11.7(d) |
| Tag-Along Participation Notice | Section 6.3(b) |
| Tag-Along Sale | Section 6.3(a) |
| Tag-Along Sale Percentage | Section 6.3(a) |
| Tag-Along Securities | Section 6.3(a) |
| Tag-Along Sellers | Section 6.3(a) |
| Tagging Members | Section 6.3(a) |
| Transfer | Section 6.1(b) |
| Transferee | Section 6.1(b) |
| Transferring Members | Section 6.2(a) |
| Transferor | Section 6.1(b) |
| Transferred | Section 6.1(b) |
| Transferring | Section 6.1(b) |
| Units | Section 3.2(a) |
| Withdrawal | Section 8.1(c) |

SECTION 1.3    Interpretation. In this Agreement, except to the extent that the context otherwise requires:

Case 15-11371-CSS   Doc 1329   Filed 04/28/16   Page 54 of 163

**Execution Version**

(a) the words "herein," "hereof" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision hereof;

(b) unless otherwise specified, references to Articles, Sections, Subsections, clauses, Schedules, Exhibits, preambles and recitals are references to Articles, Sections, Subsections, clauses, Schedules, Exhibits, preambles and recitals hereof;

(c) the table of contents hereof and the headings herein are for convenience only and shall not affect the interpretation hereof;

(d) references to any document or agreement, including this Agreement, shall be deemed to include references to such document or agreement as amended, supplemented, replaced or restated from time to time in accordance with its terms and subject to compliance with any requirements set forth therein;

(e) references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(f) references to any party hereto shall include its successors and permitted assigns;

(g) wherever the word "include," "includes" or "including" is used herein, it shall be deemed to be followed by the words "without limitation," and any list of examples following such term shall in no way restrict or limit the generality of the word or provision with respect to which such examples are provided;

(h) the words "shall" and "will" are used interchangeably throughout this Agreement, and the use of either connotes a mandatory requirement;

(i) the word "or" is not meant to be exclusive, and shall be interpreted as "and/or";

(j) unless otherwise specified, references to "day" or "days" are references to calendar days;

(k) the terms "Dollars" and "$" mean United States Dollars;

(l) pronouns used herein, whether in masculine, feminine or neuter forms, shall be deemed to include, when appropriate, each of the masculine, feminine and neuter forms and both the singular and plural, and the grammatical construction of sentences shall be deemed to conform thereto;

8

 (m) references to any particular class of Units herein shall be deemed to include any Post-IPO Subject Securities contemplated by Section ~~3.6~~**3.5** or any other equity security received in connection with any combination of shares, recapitalization, merger, consolidation, or other reorganization, or by way of stock split, stock dividend or other distribution in respect of such class of Units or Post-IPO Subject Securities;

 (n) references to any time periods herein that are initiated by the receipt of a notice shall not be deemed to include the date such notice is received in the calculation of such time period; and

 (o) all parties are deemed to have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises under any provision hereof, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions hereof.

## ARTICLE II

## GENERAL PROVISIONS

 SECTION 2.1 <u>Formation</u>.  The Company has been organized as a Delaware limited liability company by the execution and filing of the Certificate under and pursuant to the Act.  The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

 SECTION 2.2 <u>Name</u>.  The name of the Company is "Secure Natural Resources LLC", and all Company business shall be conducted in that name or in such other names that comply with Applicable Law as the Board may select from time to time.

 SECTION 2.3 <u>Term</u>.  The term of the Company commenced on the date the Certificate was filed with the office of the Secretary of State of the State of Delaware and shall continue in existence indefinitely until the Company is dissolved in accordance with the provisions hereof and of the Act.

 SECTION 2.4 <u>Purpose; Powers</u>.  The purpose of the Company shall be (i) to engage in any lawful business and activities permitted by the Act or the laws of any jurisdiction in which the Company may do business, and (ii) to do all things necessary, desirable or incidental to the accomplishment of any such business and activities.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

 SECTION 2.5 <u>Foreign Qualification</u>.  Prior to the Company's conducting business in any jurisdiction other than the State of Delaware, the Board shall, if it so

9

determines that such compliance is required or otherwise appropriate, cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Board or the Officers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Board or any Officer, each Member shall execute and deliver all certificates and other instruments conforming with this Agreement that are reasonably necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

SECTION 2.6  Registered Office; Registered Agent; Principal Office; Other Offices. The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by Applicable Law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by Applicable Law. The principal office of the Company shall be at such place as the Board may designate from time to time, which need not be in the State of Delaware. The Company may have such other offices as the Board may designate from time to time.

