(a)     Any distributions of Distributable Assets shall be made when and as declared by the Board to the holders of Common Units pro rata in accordance with the number of Common Units held by them.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to a Member on account of its interest in the Company if such distribution would violate Section 18-607 of the Act or any other Applicable Law.

SECTION 5.2     Security Interest and Right of Set-Off or Recoupment.  As security for any withholding tax or other liability or obligation to which the Company may be subject as a result of any act or status of any Member, or to which the Company may become subject with respect to the interest of any Member in the Company, the Company shall have (and each Member hereby grants to the Company) a security interest in all Distributable Assets distributable to such Member to the extent of the amount of such withholding tax or other liability or obligation.  The Company shall have a right of set-off or recoupment against such distributions of Distributable Assets to be made to such Member in the amount of such withholding tax or other liability or obligation.  The Company may withhold distributions or portions thereof if it is required to do so by the Code or any other provision of federal, state or local tax or other Applicable Law.  Any amount withheld pursuant to the Code or any other provision of federal, state or local tax or other Applicable Law with respect to any distribution to a Member shall be treated as an amount distributed to such Member for all purposes under this Agreement.

ARTICLE VI

TRANSFERABILITY OF INTERESTS; ADMISSION AND RESIGNATION OF MEMBERS

SECTION 6.1     Restrictions on Transfer.

(a)     Any purported Transfer of Securities that does not comply with the provisions of this Article VI shall be null and void *ab initio*.

(b)     No Member may directly or indirectly sell, exchange, transfer, assign, pledge, encumber or otherwise dispose of ("Transfer"; "Transferring," "Transferred," "Transferor" and "Transferee" having meanings correlative to the foregoing) its Securities other than any transfer that (i) is in compliance with Applicable Law (including state and federal securities laws) and (ii) will not (A) require the Company to register any class of equity under the Securities Act or the Exchange Act or (B) subject the Company to the reporting requirements under the Exchange Act, and in each case any such Transfer shall be subject to the remaining provisions of this Article VI (as applicable).  The restrictions on Transfer set out in this Section 6.1(b) shall terminate upon the earlier to occur of (i) immediately prior to the consummation of an Initial Public Offering by the Company, and (ii) a Sale Event; provided, that, for the avoidance of doubt, Transfers following any Initial Public Offering by the Company will remain subject to any applicable Lock-Up Period.

20

**Execution Version**

(c)  For the avoidance of doubt, any change in the direct or indirect ownership or control of any Member as a result of any merger, acquisition, joint venture, investment, sale of all or part of the equity, business or assets, or other transaction undertaken by a direct or indirect shareholder, member, partner or other equity owner of such Member shall not constitute a transfer by such Member of its interests in the Company or an assignment of the rights and benefits inuring to such Member thereby, so long as the primary objective of undertaking such change or divestiture is not to circumvent the restrictions on Transfer contained in this Article VI. For the avoidance of doubt, any such change in the direct or indirect ownership or control of any Member that has the primary objective of circumventing the restrictions on Transfer contained in this Article VI shall be subject to this Article VI, including, without limitation, this Section 6.1, Section 6.2, Section 6.3 and Section 6.4.

(d)  No Member may Transfer any Securities unless (i) such Transfer (other than any Transfer solely consisting of an Encumbrance) is made on the books of the Company or its Subsidiary, as applicable, (ii) such Transfer is not in violation of any of the provisions of this Agreement and (iii) the Transferee of such Securities (if other than (A) the Company or another Member or (B) a Transferee pursuant to a sale registered under the Securities Act) becomes a party to this Agreement pursuant to Section 6.7.

(e)  Each Member acknowledges that no Securities have been registered under the Securities Act or any state securities or "blue sky" laws and that the Securities may not be Transferred except pursuant to an effective registration statement under the Securities Act and such state laws or pursuant to an exemption from registration under the Securities Act and such state laws. Each Member agrees that it will not Transfer any Securities at any time if such action would constitute a violation of any securities laws of any applicable jurisdiction or a breach of the conditions to any exemption from registration of Securities under any such laws or a breach of any undertaking or agreement of such Member entered into pursuant to such laws or in connection with obtaining an exemption thereunder.

