Registrable Securities for offer and sale under the securities or "blue sky" or securities laws of each state and other jurisdiction of the United States as any such Holder or underwriters, if any, or their respective counsel reasonably request in writing; provided, that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or take any action which would subject it to taxation or service of process in any such jurisdiction where it is not then so subject;

    (l) obtain for delivery to the Holders of Registrable Securities covered by such Registration Statement and to the underwriters, if any, an opinion or opinions from counsel for the Company, dated the effective date of the Registration Statement or, in the event of an underwritten offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, which opinions shall be reasonably satisfactory to such Holders or underwriters, as the case may be, and their respective counsel;

    (m) in the case of an underwritten offering, obtain for delivery to the Company and the underwriters, with copies to the Holders of Registrable Securities included in such Registration, a cold comfort letter from the Company's independent certified public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters as the managing underwriter or underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement;

    (n) use its reasonable best efforts to list the Registrable Securities covered by such Registration Statement with any securities exchange or automated quotation system on which such class or series of Registrable Securities is then listed;

    (o) provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement;

    (p) cooperate with Holders including Registrable Securities in such registration and the managing underwriters, if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold, such certificates to be in such denominations and registered in such names as such Holders or the managing underwriters may request at least two (2) Business Days prior to any sale of Registrable Securities;

    (q) use its reasonable best efforts to comply with all applicable securities laws and make available to Holders, as soon as reasonably practicable, an earnings statement satisfying the provisions of Section 11(a) of the Securities Act and the rules and regulations promulgated thereunder; and

    (r) in the case of an underwritten offering, cause the senior executive officers of the Company to participate in the customary "road show" presentations that may be reasonably requested by the underwriters and otherwise to facilitate, cooperate with and participate in each proposed offering contemplated herein and customary selling efforts related thereto.

33

SECTION 8.5      Indemnification.

(a)     The Company will, and does hereby undertake to, to the fullest extent permitted by Applicable Law, indemnify and hold harmless each Holder of Registrable Securities, its Affiliates and each of such Holder's and such Affiliates' respective officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries, Affiliates and agents and each Person, if any, who controls such Holder and such Affiliates, within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, and each underwriter, if any, and each Person who controls any underwriter, of the Registrable Securities owned by or issuable to such Holder, against all claims, losses, damages and liabilities (or actions in respect thereto) arising out of or based on (i) any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular, free writing prospectus or other similar document (including any related Registration Statement, notification, or the like) incident to any registration, qualification, compliance or sale effected pursuant to this Article VIII or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, (ii) any violation or alleged violation by the Company of any federal, state or common law rule or regulation applicable to the Company in connection with any such registration, qualification, compliance or sale, or (iii) any failure to register or qualify Registrable Securities in any state where the Company or its agents have affirmatively undertaken or agreed in writing (including pursuant to Section 8.4(k)) that the Company (the undertaking of any underwriter being attributed to the Company) will undertake such registration or qualification on behalf of the Holders of such Registrable Securities (provided, that in such instance the Company shall not be so liable if it has undertaken its reasonable best efforts to so register or qualify such Registrable Securities) and will reimburse, as incurred, each such Holder, each such Affiliate, each such underwriter and each such director, officer, trustee, employee, partner, manager, member, stockholder, beneficiary, Affiliate, agent and controlling Person, for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action; provided, that the Company will not be liable in any such case to the extent, but only to the extent, that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement (or alleged untrue statement) or omission (or alleged omission) made in reliance upon and in conformity with written information furnished to the Company by such Holder, Affiliate or underwriter expressly for use therein.

