**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| re:<br><br><br>MOLYCORP MINERALS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-11371 (CSS)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 74, 86, 87**<br>**Hearing Date:  September 26, 2016 at 4:00 p.m.**<br>**(ET)**<br>**Objection Deadline:  September 19, 2016 at 4:00**<br>**p.m. (ET)** |

**WESTCHESTER FIRE INSURANCE COMPANY'S OBJECTION TO (I)**
**CHAPTER 11 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER**
**DISMISSING THE MOLYCORP MINERALS DEBTORS' CHAPTER 11**
**CASES; AND (II) MOLYCORP, INC.'S CROSS-MOTION TO CONVERT**
**CHAPTER 11 CASES TO CHAPTER 7 CASES; AND RESPONSE TO**
**OAKTREE'S JOINDER IN OBJECTION OF MOLYCORP INC.**

Westchester Fire Insurance Company ("Westchester"), by and through its undersigned

counsel, hereby submits this Objection to (I) the Motion of Paul E. Harner, the chapter 11 trustee

(the "Trustee") in the above-captioned chapter 11 cases of Molycorp Minerals, LLC, *et al.*

(collectively, the "Minerals Debtors"), for Entry of an Order Dismissing the Molycorp Minerals

Debtors' Chapter 11 Cases (the "Motion to Dismiss"); and (II) the Cross-Motion of Molycorp,

Inc. ("Molycorp") to Convert Chapter 11 Cases to Chapter 7 Cases (the "Cross-Motion to

Convert"); and Response to Oaktree's Joinder in the Objection of Molycorp Inc.; and

respectfully states as follows (the "Objection"):

---

[1] The Minerals Debtors are the following 6 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Molycorp Minerals, LLC (4170); Industrial Minerals, LLC; Molycorp Advanced Water Technologies, LLC (1628); PP IV Mountain Pass, Inc. (1205); PP IV Mountain Pass II, Inc. (5361); and RCF IV Speedwagon Inc. (0845).

## BACKGROUND

1.      On June 25, 2015 (the "Petition Date"), the Minerals Debtors and fifteen of their affiliates (the "Plan Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § § 101-1532 (the "Bankruptcy Code") in this Court.[2]

2.      From June 29, 2015 through April 13, 2016, the cases of the Minerals Debtors were jointly administered and procedurally consolidated with the cases of the Plan Debtors under the docket of *Molycorp, Inc.*, Case No. 15-11357.  The principal asset in the cases of the Minerals Debtors is a rare earth mineral mining facility located in San Bernardino County, California (including certain real and personal property and fixtures located at the facility, "Mountain Pass").

3.      On April 8, 2016, this Court entered *Findings of Fact, Conclusions of Law and Order Confirming the Plan Debtors' Fourth Amended Plan of Reorganization* (the "Confirmation Order") (Plan Debtors D.I. 1580), pursuant to which the Court confirmed the Plan Debtors' Fourth Amended Joint Plan of Reorganization (the "Plan") and approved certain related settlement agreements.  Prior to the entry of the Confirmation Order, however, the Plan had been withdrawn as to the Minerals Debtors.  Pursuant to the settlements contemplated by the Plan and approved by the Confirmation Order, among other things, the sum of $2.5 million was to be tendered to the Minerals Debtors (the "Initial Wind-Down Reserve") for the purpose of partially funding (a) the administrative costs to be incurred by a chapter 7 trustee in connection with attempting to sell the Mountain Pass assets and (b) the costs and expenses of maintaining the Mountain Pass facility in a "cold idle" status.

---

[2] The Plan Debtors include Molycorp, Inc.; Magnequench, Inc.; Magnequench International, Inc.; Magnequench Limited; MCP Callco ULC; MCP Canada Holdings ULC; MCP Canada Limited Partnership; MCP Exchangeco Inc.; Molycorp Chemicals & Oxides, Inc.; Molycorp Luexmbourg Holdings S.a. r.l.; Molycorp Metals & Alloys, Inc.; Molycorp Minerals Canada ULC; Molycorp Rare Metals Holdings, Inc.; Molycorp Rare Metals (Utah), Inc.; and Neo International Corp.

4.      Upon information and belief, the Initial Wind-Down Reserve was tendered to the Minerals Debtors in accordance with the settlements approved by the Confirmation Order.

5.      Also on April 8, 2016, the Minerals Debtors filed a motion seeking, among other relief, the conversion of their chapter 11 cases to cases under chapter 7 of the Bankruptcy Code (Plan Debtors D.I. 1581).

