UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                    .  Chapter 11
IN RE:                              .
                                    .  Case No. 15-11371 (CSS)
MOLYCORP MINERALS, LLC, et al,      .
                                    .  Courtroom No. 6
                                    .  824 Market Street
                                    .  Wilmington, Delaware 19801
              Debtors.              .
. . . . . . . . . . . . . . . . .   Monday, September 26, 2016


                    TRANSCRIPT OF STATUS CONFERENCE
            BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                    UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

Chapter 11 Trustee:          Paul E. Harner, Esq.
                             BALLARD SPAHR, LLP
                             300 East Lombard Street, 18th Floor
                             Baltimore, Maryland 21202

For the Chapter 11
Trustee:                     Tobey M. Daluz, Esq.
                             BALLARD SPAHR, LLP
                             919 North Market Street, 11th Floor
                             Wilmington, Delaware 19801

                             Vincent J. Marriott, III, Esq.
                             BALLARD SPAHR, LLP
                             1735 Market Street, 51st Floor
                             Philadelphia, Pennsylvania 19103

    (Appearances Continued)

Audio Operator:              Electronically Recorded
                             by Leslie Murin, ECRO

Transcription Company:       Reliable
                             1007 N. Orange Street
                             Wilmington, Delaware 19801
                             (302)654-8080
                             Email: gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES:   (Continued)

For the U.S. Trustee:          David L. Buchbinder, Esq.
                               OFFICE OF THE U.S. TRUSTEE
                               844 King Street, Suite 2207
                               Wilmington, Delaware 19801

For the Plan Debtors:          Justin H. Rucki, Esq.
                               YOUNG, CONAWAY, STARGATT
                                & TAYLOR, LLP
                               Rodney Square
                               1000 North King Street
                               Wilmington, Delaware 19801

                               Brad B. Erens, Esq.
                               JONES DAY, LLP
                               77 West Wacker Drive
                               Chicago, Illinois 60601

                               George R. Howard, Esq.
                               JONES DAY, LLP
                               250 Vesey Street
                               New York, New York 10281

For the Official Committee
of Unsecured Creditors:        Gregory A. Taylor, Esq.
                               ASHBY & GEDDES, PA
                               500 Delaware Avenue
                               Wilmington, Delaware 19899

                               Luc A. Despins, Esq.
                               PAUL HASTINGS, LLP
                               200 Park Avenue
                               New York, New York 10166

For Oaktree:                   Andrew Remming, Esq.
                               MORRIS, NICHOLS, ARSHT
                                & TUNNEL, LLP
                               1201 North Market Street
                               Suite 1800
                               Wilmington, Delaware 19801

                               Andrew M. LeBlanc, Esq.
                               MILBANK, TWEED, HADLEY
                                & MCCLOY, LLP
                               1850 K Street, NW, Suite 1100
                               Washington, D.C. 20006

(Appearances Continued)
```

```
APPEARANCES:  (Continued)

For Westchester Fire
Insurance:                    Gary D. Bressler, Esq.
                              MCELROY, DEUTSCH, MULVANEY
                               & CARPENTER, LLP
                              300 Delaware Avenue, Suite 770
                              Wilmington, Delaware 19801

                              Louis A. Modugno, Esq.
                              MCELROY, DEUTSCH, MULVANEY
                               & CARPENTER, LLP
                              1300 Mount Kemble Avenue
                              Morristown, New Jersey 07962

For the County of San
Bernardino:                   Joseph H. Huston, Jr., Esq.
                              STEVENS & LEE
                              1105 North Market Street, Suite 700
                              Wilmington, Delaware 19801

For the Ten Percent
Noteholders:                  Joshua K. Brody, Esq.
                              KRAMER, LEVIN, NAFTALIS
                               & FRANKEL, LLP
                              1177 Avenue of the Americas
                              New York, New York 10036

For Wells Fargo,
Collateral Agent:             J. Cory Falgowski, Esq.
                              REED SMITH, LLP
                              1201 Market Street, Suite 1500
                              Wilmington, Delaware 19801

