**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MOLYCORP MINERALS, LLC, et al.,[1] | Case No. 15-11371 (CSS) |
| Debtors. | (Jointly Administered) |

**OBJECTION TO MOLYCORP, INC.'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO CANCEL PROPERTY AND CASUALTY INSURANCE POLICIES FOR THE ABOVE-CAPTIONED DEBTORS [RE: DOCKET NO. 79]**

Ironshore Indemnity, Inc., Lexon Insurance Co. and Bond Safeguard Insurance Co. (respectively "Ironshore", "Lexon" and "BSG"), (collectively, the "Sureties"), by and through their undersigned counsel, Harris Beach PLLC, and their local counsel, The Powell Firm, LLC, submit this Objection (the "Objection") to Molycorp, Inc.'s ("Molycorp") Motion for Relief from the Automatic Stay to cancel Molycorp's property and casualty insurance policies (the "Insurance Policies"), effective no later than September 30, 2016, which currently provide coverage for the debtors in the above-captioned proceedings (the "Molycorp Mineral Debtors") (the "Motion" or "Motion for Relief"), and respectfully state as follows:

## I. PRELIMINARY STATEMENT

Just prior to the time that the bankruptcy proceedings of Molycorp and certain affiliates (the "Reorganizing Molycorp Debtors") were separated from the bankruptcy proceedings of the Molycorp Minerals Debtors on April 13, 2016, Molycorp voluntarily arranged for the payment of

---

[1] The Debtors are the following 6 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Industrial Minerals, LLC; Molycorp Advanced Water Technologies, LLC (1628); Molycorp Minerals, LLC (4170); PP IV Mountain Pass, Inc. (1205); PP IV Mountain Pass II, Inc. (5361), RCF IV Speedwagon Inc. (0845).

the Insurance Policies for a full year with the proceeds of the debtor in possession financing facility approved in the Reorganizing Molycorp Debtors' bankruptcy cases (the "DIP Proceeds").

Molycorp is now seeking relief from the automatic stay to cancel those Insurance Policies and receive any refund applicable to the Molycorp Minerals Debtors' coverage that was previously paid from the DIP Proceeds.

The Sureties oppose the Motion for Relief because the payment for the Insurance Policies was a voluntary payment for all of the jointly operating debtors at the time, which included both the Molycorp Mineral Debtors and Reorganizing Molycorp Debtors, and Molycorp should not be allowed to strip away the coverage provided by the Insurance Policies to the Molycorp Mineral Debtors. The coverage was in place when the Chapter 11 Trustee was appointed, and the issue should have been raised at that time. Molycorp should be estopped from raising it now and should not be permitted to divert funds from maintaining the safety of the Facility and from the Chapter 11 Trustee's sales efforts. In addition, since the Insurance Policies purchased by Molycorp benefited the Molycorp Mineral Debtors' estates, Molycorp may be entitled to an administrative expense claim and should be treated as any similarly situated holder of an administrative expense claim. Lastly, Molycorp, while alleging that the aggregate premium of the Insurance Policies is $2,500,064, of which the alleged portion of the Molycorp Minerals Debtors was $2,035,004, has not presented any evidence as to the accuracy or validity of those figures.

## BACKGROUND

1. On June 25, 2015 (the "Petition Date"), Molycorp and those of certain of its affiliates, including the Molycorp Minerals Debtors (the "Original Molycorp Debtors") commenced with this Court a voluntary case under Chapter 11 of Title 11 of the United States

Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2. The Original Molycorp Debtors' business operations relate, *inter alia*, to mining, preparation and sale of global rare earths products. The Original Molycorp Debtors' operations are conducted around the world, including the Mountain Pass Facility in California ("Mountain Pass"). Rare earth mining is conducted at Mountain Pass. The entire operation with equipment leased by Oaktree to the Original Molycorp Debtors is referred to as the "Molycorp Minerals Assets."

3. The other operations of the Original Molycorp Debtors are: (a) magnetic materials and alloys ("MM&A"); (b) chemicals and oxides ("C&O"); and (c) rare metals ("RM").

