**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------x
: 
In re : Chapter 11
: 
MOLYCORP MINERALS, LLC, *et al.*,[1] : Case No. 15-11371 (CSS)
: 
Debtors. : (Jointly Administered)
: 
------------------------------------------------------x
Hearing Date:  October 27, 2016 at 10:00 a.m. (ET)
Related to Docket Nos. 79, 136, 137 & 139

**REPLY TO OBJECTION OF CHAPTER 11 TRUSTEE**
**TO MOTION OF MOLYCORP, INC. FOR RELIEF FROM THE AUTOMATIC STAY**

Neo Performance Materials ("NPM"), as successor to the rights of Molycorp, Inc. ("Molycorp") under the insurance policies relevant to this matter (the "Insurance Policies"), hereby files this reply (this "Reply") to the objection (the "Objection") of Paul Harner [Docket No. 139], the chapter 11 trustee (the "Trustee") for the above-captioned debtors (the "Minerals Debtors"), to NPM's motion to lift the automatic stay under section 362(d)(1) of the Bankruptcy Code (the "Motion").[2]

While not addressing the substantive relief requested by the Motion in a direct manner, the Trustee argues instead that the Motion should be denied because (1) the Trustee views the Motion as one for payment of an administrative claim and (2) affiliates of Oaktree Capital Management have both a majority interest in NPM and indirect interests in liens against

---

[1]  The Debtors are the following 6 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Industrial Minerals, LLC; Molycorp Advanced Water Technologies, LLC (1628); Molycorp Minerals, LLC (4170); PP IV Mountain Pass, Inc. (1205); PP IV Mountain Pass II, Inc. (5361); RCF IV Speedwagon Inc. (0845).

[2]  This Reply also addresses the objections to the Motion [Docket No. 136 and 137] of the various sureties for the Minerals Debtors (the "Sureties").

the Minerals Debtors. The former argument is incorrect, as described herein, and the latter argument is not relevant to the relief sought in the Motion.[3]

Instead, the Motion should be granted because failing to do so:

1) Would effectively "punish" Molycorp for attempting to do the right thing in stabilizing the Minerals Debtors at the time when those debtors were on the verge of conversion to chapter 7 by converting the upfront efforts into an open-ended commitment;

2) Would unjustly enrich the Minerals Debtors by forcing NPM to continue to pay for their insurance even though:

   a) NPM no longer has a legal interest in those debtors;

   b) The Minerals Debtors are now pursuing a long-term, going-concern sale of their assets in chapter 11 for the benefit primarily of the Sureties, who thusly, should be funding the costs — including insurance — of a process being run for their benefit; and

   c) The Trustee now has access to court-approved financing from the Sureties, structured expressly to give the Trustee the funds to pay for such insurance.

3) Would give the Minerals Debtors more rights than they would have under state law outside of chapter 11, in violation of general bankruptcy principles.

The Trustee and, in particular, the Sureties would like for NPM to continue to pay for the Minerals Debtors' insurance. Indeed, what party would not like someone else to pay for its obligations, especially in a situation of distress? But for the reasons set forth above, such result simply is not justified. Accordingly, the Motion should be granted.

In further support of this Reply, Molycorp incorporates the Declaration of James S. Allen (the "Allen Declaration"), attached as Exhibit B to the Motion, and states as follows:

---

[3] The Sureties additionally argue that NPM should be estopped from pursuing the relief sought in the Motion, without any law or reasoning to support that position. As such, their objection is equally baseless.

01:19441958.1

NAI-1502018095v8                                2

**Background Facts**

1. As noted in the Allen Declaration, just prior to the time that Molycorp confirmed its chapter 11 plan on April 8, 2016, the yearly renewal of its property and casualty insurance came due. Allen Declaration, ¶ 5. Accordingly, in March 2016, Molycorp arranged for the purchase for itself and certain of its affiliates, including the Minerals Debtors, of property and casualty policies effective April 1, 2016 through March 31, 2017, at an aggregate premium of $2,500,064. Allen Declaration, ¶ 6. Approximately 80% of the insurance premium ($2,035,004) was attributable to the Minerals Debtors. Id.

2. At the time the policies were obtained, the Minerals Debtors had effectively no operating cash of their own, as their operations had been shut down. Instead, the Minerals Debtors' expenses were being funded by Molycorp — essentially through the debtor-in-possession financing facility in its own chapter 11 case. While at the time it could be envisioned that the Minerals Debtors' cases could be converted to chapter 7, it did not appear to Molycorp that the right thing to do was to simply leave the Minerals Debtors without any insurance, thereby forcing a chapter 7 trustee to deal with the issue. Instead, it appeared that the right thing to do was to include the Minerals Debtors in Molycorp's yearly renewal of property and casualty insurance.

