UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                      .   Chapter 11
IN RE:                                .
                                      .   Case No. 15-11357 (CSS)
MOLYCORP, INC., et al,                .
                                      .   Courtroom No. 6
                                      .   824 Market Street
                                      .   Wilmington, Delaware 19801
                  Debtors.     .
. . . . . . . . . . . . . . . . . .   Tuesday, July 26, 2016

                    TRANSCRIPT OF HEARING ON:
           INTERIM FEE REQUESTS OF PAUL HASTINGS, LLP
           BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                  UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtors:                Edmon L. Morton, Esq.
                                YOUNG, CONAWAY, STARGATT
                                 & TAYLOR, LLP
                                Rodney Square
                                1000 North King Street
                                Wilmington, Delaware 19801


For the Official Committee
of Unsecured Creditors:         William P. Bowden, Esq.
                                ASHBY & GEDDES, PA
                                500 Delaware Avenue
                                Wilmington, Delaware 19899

                                Luc A. Despins, Esq.
                                PAUL HASTINGS, LLP
                                75 East 55th Street
                                New York, New York 10022
(Appearances Continued)

Audio Operator:                 Electronically Recorded
                                by Leslie Murin, ECRO

Transcription Company:          Reliable
                                1007 N. Orange Street
                                Wilmington, Delaware 19801
                                (302)654-8080
                                Email: gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES: (Continued)

For Oaktree:                     Andrew Remming, Esq.
                                 MORRIS, NICHOLS, ARSHT
                                  & TUNNEL, LLP
                                 1201 North Market Street
                                 Suite 1800
                                 Wilmington, Delaware 19801

                                 Andrew LeBlanc, Esq.
                                 Lauren Doyle, Esq.
                                 Justin A. Alfano, Esq.
                                 MILBANK, TWEED, HADLEY
                                  & MCCLOY, LLP
                                 28 Liberty Street
                                 New York, New York 10005

APPEARANCES VIA TELEPHONE:

For the Debtors:                 George R. Howard, Esq.
                                 JONES DAY, LLP

For the Official Committee
of Unsecured Creditors:          Shiomo Maza, Esq.
                                 PAUL HASTINGS, LLP

For the 10 Percent
Noteholders:                     Joshua Brody, Esq.
                                 KRAMER, LEVIN, NAFTALIS
                                  & FRANKEL, LLP

INDEX

|  | <u>Page</u> |
|---|---|
| <u>ARGUMENT BY MR. DESPINS</u> | 4 |
| <u>ARGUMENT BY MR. LEBLANC</u> | 45 |
| <u>FURTHER ARGUMENT</u> | 73 |
| <u>COURT DECISION</u> | (Reserved) |

1          (Proceedings commence at 2:07 p.m.)

2          (Call to order of the Court)

3              THE COURT:  Please be seated.

4              I won't ask what you're doing here; I'm well aware.

5     Thank you for coming back this afternoon.

6              I did have an opportunity to prepare and review

7     everything, so I'm ready to go forward.  I don't know how

8     you've decided you want to do this, but ...

9              MR. DESPINS:  Well, given it's our application, I

10    think we'd go first.

11             THE COURT:  That's fine.

12             MR. DESPINS:  For the record, Luc Despins with Paul

13    Hastings, on behalf of Paul Hastings and the committee.

14             And that's one of the points I wanted to raise at the

15    outset, Your Honor, which is that you'll -- you saw from our

16    response that it's not only Paul Hastings, but the committee

17    wanted to appear, as well, on this issue, because Paul Hastings

18    believes that the issues in front of the Court implicate the

19    committee, as well as Paul Hastings.

20             Your Honor, only one party has objected to our fees in

21    this case and that's Oaktree, and we all know they were the

22    defendant in the litigation that we commenced and that was

23    settled.  Oaktree has objected to the fees of no professionals

24    in these cases, other than Paul Hastings'.

25             And this is the second interim application, which, as

1    the Court knows, was reviewed and approved by the fee examiner.

2    Oaktree objected to approximately 4.5 million.  It's actually

3    -- I won't repeat it, but I believe the exact number, I

4    believe, is 4,542,773.50.  And they've also told us that at the

5    final hearing on final fee apps, they will object to some of

6    the fees that were approved in our first fee application, but

7    were not objected to thus far, but that's no another day.

8    Your Honor, I have a chart which shows all the fees, which I

9    shared with Mr. Leblanc last week.  If I could approach the

10   bench, it would probably make sense where to focus the issues.

11            THE COURT:  Okay.

12            MR. DESPINS:  Yes.

13            THE COURT:  Thank you.

14            MR. DESPINS:  And, Your Honor, what this chart shows

15   is that the breakdown between fees that are objected to and on

16   Page 2 and 3, the fees that are subject to an objection, and I

17   saw that you entered the order, you know, probably around noon

18   today, approving the fees not objected to.

19            THE COURT:  I would have done that -- I was out of the

20   office yesterday, so that's why I waited until today, so ...

21            MR. DESPINS:  No problem, Your Honor.

22            So, the focus is really on the first page and the

23   three top boxes there.  And the first thing I want to mention

24   is that if you look at the bottom box as part of these three

25   top boxes, it's entitled, D&O/Oaktree investigation, and it's

1    Number 93709, Matter 10.  I want to make sure Your Honor knows

2    that that includes time with respect to the investigation and

3    the claims against the D's and O's and Oaktree, both.  And

4    that's very important and I'll come back to that later if we

5    need to, but I want to make sure Your Honor understands that we

6    have taken the position that it was fair to allocate 50 percent

7    of those fees to the D's and O's and of course claims against

8    the D's and O's, and investigation of D's and O's are not

9    subject to the DIP order fee cap under any reading of that.

10   Oaktree disagrees and, therefore, the full amount at --

11   involved here involves that 50 percent allocation and we'll

12   come back to that if we need to.

13          Now I'll turn, Your Honor, to the legal and factual

14   issues which we believe should lead the Court to conclude that

15   it is appropriate to authorize and direct the debtors to pay

16   Paul Hastings on an interim basis, the full amount of the $4.5

17   million.  I'll start with a broader proposition, which is that

18   there is plan.  The plan is confirmed.  All administrative

19   expense claims have to be paid in full and they need to be paid

20   in full regardless if they're unencumbered assets to cover --

21   to pay for those administrative expense claims.  That's their

22   general proposition.

23          And I think Oaktree initially says, oh, we're not

24   debating that; 1129 is a different issue, we're talking about

25   330 reasonableness.  But they do, in fact, debate that through

1   various -- what I'll call back doors, and I'll go through these

2   various issues.  But I think that the general proposition,

3   which was stated by Judge Jones recently in Texas and also a

4   bunch of reported decisions, has not been challenged by

5   Oaktree, directly.

6        But they do argue, and that's the first back door,

7   which is that's true, but you still have to determine that

8   they're allowable.  They need to be reasonable.  And the DIP

9   order would be meaningless if you allowed, as allowed

10  administrative expenses, fees that exceed the cap or the budget

11  by a factor of -- I forget, is it six or seven, whatever it is

12  -- but I call that the "sky is falling argument," which is that

13  the order is meaningless unless you enforce that.

14       And the point here is that the order is not

15  meaningless and we can see that from the other professionals in

16  other cases that have lost millions of dollars in other cases

17  where the case was dismissed, the secured creditor was allowed

18  to foreclose on our collateral.  At that point, these lawyers

19  and other professionals came to court and say, hey, we've

20  exceeded the budget and we'd like to get paid and the Court

21  said -- and that's the case of these cites -- that's too bad,

22  you can't get paid, that's what the order is.  And there's no

23  discussion in those cases of 1129.

24       And the perfect -- probably the best example of that

25  is the Emons case -- E-m-o-n-s -- case by Judge Abrams, where

1   it was not a creditors' committee, it was an equity committee.

2   Initially, they tried to get retained and to put in their

3   retention order that their fees would enjoy the same priority

4   as the fees of the debtor's professionals, et cetera, and Judge

5   Abrams said, I can't do that.

6       There is a cite in <u>Flagstaff</u> saying there is a cash

7   collateral order in the case that says that you cannot -- that

8   only the fees of certain professionals or in a certain amount

9   can be paid out of the collateral and, therefore, you lose.

10  They come back and she says, well, now there's a confirmed

11  plan; it's a different landscape.  And that's where the

12  expression "you have to play Santa Claus" comes in.  She

13  basically holds that the priorities or the limitations

14  contained in the cash collateral, in that case, order, have no

15  application.

16      And it's the same colloquy that took place in the

17  <u>SandRidge</u> case two weeks or three weeks ago where the judge

18  said, what am I missing here.  The cap may be the cap, but at

19  the end of the day, if I allow their claims in an amount

20  greater than the cap, you have no choice but to pay them.  And

21  in that case, Judge Jones was pretty strident about the fact

22  that he would have rejected any attempt to expressly cap -- and

23  I'll come back to that in a second -- but in that context, the

24  judge was very clear, that 1129, you know, once you have 1129,

25  the pre-confirmation priorities are essentially irrelevant.

1    And he even said very precisely, even if there's no

2    unencumbered collateral, they're entitled to get paid if they

3    have an allowed administrative expense claim.

4         They make the argument, well, obviously, the committee

5    and Paul Hastings must have thought that the DIP order was

6    binding, because they followed the time limits to commence

7    litigation.  And the answer is, yeah, we thought those time

8    limits were binding, because 1129 has nothing to do with time

9    limits.  So if there's a time limit in the DIP order that says

10   you have until X date to sue, if you miss it, I think you're

11   out of luck.  And that has nothing to do, however, with the

12   priming effect, essentially, of 1129 and once the plan has been

13   confirmed.

14        So I believe that that addresses the argument that a

15   DIP cap is rendered pointless.  So what they do next is they

16   switch gears and they say, people agreed, and the committee

17   agreed, to $250,000, and, therefore, that has to be the

18   benchmark for reasonableness, because they wouldn't have agreed

19   to that unless they thought that could be done.  And they cite

20   a case that has nothing to do with 330 -- well, I'm sorry --

21   that has nothing to do with a fee budget in a DIP order.

22        But in the Chaz Stevens case, where the Court said,

23   look, the debtors -- not the debtors -- but the professionals

24   in that case had agreed to a budget and they exceeded their

25   budget and the Court said, no, I'm going to enforce the budget,

1    and that has nothing to do with the situation we're dealing

2    with and let me tell you why.  First, the two-hundred-and-

3    fifty-thousand-dollar cap or budget, Your Honor, is all we

4    could -- oh we, the committee and Paul Hastings -- could get

5    out of Oaktree at the contested DIP financing hearing.  It is

6    not Paul Hastings' budget or the committee's professionals'

7    budget.

8            We said at the hearing that we didn't think it would

9    be enough, that there was a lot involved here.  But when we

10   took on, by agreed to the cap, Your Honor, very clearly, is

11   there risk of a failed plan or no plan happening, in which case

12   we would be in a world of hurt.  But we're not in that position

13   now.

14           And it also doesn't make sense, because when you look

15   at it, Judge, in 90 percent of the large cases -- and I'm not

16   going to try to define what a large case is, but you know it

17   when you see it -- in 90 percent of the large cases, the budget

18   of the cap is $250,000.  So, could it be that all these cases

19   have the same issues?  Could these cases also have, you know,

20   the most expensive loan in 2014?  Could they have a make-whole

21   premium of 40 percent?  Could they have a debtor filing for

22   bankruptcy nine months after cutting a deal with Oaktree?

23           No.  It's not one-size-fits-all.  The two fifty is, I

24   won't say a convention, but it's kind of a general benchmark

25   that we use, you know, get it okayed at two fifty, but we all

1   know what that means, which is that if the case fails, you're

2   going to be limited to the two fifty but that's the risk that

3   the professionals take.  But the *quid pro quo* for that is that,

4   obviously, if a plan is confirmed, that two-fifty figure is not

5   a benchmark of reasonableness.

6         And, frankly, I'm saying this with all due respect to

7   everyone, but anybody who thought that the two-hundred-and-

8   fifty-thousand-dollar figure was a benchmark for reasonableness

9   in this case, you know, I think should really -- you know,

10   anyway, I'm not going to say it, but it makes no sense.

11         In some cases, I said two fifty would be more than

12   necessary.  Because let's assume the loan was done seven years

13   ago, outside of challenge periods and it was for new money, et

14   cetera, et cetera, and there were only perfection issues.

15   Well, you know, paralegals can do perfection review for maybe

16   75,000 -- $50,000, and, therefore, the point is that two fifty

17   is not a benchmark of reasonableness and it can't be.

18         So then they turned and they say, well, okay.  This

19   was an initial budget, so the two fifty was an initial budget

20   for you to do your (indiscernible) work and you should have

21   come back to us if you determined that it was not enough after

22   what you found.  And that, Your Honor, I don't -- I've never

23   heard of that concept, and I'm sure that if I described -- I

24   can't -- let's assume -- let's play this out.

25         So do I my (indiscernible) investigation for two

1   hundred and forty-nine, nine, nine, nine, and I find all these

2   issues and I come back -- let's just say I come back to court

3   and I say, Judge, we think the budget should be increased to $3

4   million because we need to litigate the following issues, et

5   cetera, et cetera, I can hear Mr. Leblanc saying, wait a

6   minute, we have a final order.  Judge, you don't have the power

7   to modify the $250,000.

8        And so they're saying, well, we could have modified

9   consensually, but that's a bizarre -- you know, I was trying to

10  think how this would have played out.  So I go and sit down

11  with my ex-colleagues to say, well, we found the following

12  issues and that litigation against your client will cost at

13  least -- you know that's a two-week trial -- you know, four or

14  $5 million.

15       And of course the discussion would not be, well, okay,

16  sure, we'll give you a budget, you know, that sounds

17  reasonable, but, no, no, you don't need to do that.  You don't

18  need to do five depositions, you can do two, et cetera, et

19  cetera.

