## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
In re:                                    :   Chapter 11
                                          :
                                          :   Case No. 15-11371 (CSS)
                                          :   (Jointly Administered)
MOLYCORP MINERALS, LLC, et al.,[1]        :
                                          :
                                          :   Hearing Date (Bid and Other Procedures):
                                          :       May 15, 2017 at 10:00 a.m. (ET)
                    Debtors.              :   Obj. Deadline (Bid and Other Procedures):
                                          :       May 8, 2017 at 4:00 p.m. (ET)
                                          :   Sale Hearing: June 23, 2017 at 2:00 p.m. (ET)
-------------------------------------------------------------x
```

### MOTION OF PAUL E. HARNER, CHAPTER 11 TRUSTEE, FOR AN ORDER (I)(A) AUTHORIZING THE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES OF THE MINERALS DEBTORS' BUSINESS AND CERTAIN RELATED ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (II)(A) APPROVING BIDDING PROCEDURES, (B) APPROVING AN EXPENSE REIMBURSEMENT PAYABLE TO THE STALKING HORSE BIDDER, (C) SCHEDULING THE AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) GRANTING RELATED RELIEF

Paul E. Harner, as chapter 11 trustee (the "**Trustee**") in the above-captioned chapter 11 cases of Molycorp Minerals, LLC, *et al.* (collectively, the "**Minerals Debtors**"), by his undersigned attorneys, submits this motion (the "**Motion**"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and L. R. 6004-1 of the Local Rules of Bankruptcy Practice and Procedure (the "**Local Rules**"), seeking entry of orders:

1.    (a) approving the sale (the "**Sale**") of the assets of the Minerals Debtors within the United States as described in the Purchase Agreement (as defined below) (the "**Purchased Assets**") to ERP Strategic Minerals, LLC, (the "**Stalking Horse**

---

[1]    The Minerals Debtors are the following 6 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Molycorp Minerals, LLC (4170); Industrial Minerals, LLC; Molycorp Advanced Water Technologies, LLC (1628); PP IV Mountain Pass, Inc. (1205); PP IV Mountain Pass II, Inc. (5361); and RCF IV Speedwagon Inc. (0845).

**Bidder**") on the terms set forth in the Purchase Agreement, free and clear of all liens, claims, and encumbrances, subject to higher and better bids, if any, submitted in accordance with the Bidding Procedures (as defined below); and (b) approving the assumption and assignment of certain executory contracts and unexpired leases in conjunction with such Sale; and

2.      (a) establishing bidding procedures (the "**Bidding Procedures**"), substantially in the form attached as **Exhibit 1** to the proposed form of bidding procedures order (the "**Bidding Procedures Order**") attached hereto as **Exhibit A**, in connection with the Sale of the Purchased Assets; (b) authorizing an expense reimbursement (the "**Expense Reimbursement**") payable to the Stalking Horse Bidder in the event of submission of higher and better bids in accordance with the Bidding Procedures; (c) scheduling an auction (the "**Auction**"); (d) scheduling a hearing (the "**Sale Hearing**") to approve the Sale; and (e) establishing certain procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**"), and approving the form and manner of notice of the proposed assumption and assignment of executory contracts and unexpired leases (the "**Assumption and Assignment Notice**").

In support of this Motion, the Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Trustee was appointed in these cases and charged with one primary task:  to actively pursue a sale of the assets of the Minerals Debtors associated with the rare earth minerals mine and processing facility (the "**Processing Facility**")  located in Mountain Pass, California (the "**Mountain Pass Mine**") in order (a) to maximize the value of the Minerals Debtors' estates for the benefit of all creditors, and (b) to achieve, if possible, maintenance of the Mountain Pass Mine as a going concern, to avoid triggering substantial environmental reclamation and remediation obligations.

2.      In pursuit of both these objectives, the Trustee had originally hoped to orchestrate a "turnkey" sale of the Mountain Pass Mine.  Following the severance and transfer to Secure Natural Resources, LLC ("**SNR**") of certain mineral rights (the "**Mineral Rights**") to the ore at the Mountain Pass Mine in April of 2016, pursuant to the *Order (A) Approving Asset Purchase*

*Agreement, (B) Approving the Sale of Certain Molycorp Minerals Assets to the Purchaser Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to Bankruptcy Code Sections 105(a), 363(b), (f), (k), and (m), (C) Approving Assumption and Assignment of Certain Executory Contracts Free and Clear of All Liens Claims, Encumbrances, and Other Interests Pursuant to Bankruptcy Code Sections 363 and 365, and (D) Granting Related Relief* [Plan Debtors D.I. 1559], however, such a transaction became a three-legged stool, consisting of (a) the Mountain Pass Mine assets owned by the Minerals Debtors, including the surface rights and certain of the equipment associated with the Processing Facility, (b) the balance of the equipment associated with the Processing Facility, owned by OCM MLYCo CTB Ltd. ("**Oaktree**") and leased to the Minerals Debtors (the "**Oaktree Equipment**"), and (c) the Mineral Rights, now owned by SNR.  This three-legged stool lost one if its legs, however, at least insofar as a sale process conducted by the Trustee, when SNR entered into what has been represented to the Trustee is an "exclusive" arrangement with one of the potential bidders (not the Stalking Horse Bidder) for sale of the Mineral Rights.  This renders a single turnkey sale to any other bidder impossible.

3.     Nevertheless, following a comprehensive sales and marketing processes overseen by the Trustee, the Trustee has reached agreement with the Stalking Horse Bidder to acquire substantially all of the assets of the Minerals Debtors[2] associated with the Mountain Pass Mine, and to assume substantially all of the environmental obligations and liabilities, in each case as hereinafter more fully described, without any contingencies associated with acquisition by the Stalking Horse Bidder of the Oaktree Equipment or the Mineral Rights.  It is the understanding

---

[2]     For example, the Stalking Horse Bidder is not purchasing any of the Minerals Debtors' assets outside of the United States, such as those located in Sri Lanka, which will remain property of the Minerals Debtors' estates.