SECTION 2.7  Tax Classification. The Company is authorized to, and shall make, an election to be classified as an association taxable as a corporation on Internal Revenue Service Form 8832 and any comparable state or local form with an effective date ~~as of the day following~~**no later than** the Closing Date. Each Member consents to such election and shall cooperate with the Company to the extent necessary to effect such election and any similar election under state or local law. **Without the unanimous consent of the Members, no election shall be made or transaction entered into that would cause the Company (or any successor to the Company) to be treated as other than a corporation for U.S. federal income tax purposes.** Each Member acknowledges and agrees that any gain or loss recognized as a result of the exchange of creditor claims for assets contemplated by the Credit Bid Agreement shall be recognized ~~either~~ by the Member directly or by the Company prior to it being classified as an association taxable as a corporation for federal and applicable state and local income tax purposes. Each Member shall file all tax returns consistently with this Section 2.7.

ARTICLE III

CLASSES OF UNITS; THE MEMBERS

10

SECTION 3.1  Names, Addresses and Units of Members; Admission. The names and addresses of the Members, the number and classes of Units owned by each Member are as set forth on Schedule A hereto. Schedule A shall be revised from time to time by the Board following (a) the admission of a new Member, (b) the issuance, repurchase or Transfer of Units to reflect such issuance, repurchase or Transfer, (c) the conversion of any Units or (d) a change of address of a Member. Each person who is executing this Agreement as of the Closing Date is admitted as a Member of the Company upon such execution and, simultaneously with such admission, the Company hereby issues to such Member the number and classes of Units set forth opposite such Member's name as set forth on Schedule A hereto. For a period of one hundred and eighty (180) days following the Closing Date, the Company shall issue Common Units to the holders of 10% Notes who comply with the provisions of (and subject to the terms and conditions of) Section 3(b) of the Credit Bid Agreement.

SECTION 3.2  Units.

(a)  Issuance and Creation of Units. Subject to the terms of this Agreement (including Article VII), the Company is authorized to issue equity interests in the Company designated as "Units," which shall constitute limited liability company interests under the Act. The Units shall consist initially of the Common Units, which shall have the rights, privileges, limitations, restrictions and/or obligations as set forth herein. The total number of Units of any class that may be issued hereunder shall not be limited, and the references to Units shall be deemed to include fractional Units (which shall be calculated to the thousandth of a decimal place). [The Board is authorized to create and issue new Units or other Securities from time to time in one or more classes, or one or more series of such classes, which classes or series (or the holders thereof) shall have, subject to the provisions of Applicable Law, such rights, preferences, privileges, limitations, restrictions and/or obligations as shall be fixed by the Board, including with respect to: (i) the right of each class or series to receive dividends or share in distributions; (ii) maintaining separate and distinct records for each class or series; (iii) allocating specific assets, liabilities, debts, obligations and expenses to each class or series; (iv) the rights of each class or series upon dissolution and liquidation of the Company; (v) the price at which, and the terms and conditions upon which, each class or series may be redeemed by the Company, if any class or series is so redeemable; (vi) the rate at which, and the terms and conditions upon which, each class or series may be converted into another class or series of Units or other Securities; (vii) the right of the owners of each class or series to information about the Company, including limitations of the rights in Section 18-305 of the Act; and (viii) the right of each class or series to vote on Company matters. The Board may amend this Agreement without the consent of any Member in order to effect the creation or issuance of Units or other Securities or any class or series thereof and the granting of any such rights, preferences, privileges, limitations, restrictions and/or obligations pursuant to this Section 3.2(a).]²

---

² **Note to Sidley: The Board should only be permitted to issue new preferred Units if the Members have preemptive rights for any such issuance under this Agreement on customary terms. Please see footnote below in Section 7.1.**

11

(b)   Certificates for Units. Unless and until the Board shall determine otherwise, Units shall be uncertificated and recorded in the books and records of the Company, including Schedule A. If at any time the Board shall determine to certificate Units, such certificates shall contain such legends as the Board shall determine are reasonably necessary or advisable.

SECTION 3.3      Action by the Members.

(a)   Meetings of the Members.