(f)  No Member shall grant any proxy or enter into or agree to be bound by any voting trust with respect to any Securities or enter into any agreements or arrangements of any kind with any other Member with respect to any Securities inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with other Members or owners of Securities who are not parties to this Agreement), including agreements or arrangements with respect to the acquisition, Transfer or voting of any Securities, nor shall any Member act, for any reason, as a member of a group or in concert with any other Members in connection with the acquisition, Transfer or voting of any Securities in any manner which is inconsistent with the provisions of this Agreement.

SECTION 6.2    <u>Right of First Refusal</u>.

(a)  Subject to compliance with all other provisions of this Agreement, any Member shall be permitted to Transfer all or any portion of such Member's Units, provided, that (except with respect to a Transfer pursuant to Section 6.3 or 6.4 or Permitted Transfers) at least 30 days prior to any such Transfer of any Units, the Member desiring to make such Transfer (the "<u>Transferring Member</u>") shall deliver a written notice (the "<u>Offer Notice</u>") to the Company, specifying in reasonable detail the identity of the prospective Transferee(s), the

21

number and type of Units to be Transferred (the "Offered Units") and the price and other terms and conditions of the proposed Transfer, including a description of any other agreements entered into or to be entered into by the Transferring Member and the proposed Transferee(s); provided, that if the proposed consideration for such Offered Units consists in whole or in part of something other than U.S. dollars, then the Offer Notice will also contain a good faith estimate of the value of such consideration in U.S. dollars and an explanation of the manner in which such estimate was made. The Company shall provide a copy of the Offer Notice to each other Member (in such capacity, the "Other Members") promptly after the Company's receipt thereof. The Transferring Member shall not consummate such proposed Transfer until at least 60 days after receipt of the Offer Notice by the Company and the Other Members (the "Authorization Date").

(b) The Company may elect to purchase all (but not less than all) of the Offered Units at the price and on the other terms and conditions set forth in the Offer Notice, by delivering written notice of such election (an "Election Notice") to the Transferring Member with a copy to the Other Members within 30 days after receipt of the Offer Notice (such 30 day period referred to herein as the "First Refusal Period"). If after the expiration of such 30-day period the Company has not elected to purchase all of the Offered Units, the Other Members (or any of them) may elect to purchase all (but not less than all) of the Offered Units (pro rata in accordance with the number of Common Units held by the Other Members), at the price and on the other terms and conditions set forth in the Offer Notice, by delivering an Election Notice to the Transferring Member within 30 days after expiration of the First Refusal Period. If not all of the Other Members elect to purchase their pro rata portion of the Offered Units, the Other Members who have elected to purchase their pro rata portion of the Offered Units shall be entitled to purchase the remaining Offered Units, pro rata in accordance with the number of Common Units held by such Other Members.

(c) If the Company or the Other Members elect to purchase all of the Offered Units from the Transferring Member, such purchase shall be consummated as soon as practicable after the delivery of the applicable Election Notice to the Transferring Member, but in any event within 60 days after the Authorization Date.

(d) If the Company and the Other Members do not elect to purchase all of the Offered Units from the Transferring Member, the Transferring Member shall have the right, subject to compliance with Section 6.3, within the 90 days following the Authorization Date to Transfer all (but not less than all) of the Offered Units that have not been purchased by the Company or the Other Members pursuant to this Section 6.2 to the Transferee(s) specified in the Offer Notice in the amounts specified in the Offer Notice at a price not less than the price per unit specified in the Offer Notice and on other terms and conditions no more favorable to the Transferee(s) thereof than specified in the Offer Notice. Any Offered Units not so Transferred within such 90 day period shall be reoffered to the Company and the Other Members pursuant to this Section 6.2 prior to any subsequent Transfer (other than a Transfer pursuant to Section 6.3 or 6.4 or Permitted Transfers).