(b)     Each Holder (if Registrable Securities owned by or issuable to such Holder are included in such registration, qualification or compliance pursuant to this Article VIII) does hereby undertake, to the fullest extent permitted by Applicable Law, severally and not jointly, to indemnify and hold harmless the Company, each of its officers, directors, employees, stockholders, Affiliates and agents and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, each underwriter, if any, and each Person who controls any underwriter, of the Company's securities covered by such a Registration Statement, and each other Holder, each of such other Holder's Affiliates and each of such other Holder's and its Affiliates' respective officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries, Affiliates and agents and each Person, if any, who controls such Holder within

the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such Registration Statement, prospectus, offering circular, free writing prospectus or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which they were made, and will reimburse, as incurred, the Company, each such underwriter, each such other Holder, each Affiliate of such other Holder, and each such officer, director, trustee, employee, partner, manager, member, stockholder, beneficiary, Affiliate, agent and Controlling Person of the foregoing, for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) was made in such Registration Statement, prospectus, offering circular, free writing prospectus or other document, in reliance upon and in conformity with written information furnished to the Company by such Holder expressly for use therein; provided, however, that the aggregate liability of each Holder hereunder shall be limited to the proceeds actually received by such Holder (after underwriting discounts and commissions received by such Holder) upon the sale of the Registrable Securities giving rise to such indemnification obligation. It is understood and agreed that the indemnification obligations of each Holder pursuant to any underwriting agreement entered into in connection with any Registration Statement shall be limited to the obligations contained in this Section 8.5(b).

(c) Each party entitled to indemnification under this Section 8.5 (the "Indemnified Party") shall give notice to the party required to provide such indemnification (the "Indemnifying Party") of any claim as to which indemnification may be sought promptly after such Indemnified Party has actual knowledge thereof, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom; provided, that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be subject to approval by the Indemnified Party (whose approval shall not be unreasonably withheld) and the Indemnified Party may participate in such defense at the Indemnifying Party's expense if representation of such Indemnified Party would be inappropriate due to actual or potential differing interests between such Indemnified Party and any other party represented by such counsel in such proceeding; provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Article VIII, except to the extent that such failure to give notice materially prejudices the Indemnifying Party in the defense of any such claim or any such litigation. An Indemnifying Party, in the defense of any such claim or litigation, may, without the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that (i) includes as a term thereof the giving by the claimant or plaintiff therein to such Indemnified Party of an unconditional release from all liability with respect to such claim or litigation and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party, and provided that any sums payable in connection with such settlement are paid by the Indemnifying Party.

35

(d)     In order to provide for just and equitable contribution in case indemnification is prohibited or limited by law, the Indemnifying Party, in lieu of indemnifying such Indemnified Party, to the fullest extent permitted by Applicable Law, shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and such party's relative intent, knowledge, access to information and opportunity to correct or prevent such actions; provided, however, that, in any case, (i) no Holder will be required to contribute any amount in excess of the proceeds actually received by such Holder (after underwriting discounts and commissions received by such Holder) upon the sale of the Registrable Securities giving rise to such contribution obligation and (ii) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(e)     The indemnities provided in this Section 8.5 shall survive the Transfer of any Registrable Securities by such Holder.

SECTION 8.6     Information by Holder. Each Holder of Registrable Securities that are included in any registration shall furnish to the Company such information regarding itself and the distribution proposed by it as the Company may reasonably request in writing or as shall otherwise be required in connection with any registration, qualification or compliance referred to in this Article VIII.

SECTION 8.7     Assignment of Registration Rights. Subject to Section 8.12, the rights of the Members contained in this Article VIII may be assigned by such Members in connection with any Transfer permitted under Article VI.

SECTION 8.8     Delay of Registration. To the fullest extent permitted by Applicable Law, no Holder shall have any right to obtain, and hereby waives any right to seek, an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Article VIII.

SECTION 8.9     Limitations on Subsequent Registration Rights. From and after the Closing Date, the Company shall not, without the approval of Members holding a majority of the Common Units, enter into any agreement with any owner or prospective owner of any Securities of the Company that would allow such owner or prospective owner to (i) require the Company to effect a registration or (ii) include any Securities in any registration filed under Section 8.2 hereof.