6.      On April 13, 2016, the Court conducted a hearing with respect to the Minerals Debtors' motion to convert.   During the hearing, Molycorp's counsel made the following representations to the Court with respect to the Initial Wind-Down Reserve in response to the Court's expression of concern regarding the potential appointment of a chapter 11 trustee without the necessary funding in place:

> I want to be clear for the record that the Debtors are not taking the position that the $2.5 million dollars we negotiated for should not be used for this purpose.  I think if the constituents in the case want to use some or all of those funds towards this attempt to maintain the cases outside of Chapter 7, we would not stand in the way of that.  We just wanted the record to be clear that we had negotiated for that to provide an orderly wind down.  And if in the event that this attempt to stay out of Chapter 7 was not successful, it could leave a Trustee without funds for an orderly wind down.  But if that is what all of the constituents have agreed is in the best interest of the estate and they're own individual interests, we wouldn't stand in the way of that.  And to the extent it closes on Friday funds could be used -- from that $2.5 million dollars to support the two weeks interim negotiation period.

See Hr'g Tr. at 21:6-22, In re Molycorp, Inc., No. 15-11357 (CSS) (Bankr. D. Del. Apr. 13, 2016).

7.      This position was echoed by counsel for both OCM MLYCo CTB Ltd. ("Oaktree") and the ad hoc group of holders of the 10% senior secured notes (the "Ad Hoc 10% Noteholders"), who again reassured the Court that the Initial Wind-Down Reserve was available to be used by a Chapter 11 Trustee:

MR. BRODY [Counsel for Ad Hoc 10% Noteholders]: Your Honor, I just want to circle back to one item that you has asked about, about the money that's available under the settlement agreement that provides – it's real there for a Chapter 7 Trustee. So my clients are okay with that money being used by a Chapter 11 Trustee. So a Chapter 11 Trustee that comes in, we don't have an issue [with] that. I think Mr. LeBlanc [counsel for Oaktree], he can speak for himself, said that Oaktree would be okay with that as well.

***

MR. LEBLANC: Your Honor, I can just confirm what Mr. Brody just said, which is we have no concerns with the money that we've left behind to fund a Chapter 7 wind down for that being used in the interim for a Chapter 11 Trustee…

THE COURT: All right.

MR. LEBLANC: I think that's the only consent that's required of us at this point.

THE COURT: Okay. I'm just trying to think this through. So an order I would enter today would provide – direct the appointment of a Trustee to an effective date; however that's going to be defined. If there's a closing by Friday, the [$2.5] million would be available to fund operations, limited operations, but the Chapter 11 Trustee may not get appointed till Monday or Tuesday. So can you agree that the Debtor can use that money?

MR. LEBLANC: We agree with that, Your Honor. That's fine with us. The Debtor – that that money be available to continue operations; whether that is in the form of the Debtor-In-Possession, Chapter 11 trustee or if a Chapter 7 Trustee is appointed, that that same pot of money be available for those purposes.

THE COURT: Okay. Very good. All right.

Id. at 48:20-49:2; 49:14-50:10.

8.      Based upon the reassurances from counsel for Molycorp, Oaktree and the Ad Hoc

10% Noteholders, and upon the agreement reached between and among all interested parties, this

Court entered an *Order (I) Directing the United States Trustee to Appoint a Chapter 11 Trustee*

*for the Chapter 11 Cases of Industrial Minerals, LLC; Molycorp Advanced Water Technologies,*

*LLC; Molycorp Minerals, LLC; PP IV Mountain Pass II, Inc.; PP IV Mountain Pass, Inc.; and RCF IV Speedwagon Inc.; (II) Amending the Debtors' Joint Administration Order and (III) Granting Related Relief* (the "Trustee Order") (Minerals Debtors D.I. 8).

9.     Pursuant to the Trustee Order, the Minerals Debtors' cases were withdrawn from, and are no longer jointly administered for procedural purposes with, the Plan Debtors' cases, which continue to be administered under the docket of Molycorp, Inc., Case No. 15-11357. Further, in accordance with the Trustee Order, the Minerals Debtors' cases remain consolidated with each other for procedural purposes only and are jointly administered.