For Lexon Insurance Co.:      Lee E. Woodard, Esq.
                              HARRIS BEACH, PLLC
                              333 West Washington Street
                              Suite 200
                              Syracuse, New York 13202

For the United
Steelworkers:                 Susan E. Kaufman, Esq.
                              LAW OFFICE OF SUSAN E. KAUFMAN
                              919 North Market Street, Suite 460
                              Wilmington, Delaware 19801

(Appearances Continued)
```

APPEARANCES VIA TELEPHONE:

For the Ten Percent
Noteholders:                    Andrew Dove, Esq.
                                KRAMER, LEVIN, NAFTALIS
                                 & FRANKEL, LLP

For the State Water
Resource Control Board:         Alex Fisch, Esq.
                                DEPARTMENT OF JUSTICE

For UMB Bank as 10 Percent
Note Trustee:                   Ian Hammel, Esq.
                                William W. Kannel, Esq.
                                MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
                                 & POPEO, PC

For the County of San
Bernardino:                     Christopher A. Minier, Esq.
                                RINGSTAD & SANDERS, LLP

INDEX

                                                    <u>Page</u>

<u>RESOLVED/ADJOURNED/UNCONTESTED MATTERS</u>                6

<u>POST-PETITION FINANCING MOTION</u>                         8
     <u>Court Decision</u>                                  19

<u>MOTIONS TO DISMISS/CONVERT WITHDRAWN</u>                 20

1          (Proceedings commence at 4:06 p.m.)

2          (Call to order of the Court)

3               THE COURT:  Please be seated.

4               Good afternoon.

5               COUNSEL:  Good afternoon.  Good afternoon, Your Honor.

6               THE COURT:  I'm doing -- sorry.  I'm looking at my --

7     trying to get organized here, and not doing a very good job of

8     it.

9               All right.  You may proceed.

10               MR. MARRIOTT:  Thank you, Your Honor.  Good afternoon.

11     Vince Marriott, Ballard Spahr, on behalf of Paul Harner as

12     Chapter 11 Trustee of the Molycorp Minerals Debtors.  With me

13     is my partner Toby Daluz.

14               THE COURT:  Okay.

15               MR. MARRIOTT:  It might be easiest if I started by

16     discussing the status of the various matters on the agenda.

17               THE COURT:  Okay.

18     *         MR. MARRIOTT:  The first matter listed on the agenda

19     is the motion of Molycorp, Inc., for relief from the automatic

20     stay, related to ongoing insurance coverage for Molycorp

21     Minerals.  That motion has been continued until the next

22     omnibus, which is October 27th, and the parties are in the

23     midst of discussions in an attempt to resolve that motion,

24     without the need to litigate it.

25               The next three matters are listed as "contested."  In

1    fact, however, it would appear that nothing that's contested

2    will need to go forward today.

3          The motion of the Chapter 11 Trustee for entry of a

4    final order authorizing secured financing, we have received no

5    objections.

6          The motion of the trustee for entry of an order

7    dismissing the Molycorp Minerals case will be mooted, assuming

8    that the order is entered approving the financing, and so it

9    will be withdrawn.

10          And the same is true of the cross-motion of Molycorp,

11    Inc., in response to the motion to dismiss, for, in the

12    alternative, conversion.

13          Notwithstanding the fact that the motion for an final

14    order authorizing secured financing is not contested, if the

15    Court would like, I would proceed with a brief discussion of

16    the background of that motion and, to the extent the Court

17    would like it, a proffer of Mr. Harner's testimony in support

18    of that motion.

19          THE COURT:  Okay.

20          MR. MARRIOTT:  If I may first approach, I'd like to

21    give you a red-lined order, which has one small change from

22    that which was filed on Wednesday, and a red-lined credit

23    agreement, which also has two small changes from that, which

24    was filed on Wednesday.

25          THE COURT:  Okay.  Thank you.

1      (Participants confer)

2          MR. MARRIOTT:  We have shared this with others in the

3     courtroom and with the U.S. Trustee, but have -- we have extra

4     copies, if there's anyone in the courtroom who wants one and