4. The Original Molycorp Debtors' mining operations are regulated by state and federal environmental and mine safety laws, including the California Surface Mine and Reclamation Act of 1975 ("SMARA"), Cal Public Resources Code §2710 *et seq*. One of the primary purposes of SMARA is to assure that: "(a) adverse environmental effects are prevented or minimized and that mined lands are reclaimed to a usable condition which is readily adaptable for alternative land uses; (b) the production and conservation of Minerals are encouraged, while giving consideration to values relating to recreation, watershed, wildlife, range and forage, and aesthetic enjoyment; and (c) residual hazards to the public health and safety are eliminated." Id. at §2712.

5. Section 2770(a) states: "Except as provided in this section, a person shall not conduct surface mining operations unless a permit is obtained from, a reclamation plan has been submitted to and approved by, and financial assurances for reclamation have been approved by, the lead agency for the operation pursuant to this article." Id. at §2770(a).

### A. Ironshore, Lexon and BSG

6. Ironshore, Lexon and BSG provide certain of the requisite financial assurance on behalf of the Molycorp Minerals Debtors in connection with a reclamation plan.

7. As of the Petition Date, Ironshore, Lexon and BSG had outstanding Surety bonds issued on behalf of the Molycorp Minerals Debtors with penal sums totaling approximately $13 million (the "Ironshore Bonds") as follows:

| Principal | Surety | Bond No. | In Favor Of: | Project/Purpose | Updated Penal Sum |
|---|---|---|---|---|---|
| Molycorp Minerals, LLC | Ironshore | SUR 6000142 | California Regional Water Quality Control Board – Lahontan Region | Waste Management, 67750 Bailey Road | $8,172,575.00 |
| Molycorp Minerals, LLC | Ironshore | SUR 6000143 | California Regional Water Quality Control Board – Lahontan Region | Waste Management, 67750 Bailey Road | $3,935,018.00 |
| Molycorp Minerals, LLC | Lexon | 1084010 | Radiologic Health Brand of CA State Dept. of Public Health | Radioactive Materials, 67750 Bailey Road | $1,125,000.00 |

8. In connection with the issuance of the Ironshore Bonds, Molycorp (the "Indemnitor Debtor") executed a General Agreement of Indemnity dated November 7, 2011 (the "Ironshore Indemnity Agreement") whereby the Indemnitor Debtor agreed to indemnify and/or exonerate Ironshore, Lexon and BSG in connection with all bonds issued by Ironshore, Lexon and BSG on behalf of the Bonded Debtors.

9. Ironshore, Lexon and BSG's claims arise from the Ironshore Indemnity Agreement and/or exoneration rights at common law, and potential equitable subrogation rights.

### B. The Bond Motion

10. After the Petition Date, due in large part to a Notice of Violation from the Land Use Services Department of San Bernardino County, the Original Molycorp Debtors filed a

4

Motion for an Order Pursuant to Sections 105, 363, and 364 of the Bankruptcy Code authorizing Debtors to renew and cause the issuance of certain Surety Bonds with Lexon and Ironshore (the "Bond Motion").

11. The Bond Motion sought authorization for two actions: (a) renewal of the Bonds upon their expiration in October and November (the "Renewal Bonds"); and (b) issuance of an additional bond in the amount of $9,048,610.00 by Ironshore and the posting of $7.5 million in collateral by the Original Molycorp Debtors (the "New San Bernardino Bond", collectively, with the "Renewal Bonds", the "Bonds").

12. The Original Molycorp Debtors have acknowledged, by virtue of the Bond Motion, that the financial assurances provided by the Sureties are a critical component to the ongoing operations at Mountain Pass. *See* Reply of Original Molycorp Debtors to the Bond Motion, ¶ 4 (Dkt. 692). As noted, San Bernardino County has issued permits to the Debtor in connection with a reclamation plan. The reclamation plan and accompanying permits require that financial assurances such as the Bonds remain in place.

13. The Original Molycorp Debtors noted in the Reply to the Bond Motion that San Bernardino County has the ability in certain circumstances to revoke the conditional use permits and has certain administrative penalties for violation of SMARA. *See* Reply of Original Molycorp Debtors to Bond Motion, ¶¶ 10 and 11.