3. Soon after Molycorp renewed its insurance, the Minerals Debtors filed, on April 8, 2016, a motion to convert their cases to chapter 7. The Sureties objected to conversion and instead sought the appointment of a chapter 11 trustee to determine if a new sale process for the Minerals Debtors' Mountain Pass facility could be conducted. Such a sale process would, at very least, delay the calling of the Sureties' approximately $40 million in bonds for Mountain

Pass and, if successful, could ultimately prevent such bonds from ever being called. Paul Harner was appointed as the chapter 11 trustee in May 2016.

4.      In June 2016, Molycorp began discussions with the Trustee regarding the Trustee reimbursing Molycorp on a monthly basis for the cost attributable to insuring the Minerals Debtors under the Insurance Policies, or otherwise coming to some resolution that would have the Minerals Debtors be responsible for their own insurance coverage. <u>Allen Declaration</u>, ¶ 8. However, as of the time of filing the Motion, the Trustee had not agreed to reimburse Molycorp for any cost of the insurance or otherwise have the Minerals Debtors pay or arrange for such insurance themselves. <u>Id</u>. Presumably, the Trustee's unwillingness was at least, in part, a function of his belief that he did not have the funds to pay for such insurance. Recently, however, this Court approved post-petition financing for the Minerals Debtors that expressly provides a mechanism for the Trustee to seek funds in order to pay, or reimburse Molycorp, for the exact insurance at issue.[4]

5.      While the Motion has been pending, Molycorp's plan of reorganization became effective, as of August 31, 2016. As a result thereof, Molycorp was dissolved and all interests it may have had in the Minerals Debtors were extinguished.

**None of the Objections Raise Any Substantive Justification to Deny the Motion**

6.      The Trustee first argues that the Motion should be denied because it views the Motion as seeking immediate payment of an administrative claim. <u>Objection</u>, ¶ 17. The Motion, however, seeks to cancel the Insurance Policies; it does not seek any payment from the Trustee. Any refund from cancellation of the Insurance Policies would come from the insurance

---

[4]     <u>See</u> Docket No. 114-1, Loan and Security Agreement, § 2.4(b), (c) (lender, with the consent of the California Water Board, is required to increase the financing facility "as shall be necessary for the Borrower to maintain insurance covering casualty loss and other customary risks associated with the Mountain Pass Facility . . . ").

01:19441958.1

NAI-1502018095v8                                            4

carrier. While less relevant, it is not even clear that the cost of the Minerals Debtors' insurance would be part of NPM's superpriority administrative claim, since the bulk of that premium was paid directly by Molycorp. In any case, given the realities of the Minerals Debtors' cases, any such administrative claim would be worthless.

7.  The Trustee would argue that allowing NPM to receive an insurance refund, and causing the Trustee to pay for its own insurance, is the same thing as causing the Trustee to pay NPM for the cost of such insurance. But that argument *presumes* that the Trustee is entitled to have NPM continue to pay for the insurance in the first place. While characterizing NPM's current position as an effective re-trade, the Trustee cites to no actual agreement to support any such right, other than NPM's refusal to raise this as a roadblock months ago. As such, the Trustee assumes away the entire dispute before the Court and, therefore, does not address the cause that NPM asserts as grounds to lift the stay.

8.  The Trustee next argues that the Motion should be denied because different affiliates of Oaktree Capital Management own 92.5% of NPM and indirectly hold liens on substantially all of the assets of the Minerals Debtors. <u>Objection</u>, ¶ 21. Essentially, the Trustee is arguing that the Motion should be denied because one Oaktree entity (an entity that is not the primary shareholder of NPM) could benefit from the denial of the Motion. That argument is unavailing. The fact that NPM's primary equity owner may also be an affiliate of an entity with an indirect lien on the Minerals Debtors' assets (who may, thus, benefit from the Insurance Policies) is not grounds to deny the Motion.

9.  Indeed, the various Oaktree entities, NPM and the Minerals Debtors are all separate legal entities. NPM, on its own behalf (and for the benefit of numerous stakeholders other than Oaktree), seeks approval of the Motion. And neither Oaktree, nor any of its affiliates,

has objected to the relief sought in the Motion. In fact, notwithstanding the Trustee's warning that it may seek to surcharge collateral if it is required to pay for its own insurance (Objection, ¶ 22), no creditor with a lien in that collateral has objected to the Motion. Not surprisingly, the only other parties that objected to the Motion were the Sureties. That is because if the Minerals Debtors are required to pay for their own insurance — as they should be in order to run a going concern sale process for the primary benefit of the Sureties — it is likely that the Sureties will, and should, have to fund the cost of that insurance.[5]