20       It's a bizarre suggestion that somehow the course of

21  conduct here should have been to get their consent, as the

22  defendant, to a larger budget to investigate and sue them.

23  I've never -- and then they cite the Granite Broadcasting case.

24  First of all, I don't think that motion was ever granted or we

25  couldn't find an order -- maybe it was, but that's besides the

1    point -- which is they felt at risk that it could be a

2    liquidation and they decided to increase the budget and no

3    longer agreed to it.  God bless them.

4         But I've never, frankly -- I shouldn't say never -- I

5    don't recall ever seeing that, because -- another reason why

6    you don't do it is, that's going to harm the committee's

7    position, which is that even if they agreed to something,

8    there's going to be a *quid pro quo* for that and that's going to

9    cost the committee, not Paul Hastings something, and that's not

10   appropriate.

11        So they even say, and that's a quote, at each of these

12   junctures, meaning if we came back to them -- this is in their

13   surreply, Footnote 7 on Page 9:

14             "Oaktree would have had the choice of whether to

15             consent to the funding of the expended investigation

16             and/or prosecution of claims against itself, as well

17             as whether to continue funding the administration of

18             these cases generally."

19        That's also bizarre, because there's a DIP order in

20   place.  There's a DIP credit agreement.  In this case, I've

21   never heard of a default -- or I shouldn't say that -- I don't

22   recall there being a default under the DIP at any point in

23   time.  And even if there was -- let's assume he stands up and

24   says, you know, there was a default on January 1st or something

25   like that -- fine, but they elected, knowing full well what was

1    going on -- this was not hidden from them, and I'll come back

2    to that in a second -- they knew, because AlixPartners,

3    advisors to the debtors, was keeping tabs of all the fees,

4    including their fees, our fees, because they were concerned

5    about running out of cash, so they could see on a monthly basis

6    where people were from starting in late December through the

7    end of the case.  So they knew all along what was being spent

8    on this.

9         So this concept of they could have stopped funding --

10   let's assume they could have, but they didn't, because they

11   believed that it was to their benefit to continue playing along

12   with this and, therefore, they can't have it both ways.  They

13   couldn't have stopped the music -- or if they could have

14   stopped it, they decided not to do it.  And in this case like

15   this, Your Honor, this is very important -- welcome back to

16   that in a minute -- we don't have a structure where the DIP

17   lender -- not the DIP -- the lender, and the DIP lender, same

18   entity, has only pledges of stock and sometimes partial pledges

19   of stock, not entire pledges of stock, and has unsecured claims

20   against a bunch of entities and against entities that are all

21   over the world.

22        And so what you have is an entity the U.S. pledging

23   its shares of a Luxembourg entity or partially, not entirely,

24   and so on and so forth, you have entities in Luxembourg, in

25   Canada, in the U.S., Barbados -- I'm forgetting some -- there's

1    plenty more.  So in a context like this, I know when I

2    represent a DIP lender, I tell the Court, oh, yeah, if you're

3    going to do this, I'll foreclose.  That's not happening.

4           They're not foreclosing.  From day one, they needed a

5    plan to tie this up with a little bow and to take ownership of

6    a company, because the tax consequence at a local level, the

7    practical implications of foreclosing on a pledge of stock --

8    partial pledge of stock would have rendered this impossible;

9    this, being realizing on their collateral, other than through a

10   plan.

11          The next point, Your Honor, is the other reason why

12   the argument that a 250,000 cannot be our yardstick for

13   reasonableness, Judge, is that under Section 330, is that the

14   DIP order, as you know, contains a zero budget for litigation.

15   So how could it be that Your Honor, by approving a DIP which

16   contains -- and by the way, that's standard; that's not

17   something that we lost -- there are no DIPs that contain money

18   to sue.  Money to investigate, yes; money to sue, I've never

19   seen that.

20          So, how could it be that -- the implicit argument that

21   they're making is that the Court made a finding that there was

22   a reasonableness to two fifty.  Well, assuming you want to by

23   that for a second, which I don't, how about the litigation,

24   which was millions of dollars?  That's a zero budget.  So are

25   we to presume that, one, the committee agreed to a zero budget?

1    No.  We have no choice.  That's the practice, that the Court

2    made a finding, an implicit finding that zero would be a

3    reasonable budget for this litigation; that can't be.

4            And you have to remember, Your Honor, there were two

5    mediations, global mediations in this case.  I had forgotten

6    about the first one.  Well, it was the same mediation with the

7    same judge, but the first one, you'll remember, was a partial

8    -- I don't like to say the word failure -- but it didn't

9    resolve all the issues.

10           But Judge Drain was able to resolve a lot of

11   procedural issues and not-so-procedural issues.  And,

12   basically, what he was able to broker is an agreement between

13   the committee, debtors, and Oaktree, to the effect that we

14   would drop our exclusivity motion; we would drop our objection

15   to the disclosure statement, meaning on a disclosure agreement

16   cannot be approved because we have a better plan, but we

17   preserved our rights to object on other issues; we would drop

18   our objection to the sale motion; meaning, we would drop all of

19   this in exchange for the litigation going forward on a

20   consensual basis and that's what happened.

21           You remember that we filed a motion, attached a

22   complaint, 125 pages, and there was no objection from Oaktree,

23   not one, and Your Honor entered the order.  And the order had

24   some language about the fact that the entry of this order was

25   beneficial or for the benefit of the estates.  I'm not saying

1    that you opined on the merits of the litigation -- I'm not

2    saying that at all -- but the process is that that process,

3    that was a *quid pro quo* and it leads you to -- and the fact

4    that they had a benefit for that.

5         And let me tell you what the benefit was, which is

6    that remember at the DIP hearing, you were in a very -- Your

7    Honor was in a very good position because you had two very good

8    DIPs.  When a Court is in that position, the Court can, as you

9    did, at a DIP hearing, can make a list of requirements and you

10   have optionality.

11        The same thing happens at a confirmation hearing.  If

12   you have only one plan, it's up or down with all the

13   consequences that follow from that, and it could be down.  I

14   mean, I'm sure you have refused to confirm plans in the past.

15   But there are consequences to that, consequences to the debtor,

16   the employees, the vendors, et cetera, et cetera.  It puts the

17   Court in a terrible -- well, in a difficult position -- not in

18   every case.

19        But in this case, we agreed there would be no

20   competing plan; it would be up or down, a huge benefit to

21   Oaktree.  But the *quid pro quo* for that is that the litigation

22   would move forward.  So the question is, what were they

23   thinking at that point?  That this would be a freebie?  That

24   somehow we would stop accruing fees or that we would not seek

25   payment of our fees?  Did they not know the litigation would be

1    expensive?  Of course they knew that.

2         So, again, it goes to the issue of, how could it be

3    that the two fifty and the zero budget for litigation is a

4    yardstick for reasonableness?  It can't be, especially in this

5    case.

6         The next point, Your Honor, and I think one of the

7    most compelling ones from a technical point of view -- so far

8    I've been talking about the law, but also fairness, but here,

9    from a technical point of view is the absence of an automatic

10   disallowance provision in the DIP order.  I'm not saying, by

11   the way -- I want to be clear -- that you would have agreed to

12   enter that order.  When we saw Judge Jones in SandRidge who

13   reacted and said very valiantly and said I will never sign such

14   an order, but they could have sought that.

15        And it's not -- again, they love to say, surprise,

16   gotcha, and all that -- but this issue they know cold, because

17   we've been through this, Mr. Leblanc and I, probably two or

18   three times; one, together on the same side representing Silver

19   Point in the Granite Broadcasting case where we did get the

20   judge to enter that order that says, any fees incurred above

21   the cap shall be automatically disallowed and shall not

22   constitute an administrative expense claim.

23        So they -- we know how to do this and in NewPage, Part

24   1, because this is Part 1 because this is the first time it

25   filed it; it filed again recently -- and I represented the

1    committee and Mr. Leblanc represented Oaktree and other secured

2    lenders and we brought in Quinn Emanuel to sue the lenders, et

3    cetera, et cetera.

4         The same issue came up.  Mr. Leblanc filed an

5    objection saying, you cannot, Judge, enter an order authorizing

6    the retention of Quinn Emanuel, because they can't get paid.

7    That violates the DIP; it's to litigate.  And what happened

8    there is the issue was left open for another day, but very

9    expressly by saying, the issue of whether they can have an

10   allowed administrative expense claim in violation of the DIP,

11   to the extent it violates the DIP, shall be an open question

12   for a later date.  I'm not paraphrasing precisely, but,

13   essentially, that's what the order said.

14        So the point is that there's none of that here.

15   There's none of that in the order, in the DIP order, and,

16   therefore, we believe that from a technical point of view, they

17   should not get the benefit of a clause that doesn't exist and

18   that's the automatic disallowance clause.

19        So, therefore, if we are moving away from these

20   various arguments, what's left?  It's the traditional

21   reasonableness argument under Section 330.  And in that

22   context, Judge, the Court can look at many factors -- just one

23   second -- so the -- on a traditional 330, reasonableness, the

24   first thing to look at, or that the Court could look at, is a

25   result obtained?  What is the result here?  Thirty-six million

1    dollars.  I would say, per se, our fees are reasonable in that

2    context.

3            The next point is -- and I say they opened the door

4    for that in a big way in their brief -- because, essentially,

5    their argument is that they say the committee should have been

6    negotiating instead of spending its time litigating.  And,

7    essentially, this is their argument -- this is in Paragraph 25,

8    Page 15:

9            "The committee could have spent its time negotiating a

10           settlement, but it chose to pursue a scorched-earth

11           litigation."

12           So that's -- you know, that's an interesting argument.

13   Basically, the image is that we were somehow unreasonable or

14   that we should have settled earlier.

15           And, Your Honor, once they opened that door, I think

16   it's fair game, and I think I want the Court to take notice --

17   I will give Mr. Leblanc time to think about this -- but I want

18   the Court to take notice, because I have copies here, of the

19   settlement offers that the committee made to Oaktree before all

20   of this started.  When I say by before all this, in October

21   2015, because that will show you -- I'm not going to say what

22   it was -- show you that what was done here was reasonable and

23   the fees incurred were extremely reasonable.

24           And you might say, well, that's 408, and I did pause

25   on that and I did some research.  The Third Circuit in the

1    <u>Lohman</u> – L-o-h-m-a-n -- and I have the cite here at 574 F.3d

2    163 (2009), held, that it did not violate 408 in the fee

3    application context of a lawyer in a class action context,

4    where the Court has to do the lodestar analysis and all that,

5    for the Court to consider the offers made back and forth.  To

6    be candid, in that case, they were using it to ding the lawyer,

7    not to approve the fees.

8           But the Court -- and, of course, the lawyers said,

9    hey, that's 408 and you can't have -- and the point here is

10   that we're not trying to cut out on our deal with Oaktree.

11   We're not -- we have a deal.  It's the plan.  We're not trying

12   to move away from that, but if somebody is going to allege that

13   our fees are not reasonable because we were -- you know, let's

14   not beat around the bush -- but we were churning [sic].  I

15   think it's fair for the Court to have access and to see the bid

16   and to ask so that the Court can make its own determination

17   about what happened here.

18          So I don't want to -- maybe I'll pause here to see if

19   Mr. Leblanc has objections to that, but --

20          MR. LEBLANC:  Your Honor, I'd like to see the

21   proposal.  I don't remember the bid.  I generally remember, and

22   my recollection is that we ended up pretty close to where we

23   started, but I'd have to see them.  I just don't -- I haven't

24   seen them in months.

25          I also don't -- I don't think it's appropriate, and I

1   can explain why, but I'd like to at least see them before

2   responding if that's okay?

3          THE COURT:  You know what?  Why don't we sort of move

4   past this point, reserve it, and come back to it if necessary.

5          MR. DESPINS:  So let's do that.

6          MR. LEBLANC:  Just one second, Your Honor?

7          THE COURT:  Of course.

8          MR. DESPINS:  Okay.  So the bid and to ask, we'll come

9   back to that.

10         The next issue, Your Honor, on the reasonableness,

11  would be complexity of the case.  And, Your Honor, I will leave

12  -- I think Your Honor doesn't need to be bored with this, but

13  there's a 120-page complaint.  This is the first post-Momentive

14  case with what I would call a different make-whole.  There were

15  issues of insider preferences.  There were issues of

16  Luxembourg, Canadian law.  There were Barbados companies

17  involved.  There were issues of equitable subordination et

18  cetera, et cetera.  So the point is, in terms of complexity,

19  this probably ranks at the highest level, so I don't think I

20  need to belabor that point.

21         So let's turn to another concept of reasonableness,

22  which is are they arguing that we were not efficient, meaning

23  wasteful?  The first point on, that Your Honor, I would say is,

24  how -- it's kind of tough to argue that we were inefficient,

25  because they have not objected to our other fees.  So in order

1   for them to have a principal position on that, it would be that

2   we were wasteful when dealing with them on their claims, but

3   not wasteful on dealing with other matters.  So that's the

4   first point.

5        The but the second point, Your Honor, and that's where

6   I think it's very relevant, on the pure reasonableness --

7   meaning forgetting the two fifty for a second -- pure

8   reasonableness point of view, it is perfectly appropriate for a

9   Court to look at the fees charged by other counsel in the case.

10  And Your Honor can make all the adjustments in the world.  You

11  know, we were day-in, day-out 30, 45 percent lower than they

12  were and there were hearings where there were six, seven

13  Milbank lawyers at these hearings when I was alone or maybe

14  with one other lawyer present.

15       And that's not the only determinate, but it's clearly

16  -- you know, the fact that they're so much higher than we are.

17  And by the way, this is while we're dealing with the rest of

18  the world; we're fighting the KEIP, the KERP, exclusivity,

19  disclosure statement, all at the same time.  The argument they

20  make is, well, that's a (indiscernible) by half, that's what

21  they're saying, and they're saying that it's much cheaper to

22  throw a grenade than to deal with the wounded people's

23  injuries, as a result of the grenade, which that's a nice term

24  or phrase, but this is not really what happened here.