of the Trustee, however, that the Stalking Horse Bidder is in active discussions to acquire the

Oaktree Equipment, and believes it can operate the Processing Facility without the Mineral

Rights, if that ultimately proves necessary.[3]

4.    For the convenience of the Court and parties in interest, the following is a

summary timeline identifying the relevant dates and proposed deadlines in connection with the

Bidding Procedures and Sale:

- May 8, 2017 @ 4:00 p.m.    Deadline for objections to the Bidding Procedures;

  May 15, 2017 @ 10:00 a.m. (ET)    Bidding Procedures Hearing;

- May 19, 2017    Proposed deadline for filing and service of the Assumption and Assignment Notice;

- May 19, 2017    Date of publication of the notice of Auction;

- May 29, 2017 @ 4:00 p.m.    Deadline for filing objections to the assumption and assignment of executory contracts and unexpired leases and proposed cure amounts, except as to adequate assurance of future performance;

  June 9, 2017 @ 4:00 p.m.    Deadline for filing objections to the Sale;

  June 9, 2017 @ 4:00 p.m.    Deadline for filing objections to the proposed assumption and assignment of executory contracts and unexpired leases on adequate assurance grounds;

- June 12, 2017 @ 5:00 p.m.    Deadline for submitting Qualified Bids (as defined below) due with good faith Deposit, proof of financial ability to pay and mark-up of the Purchase Agreement;

- June 14, 2017    Auction to take place at the Philadelphia offices of Ballard Spahr LLP;

---

[3]    In this regard, the Stalking Horse Bidder may be uniquely situated. The "lock-up" of the Mineral Rights may well prove to be an insurmountable obstacle to other bidders.

|  | June 19, 2017 @ 4:00 p.m. | Deadline to submit supplemental objections based solely on issues arising from the Auction; |
|  | June 21, 2017 @ 4:00 p.m. | Deadline for Trustee to file replies to objections |
| • | June 23, 2017 @ 2:00 p.m. | Sale Hearing; |
| • | July 6, 2017 | Proposed Closing Date. |

## GENERAL BACKGROUND

5.     On June 25, 2015 (the "**Petition Date**"), the Minerals Debtors and fifteen (15) of their affiliates (the "**Plan Debtors**") commenced voluntary cases under chapter 11 of the Bankruptcy Code in this Court.[4]

6.     On April 8, 2016, this Court entered its *Findings of Fact, Conclusions of Law and Order Confirming the Plan Debtors' Fourth Amended Plan of Reorganization* [Plan Debtors D.I. 1580] (the "**Confirmation Order**") confirming the Plan Debtors' Fourth Amended Joint Plan of Reorganization (the "**Plan**") and approving certain related settlement agreements.  Prior to entry of the Confirmation Order, however, the Plan was withdrawn as to the Minerals Debtors.  The effective date of the Plan occurred on August 31, 2016 [Plan Debtors D.I. 1942] (the "**Effective Date**").  The reorganized Molycorp, Inc. is now known as Neo Performance Materials ("**NPM**"), with Oaktree as its controlling shareholder.  Since the Plan Debtors' Effective Date, neither NPM nor any of its affiliated entities hold an ownership interest in any of the Minerals Debtors.

7.     On May 2, 2016, pursuant to section 1104(a)(2) of the Bankruptcy Code, the United States Trustee appointed Paul E. Harner as the chapter 11 trustee of the Minerals Debtors.

---

[4]     The Plan Debtors are Molycorp, Inc.; Magnequench, Inc.; Magnequench International, Inc.; Magnequench Limited; MCP Callco ULC; MCP Canada Holdings ULC; MCP Canada Limited Partnership; MCP Exchangeco Inc.; Molycorp Chemicals & Oxides, Inc.; Molycorp Luexmbourg Holdings S.a. r.l.; Molycorp Metals & Alloys, Inc.; Molycorp Minerals Canada ULC; Molycorp Rare Metals Holdings, Inc.; Molycorp Rare Metals (Utah), Inc.; and Neo International Corp.

On May 3, 2016, this Court entered a *Corrected Order Approving Appointment of Trustee*, which order approved the appointment of Mr. Harner as the chapter 11 trustee for the Minerals Debtors [Minerals Debtors D.I. 24].

8.      The principal assets of the Minerals Debtors are real property, surface rights and equipment associated with the Mountain Pass Mine and the Processing Facility.  The Mountain Pass Mine was devoted to extracting rare earth minerals and producing rare earth concentrates, rare earth oxides and SorbX® and PhosFIX®, a line of proprietary rare earth-based water treatment products.  The products generated by the Minerals Debtors were used in oil refinery catalyst, automotive, water purification and hybrid and electric vehicle applications.  During these chapter 11 cases, the Mountain Pass Mine was transitioned into a state of care and maintenance pursuant to a limited operations plan required by the Plan Debtors' postpetition financing facility.

9.      The Mountain Pass Mine was previously marketed for sale over a period of several months by the Plan Debtors and their investment banker, Miller Buckfire & Co. LLC, however, the Plan Debtors were unable to identify a potential buyer on terms acceptable to the Plan Debtors' and the Minerals Debtors' senior secured lender and postpetition lender, Oaktree, or an ad hoc group of certain holders of 10% senior notes secured by substantially all of the Estate Assets.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested herein are section 105(a) and 363(b) of the Bankruptcy Code, along with Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1.

## THE PROPOSED SALE TRANSACTION AND BIDDING PROCEDURES

12.     The Trustee's sale process is being managed by Batuta Capital Advisors LLC ("**Batuta**").  Batuta's strategy was to conduct a focused marketing effort to identify parties best suited to serve as a stalking horse bidder in connection with a project of this type.  In addition, Batuta constructed a comprehensive financial model that detailed the potential to recommence operations against the backdrop of current commodity pricing.

13.     It is through these efforts that Batuta has identified the Stalking Horse Bidder as a potential purchaser.  Following initial negotiations, the Minerals Debtors and the Stalking Horse Bidder have executed an Asset Purchase Agreement (the "**Purchase Agreement**"), an executed copy of which, without schedules and exhibits, is attached hereto at **Exhibit B**.

14.     A summary of the material terms, including those provisions that must be highlighted in accordance with L.R. 6004-1(b)(iv), are as follows (capitalized terms appearing in the following summary, to the extent not otherwise defined, have the meanings assigned to them in the Purchase Agreement):[5]

| | |
|---|---|
| **Purchaser:** | The Stalking Horse Bidder or "**Purchaser**" |
| **Sellers:** | The Trustee, on behalf of the Minerals Debtors |
| **Purchased Assets:** | The Purchaser will acquire from the Minerals Debtors all of the Purchased Assets, including the following:<br><br>1.     all real property owned by the Minerals Debtors (the "**Owned Real Property**"), as described in a |

---

[5]     The description contained herein is summary in nature and qualified in all respects by the Purchase Agreement.  In the event of any discrepancy between this description and the Purchase Agreement, the terms of the Purchase Agreement shall control.  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Purchase Agreement.