(i)   Quorum; Actions of the Members. At all meetings of the Members, the presence of Members, in person or by proxy, owning a majority of the then outstanding Common Units required to take the action or actions to be voted upon at such meeting shall constitute a quorum for the transaction of business. ~~Unless otherwise determined by the Board,~~ Managers shall be elected by Members owning a plurality of the Common Units that are voted in the election of Managers. Except as otherwise provided in this Agreement, on each other matter presented to the Members for a vote, an action by the Members on such matter shall require and shall become effective upon the affirmative vote of the Members owning a majority of the then outstanding Common Units. Each Member shall be entitled to one vote for each Common Unit held by it. A Member shall not be obligated to abstain from voting on any matter (or vote in any particular manner) because of any interest (or conflict of interest) of such Member in such matter. ~~Except as expressly provided in this Agreement, no Members shall have any right to vote with respect to any matter hereunder under the Act, at law, in equity or otherwise with respect to the Company's affairs.~~

(ii)   Meeting Place; Notice. The Board shall have the authority, without requirement for consent by any Member, to call meetings of Members, to be held within or outside the State of Delaware, in order to discuss any business that may arise at such meeting. Meetings of Members may be called by the Board at any time and from time to time on not less than forty-eight (48) hours' notice to the Members and held at such place or places as shall be determined from time to time by the Board. Notice of any meeting of Members shall be given in accordance with Section 13.2. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by Applicable Law. Attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purposes of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in any waiver of notice. Minutes of each meeting shall be prepared at the direction of the Board.

(iii)   Telephonic Meetings. Members may participate in a meeting of Members by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting. If all participants are participating by conference telephone or other communications

equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

(iv)   Proxies. Members may participate in a meeting of the Members in person or by proxy. Any such proxy may be granted in writing, by means of electronic transmission or as otherwise permitted by Applicable Law.

(b)   Action by the Members Without a Meeting. Any vote, consent, approval or other action required or permitted to be taken by the Members may be taken without a meeting by the written consent of Members owning a majority of the Common Units. No meeting or prior notice shall be required in connection therewith. Such consent, writing or writings shall be filed with the minutes of the proceedings of the Members, and written copies of such consent, writing or writings shall be sent to each Member promptly, and in any event within fifteen (15) days, after such action by written consent has been taken.

~~SECTION 3.4 Certain Reorganizations. The Board shall have the authority to cause the Company to change its legal form or tax status, including to amend this Agreement in accordance with Section 13.3 to accomplish such change.~~

**SECTION 3.4**   ~~SECTION 3.5~~ Freedom to Pursue Opportunities. Each of the parties hereto expressly acknowledges and agrees that notwithstanding any duty that may otherwise exist hereunder or at law or in equity, to the fullest extent permitted by Applicable Law:

(a)   each of the past, present and future Members and each of their respective Affiliates, officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries and agents (the foregoing Persons in this clause (a), the "Exempted Persons"), has the right to, and shall have no duty (contractual, fiduciary or otherwise) not to, directly or indirectly engage in any business, business activity or line of business, including those that are the same or similar to those of the Company or any of its Subsidiaries or may be deemed to be competing with the Company or any of its Subsidiaries; and

(b)   in the event that any Exempted Person acquires knowledge of a potential transaction or matter that may be a business opportunity for any of the Company and/or one or more of its Subsidiaries, on the one hand, and such Exempted Person or any other Person, on the other hand, such Exempted Person shall have no duty (contractual, fiduciary or otherwise) to communicate or present such business opportunity to the Company or any of its Subsidiaries or Affiliates, as the case may be, and notwithstanding any provision of this Agreement to the contrary, shall not be liable to the Company or any of its Affiliates, Members or creditors for breach of any duty (contractual, fiduciary or otherwise) by reason of the fact that such Exempted Person, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company or any of its Subsidiaries.

**SECTION 3.5**   ~~SECTION 3.6~~ Cooperation with an Initial Public Offering.

13

(a) The Board may determine at any time that the Company or any of its Subsidiaries should engage in an Initial Public Offering. In connection with any proposed Initial Public Offering approved by the Board, the Board may (i) cause this Agreement to be amended to provide for a conversion in accordance with Delaware law to a corporation or such other capital structure as the Board may determine, (ii) cause the distribution of shares, units or other equity interests of any Subsidiary of the Company to the Members in accordance with Section 5.1, (iii) form a Subsidiary holding company and distribute its shares to the Members, (iv) change the domicile of the Company or any of its Subsidiaries to another jurisdiction to facilitate any of the foregoing and/or (v) take such other steps as it deems necessary or appropriate to create a suitable vehicle for an offering, in each such case in accordance with the Act and Applicable Law (the resulting entity, the "IPO Corporation"), and in each case for the express purpose of an initial offering of the securities of such IPO Corporation for sale to the public in a registered public offering pursuant to the Securities Act (an "IPO Conversion").