(e) ~~Notwithstanding anything herein to the contrary, the Board shall be entitled to exempt any proposed Transfer of Units from the provisions of this Section 6.2.~~

SECTION 6.3    Tag-Along Rights

(a)    If, after complying with Section 6.2, one or more Members proposes to Transfer a majority of the outstanding Common Units to another Person (other than a Transfer of the Units held by a Member to such Member's Affiliates) (a "Tag-Along Sale"), such Member(s) (the "Selling Member(s)") shall deliver written notice (a "Sale Notice") of such proposed Tag- Along Sale to each of the other Members (the "Eligible Tag-Along Members") at least ten (10) Business Days prior to the consummation of such proposed Tag-Along Sale, setting forth (i) the number and class of Units proposed to be Transferred (the "Tag-Along Securities"), (ii) the amount and form of consideration to be received for such Tag-Along Securities by such Selling Member(s) and any other consideration to be received directly or indirectly by such Selling Member(s) and its Affiliates in connection with such Tag-Along Sale, (iii) any other material terms and conditions of the proposed Tag-Along Sale, including a copy of the proposed definitive agreement (if available), (iv) the date of the closing of such Tag-Along Sale, (v) the fraction, expressed as a percentage, determined by dividing the number of each class of Units proposed to be sold by the total number of such class of Units owned by the Selling Member(s) (the "Tag-Along Sale Percentage"), and (vi) an invitation to each Eligible Tag-Along Member to elect (the Eligible Tag-Along Members making such election being the "Tagging Members", and, together with the Selling Member(s), the "Tag-Along Sellers") to include in the Tag-Along Sale Units of the same class owned by such Tagging Member as of the date of the Sale Notice, the amount of which (except as contemplated in Section 6.3(d)) does not in any event exceed the Tag-Along Sale Percentage of the total number of such class of Units owned by such Tagging Member as of the date of the Sale Notice.

(b)    Upon delivery of a Sale Notice, each Eligible Tag-Along Member may elect to sell Units of the same class in such Tag-Along Sale pursuant to the same terms and conditions as agreed to by the Selling Member(s) (subject to Section 6.5), by delivering an irrevocable written notice (a "Tag-Along Participation Notice") to the Selling Member(s) within five (5) Business Days of the date of delivery of the Sale Notice, indicating its election to sell up to the number of the same class of Units in the Tag-Along Sale specified by such Eligible Tag-Along Member in such Tag-Along Participation Notice (such specified number not in any event (except as contemplated in Section 6.3(d)) to exceed the Tag-Along Sale Percentage of the total number of such class of Units owned by such Eligible Tag-Along Member as of the date of the Sale Notice).  Upon delivery of a Tag-Along Participation Notice, (i) the Tagging Member that has delivered such Tag-Along Participation Notice shall be obligated to sell to such proposed purchaser on the same terms and conditions as the Tag-Along Sale (subject to Section 6.5), concurrently with the Selling Member(s) and the other Tag-Along Sellers, the number of such class of Units set forth in the Tag-Along Participation Notice (such number not to exceed the total number of such class of Units calculated pursuant to Section 6.3(d)) so long as such sale occurs within ninety (90) days (subject to reasonable extension to the extent necessary to obtain required governmental or other approvals) after the expiration of the five (5) Business Day period for giving Tag-Along Participation Notices with respect to such Tag-Along Sale (the "Maximum Tag-Along Period"); and (ii) in accordance with Section 6.5, such Tagging Member that has delivered such Tag-Along Participation Notice shall be obligated to make, on a several, and not joint and several, basis and as to itself and not as to any other

23

Member, the same representations, warranties and covenants with respect to such Member's title to the Units and such Member's authority as the Selling Member(s) makes with respect to itself in its capacity as a Member and an owner of Units in connection with such Tag-Along Sale.

(c)  Subject to the provisions of this Section 6.3 and Section 6.5, all determinations as to whether to complete any Tag-Along Sale and as to the timing, manner and other terms of any such Tag-Along Sale shall be at the sole discretion of the Selling Member(s); provided, that the Tag-Along Sale is consummated (i) within the Maximum Tag-Along Period, (ii) at the price per Unit set forth in the Sale Notice and (iii) on terms and conditions that are not materially different than the terms and conditions set forth in the Sale Notice. Notwithstanding the foregoing, a Tag-Along Sale may be consummated by the Selling Member(s) and, if any of them so elect, one or more of the Tagging Members on less advantageous terms to them (which may include a decrease in the price per Unit) than those set forth in the Sale Notice, in which case such Tag-Along Sale, if consummated, will be consummated on such new terms and will not again be subject to the provisions of this Section 6.3 so long as such Tag-Along Sale is consummated within the Maximum Tag-Along Period and the Selling Member(s) has provided ten (10) Business Days' notice to each Tagging Member setting forth such revised terms. For the avoidance of doubt, any of the original Tagging Members that does not elect to sell on such less advantageous terms shall not be required to do so. With respect to any Tag-Along Securities referred to in a Sale Notice that are not sold by the Selling Member(s) on or prior to the expiration of the Maximum Tag-Along Period, such Tag-Along Securities will again be subject to the provisions of this Section 6.3 upon any subsequent applicable sale of such Tag-Along Securities by such Selling Member(s).