36

SECTION 8.10    Rule 144 and 144A.  The Company agrees that, upon the request of any Holder of Registrable Securities or any prospective purchaser of Registrable Securities designated by a Holder, the Company shall promptly provide (but in any case within ten (10) days of a request) to such Holder or potential purchaser, the following information:

(a)    a brief statement of the nature of the business of the Company and any subsidiaries and the products and services they offer;

(b)    the most recent consolidated balance sheets and profit and losses and retained earnings statements, and similar financial statements of the Company for the two (2) most recent fiscal years (such financial information shall be audited, to the extent reasonably available); and

(c)    such other information about the Company, any subsidiaries, and their business, financial condition and results of operations as the requesting Holder or purchaser of such Registrable Securities shall request in order to comply with Rule 144 and Rule 144A promulgated under the Securities Act, as amended, and in connection therewith the anti-fraud provisions of the federal and state securities laws.

The Company hereby represents and warrants to any such requesting Holder and any prospective purchaser of Registrable Securities from such Holder that the information provided by the Company pursuant to this Section 8.10 will, as of their dates, not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  The Company shall also make and keep adequate and current public information with respect to the Company available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the effective date of an Initial Public Offering.

SECTION 8.11    "Market Stand Off" Agreement.  Each Holder hereby agrees that, during (i) such period (which period shall in no event exceed one hundred and eighty (180) days) following the effective date of a Registration Statement of the Company filed in connection with the Initial Public Offering as recommended by the underwriter or underwriters of such offering and (ii) such period (which period shall in no event exceed ninety (90) days) following the effective date of a Registration Statement of the Company filed under the Securities Act subsequent to the Initial Public Offering as recommended by the underwriter or underwriters of such offering and/or the Company (if applicable) (such period, the "Lock-Up Period"), it shall not, to the extent requested by the Company and/or any underwriter, sell, pledge, hypothecate, Transfer, make any short sale of, loan, grant any option or right to purchase of, or otherwise Transfer or dispose of (other than to donees who agree to be similarly bound) any Registrable Securities owned by it at any time during such period, except Registrable Securities included in such registration; provided, that any release of Registrable Securities from such agreement shall be effected among the Holders on a *pro rata* basis according to the Registrable Securities then owned by them.  Each Holder agrees that it shall deliver to the underwriter or underwriters of any offering to which clause (i) or (ii) is

37

applicable to such Holder a customary agreement reflecting its agreement set forth in this Section 8.11.

SECTION 8.12    Termination of Registration Rights. The rights of any particular Holder under this Article VIII shall terminate as to such Holder on the date such Holder, together with its Affiliates, ceases to own five percent (5%) or more of the outstanding Common Units.

## ARTICLE IX

## INFORMATION RIGHTS

SECTION 9.1    Books and Records. The Board shall cause the Company and its Subsidiaries to keep complete and accurate books of account and records with respect to the business and affairs of the Company and its Subsidiaries **in which shall be entered fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by Persons engaged in businesses of a like character**, including Schedule A, and to preserve all such books and records during the term of the Agreement and for a period of six (6) years thereafter. During such period and upon furnishing reasonable advance notice, each Member and/or its authorized representatives, at its or their sole cost and expense, shall be permitted, at a location reasonably determined by the Company, to reasonably inspect and make copies of such books and records for any proper purpose and consistent with reasonable confidentiality restrictions imposed by the Company at any reasonable time during normal business hours. **Upon written request by any Member made to the Company, the Company shall provide or make available to such Member without charge true copies of this Agreement, including Schedule A, the Company's other organizational documents, and all amendments thereto and restatements thereof.**

SECTION 9.2    Fiscal Year. The fiscal year of the Company shall end on December 31 of each calendar year.