10.     The Trustee Order imposed certain funding obligations upon Westchester and certain other sureties:

> In the event that the Closing Certification is not filed by April 15, 2016, then on April 18, 2016, Westchester shall advance $250,000 and Lexon, Ironshore and Bond Safeguard collectively shall advance $250,000 for a total of $500,000 (the "Funding Amount") to fund expenses to be incurred by the Molycorp Minerals Debtors for the care and maintenance of the Molycorp Minerals Debtors' assets for a period beginning on April 16, 2016 and ending on the earlier of April 29, 2016 and the entry of an order appointing the Chapter 11 Trustee in accordance with paragraph 2 above (the "Funding Period") out of the Sureties' cash collateral (the "Sureties' Advance").

11.     As a Closing Certificate was not filed by April 15, 2016, Westchester advanced its $250,000 share of the Funding Amount on April 18, 2016, and the remaining $250,000 was advanced by Lexon Insurance Co., Ironshore Indemnity, Inc. and Bond Safeguard Insurance Co.

12.     Contrary to the relief sought in the Cross-Motion, nothing in the Trustee Order suggests that Westchester, or any other surety, shall have any obligation to replenish the Initial Wind-Down Reserve upon its depletion or to otherwise provide any additional funding beyond the Funding Amount.

13.     Rather, the Trustee Order provides that Westchester, in connection with the Sureties' Advance, was entitled to reimbursement of the funds advanced to the extent the obligees/regulators do not agree to reduce the penal sums of the applicable bonds by the amount of the Sureties' Advance:

> [t]he Sureties' Advance shall, to the extent agreed by obligees/regulators, be designated as a dollar-for-dollar reduction in the penal sums of the applicable bonds issues by each Surety, provided that to the extent the obligees/regulators do not agree to treat the Sureties' Advance as a dollar-for-dollar reduction in the penal sums of the applicable bonds, the Sureties' Advance shall be repaid from the Minerals Wind-Down Expense Reserve (as such term is defined in the 10% Noteholder Group Settlement (D.I. 1495)), subject to the filing of the Closing Certification, which amount shall be treated as cash collateral for the Sureties.

14.     The obligees/regulators have not agreed to treat the Sureties' Advance as a dollar-for-dollar reduction in the penal sums of the applicable bonds.  Accordingly, the Trustee Order requires that Westchester be repaid its share of the Funding Amount from the Minerals Wind-Down Expense Reserve.

15.     The Debtors filed the Closing Certificate referenced in the Trustee Order on April 27, 2016 (Minerals Debtors D.I. 17).

16.     On May 2, 2016, despite repeated assurances from counsel for Molycorp, Oaktree, and the Ad Hoc 10% Noteholders during the April 13, 2016 hearing,  Molycorp's counsel drastically changed its tune with respect to the Chapter 11 Trustee's use of the Initial Wind-Down Reserve:

> So we understand the Debtors are now sort of stepping out of the way as a Chapter 11 Trustee comes in to take over, but our position has been throughout these negotiations that to remain in Chapter 11 is usually the custom that whoever is obtaining the benefits of the Chapter 11 processor also bears the burden of cost at that process.  The original settlement with the Ten Percent Noteholders was to keep that $2.5 million dollar reserve in place for sort of the wind down expenses for a Chapter 7 Trustee once it was clear a

Chapter 11 process wasn't going to function. That's been [our] continued position.

See Hr'g Tr. at 10:17-11:2, In re Molycorp, Inc., No. 15-11357 (CSS) (Bankr. D. Del. May 2, 2016).

17.    The Court, immediately recognizing Molycorp's contradiction of its reassurances during the April 13, 2016 hearing, quickly interrupted counsel, noting "[t]hat hasn't been your continuing position…. Ms. Laukitis made it pretty clear to me that you had no objection to it being used by a Chapter 11 Trustee." Id. at 11:4-9.

18.    In response, Molycorp's counsel vaguely attempted to split hairs, arguing that "our view was that there was an amount reserved to sort of fund the wind down of the estates at the end of this, and that it shouldn't be burned while negotiations are ongoing, and as of the agreement last week there would be money coming into the estate to cover the cost of an ongoing process here so that there was always a chunk left at the end to be used." Id. at 11:13-19.

19.    Rejecting the efforts of Molycorp's counsel to change the subject and allow other parties to speak, the Court continued, "[w]ell, I'm going to push you a little bit on this. I'm concerned." Id. at 12:10-11. The following exchange followed:

> THE COURT:  Are you saying that the Chapter 11 Trustee has no money?
>
> MR. HOWARD:  Absolutely not.
>
> THE COURT:   And what money does the Chapter 11 Trustee have?
>
> MR. HOWARD:  Right now there's the $2.5 million dollars, plus the [$]400,000, plus the remaining [$]500,000 from the [S]ureties in the estate right now.
>
> THE COURT:  Okay.