5     didn't get it.

6          And I will -- as we get to the relevant part of my

7     presentation, I will point to the Court the changes.

8     *          I will say, with the order, the only change was to

9     Footnote 2.  We originally contemplated simply referencing the

10    financing agreement, since we made changes to what was filed.

11    The order now contemplates that the credit agreement will be

12    attached.

13         Judge, as you know from Mr. Harner's prior

14    presentation to the Court, the trustee believes that there may

15    be substantial value in Mineral Corp -- Molycorp Minerals' mine

16    and processing plant, unblocking this value through a --

17    unlocking this value through a sale to an operator of the mine

18    and the processing plant; would have a dual advantage of

19    maximizing creditor recoveries and avoiding a remediation and

20    reclamation process that would be enormously expensive and

21    burdensome.

22         The challenge has been how to obtain the necessary

23    liquidity to keep the mine in its current state of cold idle,

24    thereby not triggering the loss of permits, reclamation

25    obligations, and the like, and continuing the administrative

1    functioning of this proceeding, while also conducting a proper

2    sale process over the time likely to be required to do so.

3         The original wind-down reserve was insufficient for

4    all of these purposes, together.  As a result, the trustee has

5    devoted substantial effort over the last few months toward two

6    objectives:  Securing the necessary liquidity and identifying

7    the appropriate professional to conduct the sale process.

8         Securing the necessary liquidity proved very complex,

9    and indeed, looked for a while to be impossible; hence, the

10   filing of a motion to dismiss.  Fortunately, in large part

11   through creative dialogue among the trustee, Lexon Insurance

12   and its affiliate Ironshore, which is the actual lender under

13   the credit agreement, and California regulators, most important

14   the California Regional Water Quality Control Board, a

15   liquidity solution was achieved and is before this Court today

16   for approval.  In a moment, I will speak to the proposed

17   financing in more detail.

18        Before I do so, Judge, I'd like to also advise the

19   Court that, in addition to having achieved a liquidity

20   solution, the trustee has identified an advisor to conduct the

21   marketing and sales process, and an application was filed last

22   week, seeking authority to approve the engagement of Batuta

23   Capital Advisors, LLC -- that's B-a-t-u-t-a -- on the terms set

24   forth in that application.  That will be heard by the Court at

25   the next omnibus, on October 27th.  But Batuta has agreed to

1    begin work immediately, and has, in fact, done so.

2          So, Judge, I'll now proceed with a proffer for the

3    post-petition financing.  If, at any point, I'm giving you more

4    than you care to hear, let me know and I'll proceed.

5          The motion titled:

6          "Motion Seeking Entry of a Final Order Authorizing

7          Secured and Unsecured Post-Petition Financing,

8          Granting Liens on Certain Insurance Proceedings, and

9          Approving Agreements with Lexon Insurance Company" --

10         As I mentioned, in fact, the agreements will be with a

11   Lexon affiliate, Ironshore Indemnity, LLC -- was filed on

12   August 30th, 2016.  Pursuant to the motion, the trustee seeks

13   relief pursuant to Sections 105, 361, 363(c)(2) and (e), and

14   364(b), (c)(2), and (c)(3).

15         If called to testify, Mr. Harner would testify that

16   he's the Chapter 11 Trustee of Molycorp Minerals, LLC, and

17   certain affiliates.  He was appointed to the position by the

18   United States Trustee on May 2nd, and this Court approved his

19   appointment on May 3rd.

20         He would testify that, since his appointment as

21   Chapter 11 Trustee, he has been devoting substantially all of

22   his effort to maintaining a cold idle status of the mine,

23   attempting to find the liquidity which we just discussed, and

24   attempting to secure the appropriate professional assistance in

25   marketing the facility for sale.

1   He believes, as he's testified previously, that -- and

2   as I indicated earlier, that the Mountain Pass mine assets may

3   have significant value, and there is certainly a real benefit