14. The Original Molycorp Debtors also noted that the "revocation of applicable permits is a dire consequence for a mining operation. In fact, many mine operators consider their permits to be the most valuable asset they own – even more valuable than the ore deposits themselves. This is because obtaining all the permits required for a surface mining operation like the ones at issue here, or re-permitting a site that has lost its permits, is an extremely difficult,

5

demanding, and expensive process under Federal, State, and local law. Indeed, the revocation of the Conditional Use Permit can cause a domino effect that results in the revocation of expiry of a site's other permits." Reply of Original Molycorp Debtors to Bond Motion, ¶ 12.

15. Similarly, the Original Molycorp Debtors noted the significant time and cost in obtaining permits. Specifically, they stated "for an operation as complex as Mountain Pass, the Debtors believe it would take as many as 10 years to re-obtain the requisite permits. Worst of all, there is a possibility that Mountain Pass would not succeed in these permitting processes and/or litigation." Reply of Original Molycorp Debtors to Bond Motion, ¶ 13.

16. An Order Authorizing the Original Molycorp Debtors to renew or cause the insurance of certain Surety bonds with Lexon and Ironshore was entered on October 26, 2015. (Dkt. 725).

17. As a result, Lexon and Ironshore issued another bond in the amount of $9,048,610.00 in favor of San Bernardino County.

**C. The Motion for Relief**

18. As the Court is aware, the Original Molycorp Debtors' own bankruptcy cases were consolidated for procedural purposes after the filing of voluntary bankruptcy petitions by all of the relevant entities on the Petition Date. Each of the Molycorp entities thereafter undertook an effort to reorganize, which included the potential sale of Mountain Pass owned by Molycorp Minerals, LLC. Unfortunately, a buyer did not emerge to purchase Mountain Pass.

19. While the Reorganizing Molycorp Debtors were reorganizing under a Chapter 11 plan that was confirmed on April 8, 2016, conversion of Molycorp Minerals Debtors' Chapter 11 cases was initially sought around that time by the filing of a Motion for Conversion to Chapter 7 on April 8, 2016 (Dkt. 1581).

20. Prior thereto, on March 25, 2016, the Original Molycorp Debtors, an ad hoc group of holders of the Original Molycorp Debtors' 10% Senior Secured Notes (the "Ad Hoc 10% Noteholders"), Oaktree and the official committee of unsecured creditors appointed in the Original Molycorp Debtors' bankruptcy cases (the "Creditors Committee"), entered into a settlement agreement (the "10% Noteholder Group Settlement"), which, among other things, provided for a reserve for certain costs including, *inter alia*, winddown of Chapter 7 costs attributable to the Molycorp Minerals Debtors, as set forth in Exhibit "3" to the 10% Noteholder Group Settlement. (Dkt. 1495-1).

21. The Sureties objected to conversion of the Molycorp Minerals Debtors' cases to Chapter 7 and instead sought the appointment of a Chapter 11 Trustee for the Molycorp Minerals Debtors. (Dkt. 1596). Negotiations ensued among the parties, including the main secured creditor constituencies of the Original Molycorp Debtors – Oaktree and the Ad Hoc 10% Noteholders. Ultimately, a consensual arrangement was reached whereby the parties agreed to the appointment of a Chapter 11 Trustee, and the Molycorp Minerals Debtors were provided with an estimated two months of cash so that the Chapter 11 Trustee could again explore a sale of Mountain Pass in lieu of an immediate shut down. (Dkt. 1611).

22. Prior to the time that Reorganizing Molycorp Debtors confirmed their Chapter 11 plan on April 8, 2016, the renewal of Molycorp's property and casualty insurance came due. See Motion for Relief, Allen Declaration ¶ 5. Historically, Molycorp had purchased, on a yearly basis, property and casualty insurance policies for itself and many of its subsidiaries (with certain limited exceptions for some foreign subsidiaries) and paid the full yearly premiums for such policies on or around the date the policies were issued, or arranged for financing such premiums. See Motion for Relief, Allen Declaration ¶ 6. Such was the case in March 2016, just before

confirmation of the Reorganizing Molycorp Debtors' Chapter 11 plan, when Molycorp arranged for the purchase, for itself and many of its affiliates, including the Molycorp Minerals Debtors, property and casualty policies effective April 1, 2016 through March 31, 2017 at an alleged aggregate premium of $2,500,064.  Id.  The alleged portion of the insurance premium attributable to the Molycorp Minerals Debtors was $2,035,004.  Id.