### The Equities Clearly Favor the Granting of the Motion

10. There are several related reasons why the Motion should be granted. Many of these reasons are essentially "equitable." As noted, Molycorp included the Minerals Debtors in its yearly insurance renewal, even though the Minerals Debtors' insurance was approximately four times the cost of its own, because it appeared to be the right thing to do at the time. The Minerals Debtors were in a precarious position, with no apparent buyer for their assets and on the verge of a chapter 7 conversion. As counsel noted to the Court at the time, Molycorp worked very hard to help ensure that any transition to chapter 7 would be proper. This included negotiating from the Minerals Debtors' secured creditors a $2.5 million fund to bridge a chapter 7 trustee for approximately two months until the Sureties' approximately $40 million in bonds could be drawn.

---

[5] As noted, the Sureties objected to the Motion on the additional ground that NPM should be "estopped" from prosecuting the Motion. The basis that the Sureties assert is apparently that Molycorp should have sought to terminate the Minerals Debtors' insurance when the motion to convert the Minerals Debtors' cases was filed. Sureties Objection, p.2. The Sureties cite no law for their position, or even the elements of whatever form of estoppel they appear to be asserting. As such, there is no legal basis for their position. In any case, what the Sureties are arguing is that Molycorp should have made the Minerals Debtors' situation even worse than it was at the time when those debtors were on the verge of conversion, rather than, as NPM has stated, trying to do the right thing by stabilizing the Minerals Debtors. NPM did not bring the Motion for several months after it separated from the Minerals Debtors and until those debtors had sufficient time to stabilize, as well as find the financing to continue in chapter 11. This "delay" was only to NPM's own prejudice, as it reduced substantially the insurance refund which NPM could obtain, and instead benefitted the Sureties. As such, the position of the Sureties is, among other things, non-sensical.

11. Including the Minerals Debtors in its yearly renewal of property and casualty insurance was simply another part of Molycorp's attempt to stabilize the Minerals Debtors. Leaving the Minerals Debtors without any insurance would have created the type of havoc for a chapter 7 trustee (and the Minerals Debtors themselves) that Molycorp sought to avoid. Molycorp sought to avoid this result, not because it somehow was primarily for its own advantage, but because it was the proper thing to do. Molycorp was on the verge of reorganizing under chapter 11 and separating from the Minerals Debtors. As such, it would have been easy to essentially discard the Minerals Debtors and incur no time or expense on their behalf. But that is not what Molycorp did. Circumstances have now changed substantially, but the Trustee and the Sureties still want Molycorp to continue to fund their insurance obligations. Such a result would "punish" Molycorp for doing the right thing at the time the Minerals Debtors were most vulnerable.

12. Moreover, denying the Motion would unjustly enrich the Minerals Debtors. Under Delaware law, unjust enrichment exists if there is: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification for the enrichment; and (5) the absence of a remedy provided by law.[6] The Minerals Debtors are enriched because they are not paying for their own insurance. NPM is impoverished because it is paying for the insurance without any benefit whatsoever to itself. The enrichment and impoverishment are obviously related. There is an absence of justification for the enrichment, because, as stated:

---

[6] LCT Capital, LLC v. NGL Energy Partners LP & NGL Energy Holdings LLC, No. N15C-08-109 WCC CCLD, 2016 WL 5793724, at *8 (Del. Super. Oct. 3, 2016) (citing Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010)); Mehta v. Smurfit-Stone Container Corp., No. 6891-VCL, 2014 WL 5438534, at *5 (Del. Ch. Oct. 20, 2014) (noting that where a contractual relationship is involved, "if the claim is not conceptualized as a contractual violation, then there is an absence of a remedy at law, creating a gap for the doctrine of unjust enrichment to fill").

a) NPM no longer has even a legal interest in the Minerals Debtors;

b) The Minerals Debtors are now pursuing a long-term, going-concern sale of their assets in chapter 11 for the benefit primarily of the Sureties, who instead should be funding the costs, including insurance, of a process being run for their benefit; and

c) The Trustee now has access to court-approved financing from the Sureties, structured expressly to give the Trustee the funds to pay for such insurance.

13. As to the financing, the Trustee may argue that access to such financing is not guaranteed. Instead, under the Minerals Debtors' financing facility, funds are available to pay for insurance only if the California Water Board approves the loan. But, to NPM's knowledge, the Trustee has never requested such loan. Further, it is highly likely that if the Minerals Debtors are required to pay for their own insurance, the Sureties will fund such obligation, whether or not the California Water Board approves the loan. The Sureties have every economic incentive to do so.