25       In this case, Your Honor, Oaktree was producing

1    documents that it had generated, or that Milbank had generated,

2    less than a year ago at the time of production, or maybe 12

3    months ago at the time of production.  They knew those

4    documents cold.  This is not something that was done six years

5    ago.

6           And percentage-wise, in terms of all documents

7    produced, because we didn't limit our production of -- for

8    asking documents from Oaktree.  We got documents from the

9    debtors, from Moelis, from a bunch of people, and Oaktree

10   represented like 25 percent of the documents produced.  So,

11   yeah, they had to review their own documents and all that, but

12   -- and by the way, those documents, we had no idea what they

13   said, so we had to review all of their documents cold and we

14   had to review all of the other documents.

15          So this argument that somehow it's cheaper to just

16   through in a document-production request, well, that's part may

17   be cheaper, but when you get the documents, you have to read

18   them and you have to catalog them, you have to understand them,

19   and that's a huge process, especially when, you know, they're

20   dealing with a limited universe and we're dealing with all the

21   documents.

22          The same thing for the depositions.  There were three

23   depositions of Oaktree personnel they had to prepare for us and

24   we had to take it, but we also deposed six other people,

25   meaning debtor, debtor's advisors, et cetera, directors -- or

1   officers -- I'm sorry, and we preparing -- when this was

2   settled, we were preparing to depose another eight directors.

3        And the point is that preparing for that, when they

4   are just monitoring is -- so it's a huge, huge difference in

5   terms of the time commitment.  So, therefore, if we just

6   compare the fees by definition, we are reasonable.  And I would

7   say, Your Honor, to the extent the Court needs live testimony,

8   we'll come back for that.

9        I've never understood their point, however, to be a

10  factual point.  I never understood Mr. Leblanc to say, you sent

11  too many people at a hearing, you spent too much time on the

12  complaint; it was more, the DIP, the DIP, the DIP, as opposed

13  to a general 330 objection, but I guess we'll hear from him on

14  that.

15       The next point, Your Honor, is the issue of having the

16  non-*pari* debtors pay for Paul Hastings' fees.  And, by the way,

17  I know you have dozens of cases, just to refresh your

18  recollection, there was Molycorp Minerals, that's now the

19  Chapter 11 Trustee and that's an entity with no cash or never

20  had a lot of cash; that's the entity that took all the money.

21  I don't want to be too negative, but I just want to, you know,

22  shortcut.

23       THE COURT:  I remember.

24       MR. DESPINS:  Okay.  So you remember that.

25       And then you have the parent, Molycorp, the parent,

1    which has limited funds as well.  And then you have the Neo

2    subsidiaries; that's where all the cash is.  So let's not kid

3    ourselves; that's where the cash is.

4        So when they're saying that the Neo debtors should not

5    pay for our fees, it means we shouldn't get paid.  So that's

6    the first thing to -- I want to make sure that Your Honor

7    recalls this.  And you'll recall that we saw this issue coming

8    in July of last year, because at the DIP hearing, I said, wait

9    a minute, these guys, the Oaktree side was saying their DIP is

10   better than the ten-percent DIP because there's no priming,

11   there's not even a liability by all these new entities; they're

12   not liable at all to Oaktree on the DIP.  It's a wonderful DIP

13   because of that, and so that's all good.

14       But I want to make sure that the limitations that are

15   contained in the DIP, Section 4(a) and 4(b); 4(a) is the

16   twenty-two fifty and the 4(b) being zero budget to litigate,

17   does not apply to the Neo entities, because the point that it

18   made is that these entities only had to pledge their stock to

19   Oaktree, pre-bankruptcy, and nothing else.  And there was a lot

20   of back and forth on that, but at the end of the hearing, this

21   was resolved by adding a provision saying that those entities

22   can't upstream -- because what I was afraid of is that they

23   would upstream their cash -- and, of course, that's what they

24   were doing -- to the parent, and then it becomes DIP collateral

25   and all the rules apply.  And, basically, the order says, you

1   cannot upstream cash until you have covered your admin claims.

2   And the good point, from our point of view, is that they don't

3   deny that these entities have plenty of cash at all relevant

4   times to pay our fees.

5        What they're saying, however, is that these entities

6   cannot pay because they derive no benefit from our work.  And I

7   would say, initially, although this may have, you know, facial

8   appeal, under close scrutiny, it doesn't work.  The first

9   reason, Your Honor, is our retention order.

10       In July of last year or maybe it was August -- late

11  July -- I remember asking Mr. Leake, is he allocating his fees

12  among debtors and the answer was no.  And because we were

13  involved in that -- I don't want to call it a fiasco, because

14  that's critical -- but, you know, in the case before Judge

15  Carey, called -- the casino case, I forget the name of the

16  case, but maybe it's <u>Station Casino</u> or something like that --

17  where after the fact, people had to reallocate their fees among

18  debtors and there was a huge mess, which, frankly, we're still

19  involved in, we put a provision in our order that says, the

20  debtors shall be jointly and severally liable for our fees.

21       And what Oaktree says about that -- and by the way,

22  this was on notice to everyone; this is not a fifty-page order,

23  this is a two-page order -- and nobody objected.  No one

24  appealed.  And their answer to that is, yes, Judge, but you

25  didn't have the power to do that because in order to do that,

1    you would be violating the principle established by -- in the

2    Station Casino case and other cases, because you must show that

3    every debtor benefits from the fees.  And, again, that's

4    facially appealing at the beginning.

5        The only problem is that that inures a long line of

6    cases that starts with the Supreme Court's decision in 1938

7    called ASARCO.  And, you know, I know Your Honor knows the

8    case, but just for the record, Stoll v. Gottlieb, there was a

9    third-party release -- the guarantors on the debt was released

10   and the people who had the claim did not appear on the

11   bankruptcy case to complain about that.  What they did is they

12   entered -- of course they didn't appear.  They didn't object.

13   They didn't appeal.

14       So two months later, they sue the guarantor, who is

15   not a debtor, and they said, well, the Court has no

16   jurisdiction to release a non-debtor, so we know that issue

17   cold.  The Supreme Court said, assuming the Court has no

18   jurisdiction to do what it did, it says that that order is

19   binding because you need to appeal it up the chain and that's

20   what Stoll v. Gottlieb stands for.  And if the Supreme Court

21   says that assuming the Court has no jurisdiction -- by the way,

22   I don't believe that's the case at all; I think this Court has

23   plenty of jurisdiction to say that the fees -- the debtor shall

24   be jointly and severally liable for the fees -- that's a final

25   order.

1        And then cite ASARCO for the -- saying that in ASARCO,

2   the Court overruled an order.  There was no order in ASARCO.

3   What Thomas -- Justice Thomas said is that the Court, the

4   Supreme Court or the Bankruptcy Court, is not free to disregard

5   the Bankruptcy Code.  But the Court was not dealing with a

6   final order there.  Was no order saying -- let me be more

7   precise, in ASARCO, if the order retaining Baker Botts had said

8   that the fees and expenses of Baker Botts, the reasonable fees

9   and expenses of Baker Botts shall be compensable by the estate

10  to defend any fee application, and that order had not been

11  challenged and appealed, there's no way the Supreme Court -- it

12  would have gone to the Supreme Court.

13       So when they say in their response, they say, well,

14  Judge, that order, the Paul Hastings retention order, it cannot

15  be binding because you have no power or jurisdiction to do

16  that, that's beside the point.  Maybe you would have ruled in

17  their favor -- I don't know that -- if they had objected to

18  this or maybe somebody on appeal would have reversed you -- I

19  don't think so -- but if they had appealed, but they didn't,

20  and that's a very -- that's the first point.  So, I don't know

21  how you ignore that order -- or how they ignore that order.

22       But let's -- by the way, I want to make sure you

23  understand there's nothing nefarious about them in the sense

24  that if we had to allocate our fees debtor by debtors, we would

25  be singled out in this case.  I'll give you an example -- Jones

1    Day -- I'm not complaining about their fees in any way, I want

2    to be clear about that -- but Jones Day has not allocated their

3    Molycorp Minerals work to Molycorp Minerals.  Do you know why?

4    Because they wouldn't get paid.  They're -- it's the Neo

5    debtors paying for that.

6              So it's not like we were pulling a stunt here, another

7    gotcha; we were going exactly what other professionals in the

8    case were doing.  And that's why the joint several provision is

9    perfectly appropriate, and at this point, I don't think can be

10   challenged.

11             Assuming, Your Honor, for a second that you are

12   inclined to ignore that order, I believe that there is -- that

13   there's still benefit to these entities in any event.  And,

14   Your Honor, if I could approach, I think this one will -- and

15   I'm sure you'll be happy to see that chart again -- but will

16   involve the organizational chart, if I may approach?

17             THE COURT:  Sure.  Yes.  Thank you.

18             MR. DESPINS:  So, it's very important, Your Honor, to

19   -- and this is going to be tied to the issue of the statements

20   made during the confirmation hearing -- but obviously you have

21   Molycorp on top and you see these three entities that are in

22   yellow and dotted.  So it's Molycorp Luxembourg, MCP

23   Exchangeco, and MCP Callco.  These entities did not pledge --

24   sorry -- Molycorp did not pledge all of its stock of these

25   entities to Oaktree or to the 10 Percent.  There's 35 percent

1    that's referred to in the DIP order as the unencumbered

2    property and that's that stock, and, obviously, that's of

3    critical importance to us because that's how people get value.

4         And you'll see that these entities have a bunch of

5    subsidiaries.  In there, are the Neo debtors, and these

6    entities, depending on the value achieved in the sale -- and

7    we'll come back to that in a second -- these entities, because

8    they own stock of entities below them have a vested interest

9    and it's to their benefit to reduce the claims of Oaktree

10   against those entities.

11        So Oaktree is saying, basically, hey, the creditors

12   there would have been paid in full.  I don't think that's true

13   -- and we'll come back to that in a sec -- but they're saying,

14   they would have been paid in full and, therefore, there cannot

15   be any benefit to those entities.  And the answer is, no, there

16   could have been benefit because every time you reduce the claim

17   of Oaktree either because the make-whole is reduced or

18   disallowed or because the lien that they got, the pledge of

19   stock is set aside or because under Canadian law, the usury

20   laws would reduce their claims, or disallow part of their

21   claim, that benefits the entity above that, which is a Neo

22   debtor.  So -- and it benefits the stockholders.

23        And Your Honor knows from EFH, that you dealt with

24   this issue, maybe on the lift the stay decision, the argument

25   was made, hey, this entity is solvent.  Stop there, Judge.

1    It's irrelevant whether money flows upstairs.  And your opinion

2    said, no, it is relevant because it affects people up the

3    chain, et cetera, et cetera.

4          So the point here is that these Neo entities all owned

5    other entities below them and it's their interest not to pay

6    Oaktree the full amount that Oaktree is claiming and,

7    therefore, there was a benefit in trying to avoid the liens,

8    because if the lien is gone completely, that's even better,

9    because then, there's only stock and it flows up or to limit

10   the claims that Oaktree had, there was a benefit to those

11   entities and that's why it was appropriate to do the work that

12   was done.

13         And, of course, if that works, if that strategy works,

14   it all flows up to the 35 percent, which is unencumbered, and

15   that's a very important point.

16         You, I said I would come back to the issue of whether

17   their -- they say all their creditors are getting paid in full.

18   It's true that the plan they proposed provided that.  One, we

19   don't know if that was going to ultimately happen that way, but

20   that's not the leading argument.

21         There was, at the time, the PBGC was a creditor, and,

22   you know, by statute, they had a claim by all the family, was a

23   creditor that was unliquidated and I know that later that claim

24   was resolved, but that was a claim that may or may not have

25   been paid and that we could piggyback off, as an unpaid

1    creditor.

2         But in addition, Your Honor, these Neo debtors, if

3    they had paid Oaktree, would have a claim against their fellow

4    Neo debtors or other entities in the chain for contribution.

5    And I know Mr. Leblanc is going to say, yeah, yeah, but the

6    agreement -- maybe he's not going to say that, but I'll say it

7    for him -- the agreement waives those rights of contribution.

8         But we know that there are cases ignoring that, you

9    know, for example TUSA -- he's not going to like that -- but in

10   TUSA, where these types of bankruptcy planning limitations have

11   been ignored.  So the point is the argument that there's no

12   benefit to those entities -- I don't know how to say this,

13   other than we could have a trial on that, of course, that --

14   and we would brief that, et cetera, et cetera -- but the point

15   is that that would take forever.  But there's certainly, at the

16   time the work was done, there was a benefit to those entities.

17        And you might say, why are you focus on at the time?

18   So, now I'm going to segue to the point made at the

19   confirmation hearing that -- and remember the setting there,

20   which is the Molycorp Minerals sureties are saying, hey, we're

21   not getting a penny out of the deal that the committee signed

22   up for and this deal should not be approved.  And we said,

23   you're wrong, you're not entitled to any of it -- although we

24   took care of them through some adjustment to the intercompany

25   claim -- but the argument was, you're not entitled to it

1    because the settlement against Oaktree represents an

2    affirmative recovery against Oaktree and it could represent an

3    affirmative recovery against Oaktree for a preference or for

4    other affirmative recovery debt only Molycorp, the parent,

5    would have.

6            So they derived from that, you see, he's admitted that

7    there was no benefit to the other entities.  And when I

8    explained that at the confirmation hearing, Your Honor, I was

9    very precise about that, the difference between affirmative

10   recovery and claims reduction.  And I said at one point, claims

11   reduction doesn't make a difference anywhere and when we were

12   in front of you, we were here in late March.  At that time, we

13   knew the result of the auction, okay.  And at that time we knew

14   what the bids were, the final bids, or were not.