schedule to the Purchase Agreement;

2.    all Mineral Properties, including facilities, improvements, fixtures and other appurtenances thereto and rights in respect there of owned by a Debtor or to which a Debtor has rights, including as described in <u>Schedule 2.1(b)(ii)</u>

3.    the buildings, facilities, infrastructure, fixtures and improvements that are owned by a Mineral Debtor and located on the Owned Real Property or Mineral Properties;

4.    all personal property, plants and equipment, machinery, heavy mobile equipment, forklifts and other warehouse equipment, vehicles, laboratory and testing equipment, samples, fixtures, furniture, furnishings, office equipment, computers and related computer hardware, information technology equipment and cabling, telecommunications equipment and cabling, leasehold improvements and other tangible personal property owned by a Minerals Debtor, wherever located, and whether or not located on or at the Owned Real Property or the Mineral Properties, including those set forth on a schedule to the Purchase Agreement;

5.    all water rights, together with all wells and related equipment;

6.    all drill core and core samples;

7.    all supplies, spare parts and consumables;

8.    all Permits, to the extent transferable;

9.    all cash and cash collateral posted in respect of letters of credit, bonds, or Permits, including under bonds posted by Westchester Fire Insurance Company, Ironshore, Lexon and Bond Safeguard and as set forth on Schedule 2.1(b)(ix);

10.    except as otherwise excluded, all deposits (including security deposits for rent, electricity, telephone, other utilities or otherwise) and all prepaid or deferred payables, charges and

|  | expenses (including for *ad valorem* taxes, leases and rentals), as set forth on schedules to the Purchase Agreement; |
|--|--|
|  | 11. all inventory, stock piles, tailings, raw materials, semi-finished goods, concentrates, work-in-process and finished goods that, as of the close of business on the Closing Date, are used or held for use in in connection with the Business and wherever located, whether or not located at the Owned Real Property or Mineral Properties; |
|  | 12. all Intellectual Property Rights and any rights, causes of action and remedies for past, present and future infringements of any of the Intellectual Property Rights, including those listed on a schedule to the Purchase Agreement; |
|  | 13. all specifications, drawings, plans, blueprints, diagrams, flow charts, engineering drawings and plans, design specifications, manufacturing data and information, processing and production manuals and procedures, operating instructions, user documentation, operating records, training materials, safety manuals, maintenance manuals and records, work papers, files, documents, papers, reports, photographs, letters, budgets, forecasts, title policies, customer lists, personnel files, data, reports, marketing, advertising and promotional materials, cost and pricing information, business plans, manuals, archives, research and development files, regulatory filings and data, information and data related to Permits, drill logs, assays, metallurgical test work, mine plans and similar information, agreements, and other documents, communications, books or records, whether in hard copy or computer or other format, related to the Business or the Purchased Assets, but excluding Retained Records (subject to the rights of Purchaser pursuant to a schedule to the Purchase Agreement; |
|  | 14. all warranties, guarantees and similar rights, including warranties and guarantees made by suppliers, manufacturers and contractors, and claims against suppliers and other third parties, |

| | |
|---|---|
| | unless specifically set forth as an Excluded Asset; |
| | 15.     all rights to telephone numbers, facsimile numbers and email addresses; |
| | 16.     the Contracts selected by the Purchaser to which any Minerals Debtor is a party that (A) are set forth on a certain schedule to the Purchase Agreement, and (B) are unexpired as of the Closing Date (including those Contracts that have been previously unrenewed) (the "**Purchased Contracts**"); and |
| | 17.     all goodwill associated with the business of any Minerals Debtor and/or the Purchased Assets. |
| **Assumed Liabilities:** | Purchaser will assume the following liabilities and obligations of the Minerals Debtors: |
| | 1.     all Liabilities arising and accruing on or after the Closing from the ownership or operation of the Purchased Assets by Purchaser; |
| | 2.     all Liabilities of the Debtors under the Purchased Contracts, including, without limitation, any Assumed Cure Costs, whether arising or accruing before, on or after the Closing; |
| | 3.     all Environmental Liabilities, except for Excluded Pre-Closing Fines, whether arising or accruing before, on or after the Closing; |
| | 4.     all Mining Liabilities, except for Excluded Pre-Closing Fines, whether or not arising or accruing before, on or after Closing; |
| | 5.     any Transfer Taxes; and |
| | 6.     all Liabilities to the extent specifically listed on a schedule to the Purchase Agreement. |
| **Purchase Price:** | $1.2 million, in cash, *plus* the assumption of the Assumed Liabilities (collectively, the "**Purchase Price**"). The Purchaser estimates the Assumed Liabilities in the maximum amount of approximately $100 million. |

| | |
|---|---|
| **Deposit:** | $500,000 (the "**Deposit**"), which will be payable within three (3) days of execution of the Purchase Agreement and will be applied toward the Purchase Price at Closing. |
| **Liens and Encumbrances:** | Subject to the entry of the Sale Order, and pursuant to Section 363(f) of the Bankruptcy Code, at the Closing, Purchaser will be vested with good and valid title to the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law.  Any Liens existing at the time of the closing under the Purchase Agreement will attach to the sale proceeds according to their relative priorities, which proceeds will be held by the Trustee until the Bankruptcy Court orders, or the parties otherwise agree on, the allocation of the proceeds. |
| **"As Is, Where Is" Transaction:** | The Sale will be on an "**as is, where is**" basis and Purchaser acknowledges and agrees that the Trustee is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Trustee in Article V of the Purchase Agreement (as modified by the Schedules). |
| **Excluded Assets:** | Sellers will retain their interests in all assets other than the Purchased Assets, including: |
| | 1.    all cash and cash equivalents, other than cash collateral posted in respect of bonds and permits, including reclamation bonds, as set forth on a schedule to the Purchase Agreement; |
| | 2.    all accounts receivable; |
| | 3.    all rights, claims, causes of action and credits to the extent relating solely to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Minerals Debtor in respect of an Excluded Asset or Excluded Liability; |
| | 4.    any shares of capital stock or other equity interest of any of the Minerals Debtors or any of their subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any of the Minerals Debtors or any of their |

<table>
<tr><td></td><td>

subsidiaries;

5.      any shares of capital stock or other equity interests of any third party held by any of the Minerals Debtors or any of their subsidiaries, including any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any such third party;

6.      all Retained Records, except that Purchaser will have the right to make copies of any portions of such Retained Records that relate to the Purchased Assets;

7.      all claims and causes of action against any insurance carrier, contractor, or other third-party covering the failure in 2014 of certain of the Minerals Debtors' leach tanks;

8.      all post-petition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to the Debtors on a pre-petition or post-petition basis unless specifically provided for under a Purchased Contract, in which case such deposit will be a Purchased Asset;

9.      subject to Section 2.7, any Purchased Contract that requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained;