(b) In connection with any proposed IPO Conversion, at the determination of the Board, all or any portion of the Units (the "Pre-IPO Subject Securities") may be converted into or exchanged or redeemed for shares (or other equity securities and/or options at Fair Market Value) (the "Post-IPO Subject Securities"). In connection with any such conversion, exchange or redemption, the number of Post-IPO Subject Securities to be issued to the Members in respect to the Pre-IPO Subject Securities shall be determined by the Board based upon (i) the Fair Market Value of the Company on the date of the IPO Conversion as determined by the Board and (ii) the resulting relative values of the Pre-IPO Subject Securities assuming the Company is dissolved and the net proceeds are distributed to the owners of Pre-IPO Subject Securities in accordance with Section 5.1 of this Agreement. If any such conversion, exchange or redemption is effected, each Member agrees to execute and deliver all agreements, instruments and documents as may be reasonably requested or required by the Board in order to consummate such conversion, exchange or redemption.

(c) If the Board determines to effect an IPO Conversion, each Member shall cooperate in good faith with the Board, including taking all actions reasonably requested or required by the Board, in connection with consummating the IPO Conversion (including the voting of any Units (including any voting as may be necessary to effect a transfer by continuation or to authorize an increase in share capital, whether by dissolution of the Company and creation of a new entity, amendment to this Agreement or otherwise) to approve such IPO Conversion and to take any other actions necessary or appropriate in order to effectuate an IPO Conversion). Without limiting the generality of the foregoing, in connection with the IPO Conversion, if the Board determines, the IPO Corporation and each Member shall enter into a stockholders agreement which shall have substantially identical terms and conditions (taking into account differences in ownership, type of securities and other circumstances, if any) as set forth in Sections 1.3, 2.4, 2.5, 2.6, 3.3, and 3.4 and 3.5, Article IV, Article VIII, Article XI and Article XIII and any associated definitions and which shall be subject to the approval of the Board.

(d) Prior to a distribution of the securities of a Subsidiary of the Company (other than publicly traded securities), if the Board determines, as a condition of the

14

distribution or issuance of any such securities to the Members, each Member shall enter into a stockholders agreement which shall have substantially identical terms and conditions (taking into account differences in ownership, type of securities and other circumstances) as set forth in Sections 1.3, 2.4, 2.5, 2.6, 3.3, and 3.4 and 3.5, Article IV, Article VIII, Article XI and Article XIII and which shall be subject to the approval of the Board. The Company shall withhold distributions or issuances of any such securities until such stockholders agreement or similar agreement is executed and delivered by a Member who would otherwise be entitled to receive such distribution or issuance (it being understood that any such withholding of distributions or issuances shall not constitute a breach of this Agreement or of any duty hereunder, at law, in equity or otherwise).

SECTION 3.6    SECTION 3.7 No Appraisal Rights. No Person Each Member shall be entitled to any appraisal rights with respect to such Person's Units, whether individually or as part of any class or group of holders, in the event of a liquidation, dissolution, merger, consolidation, Sale Event or other transaction involving the Company, any of its Subsidiaries or its or their securities unless such rights are expressly provided by the agreement of merger, agreement of consolidation or other document effectuating such transaction. to the same extent provided to a stockholder under the General Corporation Law of the State of Delaware.

ARTICLE IV

MANAGEMENT OF THE COMPANY

SECTION 4.1    Board of Managers; Delegation of Authority and Duties.

(a)    Management. The business and affairs of the Company shall be managed by a board of managers (the "Board"), which shall possess and may exercise the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes of the Company, including (i) approving all material transactions by the Company, and (ii) approving the compensation of the management of the Company. The Members agree that, subject to the terms of this Agreement, all determinations, decisions and actions duly made or taken by the Board shall be conclusive and absolutely binding upon the Company and its successors, personal representatives and permitted assigns.

(b)    Delegation by Board. The Board shall have the power and authority to delegate to one or more Persons any of the Board's rights and powers to manage and control the business and affairs of the Company, including to delegate to one or more Managers, Members, agents or employees of the Company (including Officers) or of a Member or any Affiliate of a Member, and to delegate by a management agreement or another agreement with, or otherwise to, other Persons. The Board may authorize any Person (including any Member, Manager or Officer) to enter into and perform under any document on behalf of the Company.