(d)  The Tag-Along Sellers shall be entitled to sell in the Tag-Along Sale a number of Common Units calculated as follows:

(i)  first there shall be allocated to each Tag-Along Seller a number of Common Units equal to the lesser of (A) the maximum number of such Common Units such Tag-Along Seller has elected to sell in the Tag-Along Sale in its Sale Notice or Tag Along Participation Notice (as applicable) and (B) the number of Common Units determined by multiplying (x) the number of such Common Units subject to the Tag-Along Sale by (y) a fraction, the numerator of which is the number of such Common Units owned by such Tag-Along Seller and the denominator of which is the total number of Common Units owned by all Tag-Along Sellers (the "Pro Rata Tag-Along Share"); and

(ii)  any remaining Common Units subject to the Tag-Along Sale shall be allocated to the Tag-Along Sellers that agree to sell in excess of their Pro Rata Tag-Along Share, pro rata to such Tag-Along Sellers based upon such Tag-Along Sellers' relative Pro Rata Tag-Along Shares, or as such Tag-Along Sellers may otherwise agree in writing among themselves.

(e)  This Section 6.3 shall not apply to any Transfer (i) to an Affiliate pursuant to Sections 6.6 and 6.7, (ii) in connection with any Drag-Along Sale pursuant to

24

Section 6.4, (iii) effected as part of any IPO Conversion, (iv) effected in connection with an Initial Public Offering, or (v) effected pursuant to Article VIII.

(f)    This Section 6.3 shall terminate upon the earlier to occur of (i) immediately prior to the consummation of an Initial Public Offering by the Company, and (ii) a Sale Event.

(g)    The rights of the Members contained in this Section 6.3 may be assigned by such Members in connection with any Transfer permitted under Article VI.

SECTION 6.4    Drag-Along Rights.

(a)    If the Board and Members holding a majority of the outstanding Common Units approve a Sale Event, such Members may give notice (a "Drag-Along Sale Notice") to all of the other Members (the "Drag-Along Member Recipients," and, together with the above-mentioned Members, the "Drag-Along Sellers") that such Members intend to enter into (or have agreed to vote the Securities they own, or to execute a written consent in lieu thereof, in favor of) such Sale Event (a "Drag-Along Sale") and that such Members require the Drag-Along Member Recipients to participate in such transaction (which, subject to Section 6.5, shall include the requirement that each Drag-Along Member Recipient make the same representations, warranties and covenants as such Members make with respect to themselves in their capacity as Members and owners of Units in the Company in connection with such Drag-Along Sale).  Such notice shall also specify (i) the amount and form of consideration to be received by the Drag-Along Sellers or the Company[4] and any other consideration to be received directly or indirectly by any Drag-Along Seller and/or its Affiliates in connection with such Drag-Along Sale, (ii) any other material terms and conditions of the proposed Drag-Along Sale, including a copy of the proposed definitive agreement (if available), (iii) the identity of the proposed Transferee in the proposed Drag-Along Sale, (iv) the date of anticipated completion of the proposed Drag-Along Sale (which date shall be not less than ten (10) Business Days after the date of such notice, or in the event of an amended notice pursuant to Section 6.4(d), no less than ten (10) Business Days after the date of such amended notice) and (v) the action or actions reasonably requested or required of each Drag-Along Member Recipient (without limiting those that may be reasonably requested or required in the future) in order to complete or facilitate such proposed Drag-Along Sale (including (1) the Transfer of Securities owned by the Drag-Along Member Recipient, (2) the voting by such Drag-Along Member Recipient in favor of the Drag-Along Sale and the transactions contemplated thereby and the waiver of any related appraisal or dissenters' rights and/or (3) the execution and delivery of any merger, asset purchase, security purchase, recapitalization or other agreement, as applicable).  Subject to Section 6.5, upon receipt of such notice, each Drag-Along Member Recipient shall be obligated to take the actions referred to in

---

[4] **Note to Sidley: The consideration in a Drag-Along Sale should be limited to cash or publicly traded securities.**

25

subclause (v) above and any other actions reasonably requested by the initiating Drag-Along Sellers in connection with the Drag-Along Sale.