**SECTION 9.3    Financial Statements and Other Information. The Company shall deliver to each Member that (together with its Affiliates) holds at least five percent (5%) of the Common Units outstanding as of such date(s):**

**(i)    within 60 days after the end of each quarterly accounting period in each fiscal year, the unaudited consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for each quarterly period, and consolidating and consolidated balance sheets** of the Company and its Subsidiaries **as of the end of such quarterly period, all prepared in accordance with generally accepted accounting principles, consistently applied, subject to the absence of footnote disclosures and to normal year-end adjustments; and**

**(ii)    within 120 days after the end of each fiscal year, [audited] consolidating and consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal year, and consolidating and consolidated balance sheets of**

38

**the Company and its Subsidiaries as of the end of such fiscal year, setting forth in each case comparisons to the annual budget and to the preceding fiscal year, all prepared in accordance with generally accepted accounting principles, consistently applied.**

**SECTION 9.4**    ~~SECTION 9.3~~ Accounting and Financial Matters.

~~(a)~~    All determinations, valuations and other matters of judgment required to be made for accounting or tax purposes under this Agreement shall be made by the Board and shall be conclusive and binding on all Members, their successors, heirs, estates or legal representatives and to any other Person, and to the fullest extent permitted by Applicable Law no such Person shall have the right to an accounting or appraisal of the assets of the Company or any successor thereto.

~~(b) The Board shall consider and make all determinations regarding the preparation of financial statements of the Company and its Subsidiaries, including the format of such financial statements, whether such financial statements shall be audited or unaudited, the frequency upon which such financial statements shall be prepared and whether such financial statements shall be delivered or otherwise made available to the Members.~~

**SECTION 9.5    Access. On written request stating the purpose, a Member that (together with its Affiliates) holds at least five percent (5%) of the then outstanding Common Units may make reasonable inquiries of management.**

ARTICLE X

REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 10.1    Representations, Warranties and Covenants of Each of the Parties. Each of the parties hereto hereby represents and warrants, severally, and not jointly and severally, and as to itself and not as to any other party, to each of the other parties that, on the Closing Date and on any subsequent date on which such representing party acquires Securities from the Company or any of its Subsidiaries (and in respect of Persons who become a party to this Agreement after the Closing Date, such party hereby represents and warrants to each of the other parties on the date of its execution of this Agreement or a Joinder Agreement and on any subsequent date on which such representing party acquires Securities from the Company or any of its Subsidiaries) as follows:

(a)    Such party is duly organized or incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation and has all requisite power and authority to conduct its business as it is now being conducted and is proposed to be conducted.

(b)    Such party has the requisite limited partnership, corporate, limited liability company or other organizational power and authority, as the case may be, to execute, deliver and perform this Agreement and to consummate the transactions contemplated herein. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action, corporate

39

or otherwise, of such party. This Agreement has been duly executed and delivered by such party and constitutes his, her or its legal, valid and binding obligation, enforceable against it, him or her in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies.

(c)     The execution and delivery by such party of this Agreement, the performance by such party of its obligations hereunder and the consummation of the transactions contemplated herein by such party does not and will not violate (i) any provision of its by-laws, charter, articles of association, partnership agreement, operating agreement, trust instrument or other similar document, (ii) any provision of any material agreement to which it is a party or by which it is bound or (iii) any law, rule, regulation, judgment, order or decree to which it is subject.

(d)     No consent, waiver, approval, authorization, exemption, registration, license or declaration is required to be made or obtained by such party in connection with the execution, delivery or enforceability of this Agreement or the consummation of any of the transactions contemplated herein.

(e)     Such party is not currently in violation of any law, rule, regulation, judgment, order or decree, which violation could reasonably be expected at any time to have a material adverse effect upon the Company and its subsidiaries, taken as a whole, or such party's ability to enter into this Agreement or to perform its obligations hereunder.

(f)     There is no pending legal action, suit or proceeding that would materially and adversely affect the ability of such party to enter into this Agreement or to perform its obligations hereunder.

(g)     Such party is an "accredited investor" as defined in Rule 501(a) of the Securities Act.

(h)     Such party is acquiring Securities for its own account for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of any Applicable Law, nor with any present intention of distributing or selling the same in violation of any Applicable Law.