> MR. HOWARD:  We're not saying the Chapter 11 Trustee can't use any of that money; we're just saying it was our negotiating position that we wanted funds left over after negotiations on this Chapter 11 process and that as we were stepping out of the way that, certainly, Your Honor or the other parties could all agree to a different construct, but that was where we had sort of left things.

Id. at 12:13-13:3.

20.     During the same hearing, proposed counsel for the Chapter 11 Trustee expressed

concern similar to that of the Court, resulting in the following exchange:

> MR. MARRIOTT:  It's not clear to me, from what Debtor's counsel just said, whether the $2.5 million dollar reserve is available in full and immediately for the Chapter 11 Trustee to perform its fiduciary function or whether it's a lesser amount available at some different time for some other purpose.  I think it needs to be clear one way or the other are those funds available for that purpose and when.
>
> THE COURT:  Well, are those funds in the possession, custody and control of one of the Chapter 11 Debtors that a Trustee has been appointed for?
>
> MR. HOWARD:  Yes, Your Honor.  They're all under the control of Molycorp Minerals.
>
> THE COURT:  Chapter 11 Trustee is the Trustee, so I think you can use all that money.  The way I view it is you can use all that money consistent with your fiduciary duties, of course.

Id. at 14:12-15:3.

21.     In light of the understandable confusion resulting from the shift in positions by

Molycorp, its counsel once more attempted to clarify its position:

> We, as the Debtors, negotiated very hard that if it goes to a 7, that there be money available for a Chapter 7 Trustee. So we think it's -- what Mr. Howard is saying is for the [S]ureties in that eventuality to pony up money at the end of the process to have a proper [conversion] to Chapter 7 because as Mr. Howard said, frankly, this process is for the benefit of the [S]ureties, but, you know, the reality is we're stepping out of the process and I think we just wanted to make the record clear because we negotiated very hard for money to be available in the event of a Chapter 7 conversion,

which could still happen down the road, to brave the time between that event and what would ultimately happen, which is the bonds would be pulled for the reclamation of the mine.

Id. at 16:13-25.

22.     The Court then responded as follows:

I understand your position and I concur with it, *which is that the idea was eventually it was to appoint a Chapter 7 Trustee*, but the [S]ureties and County of San Bernardino who, ultimately, are responsible for this site preferred the appointment of a Chapter 11 Trustee. So I think it appropriate to sort of adapt to and go along with that approach…. [3]

Id. at 17:1-7 (emphasis added).

23.     In order to permit the Trustee to continue his efforts to market and sell the Mountain Pass facility, Westchester offered to advance as much as an additional $2.5 million to the Minerals Debtors, subject only to the agreement of the obligees/regulators' to a dollar-for-dollar reduction of the penal sum of Westchester's bonds. Because the necessary parties did not agree to such a reduction, Westchester has not advanced any additional funds.

24.     On August 11, 2016, the Trustee filed the Motion to Dismiss (Minerals Debtors D.I. 74), anticipating the complete depletion of available funds by around mid- to late September and, as such, the inability of a chapter 7 trustee to monetize Mountain Pass and the continued accrual of administrative costs.

25.     On August 25, 2016, Molycorp filed an objection to the Motion to Dismiss, along with the Cross-Motion to Convert (Minerals Debtors D.I. 86), pursuant to which Molycorp seeks conversion of the Minerals Debtors' to chapter 7, rather than dismissal.

---

[3] In the Cross-Motion to Convert, Molycorp has disingenuously interpreted this response to mean that the Court somehow agreed with its newfound position that the Initial Wind-Down Reserve should not be utilized by the Chapter 11 Trustee. In fact, it is clear that the Court agreed only with the notion that the original purpose of the Initial Wind-Down Reserve, prior to the agreement to appoint a Chapter 11 Trustee, was that the funds would be used by a Chapter 7 Trustee. Further, in stating that the appropriateness of going "along with that approach," the Court was simply noting that, because the Sureties and County are ultimately responsible for the site, it was appropriate to adopt their approach, which was the appointment of a Chapter 11 Trustee.

26.     Pursuant to the Cross-Motion to Convert, Molycorp also requests that Westchester and the other sureties be required to pay an additional $2.5 million to replenish the Initial Wind-Down Reserve.  To support its request for this relief, Molycorp astonishingly contradicts all of its prior representations to the Court, suggesting that, because the appointment of a Chapter 11 Trustee resulted from the objections of Westchester and the other sureties to the original Motion to Dismiss, the Initial Wind-Down Reserve should not have been used by the Trustee, and the Sureties should be required to replenish it.