4   to keeping -- or placing the mine in the hands of an operator.

5   And for those two reasons, it has been the trustee's objective

6   to attempt to obtain the financing necessary to both maintain

7   the cold idle status, fund the cost of administration of the

8   case, and to conduct a marketing process of sufficient length

9   that, if there is a buyer out there willing to unlock the value

10  of the facility, there will be an adequate opportunity to find

11  out.

12  He would also testify, as I've referenced also,

13  earlier, that the 2.5-million-dollar wind-down reserve

14  initially available was insufficient for all of those purposes,

15  to move forward.

16  He would testify that he engaged in good faith

17  discussions with the sureties, the regulators, and other

18  parties regarding additional financing.  After negotiating

19  multiple proposals in the weeks leading to the filing of the

20  post-petition financing motion, he was able to reach an

21  agreement in principle with the lender Ironshore Indemnity,

22  Inc., under the terms and conditions described in the financing

23  motion, with some changes from the motion itself, although not

24  from the agreement that was filed on Wednesday, which I'll

25  discuss in a moment.

1    Mr. Harner is familiar with the assets and cash

2    position of the debtors and the terms of the financing

3    agreement, of which he seeks court approval today.

4    A true and correct copy of the proposed financing

5    agreement was just handed to the Court.  It differs in two

6    minor respects from what was filed at Docket Number 114.  It --

7    on Pages 3 and 4, it changes the phrasing of two definitions to

8    bring it into conformity with the terms, as they were defined

9    in the termsheet itself.  In other words, it's not a

10   substantive change from what was contemplated by the termsheet,

11   but it was pointed out to us that the agreement that was filed

12   defined two terms somewhat differently from the termsheet, and

13   those definitions were revised to bring them back into alliance

14   [sic] with the termsheet.  There have been no other changes

15   from what was filed under -- at Docket Number 114.

16   The basic economic terms of the proposed DIP financing

17   are as follows -- post-petition financing.  I keep saying

18   "DIP," it's not really DIP because we're not a debtor-in-

19   possession.  The basic economic terms of the proposed post-

20   petition financing are as follows:

21   The lender will provide to the Minerals Debtors a 1.5-

22   million secured administrative expense facility, in order to

23   meet the professional and other fees, costs, and expenses

24   associated with the administration of these Chapter 11 cases.

25   The lender will also provide an additional 2.7 million

1    in unsecured operating expense facility to satisfy any

2    obligations required, to abate any nuisance or pollution that

3    may exist, and to maintain the Mountain Pass mine in its

4    current state of cold idle.

5            The amount of these facilities may be increased to the

6    aggregate amount of up to $5 million as -- or as necessary for

7    the Mineral Debtors to maintain insurance coverage.

8            Here, we get to the first change from the financing

9    motion and the agreement that was filed last week and is before

10    you now.  Originally, it was only the lender that needed to

11    approve an increase in the amount of the facility within the

12    limits we were asking for.  As reflected in the revised credit

13    agreement, to increase the amount of the facility will also

14    require the consent of the California Regional Water Quality

15    Control Board.  You'll understand in a minute why they've asked

16    for that, and why we agreed to it.

17            Both of these facilities are not interest-bearing, and

18    do not require the payment of any commitment or other fees.

19            As security for the administrative expense facility,

20    the lender will receive a -- and here, we're going to get to

21    the second change -- a second priority lien on certain

22    insurance proceeds related to a failure of the debtors' leech

23    tanks, subject to any preexisting senior claims against those

24    insurance proceeds.

25            And I should tell you that those insurance proceeds

1    are not yet in hand.  The timing of when they will come and

2    what they will be and whether they will be achieved by a