23. According to Molycorp, at the time the policies were obtained, Molycorp still operated jointly with Molycorp Minerals Debtors, and Molycorp chose to include the Molycorp Minerals Debtors in the insurance renewals and arrange for the payment for the Molycorp Minerals Debtors' portion of the insurance premiums from the DIP Proceeds.  Id. at ¶ 7.

24. According to Molycorp in its Motion for Relief, "in late March 2016, it was not fully clear what the ultimate resolution would be in these bankruptcy cases with respect to Mountain Pass and, in any case, leaving the Molycorp Minerals Debtors without any property and casualty insurance would not have been prudent and likely would have violated the requirements of the Office of the United States Trustee that all debtors in possession maintain adequate insurance.  "See 3 United States Trustee Program Policy and Practices Manual, Chapter 11 Case Administration § 3-3.2.3 (July 2016)."

25. On April 13, 2016 the date of appointment of Paul E. Harner as Chapter 11 Trustee, Molycorp was well aware that it had paid the annual insurance premiums for the Molycorp Minerals Debtors, but failed to raise the issue at that time.  At this juncture, Molycorp should be estopped from its efforts to divert Molycorp Minerals' funds from maintaining safety through the bare bones operations at Mountain Pass, and interfere in the Trustee's sale process that is now well underway.

8

26. Molycorp alleges that as of the time of the hearing on this Motion, it is expected that Molycorp will have emerged from Chapter 11 and, in connection therewith, Molycorp will be dissolved and the Reorganizing Molycorp Debtors will no longer have an ownership interest in the Molycorp Minerals Debtors.

27. Molycorp, by this Motion, seeks to have the stay lifted to permit Molycorp to cancel the Insurance Policies and obtain a refund of the premium applicable to the Molycorp Minerals Debtors' coverage after the date of such cancellation. In return Molycorp would agree not to cancel the Insurance Policies until September 30, 2016 (which date has now passed) on the condition that Molycorp Minerals Debtors, upon entry of an order on the Motion, reimburse Molycorp for the cost of the insurance for the month of September 2016 (allegedly equal to $169,584). Molycorp also seeks to preserve its right to seek reimbursement as an administrative claim in the Molycorp Minerals Debtors' cases for the cost of the Molycorp Minerals Debtors' Insurance for the months of May through August 2016. For the reasons set forth below. Molycorp's Motion for Relief should be denied in its entirety.

## II. ARGUMENT

### A. THE MOTION FOR RELIEF SHOULD BE DENIED

28. Molycorp is requesting that this Court lift the stay so that it will no longer have to pay for the Insurance Policies of Molycorp Minerals Debtors, even though Molycorp admits that at the time it purchased the Insurance Policies it had an obligation to do so.

29. In its Motion, Molycorp admitted that leaving the Molycorp Mineral Debtors "without any property and casualty insurance would not have been prudent and likely would have violated the requirements of the Office of the United States Trustee that all debtors in possession maintain adequate assurance." See Motion for Relief ¶ 6.

30. Molycorp is now seeking to strip away the insurance coverage it has already voluntarily paid for the Molycorp Mineral Debtors simply because it does not feel like it should have paid for it in the first place.

31. Molycorp made the premium payments as the parent company for the benefit of the Original Molycorp Debtors and is now seeking to cancel the Insurance Policies only as to the Molycorp Minerals Debtors and presumably not to the Reorganizing Molycorp Debtors.

32. Molycorp voluntarily made the payments for the Insurance Policies to the benefit of the Molycorp Mineral Debtors' estate. Molycorp was well aware that the payment had been made when the Chapter 11 Trustee was appointed and should have raised the issue at that time. Instead, Molycorp is now seeking to divert the Molycorp minerals' estates funds from the care and maintenance of the Facility and the sale process that is ongoing. Such a result is simply inequitable.

33. The Sureties recognize those insurance payments and the amount expended should presumably be treated as an administrative expense claim.