14. The Sureties have been very adept at not funding a sale process for their benefit in hopes that "other people's money" would do so. Initially, the Sureties sat idly while the Trustee ran the sale process, using up much of the $2.5 million fund that originally was intended to be used as a bridge between the period of an appointment of a chapter 7 trustee and the drawing of the Sureties' reclamation bonds. In fact, the Trustee had to go to such lengths as to file a motion to dismiss the Minerals Debtors' bankruptcy cases when such funds were about to run out in order to get the Sureties to fund the sale process with secured loans to the Minerals Debtors. The Sureties apparently refused to do so prior to that time, even though the $2.5 million fund clearly was not sufficient to allow the Trustee to undertake the sale process. Now the Sureties seek to use NPM's money to fund the insurance portion of the sale process. But

NPM has little doubt that the Sureties instead will fund such insurance if required by the Minerals Debtors.

### Failing to Grant the Motion Would Give the Minerals Debtors More Rights Than They Would Have Outside of Chapter 11

15.     Finally, relevant state law and bankruptcy principles dictate that the Motion should be granted.  It is a basic principle of bankruptcy law that a debtor's legal rights in bankruptcy are no greater than they are under state law, with certain limited exceptions, such as the right to pursue preference actions.[7]  At the time that Molycorp provided insurance coverage to the Minerals Debtors, it had no legal obligation to do so.  The parties were separate legal entities and there existed no contract between the companies or Court order that required Molycorp to provide such insurance.

16.     Likewise, at the time Molycorp provided insurance coverage to the Minerals Debtors and paid the yearly premium in advance, it had no obligation preventing it from later canceling that insurance and obtaining a refund.  In fact, this case is essentially no different than the numerous corporate transactions that occur every day whereby a parent sells or separates from a subsidiary, the parent removes the subsidiary from various corporate family programs, including insurance, and the subsidiary then has to procure its own insurance coverage.  While Molycorp was cautious in seeking relief from the stay to permit it to cancel the relevant Insurance Policies, such an act would be routine outside of chapter 11.

17.     As noted in the Motion, this case is very similar to <u>Autobacs Strauss Inc., (n/k/a SDA Inc)</u>, Docket No. 09-10358 (Bankr. D. Del. Feb 04, 2009) (CSS), a prior case before

---

[7] <u>Butner v. United States</u>, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. . . . Uniform treatment of property interests [serves to] . . . prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'") (citing <u>Lewis v. Mfrs. Natl. Bank of Detroit</u>, 364 U.S. 603, 609 (1961).

this Court. In that case, a parent had issued a guaranty for certain obligations of its subsidiary. But during the chapter 11, the subsidiary's assets were sold. As such, the parent sought relief from the stay to cancel the guaranty, since, among other things, the parent no longer had any legal or economic interest in the subsidiary's operations. The relief was ultimately granted, even though the debtor initially objected thereto.

18. Accordingly, denying the Motion would give the Minerals Debtors more rights than they would have outside of chapter 11, in violation of the principles set out by the Supreme Court in Butner v. U.S. As such, the Objection should be overruled.

**Conclusion**

19. From the time the Minerals Debtors were separated from Molycorp, they were to stand on their own. At that time, the Sureties wanted to extend the Minerals Debtors' chapter 11 cases to see if a sale of the Minerals Debtors could be consummated and to avoid the Sureties' bonds being called for reclamation work at Mountain Pass. But the Minerals Debtors and the Sureties must, at this point, pay the cost of exploring such an option, including paying for their own insurance. Any other result would be inequitable and a windfall to such debtors and the Sureties. As a result, the stay should be lifted so that NPM will no longer involuntarily be required to provide such insurance.

WHEREFORE, NPM submits that the Objection (and the Sureties' Objection) should be overruled and the Motion should be granted, allowing for the lifting of the automatic stay to permit NPM to cancel the Insurance Policies, absent reimbursement from the Minerals Debtors for their portion of the insurance costs for such policies.[8]

---

[8] By agreement of the parties, in exchange for NPM deferring a hearing on the Motion to late October – which was originally scheduled for early September – the Minerals Debtors have agreed to pay NPM the

Dated: October 24, 2016
Wilmington, Delaware

Respectfully submitted,

  /s/ Justin H. Rucki
M. Blake Cleary (No. 3614)
Edmon L. Morton (No. 3856)
Justin H. Rucki (No. 5304)
Ashley E. Jacobs (No. 5635)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

George R. Howard
Bryan M. Kotliar
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Brad B. Erens
Joseph M. Tiller
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

ATTORNEYS FOR NEO PERFORMANCE
MATERIALS

---

cost of the insurance for the months of September and October 2016 in the event that the Court grants the Motion.