15           And I said at that time that affirmative recovery was

16   more potent and more valuable than claims reduction.  It

17   doesn't mean that in December, January, February, when we

18   didn't know the result and actually when we had a good faith

19   basis to believe that the situation would be the opposite, that

20   the work did not benefit those entities, meaning that there

21   wouldn't be a lot of value in claim reduction, it doesn't mean

22   that.  It just means that at the end when the music stopped,

23   there was more a direct -- affirmative recovery rather than

24   claims reduction.

25           And, again, I won't announce the numbers, but what I'd

1   like to do, Your Honor, just to show you that, you know, that

2   there's a basis for this, is to show you one letter of intent

3   redacted as to the name making the offer, but not the amount,

4   although, frankly, I'd like to -- all of it to stay under seal.

5   I'm sure Mr. Leblanc would prefer that as well.  We're going to

6   be a shareholder in this entity, so we have no interest in

7   effecting a future sale of this company, but the point of that

8   is to show you the initial bids that were received and what

9   range they were.

10        I'm not going to say what they are, but I -- maybe

11   it's another thing that Mr. Leblanc can consider.  But I want

12   to -- and the purpose of that is to show Your Honor that my

13   argument about claims reduction in December, January, February,

14   until we got the final bids had a lot of legs to it.  So, I

15   have that bid redacted.  I don't know how you want to handle

16   that.  Perhaps we put that one aside as well for Mr. Leblanc to

17   reflect on.  Let's make sure we -- okay.

18        Moving on to the release point, okay.  I want to be

19   very careful about this point, Your Honor, because when someone

20   starts saying that we're playing a game of gotcha, it only goes

21   downhill from there.  So let me start with the easy parts.  I

22   would say, first, it is obvious that if Your Honor rules

23   against us on the release point, it doesn't mean that 1129

24   doesn't apply.  It just means that Oaktree can object to our

25   fees.

1          The second easy part –- and I say that's easy, because

2     they have no qualms about discussing the mediation and,

3     actually, I will say something, which I'm sure they'll be happy

4     about, which is I'm comfortable telling the Court that in

5     mediation, there was no agreement by Oaktree to release its

6     objections to our fees, okay.  So there was no agreement to

7     that effect in mediation; however, that doesn't end the

8     inquiry.

9          What happened is that the business day before the

10    release agreement was signed, the settlement agreement was

11    signed, I received an email from Milbank, a partner at Milbank,

12    saying, here's a revised settlement agreement, and in there --

13    and by the way we have emails to show all this traffic, if

14    there are any doubts –- and I will be very precise –- I'm

15    paraphrasing now, but attached to that document was a modified

16    release agreement and it said that Oaktree's "representatives"

17    would be released.  Only Oaktree's representatives, not our

18    representatives, not the committee's representatives.

19         And our response was, what is that about?  By the way,

20    I said, normally, releases are mutual, so I guess I don't care

21    if we also get a release, and the response was, from an a

22    Milbank partner, it's to cover the advisors and it's okay to

23    apply it to you, as well.  And I said, are you drafting the

24    changes?  Yes, they are.

25         They resent the settlement agreement and it had, at

1  that point, a release for both; for both meaning, the advisors

2  to Oaktree, the advisors to the committee.  I assumed that

3  someone thought it was important to get a release for the

4  advisors to Oaktree.

5      Now, did I tell them, are you -- do you understand

6  what you're doing now?  Do you understand that by giving me a

7  full release, you are releasing your claims against us?  No, I

8  did not do that, Judge.  Did I tell them that the release was

9  unqualified?  No, I did not do that.

10      I saw that they wanted a release for themselves and I

11  picked up a release, I think, because they made it mutual.  And

12  if that's gotcha, then I don't know -- I don't think my job is

13  to tell them if you give me a full, unqualified release that

14  has some consequence, I don't believe that it is my job to do

15  that.  And so you might say, okay, so let's look at the

16  documents.  The first document, Your Honor, is the supplemental

17  agreement itself.

18      And, Your Honor, may I approach?

19      THE COURT:  Yes.

20      MR. DESPINS:  By the way, this -- what I've given you

21  is a more than the settlement agreement, but there are other

22  documents that I'll refer to.  So, this is, to be precise for

23  the record, it's a notice for holders of claims and interest;

24  that's the notice that went to creditors.  It attaches a bunch

25  of documents including in there, the settlement agreement.

1          So, the settlement agreement is on Page -- it's on

2     Page 6 of 17.  The problem is I don't know -- it's the document

3     under Exhibit A1, plan settlement agreement.  It's probably 10

4     pages down more than, you know -- well, it's double-sided, so

5     it's less than 10 pages down.  It's after Page 12.  It's an

6     agreement between Oaktree, Molycorp, the official committee,

7     February 22nd.

8          I'm sorry, Your Honor, there's a tab.  There's a tab

9     there.  There's an orange tab for that page that should -- not

10    the first tab, the second tab.

11         THE COURT:  Okay.

12         MR. DESPINS:  Okay.  So you'll see there, Paragraph 1,

13    pursuant to the revised plan, blah, blah, blah, in exchange for

14    a full and final release from all claims and causes of action

15    granted to Oaktree, its affiliates, and their respective

16    representatives, blah, blah, blah.  So that's the release to

17    Oaktree.

18         And you'll see on Page 3, that's the last tab,

19    Paragraph 6:

20         "No litigation trust will be created.  The revised

21         plan shall include a full and final release from, one,

22         all claims and causes of action against the committee

23         and its representatives."

24         And then the rest is really not relevant.  So the

25    point is, there, you have a document, which is the first

1    document signed between the parties and it has mutual releases.

2    Then when you go to the same document, but now we go to the --

3    what I call the meeting disclosure statement -- it's document

4    entitled, summary of plan settlement agreement.

5            THE COURT:  Uh-huh.

6            MR. DESPINS:  Okay.  And if you go to page -- that's

7    the first tabbed page -- Page 5 of that document, and you'll

8    see Paragraph 4(a), releases for Class 5(a) creditors and the

9    creditors' committee.  The admitted plan includes a full and

10   final release from the debtors and Oaktree of all claims and

11   causes of action against the creditors' committee and its

12   representatives.  And then at the end it says, see amended

13   plan, Paragraph 9(a); I'll come back to that later.

14           And then you'll see on Page 6 -- oh, and so in the

15   same heading, under consensual release provisions, under E,

16   consensual third-party releases, the amended plan contains

17   consensual third-party release provisions that will be binding

18   on all the holders of claims, et cetera, et cetera.

19           So you can see that the structure here is that you

20   have mutual releases between the creditors' committee and

21   Oaktree and you have consensual third-party releases for all

22   the other creditors, and by the way, that includes us getting a

23   release and Oaktree getting a release and giving a release as

24   well, but that's the third-party releases.  So that's the first

25   document.

1          The second, and by the way, I just want to be clear,

2   in that document, Your Honor, there's not a mention of a claim

3   -- objection to claims or anything like that being preserved in

4   any way.  There's perfect symmetry between Oaktree -- I'm sorry

5   -- the Milbank -- I'm sorry -- the advisors to Oaktree and the

6   advisors to the committee release.

7          Now, let's look at the plan.

8          Your Honor, may I approach?

9          THE COURT:  Yes, sir.

10          MR. DESPINS:  You have that, but I have the tabbed

11   version so it will be faster.

12          THE COURT:  Thanks.

13          MR. DESPINS:  By the way, you can ignore most of the

14   document, because what we're focusing on is the confirmed plan,

15   which is an attachment to the document.

16          THE COURT:  Uh-huh.

17          MR. DESPINS:  And -- but the first page to look at is

18   Page 38, Article 4(a) of the plan, which says in the

19   highlighted portion, the creditors' committee and its

20   representatives, Oaktree and its representatives, the plan

21   debtors and their representatives, the directors, blah, blah,

22   blah, shall be deemed to have provided and received the mutual

23   full and final releases from all claims and causes of action

24   including, without limitation, claims and causes of action that

25   may be asserted on behalf of the debtors' estate, et cetera, et

1    cetera.

2         Okay.  By the way, their main argument about this,

3    beyond the gotcha, is that we're -- they say you're citing to

4    snippets, as opposed to operative provision.  And that's my

5    first point.  This is an operative provision.  This is not a

6    preamble.  It's a very precise provision.

7         Then, you go to the section that they're citing to,

8    which is Section (e), on Page 75.  That should also be tabbed,

9    I hope, Page 75 of the plan, and you'll see at the end, the

10   proviso, provided that the foregoing "third-party release."

11   They put it in a quote because when you have upper-case letters

12   you can't see what's a defined term, but third-party release is

13   defined as what's in Section --

14        THE COURT:  I don't see where you're pointing me.

15        MR. DESPINS:  Okay.  Sorry.  Page 75 of the plan,

16   Paragraph E.

17        THE COURT:  Okay.

18        MR. DESPINS:  But you need to turn the page to Page 76

19   --

20        THE COURT:  Okay.

21        MR. DESPINS:  -- and if you go to -- this are two

22   paragraphs in (e), but if you go to the portion before the

23   second paragraph that is sort of -- about 10 lines from the

24   bottom, the line that starts with, "On or before the effective

25   date and related to the foregoing ..." and then it says,

1    "Provided the foregoing -- "

2         THE COURT:  Third-party release.

3         MR. DESPINS:  Yeah, exactly.  "Shall not operate ..."

4    that's the language they're relying on.  They're saying, see,

5    it says that it doesn't apply, with respect to professional fee

6    applications.

7         And my point is that that applies to the third-party

8    release, which is a defined term.  And how do we know it's a

9    defined term?  Because in Section 223 of the plan, it says,

10   third-party release means they're releases by holders of claims

11   and interest set forth in Section 9(e), that I just read to

12   you.  It makes no mention of the mutual releases contained in

13   4(a).

14        So we're not dealing with snippets as they -- and by

15   the way, they cite this Gulf Oil case that says that when

16   there's an operative provision, you defer to it.  That case,

17   Your Honor, involved the Court saying that the preamble in a

18   document must yield to an operative provision.

19        These are not -- Section 4(a) is not a preamble.  It's

20   an actual operative provision.  And the point here is that

21   there was supposed to be global peace, meaning if they want the

22   committee to leave their advisors alone -- and by the way, we

23   didn't request that; that was their request, they drafted this

24   -- then there has to be some form of quid pro quo and that's

25   what happened.

1        But, you know, I want to be clear about this.  There

2   was no agreement, meaning that I didn't raise it and they

3   didn't say we intend to release you from that, but, again, I

4   didn't ask questions about the releases they wanted.  I just

5   told them that if they want releases, they have to give

6   releases.

7        Okay.  Turning to the confirmation order -- Your

8   Honor, may I approach -- I would say, Your Honor, that the

9   confirmation order is even clearer on this.  So we'll start on

10  Page 15, Paragraph (ee).  It's a -- there are long sentences in

11  there, but the second sentence which starts with, the

12  committee's settlement agreement reflects a compromise and

13  settlement, blah, blah, blah, but you'll see at the end, in the

14  mutual release of claims and causes of action by the committee

15  settlement parties -- who are the committee settlement parties;

16  Oaktree, their representatives -- including through the plan

17  debtor releases.  So it says including -- it doesn't say

18  limited to that.

19       Next sentence:  Such mutual releases, including the

20  third-party releases.  Including -- it doesn't -- it talks

21  about mutual releases and, yes, includes the third-party

22  release, but they're separate mutual releases between the

23  parties.

24       Our view, Your Honor, is that the third-party releases

25  section applies to people like -- it was meant to apply to

1    people like the sureties, in a sense, people on their own, but

2    affected by the plan.  But it's not a third-party release

3    between us and Oaktree.  That's a direct release.  There's no

4    third-party release there.

5          But if look at Page 22, Your Honor, Paragraph 12,

6    that's the operative provision.  And, again, in the carryover

7    paragraph, it says, shall be deemed -- this is on the top of

8    Page 23, second line -- shall be deemed to have provided and

9    received a mutual full and final releases from all claims and

10   causes of action, including, without limitation, blah, blah,

11   blah.

12         So the point is that the plan -- the confirmation

13   order is clear, I would say, if not clearer, than the plan.

14   And then, when you go to the confirmation order section, the

15   confirmation order section on the third parties releases -- I'm

16   sorry, I'm trying to get there.  Okay.  It's on Page 36,

17   Paragraph B, entitled, third-party releases.  So that section

18   really, you know, is meant to apply, even though I'll stipulate

19   that it includes the committee, it includes Oaktree, is meant

20   to apply to third parties releases.  So that's the confirmation

21   order.

22         And then, I'm sure Mr. Leblanc will have a bunch of

23   arguments and I will address them later, but I think that,

24   otherwise, I mean the committee was content not to have

25   releases go beyond Oaktree and the committee.  They wanted

1    their advisors to be covered and we jumped on the bandwagon.

2    That's exactly what happened, nothing more, nothing less.

3            So, Your Honor, I do have other points, but I don't

4    want to belabor the point.  I think there are two pending

5    questions that we need to resolve, in terms of evidence and of

6    course Mr. Leblanc will be heard to respond to all my

7    arguments.  I think at this point, it would make sense for me

8    to sit down and to --

9            THE COURT:  Okay.  Thank you.

10           Let's take a very short recess and then we'll -- I'll

11   hear from Mr. Leblanc.

12       (Recess taken at 3:17 p.m.)

13       (Proceedings resume at 3:25 p.m.)

14       (Call to order of the Court)

15           THE COURT:  Please be seated.

16           MR. LEBLANC:  Good afternoon, Your Honor.  Andrew

17   Leblanc of Milbank, Tweed, Hadley & McCloy, on behalf of

18   Oaktree.

19           Your Honor, I think I will be far -- well, a little

20   bit shorter, probably by a substantial amount, because I think

21   this, in our view, comes down to two questions that the Court

22   has to answer, in reality, and then the rest of it is around

23   the margins.  I'll talk to some of it, in particular to

24   respond, but I think there are two questions:

25           The first is:  What does the DIP language mean?  Does

1   that mean that there is a -- in fact, a two-hundred-and-fifty-

2   thousand-dollar cap?  And to be clear, of amounts that can be

3   paid from certain sources that are enumerated in the DIP order.