10.      subject to Section 8.6, all of the Minerals Debtors' or the Trustee's insurance policies and rights thereunder, including all insurance proceeds or rights to insurance proceeds, in each case received or receivable by any Minerals Debtor or the Trustee;

11.      all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof;

12.      all refunds, credits and rebates of Taxes for any

</td></tr>
</table>

12

| | |
|---|---|
| | period or portion thereof prior to or ending on the Closing Date; |
| | 13. all rights in or to assets leased by the Minerals Debtors except to the extent such lease is assigned to Purchaser as a Purchased Contract; and |
| | 14. notwithstanding anything in the Purchase Agreement, any assets or properties of the Minerals Debtors or any of their subsidiaries outside of the United States. |
| **Employees:** | No Minerals Debtor has employees. |
| **Closing Conditions:** | Usual and customary closing conditions for transactions of this size and type (provided, that there will be no financing contingency of the Purchaser), including but not limited to: |
| | 1. all Permits in force and effect as of the date of the Purchase Agreement shall be in force and effect and sold, transferred and assigned (to the extent transferable) to, or renewed or amended in the name of Purchaser, without any material modification; and |
| | 2. the Purchaser shall have reached mutually acceptable agreements with the Minerals Debtors' surety companies and other bond and letter of credit providers, including Westchester Fire Insurance Company, Ironshore, Lexon and Bond Safeguard, concerning existing bonds and letters of credit, which shall include their consensual release of cash collateral under bonds posted by such surety companies to Purchaser. |
| **Approvals:** | There are no corporate or other approvals required to be obtained by Purchaser.  Except for any consents required under any Purchased Contract or by applicable law or Governmental Body, no other approvals or consents are required for closing of the transactions contemplated by the Purchase Agreement other than approval by the Bankruptcy Court. |
| **Termination; Expense** | Upon the closing of a Competing Transaction (as defined below) and on the terms and expressly subject to the |

| | |
|---|---|
| **Reimbursement:** | conditions precedent set forth in the Bidding Procedures Order, the Trustee shall reimburse, or cause to be reimbursed to, Purchaser all of Purchaser's expenses, including reasonable attorneys' fees, incurred by it in connection with its entry into the Purchase Agreement in an amount not to exceed $150,000 ("**Expense Reimbursement**")<br><br>"**Competing Transaction**" means any of the following transactions, other than the Transaction, with one or more Persons, other than Purchaser: (i) a plan of reorganization or other financial and/or corporate restructuring of the Minerals Debtors or a material portion of their assets that substantially prohibits or impairs the Transaction; (ii) the sale or disposition of all or a material portion of the Purchased Assets to one or more Persons other than Purchaser; (iii) Purchaser is not the successful bidder in any auction conducted to sell the Purchased Assets pursuant to the Bankruptcy Case and the Bankruptcy Court approves another bidder; or (iv) merger, consolidation, business combination, or recapitalization of the Minerals Debtors that substantially prohibits or impairs the Transaction. |
| **Expenses:** | Except as otherwise expressly provided in the Purchase Agreement, whether or not the Transaction is consummated, each of the Trustee and Purchaser will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and the Transaction Documents and the consummation of the Transaction and all proceedings incident thereto. |
| **Remedies:** | The Minerals Debtors will be entitled to retain the Deposit Amount if the Closing has not occurred by the Termination Date due to a breach, under the standards set forth in the applicable Section on termination, of any representations, warranties, covenants or agreements contained in the Purchase Agreement by Purchaser.<br><br>Upon the Closing of a Competing Transaction, Purchaser will receive the Expense Reimbursement, and in such event, Sellers will return the Deposit to Purchaser. |
| **Closing Date:** | The date on which the transactions contemplated by the Purchase Agreement close, which will be no later than five (5) Business Days following the satisfaction or waiver of the conditions to Closing. |

15.    As more fully set forth in **Exhibit 1** attached to the proposed form of Bidding Procedures Order, the Trustee seeks approval of the following Bidding Procedures which follow, in relevant part, the bidding procedures proposed by the Plan Debtors and approved by this Court in connection with the Purchase Agreement.

| **Bid Deadline:** | A Potential Bidder (as defined below) that desires to make a bid shall deliver written and electronic copies of its bid in both PDF and WORD format to the Notice Parties (as defined below) so as to be received no later than **5:00 p.m. (Eastern Time) on June 12, 2017 (the "Bid Deadline").**<br><br>Bids and other information that must be provided to the "**Notice Parties**" under the Bidding Procedures must be provided to the following parties:  (1) Chapter 11 Trustee, Paul E. Harner, c/o Ballard Spahr LLP, 919 Third Avenue, 37th Floor, New York, NY 10022, Email: harnerp@ballardspahr.com;<br>(2) Counsel to Trustee, Tobey M. Daluz, Ballard Spahr LLP, 919 N. Market Street, 11th Floor, Wilmington, DE 19801, Email: daluzt@ballardspahr.com and Vincent J. Marriott III, Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, PA 19103, Email: marriott@ballardspahr.com; (3) Eduardo Gonzalez and Alex Zyngier, Batuta Capital Advisors LLC, 475 Park Avenue South, Floor 12, New York, NY 10016, Email: egonzalez@batutaadvisors.com and azyngier@batutaadvisors.com; and (4) Counsel to the Stalking Horse Bidder, Oscar N. Pinkas, Dentons US LLP, 1221 Avenue of the Americas, New York, NY 10020, Email: oscar.pinkas@dentons.com, and Justin R. Alberto, Bayard, P.A., 222 Delaware Avenue, Suite 900, Wilmington, DE 19899, Email: jalberto@bayardlaw.com. |
| **Form and Content of a Qualified Bid:** | A qualified bid (a "**Qualified Bid**") is a signed document from a potential bidder (a "**Potential Bidder**") that is accompanied by a good faith deposit in the amount of ten percent (10%) of the proposed purchase price (the "**Good Faith Deposit**") and that provides that:<br><br>    1.    the Potential Bidder offers to purchase the assets indicated in its bid and to assume related liabilities indicated in the bid at the purchase |

price and upon the terms and conditions set forth in the asset purchase agreement enclosed therewith, marked to show any proposed amendments and modifications to the Purchase Agreement, (the "**Marked Agreement**");

2.     the Potential Bidder will pay any cure costs arising from the assumption of any applicable executory contracts and/or unexpired leases;

3.     the Potential Bidder has made or will make all necessary filings under applicable regulatory, antitrust and other laws, if applicable, and pay the fees associated with such filings;

4.     the Potential Bidder will take assignment and transfer of all of the Minerals Debtors' permits and licenses, and will assume all of the liabilities of the Minerals Debtors under environmental or mining laws;

5.     the bid is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Marked Agreement, including any conditions relating to the assumption and assignment of contracts and/or leases; provided that any bid that is contingent on acquisition of the Oaktree Equipment or the Mineral Rights shall not be considered a Qualified Bid) and is not subject to any due diligence or financing contingency and is irrevocable until the first business day following the closing of the Sale;

6.     the consideration set forth in such bid is higher or better than the consideration provided by the Stalking Horse Bidder, taking into account the Expense Reimbursement and Minimum Overbid (as defined below); and

7.     the bidder (other than the Stalking Horse Bidder) is not entitled to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and includes a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to the bid.