(c)    Committees. The Board may, from time to time, designate one or more committees, each of which shall be comprised of at least two Managers. Any such committee, until dissolved by the Board, shall have and may exercise any or all of the authority of the Board. At every meeting of any such committee, the presence of a majority of all the members

15

thereof shall constitute a quorum, and the affirmative vote of a majority of the members present shall be necessary for the adoption of any resolution. The Board may dissolve any committee at any time.

(d)     <u>Managers as Agents</u>. To the extent of their powers set forth herein, the Board (acting as a Board in accordance with this Agreement and Applicable Law) is an agent of the Company for the purpose of the Company's business and affairs, and the actions of the Board taken as the Board in accordance with such powers set forth herein shall bind the Company. Notwithstanding the last sentence of Section 18-402 of the Act, except as a resolution of the Board that is not inconsistent with this Agreement may otherwise provide, no individual Manager, in his or her capacity as such, shall have any authority to bind the Company (notwithstanding the fact that the Board, acting as the Board, may do so as provided above in this Section 4.1(d)).

(e)     <u>Fiduciary Duties</u>. Subject to Section 3.53.4, each member of the Board shall owe to the Company and its Members the fiduciary duties that a director of a Delaware corporation owes to such corporation and its stockholders under Delaware law.

(f)     <u>Activities of Members and Managers</u>.

(i)     Each Member acknowledges and agrees that no Member shall, in its capacity as a Member, be bound to devote any or all of such Member's business time to the affairs of the Company, and that each Member and such Member's Affiliates do and will continue to engage for such Member's own account and for the account of others in other business ventures. Each Member acknowledges and agrees that no other Member, in its capacity as such, shall have any duties, including any fiduciary duties, to the Company or any other Member.

(ii)    Each of the Managers, in his or her capacity as a manager, shall be required to devote only such time and effort to the affairs of the Company as may be necessary to manage and operate the Company; <u>provided</u>, <u>however</u>, that, subject to the terms and conditions of any applicable employment agreements, no minimum number of hours is required to be devoted by any Manager on a weekly, monthly, annual or other basis.

SECTION 4.2     <u>Establishment of the Board</u>.

(a)     <u>Size</u>. There shall be established a Board initially composed of five (5) natural persons (each, a "<u>Manager</u>"). Each Manager is hereby designated as a "manager" of the Company within the meaning of Section 18-101(10) of the Act.

(b)     <u>Initial Composition of Board</u>. The initial Managers shall be James Litinsky, Randall Weisenburger, William R. Klesse, Jared Carney and John Park.

---

[3] <u>Note to Sidley: Managers should serve for reasonable terms, the length of which should be defined at this time, and be subject to re-election at the end of each term by the</u>

16

(c)    Resignation/Removal/Vacancy.[3] Each Manager shall remain in office until his or her death, resignation or removal.  ~~Not later than 90 days after the Closing Date, the Board shall determine the length of the term of office of each Manager, including whether the Managers shall be divided into more than one class. The Board shall provide written notice of its determination regarding such matters to each Member promptly following the conclusion of such meeting. Thereafter, the Board may, without the consent of any Member, amend this Agreement in order to set forth the terms of office of each Manager.  Unless otherwise determined by the Board, any~~**Any** vacancies on the Board may be filled ~~only~~ by the vote or written consent of the Board. ~~No~~**Any** Manager may be removed, with or without cause, by a vote or written consent of the Members **owning a majority of the then outstanding Common Units**.

(d)    Compensation of Managers. The Board shall have the authority to fix the compensation of the Managers, which compensation shall be paid by the Company. In addition, the Company shall pay the reasonable, documented and direct out-of-pocket expenses incurred by each Manager in connection with such Manager's service on the Board and its committees.

SECTION 4.3    Board Meetings.

(a)    Quorum; Actions of the Board.

(i)    A majority of the total number of Managers shall constitute a quorum for the transaction of business of the Board at a meeting of the Board and, except as otherwise provided in this Agreement, the act of a majority of the Managers present at a meeting of the Board at which a quorum is present shall be the act of the Board.