(b) If a Drag-Along Sale contemplates the Transfer of less than all of the outstanding Securities of the Company, then each Drag-Along Seller shall Transfer a number and class of Securities of the Company equal to the product of the following (rounded to the nearest whole number): (x) the number of the same class of Securities owned by such Drag-Along Seller multiplied by (y) a fraction, the numerator of which is the aggregate number of such class of Securities being Transferred in such Drag-Along Sale and the denominator of which is the aggregate number of all outstanding Securities of such class as of the date of the Drag-Along Sale.

(c) To the extent not paid by the Company or the Transferees in such Drag-Along Sale, in connection with the completion of the Drag-Along Sale, all actual and reasonable out-of-pocket costs and expenses reasonably incurred by the Drag-Along Sellers in connection with the transaction or transactions described in the Drag-Along Notice shall be borne on a *pro rata* basis in accordance with the consideration received in respect of its Securities by each of the Drag-Along Sellers in connection with such Drag-Along Sale (as determined by the consideration such Drag-Along Seller would receive in such sale prior to reduction for any indemnification claims), to the extent such costs and expenses are incurred for the benefit of substantially all of the Drag-Along Sellers.

(d) Subject to the provisions of this Section 6.4 and Section 6.5, all determinations to complete any Drag-Along Sale and as to the timing, manner, price and other terms of any such Drag-Along Sale shall be at the sole discretion of the initiating Drag-Along Members. In the event that the Drag-Along Sale contemplated by a Drag-Along Sale Notice has not been completed within one-hundred and twenty (120) days after the delivery of the Drag- Along Sale Notice for such Drag-Along Sale (subject to reasonable extension to the extent necessary to obtain required governmental or other approvals), then such Drag-Along Notice shall be null and void, each Drag-Along Member Recipient shall be released from its obligations under such Drag-Along Notice and it shall be necessary for a separate Drag-Along Sale Notice to be furnished by the initiating Drag-Along Seller, and the other terms and provisions of this Section 6.4 separately complied with, in order to consummate a Drag-Along Sale pursuant to this Section 6.4.

(e) This Section 6.4 shall terminate immediately prior to the consummation of an Initial Public Offering by the Company.

SECTION 6.5    Representations, Warranties and Covenants in Connection with Sales. In connection with a transaction pursuant to Section 6.3 or Section 6.4, all participating Members shall be required to make, on a several, and not joint and several, basis and as to itself and not as to any other Member, the same representations, warranties and covenants with respect to title to the Units and such Member's authority with respect to themselves in their capacity as Members or owners of Securities, but no Member shall be required to make any other representations, warranties or covenants regarding the Company and/or its Subsidiaries; provided, that, notwithstanding anything to the contrary contained herein including the foregoing provisions of this Section 6.5, each Member participating in such transaction shall be

Case 15-11371-CSS  Doc 1622-9  Filed 04/28/16  Page 8 of 13

**Execution Version**

required (if applicable under the terms of such transaction) to provide several, and not joint and several, indemnification (if such sale contemplates indemnification) up to, but not exceeding, its *pro rata* portion (as determined by the proceeds such Member would actually receive, as compared to the proceeds all other Members would actually receive, in such sale prior, in each case, to reduction for any indemnification claims) of any such indemnification obligation if such indemnification relates to (a) representations or matters relating to the Company and its Subsidiaries and (b) such Member's individual representations, warranties and covenants including in relation to (i) such Member's ownership of, and title to, the Securities to be Transferred by such Member, (ii) such Member's authority, power and right to enter into and consummate the transaction and (iii) matters otherwise relating to such Member. For the avoidance of doubt, no Member shall have any liability for any breach of a representation or warranty of any other Member.