(i)     Such party has been advised by the Company (or a Subsidiary thereof, if applicable) and understands that (i) the offer and sale of Securities to such party has not been registered under the Securities Act or any state "blue sky" laws; (ii) the Securities must be owned indefinitely and such party must continue to bear the economic risk of an investment in the Securities unless the offer and sale of such Securities is subsequently registered under the Securities Act and all applicable state securities laws or an exemption from such registration is available; (iii) there is no established market for any of the Securities and it is not anticipated that there will be any public market for the Securities in the foreseeable future; and (iv) a notation shall be made in the appropriate records of the Company (or a Subsidiary thereof, if applicable) indicating that the Securities are subject to restrictions on Transfer and, if the

40

services of a securities transfer agent are engaged in the future, appropriate stop-transfer instructions will be issued to such transfer agent with respect to the Securities.

(j) Such party's financial situation is such that such party can afford to bear the economic risk of owning the Securities for an indefinite period of time, has adequate means for providing for such party's current needs and personal contingencies and can afford to suffer a complete loss of such party's investment in the Securities.

(k) Such party's knowledge and experience in financial and business matters is such that such party is capable of evaluating the merits and risks of the investment in the Securities.

(l) Such party understands that the Securities are a speculative investment which involves a high degree of risk of loss of some or all of such party's investment therein, there are substantial restrictions on the transferability of the Securities and, on the Closing Date and for an indefinite period following the Closing Date, there will be no public market for the Securities and, accordingly, it may not be possible for such party to liquidate any or all of such party's investment in case of emergency, if at all.

(m) Such party and its respective advisors have been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Company and its representatives concerning the Company and its Subsidiaries, the Asset Purchase Agreement, the organizational documents (including this Agreement) of the Company and the terms and conditions of the acquisition of the Securities and to obtain any additional information which such party or its respective advisors deems necessary.

(n) Such party has completed its independent investigation, verification, analysis, review and evaluation of the Company and its Subsidiaries, the organizational documents (including this Agreement) of the Company and the terms and conditions of the acquisition of the Securities, in each case, as such party has deemed necessary or appropriate, and has relied solely upon such independent investigation, verification, analysis, review and evaluation in determining whether to purchase Securities of the Company or enter into this Agreement.

(o) All information such party has provided to the Company (or a Subsidiary thereof, if applicable) and the representatives of the Company (or a Subsidiary thereof, if applicable) concerning such party and such party's financial position is complete and correct in all material respects as of the date so provided.

(p) [Each Member hereby represents, warrants and covenants, severally, and not jointly and severally, and as to itself and not as to any other Member, to each of the other parties that, as of the date hereof and for so long as such Member holds any Units in the Company, no portion of the assets used by such party to acquire or hold the Units constitutes or will constitute the assets of (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) which is subject to Title I of ERISA, (ii) a plan, individual retirement account or other arrangement which is subject to Section 4975 of the Code or any Similar Law (as defined below) or (iii) an entity which is deemed to hold the assets of any of the foregoing

41

types of plans, accounts or arrangements for purposes of ERISA or otherwise. Each such Member agrees to (x) notify the Board and the Company immediately if any representation or warranty contained in this Section 10.1(p) becomes untrue at any time and (y) provide such information and execute and deliver such documents with respect to itself as the Company may from time to time reasonably request to verify the accuracy of such Member's representations and warranties contained in this Section 10.1(p) and/or to comply with any law, regulation or governmental order to which the Company or any of its Affiliates may be subject; provided, that such Members will in no event be obligated to provide any information or execute and deliver such documents with respect to its direct and indirect beneficial owners. "Similar Law" means any federal, state, local, non-U.S. or other law or regulation that would cause the underlying assets of the Company to be treated as assets of such Party by virtue of its interest in the Company and thereby subject the Company and the Board (or other persons responsible for the investment and operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the Code.[6]

SECTION 10.2    Additional Representations, Warranties and Covenants of the Company.

(a)    The Company hereby represents, warrants and covenants to each of the Members that, as of the Closing Date:

(i)    The Company was newly formed for purposes of completing the transactions contemplated by the Asset Purchase Agreement and does not have any liabilities except as incurred in connection therewith or disclosed to the Members in writing.

(ii)    The Company is duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to conduct its business as it is now being conducted and is proposed to be conducted.