27.     The relief requested by Molycorp contradicts not only its own representations to the Court, but the clear and unambiguous language of the Trustee Order, which requires the *reimbursement* of funds advanced by the Sureties to the Minerals Debtors.

28.     On August 30, 2016, the Trustee filed a *Motion for Entry of a Final Order (A) Authorizing Secured and Unsecured Postpetition Financing, (B) Granting Liens on Certain Insurance Proceeds, and (C) Approving Agreements with Lexon Insurance Company* (the "Financing Motion") (Minerals Debtors D.I. 93), pursuant to which the Trustee seeks Court approval of its proposed financing agreement (the "Financing Agreement") with Lexon Insurance Inc. and one or more of its affiliates (collectively, "Lexon").

29.     According to the Financing Motion, the Lender has agreed to the following terms, among others:

> a.  Borrowing Limits:  [Lexon] has agreed to provide to the [Minerals Debtors]: (i) a $1,500,000 secured administrative expense facility (the "Administrative Expense Facility"), subject to increase as set forth below, to meet the professional and other fees, costs and expenses associated with administration of these chapter 11 cases (the "Administrative Expenses"); and (ii) a $2,700,000 unsecured operating expense facility (the "Operating Expense Facility" and, together with the Administrative Expense Facility, the "Facilities"), also subject to increase as set forth below, to meet the fees, costs, and expenses (other than the Administrative Expenses), required to abate nuisance or pollution that may exist, or to maintain

the Mountain Pass Mine in its current state of "cold idle" (the "<u>Operating Expenses</u>").

b. <u>Interest Rate</u>:  The Facilities shall be non-interest bearing, and there shall be no commitment or other fees associated therewith.

c. <u>Increase in Amount of the Commitment</u>:  The total amount of the Facilities may be increased in [Lexon's] sole and absolute discretion up to $5,000,000, allocated between the Facilities as the Lender shall determine.  The total amount of the Operating Expense Facility shall be increased by such amount, if any, as shall be necessary for the [Minerals Debtors] to maintain insurance covering casualty loss and other customary risks associated with the Mountain Pass Mine; provided that the [Minerals Debtors] shall use reasonable efforts to minimize the costs associated therewith.

30.    Because both the Motion to Dismiss and the Cross-Motion to Convert are premised upon the parties' anticipation that the Minerals Debtors' estates would be completely depleted by around mid- to late September, the relief requested in the Financing Motion, if granted, will render the Motion to Dismiss and Cross-Motion to Convert moot, as it will provide necessary liquidity during a potential sale process, and will help the Minerals Debtors to maintain compliance with their environmental and regulatory requirements pending any such sale.

<u>ARGUMENT</u>

**A.  The Motion to Dismiss Should be Denied as Moot**

31.    The Trustee's Motion to Dismiss was filed as a result of his inability to secure the financing necessary to continue in his efforts to sell the Mountain Pass facility.  Accordingly, in the event that the Financing Motion is granted, the Motion to Dismiss will be rendered moot.

32.    Pursuant to the Financing Motion, Lexon has agreed to provide up to $5,000,000 in post-petition financing to cover the Minerals Debtors' administrative and operating expenses in connection with the Mountain Pass facility.  The additional financing will permit the Trustee to pay the expenses necessary to maintain the Mountain Pass facility in its "cold idle" status

while proceeding with a sale process that will offer the best opportunity to maximize creditor recovery.

**B. The Cross-Motion to Convert Should Be Denied Because Conversion is Not in the Best Interests of Creditors and the Estates**

33.     Section 1112(b)(1) provides that, "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."

34.     The burden to establish the grounds for conversion by a preponderance of the evidence lies with the movant, Molycorp.  *See In re Korn*, 523 B.R. 453, 465 (Bankr. E.D. Pa. 2014).

35.     As set forth in the *Objection to: (I) Trustee's Motion to Dismiss the Molycorp Minerals Debtors' Chapter 11 Cases; and (II) Molycorp, Inc.'s Motion to Convert the Molycorp Minerals Debtors' Chapter 11 Cases to Chapter 7 Cases* filed by Ironshore Indemnity, Inc., Lexon Insurance Co. and Bond Safeguard Insurance Co. (the "Lexon Objection") (Minerals Debtors D.I. 91), which is expressly incorporated herein by reference, Molycorp has failed to demonstrate "cause" for conversion.