3    settlement or litigation is all uncertain at this point.  And

4    that is, among other things, the risk that the lender is taking

5    in advancing us funds nominally secured by those insurance

6    proceeds.  We are in discussions with the insurers, we had a

7    meeting with them last week, we have another meeting with them

8    scheduled in a couple of weeks.  But that is an ongoing

9    negotiation about what those insurance proceeds will be, and

10   when or if they will come in.

11           Now you may recall, Judge, that, shortly after it was

12   determined that the Mineral Debtors would be severed from the

13   plan debtors, and the case had a Chapter 11 Trustee appointed

14   for the Mineral Debtors.  The sureties advanced $500,000 to

15   sort of bridge the time from -- when that decision was made,

16   until when the wind-down reserve would become available.

17           That $500,000 remains outstanding.  As part of the

18   terms of the financing -- well, that $500,000 is outstanding

19   and is secured by the wind-down reserve, which will be depleted

20   as -- to zero, as we go forward.  As replacement collateral for

21   the lien on the wind-down reserve, that $500,000 will be

22   secured, as well, by the insurance proceeds.

23           The original motion contemplated that that security

24   interest would be second behind the administrative expense

25   facility.  Based on negotiations among the sureties and

1   trustee, that priority has been flipped.  That flip is

2   reflected in the credit agreement, and is reflected in the

3   revised order.

4         So that the first lien -- again, subject to any

5   preexisting senior claims, the first lien is for the benefit of

6   the five-hundred-thousand-dollar sureties advance, and the

7   second lien on those proceeds is for the benefit of the

8   administrative expense facility.  That's the other change from

9   the motion, and is reflected in the credit agreement, and is

10  reflected in the revised order that was filed last week.

11        The other lien feature of the financing is that the

12  lender, if and when we get insurance proceeds that come in,

13  that, A, are not subject to senior liens; and B, are more than

14  what would be necessary to retire the securities advance -- the

15  sureties advance and the administrative expense facility,

16  should there be proceeds above all those amounts that are not

17  subject to senior claims, then half of those proceeds would be

18  delivered to the Lexon group as additional security for their -

19  - the existing bonds that they have for reclamation at the

20  facility.

21        The facilities mature upon the earlier of March 31st,

22  2017, the closing of a sale on substantially all of the Mineral

23  Debtors' assets, or failure to file a motion to approve a sale

24  to a stalking horse bidder on or before January 31st, 2017, the

25  conversion or dismissal of the my -- of the Mineral Debtors'

1    Chapter 11 cases, or an event of default.

2          Now neither of these facilities, neither the

3    administrative expense facility, nor the operating expense

4    facility, amortize.  In effect, the administrative expense

5    facility is repaid, if at all, from the insurance proceeds, if,

6    as, and when they come in.

7          The operating expense facility is also non-amortizing,

8    and is repaid by a unique feature that was the result of

9    negotiations between Lexon and the California Regional Water

10   Quality Control Board.  That 2.7 million facility, as sums are

11   advanced by Ironshore under that facility, on a dollar-for-

12   dollar basis, the penal sums of the bonds issued in favor of

13   the California Regional Water Quality Control Board will also

14   reduce by dollar.  So each dollar out under the loan reduces

15   the penal sum of those bonds by a dollar.

16          That's the reason why the water board wants some input

17   in whether or not the 2.7-million-dollar operating expense

18   facility moves up, since the -- there is an impact on the penal

19   sum of the bonds for every dollar lent under that facility.

20   That was the reason for that request, that was the reason we

21   agreed to it, and that's the reason why the credit agreement,

22   which contemplates that consent, is different from the

23   financing motion and the termsheet attached to the financing

24   motion, which did not contemplate that consent.