34. However, Molycorp should be treated as any similarly situated holder of an administrative expense claim and should not be allowed to now terminate its obligation to its former affiliated companies.

35. Allowing Molycorp, the holder of an administrative claim, to lift the stay to terminate its dealings with the Molycorp Minerals Debtors would send a message to other creditors that hold an administrative expense claim that it can do the same.

36. Administrative expense claims are given to creditors who provide a benefit to the bankrupt estate so that it can continue to operate its business in an attempt to reorganize.

37. Allowing holders of administrative claims to terminate their dealings and/or contracts with a debtor simply because the holder of the claim no longer wishes to make payments it obligated themselves to, would provide the debtor with little to no consistency in which to attempt to reorganize. This goes against the fundamental principles of the Bankruptcy Code.

38. In addition, Molycorp is alleging that Molycorp Minerals Debtors represent $2,035,004 of the $2,500,064 of the aggregate premium it paid for the Insurance Policies. Evidently, according to the Debtors, one month of coverage for Molycorp Minerals Debtors costs $169,584. In support of its Motion for Relief Molycorp has attached as exhibits: (A) a Proposed Order; (B) Declaration of James S. Allen; (C) Certificates of Insurance for the Insurance Policies; and (D) a Proposed Reimbursement Agreement. Nowhere in Molycorp's Motion or the exhibits is there evidence of the figures that Molycorp represents are the costs of the Insurance Policies for Molycorp Minerals Debtors.

39. Furthermore, according to the Declaration of James S. Allen, Senior Vice President of Finance and Treasurer of Molycorp, Inc., the premiums for the Insurance Policies purchased by Molycorp that are the subject of this Motion were prepaid. See Motion for Relief, Allen Declaration ¶ 6.

40. As a result, there is no new money that Molycorp has to spend related to the Insurance Policies for the Molycorp Mineral Debtors. The only thing left to administer is Molycorp's administrative expense claim for the Insurance Policies.

41. For the reasons stated above, Molycorp's Motion for Relief should be denied in its entirety.

42. To the extent not inconsistent with this Objection, the Sureties join in the Chapter 11 Trustee's Objection to Molycorp's Motion for Relief.

11

## B. RESERVATION OF RIGHTS

The Submission of this Objection by the Sureties is not intended as, and shall not be construed as: (a) the Sureties' admission of any liability or waiver of any defenses or limitation of any rights of Sureties with respect to any claims against any one or more of the Bonds or under the Indemnity Agreement; (b) the Sureties' waiver or release of any right to exoneration it may have against anyone with respect to its obligations pursuant to the Bonds; (c) the Sureties' waiver or release of its right to be subrogated to the rights of one or more of the parties paid pursuant to the Bonds; (d) an election of remedy; or (e) consent to the determination of Debtors' liability to the Sureties by any particular court, including, without limitation, the Bankruptcy Court.

## C. CONCLUSION

WHEREFORE, for all of these reasons, the Sureties request that the Court deny the Motion, and grant relief consistent with the foregoing.

Dated: October 17, 2016
THE POWELL FIRM, LLC

/s/ Jason C. Powell
Jason C. Powell, Esq. (No. 3768)
1201 N. Orange Street, Suite 500
P.O. Box 289
Wilmington, DE 19899
Telephone: (302) 650-1572
Facsimile: (302) 650-1574
Email: jpowell@delawarefirm.com
*Local Counsel for Ironshore Indemnity, Inc., Bond Safeguard Insurance Co. and Lexon Insurance Co*

Harris Beach PLLC
Wendy A. Kinsella, Esq.
Lee E. Woodard, Esq.
333 West Washington St.
Suite 200
Syracuse, NY 13202
(315) 423-7100
(315) 422-9331 (fax)
wkinsella@harrisbeach.com
lwoodard@harrisbeach.com

And

Harris Beach PLLC
Bruce L. Maas, Esq.
99 Garnsey Road
Pittsford, NY 14534
(585) 419-8650
(585) 419-8811 (fax)
bmaas@harrisbeach.com
*Counsel for Ironshore Indemnity, Inc., Bond Safeguard Insurance Co. and Lexon Insurance Co.*