4   So, to be clear, to the extent that there are other sources for

5   payment, he's not limited, or the committee is not limited in

6   seeking repayment from those sources.  But from the sources of

7   the DIP proceeds, the prepetition collateral, the DIP

8   collateral, there is a limitation in the DIP order, and Your

9   Honor has to decide what that means.

10          If you agree with us that that means that there's, in

11  fact, a limit on what can be allowed as an administrative

12  claim, then Your Honor has to decide if and how much and to

13  what extent administrative claims could be allowed against

14  entities that are not subject to the DIP order, are not DIP

15  lenders, and as to whom there is no prepetition collateral.

16  Those are the downstream entities or the Neo entities or the

17  non-*pari* entities.  And that's the second question.

18          And if Your Honor agrees with us, with respect to

19  that, that Your Honor cannot allow claims against them because

20  they didn't receive a benefit from the litigation, or at least

21  there has to be some allocation as to what benefit they

22  received, it isn't just a per capita allocation, then Your

23  Honor should -- would agree with us again and disallow the

24  requested fees in the amount that they're -- or the fees in the

25  amount that they are requested to be allowed.

1          Let me tick off just a handful of things that Mr.

2     Despins started with.  He noted that Oaktree is the only party

3     objecting to his fees, and that we haven't objected to anybody

4     else.  Oaktree is the 92 and a half percent owner of this

5     company going forward, so we are paying 92 and a half percent

6     of his fees.

7          We were also the DIP lender, the party that negotiated

8     the two-hundred-and-fifty-thousand-dollar budget, the party

9     that funded $130 million to this debtor, to permit it to

10    operate while in bankruptcy, on the agreement and the order

11    from this Court that the amount that could be used from our

12    money to investigate claims against us was limited, and the

13    amount that could be used to sue Oaktree was zero, from our

14    money.  From other sources, they could use it.

15         So it shouldn't be surprising to the Court that we're

16    the only people objecting.  It also shouldn't be surprising to

17    the Court that we're not objecting to other people's fees.  The

18    reason we're objecting to the committee's fees is we negotiated

19    a limited budget, which has a corresponding effect on the fees

20    that everybody has to incur in the case.  And I'll talk about

21    that in a bit.

22         But if the budget were complied with, or at least

23    closer to complied with -- and Mr. Despins said he thought the

24    factor was six times; Your Honor will note it's twenty-one

25    times higher.  They exceeded the budget by over, in the

1    aggregate, including the first interim fee application amounts

2    that we didn't object to at the time, but we -- depending on

3    Your Honor's ruling today, we may object to at the final

4    hearing, which was about $750,000.  They exceeded the budget by

5    over $5 million, a two-hundred-and-fifty-thousand-dollar

6    budget.

7         And at no point in time -- yes, they came to the Court

8    to ask for more discovery, they came to the Court seeking more

9    depositions.  But at no point in time did they come to the

10   Court and say, we need some agreement, either an expansion of

11   the budget, which we could have then said, we're not going to -

12   - we're not going to agree to it, and Your Honor could have

13   said, I'm ordering it, so the debtors can find additional

14   financing if you won't agree to it, or we'll convert the case;

15   or -- and I'll talk about this in a minute -- they could have

16   agreed to an alternate fee structure that would have allowed

17   them to be paid from what they were entitled to be paid from,

18   where we had no control over what they spent from unencumbered

19   assets.  So it should be no surprise that we're the ones

20   objecting, and that we're objecting only to their fees.

21        And it kind of makes the point.  Their co-counsel in

22   Delaware spent some money on the investigation.  I'm not -- I

23   can't remember if it's plus or minus.  Over, about, or just

24   below the 250,000.  But if the committee's fees were close to

25   250,000, we wouldn't be here, but they're not.  They're nowhere

1    near that number; they're 21 times higher than that number.

2    That's the reason that we're here, because the fees are so

3    astronomically beyond the scope of that budget.

4         So let me turn to what I think are the two issues, and

5    I'll go through them, and then I'll take some time to respond

6    to some of the points that Mr. Despins made.  And as I -- what

7    I -- the way that I think about it, Your Honor, is to start

8    with:  Can this be an allowed claim against the entities that

9    were DIP borrowers?

10        The answer to that question, we believe, is found in

11   the DIP order itself.  Your Honor, I know Your Honor has it.

12   If you'd like another copy of it, we can hand it up.  But it's

13   in Provisions 4(a) and 4(b).  And what it makes clear is that

14   the committee can't be paid from a defined set of sources

15   beyond -- and this is what 4(b) says -- beyond the $250,000

16   that was negotiated and agreed.  It cannot be paid from that

17   defined set of sources for a particular, defined set of work.

18        What they're asking here, today, is for you to allow

19   five -- well, in today's application, 4.3 million, the effect

20   of which would be, effectively, 5.3 or 5.4 million, if you

21   include the amounts accrued in the first interim fee

22   application, to allow amounts where the only source of payment

23   for those amounts is the DIP collateral.  And the reason I say

24   that, Your Honor, is you will recall, under the plan, the DIP

25   loan isn't even being repaid in full because an enormous amount

1    of money was spent, and the DIP loan is not being paid in full.

2         And so what becomes clear -- and Mr. Despins made no

3    effort to identify even a dollar of unencumbered assets to be

4    used -- at the DIP borrowers, to be used to pay his fees, as to

5    which we would -- we would and could have no objection.  If

6    there were unencumbered assets there, the DIP order would not

7    preclude the payment of those fees, but there are not.  And

8    he's not suggested, for a second, that there are.

9         Now, importantly -- and alluded to this a second ago -

10   - it doesn't mean what Mr. Despins says.  Mr. Despins says,

11   well, if they're right, then a committee has no way to get paid

12   for this work.  And I say, Your Honor, that's wrong for -- in

13   at least three different ways.

14        We talked about one.  They could negotiate with us for

15   some modification; or, alternatively, they could come to Court

16   and say, as they did with the time limit, that's not

17   sufficient, I need more money than what is put in here.  And

18   there may be consequences, if the Court ordered that.  It may

19   be a default under the DIP, and then the debtor would have

20   consequences, and they'd have to deal with that.

21        Mr. Despins refers repeatedly to Judge Jones' decision

22   in SandRidge, which was, as it relates to this issue, entirely

23   dicta because it was at the beginning of a case, and it was --

24   he had -- and in fact, if you read the rest of the transcript,

25   he goes on to say, I don't know what I would allow, but if it's

1    allowed, then it has to be paid.

2         And Your Honor, I was in front of Judge yesterday on

3    _Energy XXI_, and I was in front of him two weeks ago on _Energy_

4    _XXI_.  And the Southern District of Texas, twice, in the course

5    of the last 18 months, has approved the appointment of a equity

6    committee on the condition that they work on a contingency.

7    So, in other words, if they get a recovery, then their clients

8    would pay their fees for the work that they were doing.

9         There is no reason Mr. Despins couldn't have

10   negotiated with his clients some form of a contingency, where

11   he would say -- and he could get it approved by this Court,

12   they could come and object -- where they would say, if we

13   believe the litigation has merit, we want you to pursue it,

14   we'd like you to do it on a contingency, and we understand

15   that, if you identify and establish that there are, in fact,

16   unencumbered assets, that you should get paid out of that, and

17   you may lose, which is why we would do it on a contingency,

18   because that allows you to get some benefit from it.

19        And the third alternative, and the one, frankly, why

20   we believe this is an issue -- it truly is an issue of first

21   impression.  We don't -- neither of us have cited to a case

22   where a Court has actually been faced with this issue and

23   decided it.  Because the third way that this gets resolved in

24   most cases is the parties do, in fact, negotiate a resolution

25   that includes the payment of fees.

1        Here, that didn't happen.  Mr. Despins alluded to it
2   before.  I won't talk about the substance of mediation.  But he
3   is right that mediation did not conclude with an agreement that
4   we would pay their fees.

5        Now I would suggest Your Honor could infer -- based on
6   the fact that we had already objected to their fees, you can
7   infer whether or not the subject of their fees -- which were
8   unknown to us during the time of the mediation because not all
9   their fee applications had been filed -- whether that was the
10  topic of discussion or not.

11       But what was done here is the committee made the
12  decision to settle for an amount to be paid to the committee,
13  to be dispensed to the committee, without providing for the
14  payment of the fee -- of their fees.  So that was a decision
15  they made.

16       In every other case, or I would suggest, Your Honor,
17  in most cases, a different decision is made.  An agreement is
18  reached on a quantum of value that will be distributed to
19  unsecured creditors, and that would include payment of the
20  fees.  And it may be negotiated separately; or, alternatively,
21  if the committee believes that this was such a great outcome,
22  they could have provided for the payment of Paul Hastings' fees
23  out of their recovery.

24       That's what should have happened here.  That's the way
25  that the DIP order is structured, is you can't -- and what

1    they're asking you to allow here, through the allowance of

2    their fees, is to negotiate with us on an amount of money to be

3    paid to them in respect of their claims that there are

4    unencumbered assets, whether they are avoidance claims or just

5    assets that are not subject to liens, or -- whatever the source

6    of those unencumbered assets, they are post-petition dollars

7    that are not subject to our liens because they've been

8    recovered post-petition.  And they're saying that you should

9    allow us to take that, but then also allow us to take an

10   additional amount for the payment of the fees, and that's not

11   what the Court ordered in the DIP order.

12          And we think, Your Honor -- and the reason I raise

13   these issues is because I do think it's important that we not

14   get lost in the notion that, if Your Honor were to decide that

15   the DIP order -- the DIP budget, the 250,000 that can be paid

16   from certain specified assets, in fact, has meaning -- and

17   just, I think we can dispense with any misgiving that it has

18   meaning or not.

19          It clearly has -- it has no meaning.  Mr. Despins

20   said, in my view, it has no bearing whatsoever; I think those

21   were his actual words.  If Your Honor were to agree with him,

22   then this DIP budget, which arises in every case, so long as it

23   is -- ends in a confirmed plan and administrative claims get

24   paid, it has absolutely no bearing whatsoever, if you agree

25   with Mr. Despins.

1          What we would suggest, we think the right answer to
2     this question is to say the order of this Court, with respect
3     to the budget, like every order of this Court, does have
4     meaning.  And its meaning is that it dictates what amount can
5     be allowed from the sources of collateral or the sources of
6     dollars that are the subject of those orders.
7          And if you, Committee, want to litigate over whether
8     or not there are unencumbered assets, then -- and you don't
9     prevail, and there are no unencumbered assets, your counsel
10    doesn't get paid for that because there's an order that says it
11    doesn't.  If you do prevail, then you provide for the source of
12    payment because that's the unencumbered assets.  Either you
13    negotiate for it, you agree with them in advance how it would
14    be allocated to them, or you provide to it as a reduction to
15    your distribution.
16         And the reason that that's important is exactly the
17    circumstances that we have here.  As I said at the outset, a
18    budget provides a governor, not just on what the committee
19    spends, but it's what it can impose on everybody else to spend.
20         Let's just assume, what I would say counter-factually,
21    that a committee -- which doesn't have to produce documents,
22    and produced one witness in this case, a 30(b)(6), plus their
23    experts, which we've also paid for.  But let's just assume,
24    counter-factually, that a committee spending $5.4 million
25    imposes an equal obligation on the target of their

1    investigation; here, Oaktree, and on the debtors.  And I think

2    that's -- I say "counter-factually" because I think it probably

3    understates the obligations that they impose.  If that's true,

4    and the committee has a two-hundred-and-fifty-thousand-dollar

5    budget, we could be looking at less than a million dollars of

6    aggregate spend, unless there are unencumbered assets that they

7    believe can serve as the source of their funding.

8         Here, five -- let's just use a round number, 5

9    million.  That imposes $15 million of administrative expense,

10   again, assuming, counter-factually, that each of us spend an

11   equal amount as the committee.  It's a completely different

12   case.

13        And if the committee understood that Your Honor's

14   orders have meaning; and, therefore, they can't get paid unless

15   they make provision for it from unencumbered assets, the

16   committee would be a lot more circumspect in what they had

17   their counsel do.  And that, in fact, is what you want.  If --

18   it is, effectively, the American rule.

19        If the committee is spending it's own money, then we,

20   likely, don't have multiple hearings to talk about the scope of

21   discovery, to talk about how many witnesses they have.  Your

22   Honor will recall, we had lots of discovery disputes over those

23   issues because the committee perceived the DIP budget to have

24   no bearing whatsoever because, as Mr. Despins said, he knew

25   from the beginning a plan was going to be confirmed here.

1        And if he knew that, and his view was the budget has

2   no bearing in a circumstance where we confirm a plan, then Mr.

3   Despins had no incentive to limit what he spends.  He had every

4   incentive to spend as much as he possibly could, the

5   consequence of which is we then have to spend an equal, and

6   here, I would submit, far greater amount.

7        And I'm not going to really talk about his arguments

8   about the reasonableness, as compared to ours, but let me just

9   be clear about this.  When Mr. Despins says, well, we had to

10  depose, not just their witnesses, but everybody else, and

11  Oaktree only had to monitor those, they were suing us for

12  millions of dollars, maybe hundreds of millions of dollars, in

13  purported damages.  We were preparing ourselves for trial.

14       So, when they lob a fifty-part discovery request on

15  us, and we have to spend however many thousands of hours

16  searching documents, culling out of that what we can produce,

17  what's not privileged, hand it over to them, we have to do

18  everything they have to do, and immeasurably more.