| | |
|---|---|
| **Auction:** | If more than one Qualified Bid is received by the Bid Deadline, the Trustee will conduct the Auction. The Auction will take place at **10:00 a.m. (Eastern Time) on June 14, 2017,** at the offices of Ballard Spahr LLP, 1735 Market Street, 48th Floor, Philadelphia, PA 19103, or such other time as the Trustee may notify all Qualified Bidders. Only the Potential Bidders who have submitted Qualified Bids will be eligible to participate at the Auction, subject to such limitations as the Trustee may impose in good faith. For purposes hereof, the Stalking Horse Bidder shall be a Qualified Bidder and the Purchase Agreement shall be a Qualified Bid for all purposes. |
| **Minimum Overbid:** | The Trustee may select one Qualified Bid as the "**Baseline Bid.**" At the Auction, participants will be permitted to increase their bids and bidding will start at the purchase price, plus the Expense Reimbursement for the Stalking Horse Bidder, plus $50,000, and other terms proposed in the Baseline Bid, and will proceed thereafter in increments of $50,000 (the "**Minimum Overbid**"). The Trustee reserves the right to change any Minimum Overbid prior to or during the Auction.<br><br>The Stalking Horse Bidder will be entitled to a "credit" in the amount of the Expense Reimbursement to be counted towards its bid(s), such that the cash and other consideration proposed by the Stalking Horse Bidder plus the Expense Reimbursement must exceed the most recent bid by at least the Minimum Overbid. |
| **Additional Rules for Auction:** | The Trustee may adopt additional rules not inconsistent with those set forth herein for the Auction at any time that the Trustee determines to be appropriate to promote the goals of the bidding process and are not inconsistent with these Bidding Procedures. The identity of each bidder at the Auction will be fully disclosed to all other bidders and all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be fully disclosed to all other bidders throughout the entire Auction, and each Qualified Bidder will be permitted what the Trustee determines to be an appropriate amount of time to respond to the previous bid at the Auction.<br><br>The Trustee reserves the right to, and may, reject at any time before entry of the an order approving the Sale (the "**Sale Order**") any bid (other than a bid put forth by the Stalking |

| | |
|---|---|
| | Horse Bidder) that, in the Trustee's judgment, is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures or the terms and conditions of the Sale; or (c) contrary to the best interests of the Minerals Debtors and their estates. In doing so, the Trustee may take into account the factors set forth in the Bidding Procedures regarding the contents of a Qualified Bid. |
| **Selection of Successful Bid:** | Prior to the conclusion of the Auction, the Trustee will: (a) review and evaluate each bid made at the Auction and identify the highest or otherwise best offer (the "**Successful Bid**") and the next highest or otherwise best bid (the "**Next Highest Bid**"); and (b) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the identity of the party that submitted the Successful Bid (the "**Successful Bidder**"), the amount and other material terms of the Successful Bid, and the identity of the party that submitted the Next Highest Bid (the "**Next Highest Bidder**"). |
| **Acceptance of Qualified Bids:** | The Trustee's presentation of a Successful Bid to the Bankruptcy Court for approval does not constitute the Trustee's acceptance of such bid. The Trustee will be deemed to have accepted a Successful Bid only when such bid has been approved by the entry of the Sale Order.<br><br>If for any reason a Successful Bidder fails to consummate its purchase, the Trustee may proceed to a Sale with the Next Highest Bidder as soon as is commercially reasonable. The Trustee shall have the right to retain such Successful Bidder's Good Faith Deposit (unless required to return it by an order of the Bankruptcy Court) and shall reserve the right to seek all available additional damages from the Successful Bidder unless the Marked Agreement otherwise provides. |
| **Return of Deposits:** | The Good Faith Deposits of all Qualified Bidders, including the Stalking Horse Bidder, will be held by the Trustee in a deposit account and will not become property of the Minerals Debtors' bankruptcy estates unless released pursuant to further order of the Bankruptcy Court. The Trustee will retain the Good Faith Deposits of the Successful Bidder and the Next Highest Bidder until the closing of the Sale unless otherwise ordered by the Bankruptcy Court. The Good Faith Deposits of the other Qualified Bidders will be returned within five (5) business days of the entry of the Sale Order. At the closing of the |

| | Sale contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its/their Good Faith Deposit.  The Good Faith Deposit of the Next Highest Bidder will be released five (5) business days after the closing of the Sale. |
|---|---|
| **"As Is, Where Is":** | The Sale will be on an "**as is, where is**" basis and without representations or warranties of any kind, nature or description by the Trustee, the Minerals Debtors, their agents or the bankruptcy estates, whether written or verbal, whether express, implied or by operation of law, except and solely to the extent expressly set forth in the Purchase Agreement or Marked Agreement, as applicable, that is approved by the Bankruptcy Court and consummated.  Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its bid, and that it has relied solely upon its own independent review and investigation in making its bid.  Except as otherwise expressly provided in the Purchase Agreement, Marked Agreement or the Sale Order, all of the Minerals Debtors' right, title and interest in the relevant Purchased Assets shall be sold free and clear of liens, claims and encumbrances (collectively, "**Liens**"), with any Liens to attach to the proceeds of the Sale. |
| **Modification to Bidding Procedures:** | The Trustee may, amend the Bidding Procedures in a manner not inconsistent with the foregoing at any time and from time to time that he may determine will best promote the goals of the bidding process, including extending or modifying any of the dates set forth herein (except that prior to the Auction, any such amendment shall require the consent of the Stalking Horse Bidder). |

16.     Pursuant to Local Rule 6004-1(c)(ii), each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.  The Auction will be conducted openly and will be transcribed.  However, the Trustee requests that the Court waive the requirement in Local Rule 6004-1(c)(ii) that all creditors be permitted to attend the Auction, and, instead, limit attendance at the Auction to

Qualified Bidders and their professionals and representatives as set forth in the Bidding Procedures.

## RELIEF REQUESTED

17.    By this Motion, the Trustee *first* requests entry of the Bidding Procedures Order, which will, among other things, (a) authorize the Bidding Procedures and approve the form and manner of notice of the Bidding Procedures in connection with the Sale of the Purchased Assets; (b) schedule the Auction and the Sale Hearing to consider the Sale; (c) approve the Expense Reimbursement and other bid protections; (d) authorize procedures governing the assumption and assignment of executory contracts and unexpired leases and approved the form and manner of notice thereof; and (e) grant related relief.