(ii)    Each Manager shall have one vote on all such matters. A Manager who is present at a duly called meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the Person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b)    Place; Waiver of Notice. Meetings of the Board may be held at such place or places as shall be determined from time to time by resolution of the Board. At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by resolution of the Board. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not

---

**be defined at this time, and be subject to re-election at the end of each term by the Members.**
[3] **Note to Sidley: Managers should serve for reasonable terms, the length of which should be defined at this time, and be subject to re-election at the end of each term by the Members.**

17

lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in any waiver of notice.

(c) <u>Regular and Special Meetings</u>. Regular quarterly meetings of the Board shall be held upon notice as provided below and at such times and places as shall be designated from time to time by resolution of the Board. Special meetings of the Board may be called on at least twenty-four (24) hours' notice to each Manager by any two Managers. Such notice to the Managers ~~need not~~<u>shall</u> state the purpose or purposes of, or the business to be transacted at, such meeting~~, except as may be otherwise required by Applicable Law~~.

(d) <u>Notice</u>. Notice of any meeting of the Board may be given personally (including by telephone), by mail, facsimile, electronic mail, courier or other means at the address, electronic mail address, telephone number or facsimile number of the Managers or the committee members, as applicable, shown in the Company's books and records. Notice shall be effective and deemed to have been delivered (i) if given personally, upon delivery, (ii) if given by electronic mail or facsimile, upon dispatch, (iii) if given by courier, upon the earlier of actual delivery and one (1) day after deposit with a nationally recognized overnight courier specifying next day delivery, (iv) if given by mail, three (3) days after it is deposited in the mails (first class or airmail postage prepaid) or (v) if given by other means, when delivered to the address of the Manager set forth in the books and records of the Company.

(e) <u>Chairman</u>. The Board shall designate a Manager to serve as Chairman. The Chairman shall, unless a majority of Managers present determine otherwise, preside at all meetings of the Board. If the Chairman is absent at any meeting of the Board, a majority of the Managers present shall designate another Manager to serve as interim Chairman for that meeting. Without approval by the Board, the Chairman, in his or her capacity as such, shall have no authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditure or incur any obligations on behalf of the Company or authorize any of the foregoing. The Chairman shall initially, as of the Closing Date, be James Litinsky.

SECTION 4.4   <u>Approval or Ratification of Acts or Contracts</u>. Any act or contract that shall be approved or be ratified by the Board in accordance with the terms of this Agreement shall be as valid and as binding upon the Company as if it shall have been approved or ratified by every Member of the Company.

SECTION 4.5   <u>Action by Written Consent or Telephone Conference</u>.

(a) Any action permitted or required by the Act, the Certificate or this Agreement to be taken at a meeting of the Board may be taken without a meeting if a consent in writing (including electronically), setting forth the action to be taken, is signed (or clearly indicated electronically) by a majority of the Managers. Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board. Such consent shall be filed with the minutes of the proceedings of the Board.

18

(b)  Subject to the requirements in this Agreement for notice of meetings, the Managers may participate in and hold a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

SECTION 4.6    Officers and Agents.

(a)  Designation and Appointment.  Without limiting the generality of Section 4.1(b), the Board may, from time to time, designate or retain one or more Persons (subject to the supervision and control of the Board and any of whom may be, but need not be, a Member) as (i) officers ("Officers") of the Company, with titles including "chairman," "chief executive officer," "president," "vice president," "treasurer," "secretary," "general manager," "director" "chief financial officer," and "controller," as and to the extent authorized by the Board or (ii) agents, consultants or other positions as may be necessary or appropriate for the conduct of the Company's business.  Any number of offices or other positions may be held by the same Person.  In its discretion, the Board may choose not to fill any office or other position for any period as it may so determine.  Officers, agents, consultants and such other Persons need not be residents of the State of Delaware or Members.  Any Officers, agents, consultants and such other Persons so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them.  Each Officer shall hold office until his or her successor shall be duly designated and shall qualify or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided.  Each such other Person shall hold such position in accordance with the provisions of his or her appointment thereto.  Subject to Section 3.5 3.4, the Officers shall owe to the Company and its Members the fiduciary duties that officers of a Delaware corporation owe to such corporation and its stockholders under Delaware law.

(b)  Resignation/Removal of Officers.  Any Officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any Officer may be removed as such, either with or without cause at any time by the Board.  Except as provided in Section 11.3 and Section 11.5, designation of an Officer shall not of itself create any contractual or employment rights.

ARTICLE V

DISTRIBUTIONS

SECTION 5.1    Distributions.