SECTION 6.6   Permitted Transfers. The procedures set forth in Section 6.2 or Section 6.3 shall not apply to any Transfer by a Member of its Securities to an Affiliate of such Member (a "Permitted Transfer").

SECTION 6.7   Admission of Additional Members. An Affiliate of a Member or any Person otherwise seeking to be admitted as an additional or substitute Member shall (i) execute and deliver a joinder in the form attached to this Agreement as Exhibit A, signifying its agreement to be bound by all the terms and conditions hereof, which joinder shall not be effective unless accepted and countersigned by the Company and, subject to Section 6.1, which the Company shall accept and countersign as promptly as practicable, and (ii) execute and deliver any further documents and take any further actions as may be necessary or appropriate, in the reasonable determination of the Board, to make such Person an additional Member in compliance with the terms and conditions of this Agreement, and shall notify the Company of the address to which notices, consents and communications hereunder shall be sent pursuant to Section 13.2. When a Member Transfers all its Units pursuant to this Article VI, such Member shall cease to be a Member of the Company.

SECTION 6.8   Effect of Transfer. Following a Transfer of any Unit that is permitted under this Article VI, the Transferee of such Unit shall (a) receive distributions under Article V in respect of such Unit and (b) have all rights as a Member under this Agreement.

ARTICLE VII

PREEMPTIVE RIGHTS

SECTION 7.1   [Determination by Board. Except with respect to the issuance of Common Units in accordance with Section 3(b) of the Credit Bid Agreement, each Member who holds Common Units shall be entitled to preemptive rights, on a pro rata basis, with respect to any issuance of Securities by the Company following the Closing Date; provided, however, that with respect to any issuance of Securities by the Company more than one hundred and twenty (120) days following the Closing Date, the Board shall determine the specific terms and conditions on which such preemptive rights may be exercised, including any limitations or restrictions thereon or exemptions therefrom. Following such determination, the Board shall, without the consent of any Member, amend this Agreement in order to set forth

27

such specific terms, conditions, limitations, restrictions and exemptions, and shall provide written notice to each Member describing in reasonable detail such specific terms, conditions, limitations, restrictions and exemptions.[5]

## ARTICLE VIII

## REGISTRATION RIGHTS

The Company hereby grants to each of the Holders the registration rights set forth in this Article VIII, with respect to the Registrable Securities owned by such Holders.

SECTION 8.1      Demand Registration.

(a)     At any time on or after the date on which the Company has consummated an Initial Public Offering and is eligible to use a Form S-3 registration statement to register Securities under the Securities Act, the holders of a majority of the outstanding Common Units (the "Demanding Members") may request registration under the Securities Act of their Registrable Securities (a "Demand Registration"). The request for a Demand Registration shall be in writing and shall specify the number of Registrable Securities requested to be registered and the intended method of distribution.

(b)     Within ten (10) days after receipt of any request for a Demand Registration, the Company shall give written notice of such requested registration to all other Holders and, subject to Section 8.1(c), will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 15 days after receipt of the Company's notice.

(c)     A request for Demand Registration shall be deemed to have been effected for purposes of Section 8.1(a) if the Registration Statement relating to such Demand Registration has been declared effective by the SEC; provided, however, that if the holders of a majority of Registrable Securities held by the Demanding Members request that the Company withdraw the registration statement relating to such Demand Registration prior to it being declared effective by the SEC, or if such holders revoke such Demand Registration prior to the initial filing of a registration statement relating to such Demand Registration (any such request or revocation a "Withdrawal"), the Demanding Members shall not be entitled to make a subsequent Demand Registration prior to the date that is one-hundred and eighty (180) days after the date of such Withdrawal unless such Withdrawal is as a result of a material adverse change in the Company's business, financial condition or operating results or the market for the Company's equity securities or as a result of an event which materially and adversely affects the Demanding Members' ability to sell their Registrable Securities in compliance with the

---

[5] **Note to Sidley: The Members' preemptive rights should be set forth in this Agreement on customary terms, rather than left entirely to the Board's discretion without parameters.**

28

federal securities laws (other than an event that results from an act or omission by a Demanding Member).