(iii)    The Company has the requisite limited liability company power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated herein. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action of the Company. This Agreement has been duly executed and delivered by the Company and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and the availability of equitable remedies.

(iv)    Schedule A sets forth the names of the Members and their Units as of the Closing Date. Except as otherwise set forth in this Agreement, the Company (A) does not have any authorized or outstanding subscription, warrant, option,

---

[6] Note to Sidley: Subject to on-going review.

42

convertible security or other right (contingent or otherwise) to purchase or acquire any of their Units, (B) is not committed to issue any subscription, warrant, option, convertible security or other such right or to issue or distribute to holders of any of its Securities any evidences of indebtedness or assets and (C) has no obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of its Securities or any interest therein or to pay or make any distribution in respect thereof.

(v) The execution and delivery by the Company of this Agreement, the performance by the Company of its obligations hereunder and the consummation of the transactions contemplated herein by the Company does not and will not violate (A) any provision of the Certificate, (B) any provision of any material agreement to which it is a party or by which it is bound or (C) any law, rule, regulation, judgment, order or decree to which it is subject.

(vi) (A) There is no pending or, to the knowledge of the Company, threatened legal action, suit or proceeding that would materially and adversely affect the ability of the Company to enter into this Agreement or to perform its obligations hereunder and (B) there are no outstanding orders, writs, judgments, decrees, injunctions or settlements that would reasonably be expected to have a material adverse effect on the Company.

(vii) No consent, waiver, approval, authorization, exemption, registration, license or declaration is required to be made or obtained by the Company in connection with the execution, delivery or enforceability of this Agreement or the consummation of any of the transactions contemplated hereby.

(b) The Company shall promptly notify each Member if it determines that such Member's ownership of the Company, or indirect ownership of any Subsidiary of the Company, or any action or proposed action by the Company or any of its Subsidiaries, will likely give rise to any beneficial ownership reporting requirements of the Company or any Member under Sections 13(d) or 13(g) of the Exchange Act, or any other public disclosure or reporting requirements that require disclosure of the identity of any Member or any of its Affiliates, partners, or members.

(c) In case of any filing or other transaction which would result in the Securities of the Company or the securities of any of its Subsidiaries being listed on any regulated stock exchange, the Company shall notify each Member at least thirty (30) days prior to such filing or other transaction and cooperate with, and take such actions as are reasonably requested by, such Member so that it can comply with and meet all restrictions and obligations applicable to it in connection with any such filing or other transaction.

ARTICLE XI

LIABILITY, EXCULPATION, INDEMNIFICATION

SECTION 11.1 Liability. To the fullest extent permitted by Applicable Law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise,

shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for the repayment, satisfaction or discharge of any portion of such debt, obligation or liability solely by reason of being a Covered Person.

SECTION 11.2    Exculpation. No Covered Person shall be liable to the Company, any of its Subsidiaries, the Board, any Member or any creditor for any Claims and Expenses arising out of any act or omission of such Covered Person to the extent that such act or omission did not constitute Disabling Conduct. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person believes are within such other Person's professional or expert competence and which such other Person the Covered Person believes has been selected with reasonable care, including information, opinions, reports or statements as to the value and amount of assets, liabilities, profits or losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

SECTION 11.3    Indemnification. The Company and its Subsidiaries shall indemnify and hold harmless each of the Covered Persons from and against any and all liabilities, obligations, losses, damages, fines, taxes and interest and penalties thereon (other than income taxes and other taxes based on fees or other compensation received by such Covered Person from the Company), claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including reasonable and documented legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever (collectively, "Claims and Expenses") which may be imposed on, incurred by or asserted at any time against such Covered Person by reason of its status as a Covered Person, including that is in any way related to or arising out of the ownership of Securities, the control of, or ability to influence, the Company or any of its Subsidiaries or the management or administration of the Company and its Subsidiaries (if applicable) or the activities of such Covered Person pursuant to this Agreement or otherwise on behalf of the Company and its Subsidiaries; provided, that a Covered Person shall not be entitled to indemnification hereunder (a) against Claims and Expenses that are finally determined by a court of competent jurisdiction or binding arbitration to have resulted from such Covered Person's Disabling Conduct, or (b) to the extent such Claims and Expenses arise out of any economic losses or tax obligations incurred by a Covered Person as a result of its owning Securities of the Company.