36.     Specifically, Molycorp argues that conversion would benefit the Minerals Debtors' creditors and their estates by permitting a chapter 7 trustee to abandon the Mountain Pass facility and to recover other assets for distribution to creditors.  As noted in the Lexon Objection, Molycorp's analysis of the supposed benefits of conversion is flawed, in that (a) the chapter 11 Trustee has the same ability to recover assets that a chapter 7 trustee would have, and (b) the conversion to chapter 7 and abandonment of the Mountain Pass facility by a chapter 7

trustee would likely result in a violation of the Surface Mining and Reclamation Act of 1975 (SMARA).

37.    Even assuming that Molycorp could demonstrate "cause" for conversion, the court retains discretion in evaluating whether there are "unusual circumstances" establishing that conversion is not in the best interests of creditors and the estate.  *Id.*

38.    As set forth in the Lexon Objection, this case presents unusual circumstances that render conversion particularly inappropriate.    Conversion would inevitably result in environmental and water contamination at the Mountain Pass facility, as well as the revocation of the Minerals Debtors valuable permits.

**C.  Westchester Should Not be Required to Replenish the Wind-Down Reserve**

39.    In the Cross-Motion to Convert, as part of its request for conversion of the Minerals Debtors' cases to chapter 7, Molycorp argues that Westchester and the other sureties be required to advance an additional $2.5 million to replenish the Initial Wind-Down Reserve.

40.    Molycorp offers absolutely no legal authority to support its request for this relief.

41.    Moreover, as set forth in Background section of this Objection, the request completely contradicts the Trustee Order and the representations made to the Court on the record by Molycorp's own counsel.

42.    Indeed, pursuant to the Trustee Order, Westchester is entitled to reimbursement of its $250,000 share of the Funding Amount from funds of the Minerals Debtors' estates, as the Sureties were not given a dollar-for-dollar reduction in the penal sums of their applicable bonds.

**D.  In the Event the Financing Motion is Denied, the Cases Should be Dismissed, Rather Than Converted**

43.    Assuming, *arguendo*, that the Financing Motion is denied, the Minerals Debtors' cases should be dismissed, rather than converted.  Based upon the arguments raised by the

Trustee in the Motion to Dismiss, dismissal, as opposed to conversion, will be far more beneficial to the Minerals Debtors' respective creditors and estates.

44.    However, given that Westchester advanced $250,000 in order to assist funding the care and maintenance of the Minerals Debtors assets pending the appointment of the Trustee, and given that Westchester was not provided a dollar-for dollar reduction of the penal sums of its surety bonds, the Trustee Order requires that Westchester be reimbursed its share of the Funding Amount prior to the dismissal of the Minerals Debtors' chapter 11 cases.

45.    Accordingly, Westchester respectfully requests that, in the event this Court denies the Financing Motion, that it dismiss, rather than convert, the Minerals Debtors' cases, and that the dismissal be expressly conditioned upon the repayment to Westchester of its portion of the Funding Amount prior to dismissal.

## **RESERVATION OF RIGHTS**

46.    The submission of this Objection by Westchester is not intended as, and shall not be construed as: (a) Westchester's admission of any liability or waiver of any defenses or limitation of any rights of Westchester with respect to any claims against any one or more of the surety bonds or under agreement(s) of indemnity; (b) Westchester's waiver or release of any right to exoneration it may have against any person or entity; (c) Westchester's waiver or release of its right to be subrogated to the rights of one or more of the beneficiaries of the surety bonds; (d) an election of remedy; or (e) consent to the determination of the Minerals Debtors' liability to the Sureties by any particular court, including, without limitation, the Bankruptcy Court.

47.    Westchester reserves the right to raise any arguments raised by any other party in their pleadings at the hearing on the Motion to Dismiss and the Cross-Motion to Convert.

Content:

**DATED** this 19th day of September, 2016.

Respectfully submitted,

**MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

*/s/ Gary D. Bressler*
Gary D. Bressler, Esq. (DE Bar ID No. 5544)
300 Delaware Avenue, Suite 770
Wilmington, DE 19801
Telephone:     (302) 300-4514
Facsimile:     (302) 654-4031
Email: gbressler@mdmc-law.com


Louis A. Modugno, Esq.
Michael R. Morano, Esq.
1300 Mt. Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
Telephone:     (973) 993-8100
Facsimile:     (973) 425-0161
Email: lmodugno@mdmc-law.com
          mmorano@mdmc-law.com

*Attorneys for Westchester Fire Insurance Company*