25          Mr. Harner would testify that, in his business

1  judgment, the financing requested in a post-petition financing

2  motion is essential to preserve and protect the value of the

3  Mineral Debtors' assets for all creditors, while he undertakes

4  an orderly and appropriate process to market and sell the

5  Mountain Pass facility, in hopes of maximizing value and

6  keeping it operating.  The Mineral Debtors' liquidity needs for

7  that purpose can only be satisfied if Mr. Harner is authorized

8  to borrow sums under the facilities that have been presented by

9  this motion.

10       Mr. Harner would testify that, except as offered by

11  the lender, the Minerals Debtors are unable to obtain unsecured

12  credit allowable under Sections 364(b) and 503(b)(1) of the

13  Bankruptcy Code.

14       Due to the secured debt and liens that encumber most

15  of the Mineral Debtors' assets, Mr. Harner has not been able to

16  obtain post-petition financing or other financial

17  accommodations under Section 364(c) of the Bankruptcy Code from

18  any alternative prospective lender or group of lenders, on

19  terms and conditions as or more favorable than those offered by

20  the lender.

21       Mr. Harner would testify that the proposed financing

22  is interest-free and, in large part, unsecured.

23       I should point out that, if we successfully sell the

24  facility, then the administrative expense facility is entitled

25  to, not a superpriority administrative claim, but an

1    administrative claim in that context.

2         Mr. Harner would testify, as I said, that the proposed

3    financing is interest-free and, in large part, unsecured.

4    There are no associated fees.  And the financing will be repaid

5    only to the extent that funds are available from the insurance

6    proceeds or from a sale.

7         The proposed financing does not provide the lender

8    with a superpriority claim, a priming lien requiring approval

9    under Section 364(d), a lien on avoidance action, or a Section

10   506(c) waiver, nor does it provide for the payment of the

11   lender's legal fees and expenses.

12        In short, Mr. Harner would testify that, in his

13   business judgment, entering into the proposed financing is in

14   the best interests of the Mineral Debtors, their estates, and

15   their creditors.  Mr. Harner believes that he exercised proper

16   and reasonable business judgment in reaching that conclusion.

17        Mr. Harner, having considered all reasonable possible

18   avenues to provide the Mineral Debtors with the liquidity

19   necessary to fund operations in the pursuit of an orderly sale,

20   believes that the financing agreement provides the best

21   likelihood of extracting the maximum possible value out of the

22   Mineral Debtors' assets, for the ultimate benefit of the

23   creditors and parties-in-interest.

24        On that basis, Your Honor, I invite any questions that

25   you might have, either for me or for Mr. Harner, that anybody

1   in the courtroom might have for either me or Mr. Harner.  And

2   otherwise, I have a clean copy of the revised order that I

3   could hand up.  And I would ask that the order be entered.

4           THE COURT:  All right.  Please approach.

5           Does anyone wish to cross-examine the witness?

6       (No verbal response)

7           THE COURT:  I have no questions.

8           Does anyone wish to be heard in connection with the

9   financing?

10      (No verbal response)

11          THE COURT:  Okay.  Let me just look at your black-line

12  here.

13      (Pause in proceedings)

14          THE COURT:  Okay.  On Page 6, at the very bottom of

15  your black-line, Paragraph 4, I'm striking "and directed" in

16  connection with -- which would require the filing officer to

17  file the document.  I'm not going to direct --

18          MR. MARRIOTT:  This is at the bottom of Page 6?

19          THE COURT:  Paragraph 4.

20      (Participants confer)

21          THE COURT:  It says:

22          "The lender may, in its discretion, file a certified

23           copy of this final order in any filing or recording

24           office.  And in such event, the filing or recording

25           officer is authorized and directed to file or record

1          such copy."

2          I'm striking "and directed."

3          MR. MARRIOTT:  Oh, you're striking "and directed."

4          THE COURT:  Yeah.

5          MR. MARRIOTT:  Okay.

6          THE COURT:  I'm not going to --