19       When they do the same thing on the debtor, and those

20  documents come in -- the document requests go in to the debtor,

21  and the debtor does the same thing that we had to do, produces

22  those documents to the committee, we do the same thing, at that

23  point, that they have to do because we're the defendant in the

24  litigation that they're investigating.  So we do everything

25  they have to do, and much, much more.

1          And so it -- there really is no relationship.  It is -

2     - and we used -- he liked our turn of phrase; it is -- it's not

3     just a term, it's absolutely correct.  It is far easier to have

4     an associate sit down and draft a document request, and cost

5     virtually nothing in the context of these sorts of things.  You

6     can actually do that for a two-hundred-and-fifty-thousand-

7     dollar budget, and then impose on the recipient the cost of

8     responding.

9          So, Your Honor, I'm -- as to this first point, we

10    think it's clear that Your Honor's orders do, in fact, have

11    meaning.  And they have meaning as written; that, if there's

12    not another source of payment for these administrative

13    expenses, they shouldn't and can't be allowed.

14         THE COURT:  Isn't allowance and source of payment two

15    different issues?

16         MR. LEBLANC:  Well, Your Honor, it is.

17         THE COURT:  Okay.  So --

18         MR. LEBLANC:  And I think --

19         THE COURT:  -- it doesn't --

20         MR. LEBLANC:  -- that's where we --

21         THE COURT:  -- go to whether --

22         MR. LEBLANC:  -- draw the --

23         THE COURT:  So -- but the problem is to say that they

24    can't be paid out of your collateral, that doesn't mean they

25    can't -- the claim can't be allowed.  And once I allow it, or

1    don't allow it, but once I allow it, then we run into the issue

2    Mr. Despins recognizes, which is, okay, it's allowed, but it

3    can't be paid out of your collateral, so I get nothing, except

4    you want to confirm a plan, and now you have to pay it.

5         So that puts you in a situation where you have to make

6    a choice:  Do I care more about paying Mr. Despins, or do I --

7    or not paying Mr. Despins, or do I care more about getting a

8    plan confirmed?  Because if I want confirmation, I got to pay

9    the toll, and the toll is all allowed admin claims get paid.

10        MR. LEBLANC:  Your Honor, I -- and Your Honor, we -- I

11   understand -- I understand that to be his position.  We

12   disagree, and we disagree for this reason:  Is it reasonable,

13   under Section 330, to allow a claim, where there is no source

14   of payment for that claim, where you've agreed that there is no

15   source of payment for that claim?

16        And the reason is you -- if Your Honor were to rule

17   that way -- and again, I do believe this to be an issue of

18   first impression -- then parties are going to have to actually

19   face that decision that Your Honor just identified, and face

20   the decision of whether we either don't allow -- either

21   negotiate up front for that modification in the language

22   something that says that they're disallowed, and Your Honor

23   will decide --

24        THE COURT:  And I've done that.  I mean, I just

25   appointed an equity committee in Horsehead, and I said you

1    can't have an allowed fee in excess -- I can't remember what it

2    is, $2 million, I can't remember off the top of my head.  But I

3    put a hard fee cap on.  I will not allow a claim in excess of

4    that amount.  That wasn't based on someone not wanting to get

5    sued out of paying -- you know, paying out of their own

6    collateral for getting sued.  That had to do with wanting to

7    limit the damage --

8            MR. LEBLANC:  Right.

9            THE COURT:  -- to the admin claims that an equity

10   committee might perform.  But the Court did that.  So, in that

11   case, they can -- all they want.  They can send me a bill for 5

12   million; they're not going to get an allowed claim in excess of

13   the cap, I said.

14           MR. LEBLANC:  Well, Your Honor, I -- look, I

15   understand.  This is why I thought we could be more efficient

16   about the argument because it comes down to that particular

17   issue, and it's an issue as to which we simply disagree with

18   Mr. Despins.

19           And what we believe is, when you write that provision

20   -- because his argument, and particularly in the context of

21   this, he should have stood up and said, make it $5,000 because

22   I know you're going to confirm a plan.  Two hundred and fifty

23   or 100,000 -- because you'll recall, it started at a hundred

24   and was negotiated up two and a half times to 250,000.  It is

25   completely and totally irrelevant because I know there's no way

1    you're getting this company out without confirming a plan.  And

2    then, at that point, we could have made the decision.

3            Instead, what we have is an order that says they can't

4    be paid from any of our collateral.  It doesn't say unless we

5    confirm a plan, it doesn't say unless -- you know, except for

6    1129; it doesn't say any of that.  It just says, you can't be

7    paid.

8            And it's not unreasonable for us to believe, when that

9    -- when an order from the Court comes out that says that, in

10   the absence of this -- again, this is an issue, I believe, of

11   first impression.  But that -- the committee is not going to

12   spend two -- or five and a half million dollars in a case that

13   they have a two-hundred-and-fifty-thousand-dollar budget, and

14   then simply say, you're obligated to pay it because you

15   confirmed a plan.

16           We just don't think -- we disagree with that

17   interpretation of the law; that's not how we would read your

18   order, and it's not how we would read 1129 because it would be

19   unreasonable -- to our -- in our mind, the cap has to have some

20   purpose.  It has to have some governor on what is spent in a

21   case.

22           We just did NewPage II.  Mr. Despins was counsel in

23   NewPage I, to the committee; he wasn't in NewPage II, they

24   spent less than $250,000, notwithstanding the fact that there

25   was a merger transaction, and we negotiated something without

1    them ever exceeding the cap.

2           If Mr. Despins wanted to, again, he could have

3    negotiated to have his clients' recovery, what he described as

4    $36 million, fund his own fees, but he didn't do that.  And as

5    he suggested, there wasn't an agreement at the mediation with

6    respect to this point.

7           But it is -- Your Honor, what it comes down to -- and

8    Your Honor is going to call a ball and a strike on that one

9    because neither of us can point you to a decision from another

10   court.  All he can do is looked at SandRidge, which, plainly,

11   is dicta, and I -- we'll see what happens in SandRidge, when

12   they get to plan confirmation - -as of this morning, it was

13   delayed until early September, so about six weeks after the

14   committee was formed -- whether they've exceeded their two-

15   hundred-and-fifty-thousand-dollar budget in that investigation

16   period, but -- and you know, by what amount, because,

17   obviously, it certainly happens that people exceed the budgets.

18          It's just what happened here was no effort whatsoever

19   to restrain the committee's investigation or its prosecution,

20   none.  It was full-throated litigation from the get-go, and to

21   the point where we had to come back and ask for relief from the

22   Court repeatedly, from discovery requests.  And Your Honor

23   ruled in favor us, and some in favor of them.  But they clearly

24   believed from the outset that they had no restraints, and that

25   Your Honor's decision, Your Honor's order had no meaning

1    whatsoever, as it related to their litigation.

2         And therefore, we -- when we lent $130 million to this

3    company to operate, with an order from the Court that said that

4    only $250,000 of that money could be used to fund their

5    litigation, that that was irrelevant; that they could incur,

6    between what they impose upon us and what they spent

7    themselves, over $15 million.  And we think that's just wrong.

8         But again, Your Honor, it's an issue of first

9    impression.  And we represent committees from time to time.

10   We've never seen this litigated.  I think, we -- I would

11   submit, Your Honor, we probably would have shown a little more

12   restraint in this case, not because of the budget, just because

13   of the facts of the case.

14        And so I think, Your Honor, if you were to decide that

15   the budget means -- you have to decide, I think, the budget has

16   no meaning whatsoever in the context of what is an allowed

17   administrative claim and what is a reasonable amount for a

18   committee to incur, when they've negotiated for and accepted a

19   budget.

20        I'm happy to talk to the second issue, if Your Honor

21   wants to.  The second issue, as we view it, is, if you agree

22   with us on the first, then the question becomes:  What amounts,

23   if any, can be allowed from the non-*pari* debtors.  We've put

24   this -- we've laid this out in our papers, but it's absolutely

25   crystal-clear here.

1          What the committee has done is they've -- their first

2     allocation is to say 50/50 between the debtor -- the D&O

3     litigation and the Oaktree litigation, and therefore, reduce

4     our, in the aggregate, 5.3, 5.4 million down to 2.7 or so

5     million dollars.  And then they say, we are going to allocate

6     it per capita amongst all of the debtors, and the non-*pari*

7     debtors are 63 percent of the total number of debtors; and,

8     therefore, even if you -- even if we can't get paid from those

9     that are DIP borrowers, we should be able to be paid from the

10    other entities that are not.  And they rely on their "joint and

11    several" language.

12          Now Your Honor will recall -- and we cited this in our

13    papers -- this exact issue was actually addressed at the DIP

14    hearing, and Mr. Despins said he agreed.  I'll read the

15    language.  He said -- Mr. Khalil, my partner, said:

16          "There's just one clarification that I want to make,

17    that none of the -- the debtors aren't going to be jointly and

18    severally liable for administrative claims however we resolve

19    this.  If that janitor provides a benefit to one particular

20    debtor, it's that debtor who would be obligated to pay that

21    amount, not another debtor.  That's the only" --

22          Mr. Despins says:

23          "That's agreed, Your Honor.  That's agreed.  It can

24    only be done on a debtor-by-debtor basis."

25          And Your Honor, the point of that is that he has to

1    establish that there's a benefit provided to the non-*pari*

2    debtors from the work that he did, including the prosecution of

3    the litigation.

4         If you look at his submission to the Court, in -- with

5    respect to the confirmation hearing, it is replete -- and I can

6    go through the examples.  But it is replete with examples of

7    Mr. Despins telling the Court that the only party that

8    benefitted from his litigation was the parent.  And he needed

9    to do that because he was trying to take all the value from the

10   litigation and provide it to the unsecured creditors at the

11   parent level.

12        But most importantly, the first -- the starting

13   proposition is the recognition that there has never been a

14   circumstance in this case where the unsecured creditors at the

15   non-*pari* debtors were not being paid in full.  In the very

16   first plan proposed by the 10's, it paid the non-*pari* debtors

17   in full, their -- or their unsecured creditors.  In the plans

18   that were negotiated, that were proposed by us, we paid the

19   non-*pari* unsecured creditors in full.  In the plan that we

20   negotiated with them, that had a toggle between a sale or a

21   reorganization, the non-*pari* debtors were paid in full -- their

22   unsecured creditors were paid in full, other than us.  And if

23   it were sold, we were releasing our guarantee claims, to allow

24   it to be sold to somebody who would then take those free and

25   clear of our guarantees, and those obligations would become

1   obligations of the new company.  There was never a circumstance

2   in which those entitles were not being -- their creditors were

3   not being paid in full, and so there's absolutely no benefit to

4   it.

5           And what Mr. Despins just said today is, well, there

6   is a benefit because the equity value would be enhanced, and

7   therefore, as that flows up the system, there would be more

8   money going up to the top co.  Well, that's exactly the point.

9   That doesn't benefit the subsidiary debtors, that their equity

10  is worth more, so that they can give more money to -- up to

11  TopCo.  That benefits TopCo.

12          And it certainly -- while there's some world in which

13  you could argue, theoretically, that there's a benefit because,

14  until the plan is confirmed that pays those entities in full,

15  you don't know -- there's no evidence that Mr. Despins ever

16  undertook an individual solvency analysis; that he ever argued

17  against the effect -- or argued that these entitles, when

18  giving effect to the guarantee, were, in fact, insolvent

19  entities; or that he ever established that the savings clause,

20  what he referred to, the TUSA litigation, that that would be

21  inapplicable here.  And so there's really no question.

22          And Mr. Despins, I wouldn't use anyone's words but his

23  own for this.  The only -- in his words:

24          "The only victims entitled to compensation are the

25          Class 5A creditors.  There's no value to be received

1            by the Neo debtors or the Mineral debtors.  It would

2            be inappropriate to dilute the settlement recovery and

3            arbitrarily distribute the benefit of a plan

4            settlement to those estates."

5            That was his words, in his confirmation brief.

6            "Their value" -- referring to the claims -- "is

7            overwhelmingly concentrated in the Moly parent claims.

8            The plan settlement allocates the recovery

9            consistently with the fact that the complaint's value

10           lies in the parent claims."

11           Those are the arguments that he made to this Court.

12  And we had a discussion about it, and he understood the risk he

13  was taking in making those arguments because we told him that

14  we're free to use those arguments in any other context, if you

15  want to make them to the Court; we had a discussion about that.

16           And so it would be -- and to borrow his words --

17  "inappropriate," it would be "arbitrary," and it would be -- it

18  would make no sense, frankly, to allocate any portion of the

19  fees, or even any meaningful portion of the fees -- I would say

20  zero, but if they want to argue for some small allocation to

21  the entities who didn't benefit from the claim, but could have,

22  theoretically, in some world, benefitted from the claims,

23  that's one thing.

24           But to say that they're obligated to pay 64 percent of

25  the claims that were incurred, it's really just saying, I found

1   a loophole here by calling them *pari* -- by calling them

2   "jointly and severally liable."  That was never contemplated.

3   And in fact, the discussion at the DIP hearing is exactly the

4   opposite.

5          Your Honor, I -- those -- to use, those are the two

6   issues that the Court really has to address.  If Your Honor

7   wants to hear about the release, his argument that we waived

8   this claim, I'll just do it very quickly.

9          He's conceded -- and we've gone through this once

10  before.  He's conceded that there was never a meeting of the

11  minds.  In fact, the discussion was exactly the opposite, that

12  we were not waiving our objection to his fees.  But he's saying

13  that, nonetheless, we've drafted language in a way that does.

14         If you look at the very language that he points to, in

15  the description of the settlement agreement that says that

16  there are mutual releases, those are mutual releases between

17  the committee and its representatives and the debtor, among

18  others, including Oaktree.

19         What that means, if you want to -- and if you want to

20  argue that that has the meaning he's interpreting it to, what

21  it means is that he has waived, Paul Hastings has waived its

22  claims against the debtors for fees.  There is no carveout from

23  that language that says that they haven't done that, that

24  they've preserved their claims.