18.    *Second*, at the Sale Hearing, the Debtors will request entry of the Sale Order, which will, (a) designate the Successful Bidder and approve the Sale of the Purchased Assets in accordance with the Purchase Agreement or Marked Agreement between the Minerals Debtors and the Successful Bidder, which Sale shall be free and clear of all liens, claims, encumbrances, and other interests (other than expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the Successful Bid); (b) approve the assumption and assignment of certain executory contracts and unexpired leases related to the Purchased Assets; and (c) grant related relief.

## LEGAL BASIS FOR THE RELIEF REQUESTED

### I.    REQUEST FOR APPROVAL OF BIDDING PROCEDURES

#### A.    Standards for Approval of Bidding Procedures

19.    Section 363(b) of the Bankruptcy Code permits, after notice and a hearing, the sale, other than in the ordinary course of business, of property of the estate.  11 U.S.C. § 363(b).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

20.     To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate, and, therefore, are appropriate in the context of bankruptcy sales. *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *see also Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

21.     The Trustee believes that the Bidding Procedures are appropriately tailored to ensure that the bidding process is fair and reasonable and will yield the maximum value for the Minerals Debtors' estates and creditors. The proposed Bidding Procedures are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to

acquire information necessary to submit a timely and informed bid.  At the same time, the Bidding Procedures provide the Trustee with the opportunity to consider all competing offers and to select, in his reasonable business judgment, the highest or otherwise best offer(s) for the Purchased Assets.

22.     Accordingly, the Trustee believes the Court should approve the Bidding Procedures.  The Bidding Procedures contain features—including bid deadlines, auction procedures and bid criteria—that are largely consistent with other procedures previously approved by courts in this District in other large chapter 11 cases.  *See, e.g.*, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Jan. 14, 2015) [Docket No. 3295]; *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014) [Docket No. 195]; *In re RS Legacy Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Mar. 12, 2015) [Docket No. 946]; *In re Savient Pharm., Inc.*, No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013) [Docket No. 110]; *In re OSH 1 Liquidating Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. July 8, 2013 [Docket No. 155]; *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) [Docket No. 206].  Like those approved in other cases, the Bidding Procedures that the Trustee proposes will help maximize the value of the bids received for their assets.

**B.      Authority to Offer Proposed Expense Reimbursement to the Stalking Horse Bidder**

23.     As part of the Bidding Procedures Order, the Trustee is also requesting authority to enter, if applicable, into the Purchase Agreement and to pay the Expense Reimbursement to such Stalking Horse Bidder.  The Expense Reimbursement is designed to compensate the Stalking Horse Bidder for the substantial investment of time and a significant commitment of resources necessary to negotiate and prepare the Transaction Documents, this motion, the Bidding Procedures Order, and the Sale Order.  If approved by this Court, the Trustee would be

authorized to pay the Stalking Horse Bidder an Expense Reimbursement of up to $150,000.  The Expense Reimbursement would only be payable in the event the Stalking Horse Bidder is overbid at the Auction and the Minerals Debtors close a transaction with the overbidder.  Any such overbid must be in an amount greater than the Stalking Horse Bid, including the applicable Expense Reimbursement and Minimum Overbid, and include sufficient cash consideration to pay the Expense Reimbursement in full at closing.

24.    Approval of expense reimbursements and other forms of bid protections in connection with the sale of significant assets is an established practice in chapter 11 cases. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In the Third Circuit, courts have authorized transactions outside the ordinary course of business when the transaction has a sound business purpose and is proposed in good faith.  *See In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

25.    Under these principles, bidding incentives may be approved when they provide a benefit to the estate by maximizing the value of the estate's assets.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate).  In the Third Circuit, expense reimbursements or breakup fees are considered administrative expenses and, therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate.  *See id.* at 533.  In *O'Brien*, the Third Circuit provided two examples of a potential benefit accruing from the payment of a termination fee. *Id.*

23

First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, a breakup fee encourages potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

26.    In connection with evaluating and analyzing the Purchased Assets available for sale, the Stalking Horse Bidder has incurred and will continue to incur substantial costs. By offering the Expense Reimbursement, the Trustee was able to incentivize the Stalking Horse Bidder to undertake those costs and make an initial bid for the Purchased Assets which serves as the floor price for the Auction. This initial bid will serve as a catalyst for other bids. As a result, the Trustee believes that being able to enter into the Purchase Agreement, including the provisions that provide for the Expense Reimbursement and Minimum Overbid, will place the Minerals Debtors in a more favorable position to solicit competing bids that may be materially higher or otherwise more favorable than the initial Stalking Horse Bidder's bid, especially in light of the Stalking Horse Bidder's agreement to close without the Oaktree Equipment or Mining Rights. In short, the Stalking Horse Bidder should be compensated for the risk they are taking and the benefit they are providing to the Minerals Debtors' estates. Accordingly, the Trustee's ability to offer the Expense Reimbursement will enable him to obtain the greatest benefit to the estate from the sale of the Purchased Assets.

27.    Moreover, payment of the Expense Reimbursement will not diminish the Debtors' estates. The Trustee does not intend to terminate the Purchase Agreement if to do so would incur an obligation to pay the Expense Reimbursement, except to accept an overbid that must exceed

the total amount of the Stalking Horse Bid and include sufficient cash consideration to pay the applicable Expense Reimbursement in full at closing.

28.     Accordingly, the Expense Reimbursement and other bidder incentives satisfy the requirements for approval in this Circuit and should be approved.

## II.    REQUEST FOR APPROVAL OF PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Description of Assumption and Assignment Procedures

29.     As part of the Sale, the Debtors may assume and assign certain of their executory contracts and unexpired leases to one or more Purchasers (the "**Assumed and Assigned Agreements**").  The Debtors propose that the following Assumption and Assignment Procedures govern the assumption and assignment of the Assumed and Assigned Agreements in connection with the Sale of Purchased Assets to the Successful Bidder(s):

a.    By no later than five (5) business days after entry of the Bidding Procedures Order, the Trustee will file a schedule (the "**Cure Schedule**"), which will be attached to the Assumption and Assignment Notice, identifying (a) the Assumed and Assigned Agreements, potentially to be assumed and assigned to the Staking Horse Bidder; and (b) the amount, if any, the Minerals Debtors believe is necessary to cure all monetary defaults under such agreement pursuant to section 365 of the Bankruptcy Code (the "**Cure Costs**");

b.    Upon the filing of the Cure Schedule, the Trustee will serve the Cure Schedule and the Assumption and Assignment Notice on each of the nondebtor counterparties listed on the Cure Schedule by first class mail. The Assumption and Assignment Notice will state that the Minerals Debtors are or may be seeking the assumption and assignment of the Assumed and Assigned Agreements and include (i) a description of each executory contract and unexpired lease that may be assumed and assigned in connection with the Sale; (ii) the deadline for objecting (a "**Cure/Assignment Objection**") to the assumption and assignment of the applicable Assumed and Assigned Agreement, including to the amount of the proposed Cure Costs related to any such executory contract or unexpired lease, which deadline will be no later than three (3) business days prior to the Bid Deadline (the "**Cure/Assignment Objection Deadline**"); and (iii) the deadline for objecting (an "**Adequate Assurance Objection**") to the ability of the relevant purchaser to provide adequate

assurance of future performance under any Assumed and Assigned Agreement, which deadline shall be no less than one (1) day prior to the Sale Hearing (the "**Adequate Assurance Objection Deadline**" and collectively, the "**Cure/Adequate Assurance Objection Deadlines**").