(d)     The Company shall not be obligated to effect more than one (1) Demand Registration hereunder in any six (6) month period.

(e)     If a Demand Registration is an underwritten offering and the managing underwriters advise the Company that, in their opinion, the number of Registrable Securities requested to be included in such offering, and other securities requested to be included in such offering, exceeds the largest number of securities which can be sold therein without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the holders of a majority of the Registrable Securities requested to be registered, then the Company shall include in such registration, prior to the inclusion of any securities which are not Registrable Securities, the Registrable Securities requested to be included which in the opinion of such underwriters can be sold without adversely affecting the marketability of the offering, allocated in accordance with the following priorities:  first, the Registrable Securities requested to be included therein by the Holders that initially requested such Demand Registration, and, second, the Registrable Securities requested to be included therein by the other Holders of Registrable Securities participating in such Demand Registration, in each case pro rata among the respective Holders on the basis of the number of Registrable Securities so requested to be included therein by each such Holder.

(f)     The Company shall be entitled to postpone for up to one-hundred and eighty (180) days the filing, effectiveness or use of a Registration Statement for a Demand Registration (and the Holders of Registrable Securities participating in the related offering hereby agree not to offer or sell any Registrable Securities pursuant to such Registration Statement during such postponement or suspension) pursuant to Section 8.1(a) if the Company provides written notice to the Demanding Members requesting such registration stating that, in the good faith judgment of the Board, such filing or effectiveness would be reasonably expected to (i) interfere with or adversely affect the negotiation or completion of any material transaction or other material event that is being contemplated by the Company or (ii) involve initial or continuing disclosure obligations relating to a material event or material state of facts regarding the Company, the disclosure of which would, in the reasonable judgment of the Company, be adverse to its interests; provided, however, that in the event of such a postponement or suspension of registration, the holders of Registrable Securities initially requesting such Demand Registration shall be entitled to withdraw such request and, if such request is withdrawn, such Demand Registration shall not count as a Demand Registration hereunder, or constitute a "Withdrawal" pursuant to Section 8.1(c).

(g)     If any public offering pursuant to a Demand Registration shall involve, in whole or in part, an underwritten offering, the Company shall have the right to designate an underwriter or underwriters as the lead or managing underwriter(s) of such underwritten offering, provided that such underwriter shall be reasonably acceptable to the holders of a majority of Registrable Securities held by the Demanding Members.  The holders of Registrable Securities and the Company agree that if the Registrable Securities, or any portion thereof, are sold in any public offering involving, in whole or in part, an underwritten offering, then such

29

**Execution Version**

holders and the Company will enter into a customary underwriting agreement with the underwriter(s) selected pursuant to the preceding sentence.

SECTION 8.2    Piggyback Registration.

(a)    If at any time or from time to time the Company determines to register any of its securities, either for its own account or for the account of any party owning any Registrable Securities (other than (1) in a registration relating solely to employee benefit plans, (2) a Registration Statement on Form S-4 or S-8 (or such other similar successor forms then in effect under the Securities Act), (3) a registration pursuant to which the Company is offering to exchange its own Securities, (4) a Registration Statement relating solely to dividend reinvestment or similar plans, (5) a Shelf Registration Statement pursuant to which only the initial purchasers and subsequent transferees of debt securities of the Company or any Subsidiary that are convertible for Units and that are initially issued pursuant to Rule 144A and/or Regulation S of the Securities Act may resell such notes and sell the Units into which such notes may be converted or (6) a Demand Registration) (a "Piggyback Registration"), the Company will:

(i)    promptly (but in no event less than fifteen (15) days before the effective date of the relevant Registration Statement) deliver to each Holder written notice thereof; and

(ii)    include in such registration (and any related qualification under state securities laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request or requests delivered within ten (10) days after delivery of such written notice from the Company by any Holders, except as set forth in Section 8.2(b).