SECTION 11.4    Exception to Right of Indemnification. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity or pay any expenses (in advance or otherwise) in connection with any claim made against a Covered Person in the following circumstances:

(a)    for which payment has actually been made to or on behalf of such Covered Person under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; provided, that the foregoing provisions of this clause (a) shall not affect the rights of a Covered Person or the Sponsor Indemnitors set forth in Section 11.7(d);

44

Case 15-11371-CSS    Doc 1632    Filed 04/22/16    Page 13 of 15
Case 15-11357-CSS    Doc 1622-9    Filed 04/19/16    Page 51 of 63

(b)    for an accounting of profits made from the purchase and sale (or sale and purchase) by any Covered Person of Securities within the meaning of Section 16(b) of the Exchange Act or similar provisions of state statutory law or common law; or

(c)    in connection with any claim, demand, action, suit or proceeding (or any part thereof) initiated by such Covered Person, including any claim, demand, action, suit or proceeding (or any part thereof) initiated by a Covered Person against the Company or against any other Covered Person (in its capacity as such), unless (i) the Board authorized the claim, demand, action, suit or proceeding (or such relevant part thereof) prior to its initiation or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under Applicable Law.

SECTION 11.5    Advancement of Expenses.  Subject to Section 11.4, the Company shall pay the expenses (including reasonable legal fees and expenses and costs of investigation) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding (other than a claim, demand, action, suit or proceeding brought by the Company against (i) a Member for such Member's material breach or violation of this Agreement or (ii) an employee of the Company or any of its Subsidiaries for such employee's material breach or violation of his or her employment agreement, as such expenses are incurred by such Covered Person and in advance of the final disposition of such matter); provided, that such Covered Person undertakes to repay such expenses if it is determined by agreement between such Covered Person and the Company or, in the absence of such an agreement, by a final judgment of a court of competent jurisdiction that such Covered Person is not entitled to be indemnified pursuant to Section 11.3.

SECTION 11.6    Notice of Proceedings.  Promptly after receipt by a Covered Person of notice of the commencement of any claim, demand, action, suit or proceeding against such Covered Person, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Board of the commencement of such claim, demand, action, suit or proceeding; provided, that the failure of a Covered Person to give notice as provided herein shall not relieve the Company of its obligations under Section 11.3 and Section 11.5 except to the extent that the Company is materially prejudiced by such failure to give timely notice.  In case any such claim, demand, action, suit or proceeding is brought against a Covered Person in his, her or its capacity as a current or former Member (other than a claim, demand, action, suit or proceeding by or in the right of the Company), the Company will be entitled to assume the defense of such proceeding; provided, that (i) the Covered Person shall be entitled to participate in such proceeding and to retain its own counsel at its own expense and (ii) if the Covered Person has been advised by its counsel that the proposed representation of such Covered Person and other parties by the same counsel in such matter would be inappropriate under applicable standards of professional conduct due to actual or potential conflicts of interest between the Covered Person and such other parties with respect to such matter, then the Covered Person shall have the right to control (at its own expense and with counsel reasonably satisfactory to the Company) the defense of such specific claims with respect to the Covered Person (but not with respect to the Company or any other Person); provided, further, that no Covered Person shall consent to the entry of a judgment or enter into a settlement that would require the Company to pay any

amounts under this Article XI without the prior written consent of the Company, such consent not to be unreasonably withheld. After notice from the Company to such Covered Person electing to assume the defense of such claim, demand, action, suit or proceeding, the Company will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. Without the consent of such Covered Person, such consent not to be unreasonably withheld, the Company will not consent to the entry of any judgment or enter into any settlement with respect to such claim, demand, action, suit or proceeding that does not include as a term thereof the giving by the claimant or plaintiff to such Covered Person of an unconditional release from all liability arising out of the claim, demand, action, suit or proceeding and all claims asserted therein.