7          MR. MARRIOTT:  I thought you said I had stricken it,

8    and I didn't remember --

9          THE COURT:  No.

10         MR. MARRIOTT:  -- having done that.

11         THE COURT:  No, I'm doing it.

12         MR. MARRIOTT:  Okay.

13    (Laughter)

14    (Pause in proceedings)

15         THE COURT:  Okay.

16    (Pause in proceedings)

17         THE COURT:  I've signed the order as modified.

18         MR. MARRIOTT:  Thank you very much, Your Honor.

19         That -- in light of that, the motion of the trustee

20    for entry of an order dismissing the case is withdrawn.  And I

21    believe I can represent that Molycorp, Inc.'s cross-motion to

22    convert to Chapter 7 is also withdrawn.

23         THE COURT:  Somebody needs to say that.

24         MR. ERENS:  Good afternoon, Your Honor.  Brad Erens on

25    behalf of Neo transportation -- Neo Performance Materials --

1   excuse me -- formerly Molycorp.

2          Yes, we can confirm that our cross-motion is

3   dismissed, since the dismissal motion is also dismissed or

4   withdrawn.

5          THE COURT:  Okay.

6          MR. ERENS:  Thank you.

7          THE COURT:  If you both could file notices on the

8   docket, I'd appreciate it.

9          MR. MARRIOTT:  We will do that.

10          MR. ERENS:  Will do.

11          THE COURT:  Thank you.

12          MR. MARRIOTT:  Your Honor, I have nothing further,

13   unless you have something further for me.

14          THE COURT:  I don't.  Does anybody?  Mr. Despins is

15   just itching to say something, I can tell; he's got that look

16   in his eye.

17          MR. DESPINS:  Good afternoon, Your Honor.  This is

18   actually to save money.

19          Technically, the committee, in this case, still

20   exists, but I want to be candid with you.  We're -- the

21   unsecured creditors and unsecureds [sic] are so far behind so

22   much debt and all that, and there's a trustee appointed, so I

23   can't believe I'm saying that, but I'm wondering whether

24   there's really any purpose for the committee to continue in

25   existence in this case.

1          THE COURT:  Uh-huh.

2          MR. DESPINS:  And in light of this, would it be

3     appropriate for Your Honor to enter a consent order disbanding

4     the committee?  We're happy to stay in place, but we don't want

5     --

6          THE COURT:  Right.

7          MR. DESPINS:  We're kind of out of the game here.

8          THE COURT:  Right.  You need to -- I was going to say

9     -- I was going to ask if you've consulted with Mr. Buchbinder.

10         MR. DESPINS:  We -- I did, briefly.

11         MR. BUCHBINDER:  Good afternoon, Your Honor.  Dave

12    Buchbinder on behalf of the U.S. Trustee.

13         Mr. Despins did consult with me just immediately prior

14    to the hearing, and I suggest to him two things:  A, which I

15    didn't suggest to him at the time, the confirmation of the non-

16    Minerals Debtors plan acted to disband the committee as to

17    those debtors.  Mr. Despins is technically correct that,

18    because Minerals is still functioning as a Chapter 11, it still

19    has a committee.

20         But it is the Office of the United States Trustee that

21    appoints a committee, not the Court.  And I suggested to Mr.

22    Despins that perhaps the path of least resistance here, for

23    what he wants, is that, if the individual committee members

24    want to resign and submit their resignations, we shall act

25    accordingly.

1          MR. DESPINS:  Happy to do that, but I wanted Your

2    Honor to know what the background was.  So we'll do that, if --

3    unless Your Honor wants to --

4          THE COURT:  It's fine.

5          MR. DESPINS:  Okay.

6          THE COURT:  That sounds like an elegant solution.

7          MR. BUCHBINDER:  Thank you.

8          MR. DESPINS:  Thank you, Your Honor.

9          THE COURT:  Everybody resign.

10         Anything else?

11      (No verbal response)

12         THE COURT:  All right.  Thank you.  We're adjourned.

13   Have a good day.

14         UNIDENTIFIED:  Thank you, Your Honor.

15      (Proceedings concluded at 4:37 p.m.)

16                          *****

1                          <u>CERTIFICATION</u>

2              I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter to the best of my knowledge and ability.

5

6

7

8    <u>/s/ Coleen Rand                </u>        October 3, 2016

9    Coleen Rand

10   Certified Court Transcriptionist

11   For Reliable