25         In fact, the only carveouts that exist -- and he -- I

1    don't know how he did this, but he didn't point the Court, in

2    the confirmation order, to the language that Your Honor

3    actually signed, that says that all objections --

4            "Notwithstanding anything to the contrary herein, all

5             objections to fees are preserved."

6        That's --

7    (Participants confer)

8            MR. LEBLANC:  In the confirmation order, Your Honor,

9    at --

10           UNIDENTIFIED:  69.

11           MR. LEBLANC:  -- Page 53, in a section that deals with

12   professional fees.  Page 52 is the section -- the start of the

13   section.  Page 53, Paragraph 69.  It ends with:

14           "-- provided, however, that nothing herein shall, in

15            any way, limit, impair, or waive any objection to

16            allowance of any fee claim."

17           He didn't read that portion to you.  But it's clear

18   that -- it begins with "nothing herein."  But he's saying that

19   other sections herein waived the objection to the fee claim.

20           If anything, if his interpretation of the -- if he's

21   right that we agreed to exchanged mutual releases that included

22   the representatives, then those releases are mutual.  And not

23   only should he not be allowed the 4.5 million he's seeking with

24   respect to the investigation, the three-plus million dollars

25   that he will be paid pursuant to Your Honor's direction is

1    something that will have to be disgorged at the final fee

2    hearing, if he's right that he slipped this -- that we changed

3    this language, and he knew what it meant, and he knew we were

4    waiving our objection to his fees, and he allowed it to go past

5    him.  What he did is he allowed -- it's not a unilateral

6    mistake on our part.  It is his mistake because he understood

7    clearly and full and well what he was doing; he was waiving his

8    claim to fees against this estate.  That's how you have to read

9    the mutual release language, if you want to read it the way

10   that -- if you want to give it the meaning that Mr. Despins

11   suggests that it should have.

12           And I'll also note, with respect to that, Your Honor,

13   even after this objection -- even after the plan was confirmed

14   -- or may have been before the plan was confirmed, but

15   certainly after our settlement -- Mr. Despins has a pending

16   objection to one of our fee requests.  So, if he thinks that

17   there's a waiver of the fee request, why hasn't he told us that

18   my fee request has been waived or didn't even make the

19   objection in the first instance?  He's objected to our fees

20   because he said they were unreasonable because we objected to

21   his fees because we said they exceeded the DIP cap.  And so we

22   haven't put that on for hearing yet because we don't think that

23   there is a relationship between the two.  But you can't, on the

24   one hand, say that all of us have agreed to exchanged mutual

25   releases, and at the same time, maintain an objection to our

1    fees as unreasonable.

2         Your Honor, let me -- I think those are all the -- one

3    second.  Your Honor, I think those are all the specific

4    responses I wanted to offer, unless the Court has other

5    questions.

6         THE COURT:  Uh-uh.

7         MR. LEBLANC:  I will say, Your Honor, I think this is

8    an important decision because it will guide us, the

9    practitioners, in other courts in how we deal with these issues

10   as we go forward.  And it will be -- I certainly know that I

11   will advise my clients differently if the answer to the

12   question that is posed is, notwithstanding the negotiation of

13   that fee cap, you have to pay these fees, and there isn't --

14   the budget provides no check whatsoever on what is reasonable

15   for a creditors' committee to spend in the circumstance where

16   you confirm a plan.

17        Our client was never presented with that as an

18   understanding because the case law doesn't hold that to be

19   true.  They have the burden of proof on their fees.  If we had

20   understood that, by confirming a plan, we were assenting to the

21   payment of their fees, something we refused to do through the

22   mediation process, then our client will know in the future that

23   that's the consequence of doing so.

24        And I think, for that reason, it's a very important

25   decision because it will dictate what meaning Your Honor's

1    orders have with respect to issues like this.  And these

2    issues, obviously, arise in every case; they just haven't been

3    litigated.  And I think, Your Honor, for that reason, you

4    should be clear that parties that want to exceed a budget have

5    avenues available to them, but one of them is not simply to

6    ignore it, and then come and tell the Court that they should --

7    they -- the Court should just ignore its own order, as well.

8           So, with that, Your Honor, we would ask that the Court

9    sustain our objection to the portion of their fees that exceed

10   the budget.

11          THE COURT:  Okay.

12          MR. LEBLANC:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Mr. Despins?

15          MR. DESPINS:  Your Honor, may I speak to Mr. Leblanc

16   one second?

17          THE COURT:  Uh-huh.

18          MR. DESPINS:  Or should --

19          THE COURT:  No, no.  Go ahead.  That's fine.

20      (Participants confer)

21          MR. LEBLANC:  We -- Your Honor, there were two open

22   discovery issues.  We don't agree to the relevance of either of

23   them.

24          Mr. Despins has proposed to put in -- he's shown me

25   two -- a back-and-forth proposal from one point in time, but

1    not the full range of proposals that went back and forth

2    between us.  I don't think it's relevant at all, and I think it

3    would be inappropriate for the Court to take a look at what our

4    negotiations were.

5         But if you want to, I would submit, Your Honor, you

6    should look at the full range, see where they started, see

7    where they went to, then where they went to, and then where

8    they went to, and then where we ended up.  I don't think you

9    should see just one, you know, couple-of-week period of time of

10   the back-and-forth.

11        As to the second issue, I just don't think it's

12   relevant what indications of interest were provided at any

13   point in time; it just doesn't strike me as relevant.  If Your

14   Honor did want -- if Your Honor wanted to allow that to be

15   seen, I would just ask that Mr. Despins walk up -- we can walk

16   up with it, you can you look at it, and he can walk back with

17   it because I think, for all of our interests, it's always been

18   held out from the public view, and I don't think we want to

19   bother with a motion to seal.  I just don't think the

20   information that's contained on what he wants to show you is at

21   all relevant to the issues before the Court.

22        THE COURT:  Okay.  Thank you, Mr. Leblanc.

23        Do you want to deal with the latter two issues first -

24   -

25        MR. DESPINS:  Yes.

1              THE COURT:  -- and then reply to what Mr. Leblanc --

2              MR. DESPINS:  Yeah, here's my concern, Judge.  Mr.

3      Leblanc may have said, like at least five times, that there are

4      not precedents on this issue.  And I know what that telegraphs.

5      And I'm concerned about having a full record, and that's why I

6      think these issues are important, so let me try to address

7      them.

8              The first one is a letter of intent received in

9      December.  I'm not going to mention names or amounts at this

10     point.  But we believe that's relevant because it shows a

11     certain view of the world, where a lot of what he's addressed

12     would become very, very relevant.  So, to me, that's important.

13             I share his view, though.  I don't want -- we don't

14     want to reveal the amounts in the public.  We're going to be a

15     7.5 percent shareholder of this debtor, you know, or this

16     entity, if it's going to be sold.  We don't want -- we don't

17     want to muck that up.  On the other hand, we believe -- we're

18     concerned about having a full record about the state of play,

19     when the work was undertaken, and the difference between that

20     and at the confirmation hearing, where these statements were

21     made, regarding where we ended up and why.  So you understand

22     that point.

23             THE COURT:  Okay.  Yes, I understand that point.

24     What's the -- well, respond to the other issue.

25             MR. DESPINS:  Okay.  The other issue was these are

1  exchanges of offers before -- in October of 2015, before --

2  long before a complaint was filed, long before mediation was

3  started.  And it's solely to establish the reasonableness of

4  the committee's approach, given Oaktree's response to our

5  offers.  And it was done before any discovery -- I'm sorry --

6  before any depositions were taken, and we -- and it was

7  described to them as a "blue-light special," meaning a one-time

8  opportunity.

9          And we -- you know, obviously, after that, there was

10  depositions where the CFO, for example, said he didn't

11  understand how the make-whole worked and all of that.  So,

12  obviously, our position may have changed.  But at that time --

13  so -- and I believe, again -- I'm concerned about having a full

14  record -- that it's important as a data point because there's a

15  lot of allegations about the committee being out of control,

16  dah, dah, dah, dah.  And I'd rather have a full record on that,

17  and that's why I think it's relevant.

18          THE COURT:  All right.  Mr. Leblanc?

19          MR. LEBLANC:  Your Honor, I think, with respect to the

20  first document, I talked about that already, while -- it has no

21  probative value because what he's referring to is how much

22  value would flow up to somebody other than those subsidiary

23  entities.  I don't think it has any probative value.

24          With respect to the second one, if Your Honor wants to

25  delve into the settlement discussions -- and he -- I don't know

1  why he would have just offered, you know, his <u>Kmart</u> example.

2  But if you want to delve into that, we don't think you should,

3  we object to it.  But if you do, you should do it on a full

4  record.

5          THE COURT:  All right.  Well, with regard to the LOI,

6  I don't see the relevance or probative of looking at that, and

7  I'm very concerned about its confidential nature.  But I don't

8  really see how it plays in, given the arguments, about how it

9  shows the value and how that sort of percolates up.  I don't

10  know.  I don't believe that, necessarily, addresses what's

11  more, perhaps, a legal point, or a finding of a legal point

12  about how liability should or shouldn't be allocated to the

13  *pari* debtors.

14          MR. DESPINS:  Yeah, and --

15          THE COURT:  So ...

16          MR. DESPINS:  -- I wasn't clear on that.

17          It addresses that point, which is -- let's not talk

18  about amounts; let's talk about concept.

19          Let's assume that there was a huge amount of value

20  offered.  I'm not saying that's the case, but let's assume that

21  there was.  It goes to the issue of what I said at the

22  confirmation hearing because they're hitting us with what I

23  said at confirmation, where we -- you know, the point I was

24  making is that, when the value is less than or very close to

25  what they're owed in principal and interest, all of these

1   claims reduction theories are not that compelling anymore,

2   right?

3          THE COURT:  Uh-huh.

4          MR. DESPINS:  Because you can disallow their make-

5   whole claim all you want.  But if they're -- if the value is

6   equal or close to their principal and interest, then it's not -

7   - what we're focusing on, in terms of recovery, are direct

8   claims, and those direct claims were owed by the parent.

9   That's the justification for the settlement, at the end.  But

10  the world was not always like that.

11         THE COURT:  All right.  I understand.

12         MR. DESPINS:  The world was --

13         THE COURT:  All right.

14         MR. DESPINS:  Okay.

15         THE COURT:  I'll allow it, and I'll take it under seal

16  under 107, so no formal motion is required.

17         MR. DESPINS:  May I approach, Your Honor?

18         THE COURT:  Yes.  Thank you.

19         MR. DESPINS:  And just to complete the record on that,

20  I would point out that the deadline by which this entity and

21  other entities had to submit a bid was February 26th, 2016, and

22  at that time, this entity did not submit a bid, so well into

23  the litigation.  And actually, it sort of coincides with the

24  signing of the settlement agreement.

25         THE COURT:  Okay.

1          MR. DESPINS:  As to the other issue, which is the bid

2     and the ask, if Mr. Leblanc wants to supplement the record, I -

3     - he's free to do so.  But I think that the point we're making

4     is that the position of the committee, given, ultimately, what

5     we got --

6          THE COURT:  All right.  I'll allow it.  And Mr.

7     Leblanc, if you want to supplement the record, you can -- I'm

8     going to take this matter under advisement.  So, if you want to

9     supplement the record, you can do so.

10          MR. DESPINS:  And Your Honor, are we doing -- are we

11     doing these under seal, or are we now putting our respective

12     proposed --

13          THE COURT:  They're under seal.

14          MR. LEBLANC:  Thank you.  And that -- does that order

15     apply to anything that we --

16          THE COURT:  Yes.

17          MR. LEBLANC:  If there are offers --

18          THE COURT:  Yes.

19          MR. LEBLANC:  -- that we want to -- yeah.

20          MR. DESPINS:  Except these offers were not made in

21     mediation, so I don't know if we're -- so --

22          THE COURT:  Well, but they're subject to rule -- I

23     mean, look, I don't think it's constructive to publicize to the

24     world --

25          MR. DESPINS:  No, no.

1          THE COURT:  -- the negotiations that went on that led

2     to confirmation of this plan --

3          MR. DESPINS:  No, no.

4          THE COURT:  -- just because there's a fee dispute.

5          MR. DESPINS:  Sorry, Your Honor.  I was not clear.  I

6     didn't mean that there shouldn't be any seal.  I was just

7     pointing out that these were made before -- well, before the

8     mediation started.

9          So, Your Honor, I have two documents, one is an email

10    dated October 30th, and one dated October 25th.  So may I

11    approach?

12         THE COURT:  Yes.

13         MR. DESPINS:  Let me give a copy to Mr. Leblanc.  He's

14    already seen them, but ...

15         THE COURT:  And then I'm going to ask you to do your

16    reply, and try to wind up by 4:30, if you can.

17         MR. DESPINS:  Yes, Your Honor.

18         THE COURT:  I know that's a tight -- but you know, do

19    what you can, but ...

20         MR. DESPINS:  Yes, Your Honor.  So I just want to take

21    you through these documents very --

22         THE COURT:  Yes.

23         MR. DESPINS:  -- very quickly.  The first one,

24    starting on October 25th, is an offer from the committee.

25    You'll see it, I marked a page, Page 2.

1          THE COURT:  Uh-huh.

2          MR. DESPINS:  And this is where there's a description

3     of what the committee was asking of Oaktree.  You see -- I'm

4     not going to give the amounts, but you can see them.

5          THE COURT:  I see them.

6          MR. DESPINS:  X percent of new common stock and Y

7     percent of out-of-the-money warrants, and other matters there.

8          But that's the -- and the next document is an email

9     from Milbank, dated October 30th, which is their counter.  And

10    you'll see what they were offering us, which is on the tabbed

11    page.  You'll see that there's -- actually, this one ...