c.  Each Cure/Assignment Objection and/or Adequate Assurance Objection must be filed with the Bankruptcy Court and served on the following parties so as to be received no later than the applicable Cure/Adequate Assurance Objection Deadline:  (1) Chapter 11 Trustee, Paul E. Harner, c/o Ballard Spahr LLP, 919 Third Avenue, 37th Floor, New York, NY 10022, Email: harnerp@ballardspahr.com; (2) Counsel to Trustee, Tobey M. Daluz, Ballard Spahr LLP, 919 N. Market Street, 11th Floor, Wilmington, DE 19801, Email: daluzt@ballardspahr.com and Vincent J. Marriott III, Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, PA 19103, Email: marriott@ballardspahr.com; (3) Eduardo Gonzalez and Alex Zyngier, Batuta Capital Advisors LLC, 475 Park Avenue South, Floor 12, New York, NY 10016, Email: egonzalez@batutaadvisors.com and azyngier@batutaadvisors.com; (4) Counsel to the Stalking Horse Bidder, Oscar N. Pinkas, Dentons US LLP, 1221 Avenue of the Americas, New York, NY 10020, Email: oscar.pinkas@dentons.com, and Justin R. Alberto, Bayard, P.A., 222 Delaware Avenue, Suite 900, Wilmington, DE 19899, Email: jalberto@bayardlaw.com; and (5) the Office of the United States Trustee, District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Linda J. Casey, Esq. and David L. Buchbinder, Esq.).

d.  If no objections are received with respect to any Assumed and Assigned Agreement, then the Cure Cost set forth in the Cure Schedule for such agreement will be binding upon the nondebtor counterparty to such agreement for all purposes and will constitute a final determination of the Cure Cost required to be paid by the applicable Minerals Debtor or Purchaser in connection with the assumption and assignment of such agreement. In addition, all counterparties to the Assumed and Assigned Agreements who fail to file an objection before the Cure/Adequate Assurance Objection Deadlines, as applicable, will be (i) forever barred from objecting to the Cure Costs or adequate assurance of future performance with respect to the Assumed and Assigned Agreements, and the Minerals Debtors and the purchaser(s) will be entitled to rely solely upon the Cure Cost set forth in the Cure Schedule; (ii) deemed to have consented to the assumption and assignment; and (iii) forever barred and estopped from asserting or claiming against the applicable Minerals Debtor(s) or the purchaser(s) or their assets that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied or that there is any other objection or defense to the assumptions or assignment of the applicable Assumed and Assigned Agreements.

    e.      At any time prior to the closing of the Purchase Agreement, the Successful Bidder may amend the list of Assumed and Assignned Agreements and Cure Schedule to (i) include any additional executory contract or unexpired lease thereon, or (ii) remove any executory contract or unexpired lease therefrom.  The non-debtor party or parties to any such contract or lease will be notified of the inclusion or exclusion by written notice mailed within one (1) business day after such determination.

    f.      Where a nondebtor counterparty to an Assumed and Assigned Agreement files a Cure/Assignment Objection asserting a cure amount higher than the proposed Cure Cost (the "**Disputed Cure Amount**"), then (i) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the applicable purchaser's consent to such resolution, the parties shall amend the Cure Schedule; or (ii) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or at such other date and time as may be agreed to by the Trustee and Purchaser and fixed by the Court.  The Trustee intends to cooperate with counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences with respect to a particular Cure Cost.  At any time prior to or after the Court's ruling on the Disputed Cure Amount, the Trustee, with the Successful Bidder's consent, may remove such contract or lease from the list of Assumed and Assigned Agreements.

30.    The Trustee requests that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code.  Moreover, the Trustee requests that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment in such contract or lease.  *See* 11 U.S.C. § 365(c)(1)(B), (e)(2)(A)(ii), (f).

**B.    Approval of Assumption and Assignment Procedures and the Assumption and Assignment Notice**

31.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court

approval of a debtor's decision to assume or reject and executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

32.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).   Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1983).   Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

33.    Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party. 11 U.S.C. § 365(f); *see also In re Rickel Home Ctr., Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) of the Bankruptcy Code is

to assist the trustee in realizing the full value of the debtor's assets).   Section 365(f)(2)(B)
requires, however, that adequate assurance of future performance by an assignee exist.   11
U.S.C. § 365(f)(2)(B).   The purpose of the adequate assurance requirement is to protect the
interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy
Code relieves a debtor from liability for any breach of a contract that may occur after an
assignment. *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001).  Adequate assurance
of future performance is not required for every term of an executory contract or unexpired lease,
but only such terms that are "materially and economically" significant.  *In re Fleming Cos., Inc.*,
499 F.3d 300, 305 (3d Cir. 2007).  The meaning of "adequate assurance of future performance"
depends upon the facts and circumstances of each case, but should be given a "practical,
pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In
re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. May 20, 2002) ("[A]dequate
assurance falls short of an absolute guarantee of payment.").   Adequate assurance may be
provided by demonstrating the assignee's financial health and experience in managing the type
of enterprise or property assigned.  *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr.
S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease
from debtor has financial resources and has expressed willingness to devote sufficient funding to
business to give it a strong likelihood of success).

34.   Central to the Trustee's proposed sale of Purchased Assets of the Minerals
Debtors is the ability to operate the Business and the assumption and assignment of executory
contracts and unexpired leases is a critical component of the Sale.   It is thus an appropriate
exercise of business judgment for the Trustee to propose that purchasers may direct the Minerals
Debtors to assume and assign to them the contracts and leases that will be required in connection

with the Sale.  The assumption and assignment of the Assumed and Assigned Agreements will be subject to the final approval by the Court in connection with approval of the Sale. Additionally, the Trustee submits that the objection deadline for counterparties to raise objections to the assumption and assignment of contracts and leases, as proposed in this Motion, are adequate to protect the rights of counterparties to the Minerals Debtors' contracts and leases. Finally, the Trustee submits that the Assumption and Assignment Notice provides adequate notice of the proposed assumption and assignment of counterparties' contracts and/or leases and should be approved.