(b)    Underwriting.  If the Company gives notice of a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 8.2(a)(i).  In such event the right of any Holder to registration pursuant to this Section 8.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein.  All Holders proposing to dispose of their Registrable Securities through such underwriting, together with the Company and the other parties distributing their securities through such underwriting, shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company.  If a Piggyback Registration is an underwritten offering and the managing underwriters advise the Company that, in their opinion, the number of Registrable Securities requested to be included in such offering, and other securities requested to be included in such offering, exceeds the largest number of securities which can be sold therein without adversely affecting the marketability of the offering and within a price range reasonably acceptable to the holders of a majority of the Registrable Securities requested to be registered, then the Company shall include in such registration, prior to the inclusion of any securities which are not Registrable Securities, the Registrable Securities requested to be included which in the opinion of such underwriters can be sold without adversely affecting the marketability of the offering, allocated in accordance with the following priorities: first, the Securities the

30

Company proposes to sell and <u>second</u>, the Registrable Securities requested to be included in such registration, pro rata among the respective Holders thereof on the basis of the number of Registrable Securities so requested to be included therein by each such Holder. No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration. For the avoidance of doubt, nothing in this Section 8.2(b) is intended to diminish the number of Registrable Securities to be included by the Company in the underwriting.

(c) <u>Right to Terminate Registration</u>. The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 8.2 prior to the effectiveness of such registration whether or not any Holder has elected to include Registrable Securities in such registration.

SECTION 8.3    <u>Expenses of Registration</u>. All Registration Expenses incurred in connection with all registrations effected pursuant to Section 8.1 or Section 8.2 shall be borne by the Company; <u>provided</u> that, for the avoidance of doubt, the Company shall not be required to pay transfer taxes or underwriters' discounts or selling commissions relating to Registrable Securities.

SECTION 8.4    <u>Obligations of the Company</u>. Whenever required under this Article VIII to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a) prepare and file with the SEC a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective, and keep such Registration Statement effective for (x) the lesser of one hundred and eighty (180) days or until the Holder or Holders have completed the distribution relating thereto or (y) for such longer period as may be prescribed herein;

(b) prepare and file with the SEC such amendments and supplements to such Registration Statement and the prospectus used in connection with such Registration Statement as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement in accordance with the intended methods of disposition by sellers thereof set forth in such Registration Statement;

(c) permit (i) any Holder that (in the good faith reasonable judgment of such Holder) might be deemed to be a Controlling Person of the Company to participate in good faith in the preparation of such Registration Statement and to cooperate in good faith to include therein material, furnished to the Company in writing, that in the reasonable judgment of such Holder and its counsel should be included, and (ii) any Holder that is including Registrable Securities in such Registration Statement a reasonable opportunity to review and comment on any portions of such Registration Statement with respect to which such Holder would be obligated to provide any indemnification or contribution pursuant to Section 8.5;

(d) furnish to the Holders such numbers of copies of the Registration Statement and the related Prospectus, including all exhibits thereto and documents incorporated

31

by reference therein and a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them;

(e) in the event of any underwritten public offering, enter into and perform its obligations under any applicable underwriting agreement, in usual and customary form, with the underwriter(s) of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under any such an agreement;

(f) notify each Holder of Registrable Securities covered by such Registration Statement as soon as reasonably possible after notice thereof is received by the Company of any written comments by the SEC or any request by the SEC or any other federal or state governmental authority for amendments or supplements to such Registration Statement or such Prospectus or for additional information;

(g) notify each Holder of Registrable Securities covered by such Registration Statement, at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(h) notify each Holder of Registrable Securities covered by such Registration Statement as soon as reasonably practicable after notice thereof is received by the Company of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or any order by the SEC or any other regulatory authority preventing or suspending the use of any preliminary or final Prospectus or the initiation or threatening of any proceedings for such purposes, or any notification with respect to the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

(i) use its reasonable best efforts to prevent the issuance of any stop order suspending the effectiveness of any Registration Statement or of any order preventing or suspending the use of any preliminary or final Prospectus and, if any such order is issued, to obtain the withdrawal of any such order as soon as practicable;

(j) make available for inspection by each Holder including Registrable Securities in such registration, any underwriter participating in any distribution pursuant to such registration, and any attorney, accountant or other agent retained by such Holder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, as such parties may reasonably request, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Holder, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(k) use its reasonable best efforts to register or qualify, and cooperate with the Holders of Registrable Securities covered by such Registration Statement, the underwriters, if any, and their respective counsel, in connection with the registration or qualification of such

32