SECTION 11.7    Non-Exclusivity; Survival of Rights; Primacy of Indemnification; Subrogation.

(a)    The rights of indemnification as provided by this Agreement are not intended to be and shall not be deemed to be exclusive of any other rights to which a Covered Person may at any time be entitled under Applicable Law, any agreement, a vote of the Members, a resolution of the Board or otherwise. No amendment, alteration or repeal of this Agreement or of any provision of this Article XI shall limit or restrict any right of a Covered Person under this Article XI in respect of any action taken or omitted by such Covered Person in his, her or its capacity as such prior to such amendment, alteration or repeal. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    Except as provided in clause (d) below, in the event of any payment under this Article XI, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of the Covered Person, who shall execute all papers required and take all action necessary to secure such rights for the Company, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(c)    Except as provided in clause (d) below, the Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that a Covered Person has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(d)    The Company hereby acknowledges that certain Covered Persons may have rights to indemnification, advancement of expenses and/or insurance provided by an Affiliated or otherwise related investment fund or investment manager or certain Affiliates of such investment fund or investment manager (collectively, the "Sponsor Indemnitors"). The Company hereby agrees (i) that the Company is the indemnitor of first resort with respect to matters that are the subject of indemnification or advancement of expenses under this Article XI except to the extent that indemnification is available to a Covered Person from another Subsidiary of the Company, in which case such other Subsidiary shall be the indemnitor of first resort if the arrangements with such other Subsidiary so provide (i.e., the Company's

46

obligations to a Covered Person pursuant to this Article XI are primary to any obligation to such Covered Person from the Sponsor Indemnitors, and any obligation of the Sponsor Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Covered Person are secondary to such obligations of the Company), (ii) that the Company shall be required to advance the full amount of expenses incurred by the Covered Persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Agreement (or any other agreement between the Company and the Covered Person), without regard to any rights a Covered Person may have against the Sponsor Indemnitors (except to the extent that any such advancement or payment is available to a Covered Person from another Subsidiary of the Company, in which case such Subsidiary shall be responsible for such advancement if the arrangements with such Subsidiary so provide), and (iii) that the Company irrevocably waives, relinquishes and releases the Sponsor Indemnitors from any and all claims against the Sponsor Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Sponsor Indemnitors on behalf of any Covered Person with respect to any claim for which a Covered Person has sought indemnification and/or advancement or payment of expenses from the Company shall affect the foregoing and the Sponsor Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Company. The Company agrees that the Sponsor Indemnitors are express third party beneficiaries of the terms of this Section 11.7(d).

## ARTICLE XII

## DISSOLUTION; WINDING UP

SECTION 12.1    Dissolution. The Company shall be dissolved and its affairs shall be wound up upon a determination by the Board to dissolve the Company at any time. The death, termination, retirement, dissolution, resignation, expulsion or bankruptcy of any Member shall not cause the dissolution of the Company, and following any such event the remaining Members shall continue the business of the Company. The Company shall not be dissolved as result of there no longer being any Members of the Company if the Company is continued in accordance with Section 18-801(a)(4) of the Act. The Members (in their capacity as such) and Managers (in their individual capacity as such but not in their collective capacity as the Board) hereby waive any rights to, and shall not petition for, judicial dissolution of the Company under Section 18-802 of the Act and any rights to petition or apply for the appointment of a liquidator, receiver or trustee under the Act or otherwise.

SECTION 12.2    Winding Up. If the Company is dissolved pursuant to Section 12.1, the Board has the full right and discretion to manage such process, including without limitation the power to prosecute and defend suits, collect debts, dispose of property, settle and close the business of the Company, discharge the liabilities of the Company, pay reasonable costs and expenses incurred in the winding up, distribute remaining assets to Members (in accordance with Section 5.1) and execute and file a certificate of cancellation under the Act.

47