12    (Participants confer)

13         THE COURT:  I see what you've highlighted.

14         MR. DESPINS:  Yeah, okay.  So out-of-the-money

15    warrants for that percentage.

16         THE COURT:  I see it.

17         MR. DESPINS:  Okay.  And by the way, on October -- I

18    think it was November 1st, the debtors filed their plan with

19    Oaktree -- and that's public -- offering us seven and a half

20    percent out-of-the-money warrants, no primary equity, no cash.

21    And where we ended up is seven and a half percent outright

22    stock, plus 2 million of cash, plus 3 million of cash from the

23    insurance carrier.

24         So the point there, Your Honor, is this is October,

25    before millions of dollars were spent in fees.  But we were

1   offered -- you see what we're being offered, what we asked for,

2   which is very close to where we ended up.  And so I think

3   that's a very important point, in terms of showing the

4   committee -- the reasonableness of the committee's fees.

5       So, now, let me turn to -- and I'll conclude by 4:30,

6   Your Honor.

7       MR. LEBLANC:  Your Honor, I'm going to have a couple

8   of minutes to talk to these documents, now that they've been

9   admitted.  So if you want us to done by -- if he could end by

10  4:28, that would be ...

11  (Laughter)

12      THE COURT:  All right.  I'll give you a couple of

13  minutes.

14      MR. LEBLANC:  Thank you.

15      MR. DESPINS:  And I'll do my best.

16      Okay.  So the first thing is Mr. Leblanc keeps saying

17  this is a case is a first impression.  It's not a first

18  impression.  First of all, Your Honor has already said that.

19  You haven't published a decision, but I believe you've said

20  that in other cases, before.  I think we cited to Cal Dive.  I

21  know it was not -- it was probably dicta or something on -- you

22  know, on the bench, not a written decision.  But clearly, you -

23  - I believe you've already stated that, whether it exceeds the

24  budget or not, it's an admin claim, that it must be paid.

25      The second case is Emons, E-m-o-n-s, the equity

1   committee case.  It's exactly on point:  Cash collateral

2   provision saying you can't pay more than X, and the Judge says,

3   hey, there's a plan confirmed, different world now.

4        Channel, Walrath's -- Judge Walrath's decision.  That

5   was not a plan --

6        THE COURT:  That's a 7.

7        MR. DESPINS:  -- but she --

8        THE COURT:  Yeah.

9        MR. DESPINS:  -- but she did say that the cap on fees

10   for professionals -- for the committee professions are not

11   binding on the Court.

12        The Scott Cable case, a Connecticut case, not

13   involving professional fees, but the same argument; basically,

14   secured creditors saying IRS can't get paid its admin claim,

15   I'm owed -- there's no value left after I'm paid.  And the

16   Court said, sorry, plan, 1124, you must pay.

17        So the point is the argument that you can get paid

18   from other sources, that's what these Court reject, which is

19   that 1124 does not contain such an exception.  If you want a

20   plan confirmed, 1124 says you must pay all admin claims, and

21   that's what we have here.

22        The next point, briefly, is, you know, there was no

23   worry about the automatic disallowance provision.  And to me,

24   that speaks volumes about, you know, what they should have done

25   and didn't get here.  And I think the Court would be in a box,

1    if you had approved that.  By the way, I don't think the Court

2    should ever approve that, unless I represent the secured

3    creditor.  But no, all kidding aside, I think that -- you know,

4    that's very important.

5         The -- you know, the fact that the budget has no

6    consequence, I really disagree with that, you know, from a

7    whole slew of reasons:  Rule 11, reasonableness under 330,

8    results obtained.  Let's assume in this case that we racked up

9    $5 million in fees litigating against them, and that we got a

10   settlement for $500,000.  I think Your Honor would look at us

11   and say, you know what, you guys have a problem.  And

12   therefore, there is a check and balance.

13        But clearly, we cannot have -- this is a fundamental

14   issues.  If we're going to have -- start -- if we're going to

15   start -- have committee counsel -- I'm talking about creditors'

16   committee counsel, which is mandatory under the Code, not an

17   equity committee, which is not mandatory -- but creditors'

18   committee counsel on a contingency fee basis, I think that's

19   going to change the nature of the practice.  And I think that

20   the Code doesn't support that.

21        Now NewPage.  He says, in NewPage II, because I was

22   not involved, there was $100,000, and that's wonderful.  But

23   NewPage II, the company had come out of Chapter 11 two years

24   before that, so they had a clean -- meaning, they had -- there

25   were no -- it's -- the financings had been approved by the

1   prior -- by the prior court, so, clearly, there were no issues

2   there.

3          Not a word about the joint and several retention

4   order.  And Your Honor, again, I'm really concerned about

5   having a full record here.  I think that, if Your Honor is

6   going to rule, I think that it's important.  That order is

7   final, nobody is -- there's not been any allegations regarding

8   that order not applying, or somehow, you know, lack of notice

9   or anything like that.  That order and our motion to be

10  retained came after the DIP hearing and the DIP order.

11         And the argument regarding benefit to creditors.  This

12  is assuming that the order doesn't apply, the retention order

13  doesn't control on joint and several.  Basically, there's no

14  need to avoid certain obligations or to limit claims.  You

15  don't need to show insolvency, we know that.

16         And in fact, in cases involving Judge Abrams -- I

17  forget the name of the case now -- but on make-wholes, she

18  disallowed the <u>Access</u> (phonetic) make-whole, even though there

19  was solvency or payment in full.

20         The argument on the releases.  I mean, I -- basically,

21  they say, well, if that's what the release says, then everybody

22  -- then you waive all your claims against the estate.  That's

23  amusing.  But then, if you follow that logic, Oaktree would

24  also have waived this claim against the estate because they

25  exchanged releases with the debtors.  Of course, the meaning of

1   this was global peace for all, and that's the only way the

2   Court, you know, can read it.

3          Now the last two points, Your Honor.  They reference

4   in Section 69 to the word "herein."  They say, you see, we

5   protected our right to assert objections because, in Paragraph

6   69, we added "nothing herein."  And so I -- again, we have to

7   look at that, and I've looked at it extensively.  And Your

8   Honor, there are tons of references to a different wording in

9   the confirmation order, in the plan, that says "nothing

10  contained in the plan," "nothing contained in this confirmation

11  order."  This says "nothing contained herein."  It refers to

12  the provision itself, not to other provisions.

13         And just to give you some examples -- and I'll give

14  you all of the -- the use of the words "nothing contained in

15  the plan," there are about half a dozen of those, both in the

16  plan and in the confirmation order.  I'm trying to find them.

17  Sorry.

18         Okay.  Confirmation order, Paragraphs 44, 45, 49, 50,

19  58, and 64 all use the words "nothing contained in this

20  confirmation order" or "contained in the plan."

21         In the plan, Paragraphs -- Page 65, Article 7(d); Page

22  66; 8(d) on 67; Article 8(b) on Page 71; Article 10 on Page 80

23  all use the different formulation "nothing contained in the

24  plan."

25         And actually, some of these provisions actually say

1  "nothing contained herein or in the plan."  So, clearly,

2  there's a difference between the two.  So "nothing herein"

3  protected them against something contained in Section 69, not

4  something contained in other sections of the confirmation order

5  or the plan.

6        I'm trying to go quickly.

7        THE COURT:  It's okay.

8        MR. DESPINS:  The last point is that they're basically

9  saying they did not --

10       THE COURT:  I'm here.

11       MR. DESPINS:  Okay.  They did not understand that

12  confirmation of the plan meant they had to pay admin claims in

13  full.  I don't know what to say about that.  This is an issue,

14  as I said, because we worked on this, either opposite side or

15  on the same side.  They know this issue cold.  They know that

16  confirmation means you have to pay admin claims in full,

17  regardless of whether there's unencumbered assets or not.  It's

18  not up to us to prove those.

19       Just one second, Your Honor.

20   (Pause in proceedings)

21       MR. DESPINS:  That's all we have, Your Honor.

22       THE COURT:  Okay.  Thank you.

23       MR. LEBLANC:  Your Honor, just responsive to the

24  couple of points.  So, if you have the two exhibits that Mr.

25  Despins handed up, the first of -- on the 25th.

1          THE COURT:  Yes.

2          MR. LEBLANC:  He highlighted only Clause 1 of that.

3  I'm just going to ask the Court to read Clause 2, which Clause

4  2, the first section, "X."

5          THE COURT:  Uh-huh.

6          MR. LEBLANC:  I can't even begin to tell you the

7  extent to which that was negotiated.  That was the subject of

8  the first couple of months of the mediation.  So to say that it

9  was limited to what is in one is a fallacy.

10          THE COURT:  Okay.

11          MR. LEBLANC:  I would also point the Court to 2(z),

12  which --

13          THE COURT:  Okay.

14          MR. LEBLANC:  So to say that we were just -- we were

15  really close, because that -- I don't know why he would have

16  suggested that without having this document in the public

17  record.  It's not even remotely the case.

18          And then Section 3 is another provision that doesn't

19  find its way into the final plan, and Section 4 doesn't find

20  its way into the final plan.

21          And I'll also note, with respect to the second

22  document, that -- the proposal from us -- there are two

23  scenarios.  Scenario two, Your Honor, I would submit, is

24  exactly what we agreed, ultimately, in the plan, in the event

25  of a sale.  So just below the portion that he highlighted --

1    you see scenario one -- there's a scenario two.  And so, on

2    October 30th, we proposed something that is exactly what we

3    settled on, after another $4 million of fees just on their

4    side.

5          The only other point I'll make, Your Honor, because I

6    think we've addressed all of their points, including -- I think

7    we've talked about the joint and several.  I don't know how the

8    Court can ignore the fact that there has to be a benefit to

9    those entities.  They've argued that there is a benefit; we

10    disagree.

11          Even the other document that Your Honor received under

12    seal doesn't support a benefit to that entity at all because,

13    if there was a sale, there was never contemplated a sale where

14    the unsecured creditors, the trade vendors of those entities,

15    were not going to go with the sold asset, and weren't going to

16    be satisfied in full.  There was never a contemplation of that,

17    not a single time.

18          The creditors' committee, for $250,000, the budget

19    that they had agreed to, could have, with that amount of money,

20    negotiated for an agreement that the unsecured creditors at the

21    Neo entities that were non-*pari* entities would have been paid

22    in full because we've never taken a contrary position.  So they

23    didn't need five and a half million dollars to do it, and they

24    certainly didn't need 63 percent of five and a half million

25    dollars to do it.

1          The last point I'll make, Your Honor, is the language

2     that's in the confirmation order, although this is in the plan,

3     there's a rule of construction in the plan that says the words

4     "herein" -- and it has "hereof" and "hereunder" and "hereto" --

5     refer to the plan in its entirety, rather to a particular

6     portion of the plan.

7          So it's just a -- I mean, we've made this point in our

8     brief.  For them to stand here and say that, when we had a

9     negotiation, where we understood it was contested, whether or

10    not their fees would be allowed in the full amount because of

11    the budget, for him to say that, well, we -- I got a waiver

12    from you, notwithstanding that, you messed up, it's just a

13    fallacy, particularly when they lodge an objection to our fees,

14    when he's never raised it.  We've continued to -- we objected

15    to his fees before, we objected to his fees after.  The first

16    time he raised it is in his reply brief, filed here.  And he

17    did so thirty-plus pages into his reply.  It's clear not even

18    he believes it.

19         And so, Your Honor, I think, for the reasons I

20    discussed earlier, we'd ask that you sustain our objection to

21    his fees.  Thank you, Your Honor.

22         THE COURT:  All right.  Mister --

23         MR. DESPINS:  Yeah, two seconds.

24         THE COURT:  Yes.

25         MR. DESPINS:  The offer, on a stand-alone basis, on

1    the sale context, is not what was agreed to under the plan at

2    all.  And what I would -- it's true that I focused you on the X

3    percent of the common stock and not the other provision.  But

4    also, this was completely settled without cash.  We are getting

5    zero cash.  We're getting 5 million of cash under the plan.  So

6    that's a material difference.  So I wasn't saying that we were

7    close.  We were very far, meaning we were close to where we

8    ended up.  We were very far from them, which was seven and a

9    half percent, no cash, out-of-the-money warrants.  Remember

10   what Mr. Tracy testified at the confirmation hearing.  Those

11   warrants were worthless in a real-life context.

12          Their rule on interpretation, you know, that's -- I

13   love these arguments, and that's a nice one.  Except that I

14   don't believe -- the plan -- sorry -- the confirmation order

15   takes precedence over the plan.  And the confirmation order is

16   replete with this "in the order or in the plan."

17          So I -- but also, just to change the analysis, I mean,

18   it doesn't change 1124 one bit, which is that, you know, once

19   you have a confirmed plan, you need to pay the claims in full.

20   Thank you.

21          THE COURT:  Okay.  All right.  Thank you very much.

22   I'm going to take the matter under advisement.

23          Mr. Leblanc, if you want to supplement the record, you

24   can do that.  I -- just contact chambers to inform them, you

25   know, if you're going to do it, and if so, when.  Don't file

1   anything on the docket, obviously; submit it to the Court under

2   seal.

3             MR. LEBLANC:  We will do so, Your Honor.

4             THE COURT:  All right.  Very good.  Thank you very

5   much.  We are adjourned.

6             MR. LEBLANC:  Thank you, Your Honor.

7             MR. DESPINS:  Thank you.

8        (Proceedings concluded at 4:26 p.m.)

9                              *****

1                        <u>CERTIFICATION</u>

2           We certify that the foregoing is a correct transcript

3     from the electronic sound recording of the proceedings in the

4     above-entitled matter to the best of our knowledge and ability.

5

6

7

8     <u>/s/ William J. Garling</u>          July 27, 2016

9     William J. Garling

10    <u>/s/ Coleen Rand</u>                 July 27, 2016

11    Coleen Rand

12    Certified Court Transcriptionist

13    For Reliable