## II.    REQUEST FOR APPROVAL OF THE SALE

### A.    The Sale of the Purchased Assets is Authorized by Section 363 of the Bankruptcy Code

35.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting a "sound business purpose" test and a good faith test); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (concluding that the Third Circuit had adopted a "sound business purpose" test).  In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain

objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v.* *Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

36.      Applying section 363, the proposed Sale should be approved.  The Trustee has a sound business justification for the Sale of the Purchased Assets.  As noted above, the Trustee was appointed for the primary purpose of selling the Mountain Pass Mine for the benefit of the creditors of the Minerals Debtors.  Not only is the proposed Sale the best method of maximizing the recovery for the creditors, it may be the only means for those creditors to obtain a cash distribution in these cases.  The fairness and reasonableness of the consideration to be paid by the Successful Bidder will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid.

**B.      The Sale of the Purchased Assets Free and Clear of All Liens, Claims and Encumbrances is Authorized by Section 363(f) of the Bankruptcy Code**

37.      The Trustee further submits that it is appropriate to sell the Purchased Assets free and clear of all liens, claims, encumbrances or other interests pursuant to section 363(f) of the Bankruptcy Code (except for those liabilities expressly assumed pursuant to the terms of the Purchase Agreement), with any lien attaching to the proceeds, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, interests, and encumbrances if (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interests; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

38.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

39.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the Sale "free and clear" of liens and interests. *Michigan Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991); *In re Dundee Equity Corp.*, Case No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986).

40.     The Trustee submits that one or more of the tests of section 363(f) will be satisfied with respect to the Sale of the Purchased Assets. For example, the Trustee believes that section 363(f)(2) of the Bankruptcy Code may be met in connection with the Sale because each of the parties holding a lien on all or a portion of the Purchased Assets will consent, or absent any objection to this Motion, will be deemed to have consented to the Sale. Moreover, all holders of liens, claims, encumbrances, and other interests could be compelled to accept a money satisfaction of their liens in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code. *See, e.g.*, *In re Boston Generating, LLC*, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010). Section 363(f) of the Bankruptcy Code therefore authorizes the transfer and conveyance of the Purchased Assets free and clear of all liens, claims, interests or encumbrances except for those liabilities expressly assumed pursuant to the terms of the Purchase Agreement.

**C.      The Successful Bidder is Entitled to the Protections Afforded as a Good Faith Purchaser under Section 363(m) of the Bankruptcy Code**

41.     The Successful Bidder (including the Stalking Horse Bidder) will be entitled to an order incorporating the protections of section 363(m) of the Bankruptcy Code. That subsection

protects a good-faith purchaser as one who purchases assets for value, in good faith, and without notice of adverse claims. Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Chateaugay Corp.*, 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147.

42.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that the "requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147. As such, a party would have to show "fraud, collusion between the [Stalking Horse Bidder] and other bidders or the [Sellers,] or an attempt to take grossly unfair advantage of other bidders" to demonstrate a lack of good faith. *See In re Tempo Tech. Corp.*, 202 B.R. 363, 370 (D. Del. 1996) (rejecting good faith challenge by unsecured creditors at sale hearing).

43.     Assuming the Stalking Horse Bidder is the Successful Bidder, the Purchase Agreement was negotiated at arms'-length and in good faith, with both parties represented by their counsel. Similarly, the Trustee expects to show at the Sale Hearing that any other Successful Bidder similarly conducted itself in good faith. The Trustee therefore requests that the Sale Order include a provision that the Successful Bidder for the Purchased Assets is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

**D.**    **The Successful Bidder is Entitled to the Protections Afforded under Section 363(n) of the Bankruptcy Code**

44.    The Trustee submits that the purchase price of the Successful Bid was not controlled by any agreement among potential bidders and that neither the Trustee or the Minerals Debtors, nor the purchaser engaged in collusion or any other conduct that would cause or permit the transactions to be avoidable under section 363(n) of the Bankruptcy Code.  The Court's order approving the sale should, therefore, hold that the transactions may not be avoided and no party shall be entitled to damages or other recovery pursuant to Section 363(n) of the Bankruptcy Code.

**E.**    **The Successful Bidder is Entitled to Tax Exemptions**

45.    The Trustee and the Minerals Debtors assert that any laws regarding bulk sales, or similar laws, are not applicable to the sale of Purchased Assets.  In addition, the Trustee and the Minerals Debtors believe that because the assignment, transfer and/or sale of the Purchased Assets:  (i) is in exchange for the Purchase Price, no withholding of U.S. federal income tax pursuant to sections 1441 or 1442 of the Internal Revenue Code is required, and (ii) constitutes an occasional sale, it is exempt from sales and use tax.

## NOTICE

46.    Notice of this Motion has been provided to:  (i) counsel for Oaktree; (ii) counsel for the Ad Hoc Group of 10% Notes; (iii) counsel for the indenture trustee for the 10% Notes; (iv) counsel for the sureties; (v) the United States Trustee; (vi) the holders of the 20 largest general unsecured claims against the Minerals Debtors; (vii) counsel for the environmental regulators of the Mountain Pass Mine; and (viii) those parties who have formally filed requests for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  Notice of this Motion will be provided to any person or entity that has an interest in the Purchased Assets or a recovery

from one of the Minerals Debtors' bankruptcy estates, including, but not limited to, all creditors of the Mineral Debtors as reflected on the claims register or in one of their schedules filed as the outset of these cases.  The Trustee submits that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

47.     No previous request for the relief sought herein has been made by the Trustee to this or any other court.

## STATEMENT UNDER LOCAL RULE 9013-1(F)

48.     The Trustee hereby consents to the entry of a final order or judgment by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

WHEREFORE, the Trustee respectfully requests entry of an order, substantially in the form of order attached hereto as **Exhibit A**, and granting such other and further relief as the Court deems proper.


Dated: April 24, 2017                    Respectfully submitted,
       Wilmington, Delaware


                                         */s/ Tobey M. Daluz*
                                         Tobey M. Daluz (DE No. 3939)
                                         Matthew G. Summers (DE No. 5533)
                                         Leslie C. Heilman (DE No. 4716)
                                         Laurel D. Roglen (DE No. 5759)
                                         BALLARD SPAHR LLP
                                         919 N. Market Street, 11th Floor
                                         Wilmington, Delaware 19801
                                         Telephone: (302) 252-4428
                                         Facsimile:  (302) 252-4466
                                         E-mail: daluzt@ballardspahr.com
                                                 summersm@ballardspahr.com
                                                 heilmanl@ballardspahr.com
                                                 roglenl@ballardspahr.com

and

Vincent J. Marriott, III*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 864-8236
Facsimile: (215) 864-9762
E-mail: marriott@ballardspahr.com
(*Admitted *Pro Hac Vice*)

*Counsel to the Chapter 11 Trustee*